IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WEST COAST CONTRACTORS OF NEVADA, INC,<br><br>Plaintiffs,<br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Case No. 05-1121 C<br>(Chief Judge Damich) |

**AMENDED JOINT PRELIMINARY STATUS REPORT**

Pursuant to Appendix A, Section III, of the Rules of the United States Court of Federal Claims, the Court's Special Procedures Order, and this Court's May 10, 2006 Order, the parties submit the following Amended Joint Preliminary Status Report.

(a) **Jurisdiction** - Plaintiff states that the Court appears to have jurisdiction over this action pursuant to the Tucker Act (28 U.S.C. § 1491).

Defendant states that it has no reason to question the jurisdiction of the Court at this time.

(b) **Consolidation** - At the present time, the parties agree that this case should not be consolidated with any other case.

(c) **Bifurcation** - The parties believe that this case should not be bifurcated into damages and liability phases.

(d) **Further Proceedings** - There is no need to defer further proceedings in this case at this time.

(e) **Remand or Suspension** - No remand or suspension will be sought.

(f) **Dispositive Motions pursuant to RCFC 12(b), 12(c) or 56** - At the present time, neither party intends to file any dispositive motions. However, after discovery is completed, both parties reserve the right to file a dispositive motion if it believes that such a motion is appropriate.

(g) **Relevant Factual And Legal Issues**

**Plaintiff States**

This is an action for money damages for the Navy's breach of a contract with West Coast for the construction of an extension to Building 245 of the Naval Post Graduate School in Monterey, California (the "Project"). The Navy caused West Coast to incur $756,654.62 in damages arising from: (1) work the Navy required West Coast to perform that was outside the scope of the contract and for which the Navy refused to increase the contract price; (2) delay caused by the Navy's actions and inactions; and (3) improperly assessed liquidated damages. The Government admits that it entered into a contract with West Coast for construction of the project, but denies that West Coast incurred or that the Government is responsible for the damages that West Coast incurred. Each element of West Coast's damages and the causes therefore are set forth explicitly in the Complaint.

The Navy's Answer denies the validity of West Coast's claims. The Navy has set forth its position as to each claim below.

The allegations in the Complaint were gleaned from West Coast's records concerning the Project, including its communications with the Government, and its accounting and time records. The legal theories, statutes, and contract provisions upon

which West Coast relies include: breach of contract, unjust enrichment, Contract Disputes Act (41 U.S.C. § 601 et seq.), Equal Access to Justice Act (5 U.S.C. § 504 et. Seq.); 28 U.S.C § 2412; FAR 52.233-1; FAR 52.243-4.

A review of these records reveals the following:

**A. Equitable Adjustments**

**1. Paving**

Through Proposed Change Order #8, dated February 7, 2002, the Navy altered the paving and landscaping requirements for the Project. The new sketch attached to Proposed Change Order #8 required West Coast, inter alia, to accommodate an 80-foot setback that was not shown on the original drawings. As a result, West Coast was required to incur $15,891.28 in additional design costs and $57,575.08 in additional labor and materials, for a total of $73,466.36.

**2. Mechanical Equipment**

The RFP drawings expressly designated a 15-ton chiller and a 6500 CFM air-handling unit. West Coast reasonably relied upon this designation when bidding the Project. In order to meet the Navy's actual requirements, however, a 40-ton chiller and a 14,000 CFM air-handling unit were required, which the Navy directed to be installed without adjustment in the contract price. West Coast incurred an additional $114,989.08 in labor and materials as a result of this error in the Navy's bid documents.

**3. Change in Grade Beam Elevations**

The RFP drawings show the exterior wall grade beam and pile caps to be one foot below the first floor top-of-slab. West Coast reasonably relied upon these drawings in

preparing its bid. After award, it was discovered that the Navy's drawings were erroneous and substantial re-design was necessary to change the elevation to three feet below the slab with the exception of one grid area. These elevation changes significantly impacted design and construction costs and required West Coast to incur additional labor, materials and design costs of $170,797.54.

**4. Relocation of Fire Riser**

The drawings upon which West Coast formulated its bid do not show the fire alarm riser that existed in the breezeway between the existing building and the Project. As a result, West Coast had to incur $6,375.22 in additional labor, materials and overhead to relocate the fire alarm riser.

**5. Increased Design Costs**

The Contract required West Coast to submit its design to the Navy for review at 100 percent completion. Pursuant to Sections 1.4 and 1.7 of the specifications, the Navy's review was not to "provide detailed checking or coordination of various drawings and specifications prepared by the Contractor." Despite this restriction on the Navy's review authority, the Navy undertook an unreasonably detailed review and required re-design by West Coast that far exceeded the scope of the Navy's contractual authority. For example, the Navy required HVAC control design to be included within the 100 percent design submittal when the contract did not require HVAC design to be included at that stage. The same is true of the telecommunications distribution system design addressed in the Navy's letter of December 5, 2001. Perhaps more importantly, the Navy required so-called "prescriptive" specifications in cases where prescriptive specifications

were not required. As a result, the Navy unreasonably withheld 100 percent design approval, which should have been given upon West Coast's initial submission, and unreasonably withheld approval for West Coast to proceed. The Navy's actions caused unreasonable delay in the project and required West Coast to incur $37,500.00 in additional design costs.

**B. Delay Damages**

**1. <u>Use of Native Soil</u>**

On February 6, 2002, West Coast notified the Navy of a potential ambiguity in the Project specifications relating to use of native soils as backfill. West Coast timely responded to the Navy's Request for Information respecting the issue and advised that West Coast was prepared to proceed using the native soil upon the Navy's direction. The Navy unreasonably delayed until April 8, 2002 before issuing a notice to proceed to West Coast. The Navy's delay caused West Coast to incur $81,422.48 in additional labor, equipment rental and overhead charges.

**2. <u>Fire Alarm System</u>**

In the spring of 2002, the Navy approached West Coast to discuss replacing, as an accommodation to the Navy, the fire alarm subcontractor to West Coast with the fire alarm contractor, Elecon, that was performing work in the existing building. The Navy issued Proposed Change Order #13 on May 14, 2002 to cover this change. Thereafter, West Coast acted diligently in attempting to coordinate with Elecon and the Navy to secure approval to proceed, but no progress was made, causing West Coast to incur delay damages. In October 2002, West Coast received pricing from a new fire alarm

contractor, First Alarm, that apparently was replacing Elecon, at the Navy's direction, on the existing building. As a result of issues between Elecon, First Alarm and the Navy, it was not until January 17, 2003 that the government issued P00012 for the installation of the fire alarm system. The unreasonable eight month delay caused West Coast to incur $59,033.24 in damages.

**3. Concrete Repairs**

On May 29, 2002, the Navy issued a suspension of work to West Coast due to possible structural repairs needed to the concrete foundation. On May 31, 2002, West Coast submitted its repair recommendations to the Navy and by June 5, 2002 was ready, willing and able to perform the necessary repairs. The government acted unreasonably in not lifting the suspension until June 27, 2002. In the interim, West Coast incurred increased costs due to idle and lost crews, equipment rental and overhead. The cost impact of the Navy's unreasonable delay was $90,991.71.

**4. Notice to Proceed No. 3**

West Coast completed all work pursuant to Notice to Proceed No. 2, respecting the building caissons, on January 24, 2002. West Coast had complete design approval pertaining to all work to be performed pursuant to Notice to Proceed No. 3 by January 24, 2002. Despite this approval, the Navy delayed without justification in issuing Notice to Proceed No. 3 until March 14, 2002. The delay caused by the government had a cost impact on West Coast of $81,478.99.

### C. Liquidated Damages

By letter dated May 23, 2003, the Navy assessed liquidated damages of $1,450.00 per calendar day based on allegations of delay caused by West Coast that, according to the Navy, affected the date of substantial completion. P00015, dated November 10, 2003, set the liquidated damages at $40,600.00.

**Defendant States**

The contract at issue required West Coast to design and construct an extension to Building 245 at the Naval Postgraduate School in Monterrey California. The design phase included design and engineering to complete the preparation of detailed working drawings and specifications suitable for construction. The contract states at section 00201, page 1, paragraph 1, Description of Work, that the Government had "developed mandatory design requirements and preliminary design drawings and prescriptive specifications . . ." which were provided to the bidders. Thus, this was not a typical Government contract where the Government impliedly warrants the fitness of the plans and specifications. See, United States v. Spearin, 248 U.S. 132, 136 (1918). Instead, the contract allocated the risk of an incomplete design to West Coast. When West Coast agreed in this contract to perform the design role often performed by the Government, much of the risk normally allocated to the Government shifted to West Coast. West Coast's claims for an equitable adjustment generally fail to acknowledge this aspect of the contract's risk allocation.

A. **Equitable Adjustment Claims**

1. **Paving**

Defendant's records indicate that on November 19, 2002, West Coast signed a "no-cost field change," waiving any right to entitlement to additional costs associated with this claim. However, defendant's counsel has not received a copy of this document because the Navy is still attempting to locate the document.

In addition, defendant states that it has not received any documents or information from West Coast which supports the claimed damages.

2. **Mechanical Equipment**

West Coast's claim for the 40 ton chiller lacks merit because the contract allocated the risk of the design of the HVAC system to West Coast. Contract section 01112, General Design and Construction Criteria, provides the HVAC requirements at paragraph 1.11. This section started by informing bidders that "This is a Design Build project. Provide a complete, functional, operational and maintainable HVAC system." Paragraph 1.11.1 of this section stated that the RFP drawings to which West Coast refers:

> are intended to show design intent only. The Design Build Contractor's Team shall perform independent design to meet the requirements of this RFP. The Contractor's design shall fully demonstrate and meet the functional, operational and maintenance adequacy of this RFP. The Contractor shall be fully responsible for the design.

The contract further provided at section 1.11.4 the indoor temperature requirements in winter and summer which the HVAC system designed by the contractor must provide.

Although West Coast correctly states that the RFP drawings showed a 15-ton chiller, the RFP drawings that show the 15-ton chiller show a two story building. West

Coast opted to furnish a three story building. West Coast's assumption that an HVAC system for the two story building would be the same as a three story building was not reasonable.

### 3. <u>Change in Grade Beam Elevations</u>

West Coast failed to consider the RFP package as a whole. Although it correctly states that the structural drawings showed the grade beam elevations to be one foot below the top of the first floor slab, various other drawings, C-1, C-5, A-1, would have informed West Coast that the grade beams would be at three feet. This discrepancy would have been a patent ambiguity in any contract, and thus the responsibility of West Coast. This is particularly true here where the design build nature of the contract required the contractor to coordinate among the various disciplines in the design build team. If West Coast's design effort were properly coordinated, it would have recognized this discrepancy and avoided the costs it allegedly incurred.

### 4. <u>Relocation of Fire Riser</u>

This claim lacks merit because it does not recognize that the drawings were incomplete and West Coast accepted the risk of those incomplete drawings. Among other relevant provisions of the contract, section 01730, paragraph 1.4 provided:

> Prior to providing a pricing proposal, visit the project site and inspect the existing conditions. Attention is directed to the fact that the Drawings and Specifications do not necessarily indicate in detail all portions of the existing work nor of the work to be done. All new work shall be expected to include conditions, both exposed and concealed, generally characteristic on construction of the type.

The fire riser in question would have been evident during a site visit. Thus, West Coast is not entitled to additional costs.

#### 5. **Increased Design Costs**

The contract provides for review of the design by the Government and allows the Government to reject the design if it does not conform to the contract. The Government's design responsibilities are set forth in section 01331, page 2, paragraph 1.3(c) (ii & iv). The Government advised West Coast of the deficiencies in its designs in various written communications. The Government was not obligated to approve West Coast's initial 100 percent submittal as West Coast contends. In the Government's December 5, 2001 letter to West Coast, the Government pointed out to West Coast, among other things, that its design submittal lacked fire protection system design drawings. These drawings were required by section 01331, page 2, paragraph 1.3, (c)(iv)(b)(6). With respect to West Coast's claim that the Government should not have required prescriptive specifications, such specifications are required at section 01331, page 3, paragraph 1.3(c) (2-4).

### B. Delay Damages

#### 1. **Use of Native Soil**

The Government denies that it caused West Coast any delays with respect to this issue. The Government responded timely (within three days) to West Coast's initial request to use silty sand materials as backfill, and responded in a timely manner to each subsequent communication received from West Coast. West Coast has not submitted a schedule analysis or cost information which enables the Government to analyze this claim.

2. **Fire Alarm System**

There has been an accord and satisfaction with respect to this issue. Modification P00012, to which West Coast refers above, provided that "Acceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full for both time and money and for any and all costs, impact effect, and for delays . . ."

3. **Concrete Repairs**

The contract, at FAR clause 52.246-12, Inspection of Construction, required the contractor to replace or correct defective work found by the Government not to conform to contract requirements. On May 29, 2002, the Government issued a stop work order related to the concrete walls and columns because they had a "honeycomb" appearance and some of the columns had visible reinforcing steel bars ("rebar"). The Government responded in a timely manner to communications from West Coast concerning this issue. The Government responded to West Coast's initial corrective plan on June 10, 2002 with several comments. After West Coast attempted to address those comments in submissions to the Government on June 19 and 26, 2002, the Government approved West Coast's corrective plan on June 27, 2002. Given the nature of the deficiencies and the critical nature of the walls and columns, the Government was well within its rights to require a proper corrective plan before allowing West Coast to resume this work.

Defendant further states that it has not received a schedule analysis or cost and pricing information which allows it to analyze this claim.

**4. Notice to Proceed No. 3**

The Government issued three separate notices to proceed on this project: November 13, 2001 for mobilization, survey, site demo, clear and grub, relocation of existing utilities, and prep for caissons; December 12, 2001 for drilling of caissons; and May 14, 2002 for all other work. As we stated with respect to West Coast's claim for increased design costs above, West Coast's design submissions were incomplete and defective, so that that West Coast had to submit its final design three times in order to obtain approval by the Government. As we stated above, the Government rejected West Coast's design because it lacked materials required by the contract, such as fire protection system design drawings. Thus, any delays were caused by West Coast's failure to comply with the contract, not the Government.

Defendant further states that it has not received a schedule analysis or cost and pricing information which allows it to analyze this claim.

**C. Liquidated Damages**

The contract, at FAR clause 52.211-12, Liquidated damages – Construction (Sep 2000) provided that the contractor would be liable for liquidated damages in the amount of $1,450 per calendar if it failed to complete the work in a timely manner. West Coast completed the contract work 28 days late, through no fault of the Government. The Government, therefore, assessed liquidated damages in the amount of $40,600.

**(h) Likelihood of Settlement and ADR** - At this time, until it conducts some discovery, the Defendant does not know how likely it is that the case will settle prior to a determination on the issue of liability, and does not believe any ADR method would

cause a speedier resolution of the case. Plaintiff believes that settlement is in the parties' best interest and has been attempting to conduct settlement discussions since the inception of this case. If Defendant does not agree to meet in an attempt to informally discuss settlement, Plaintiff believes that early ADR is warranted in this case and would be a more efficient use of the parties' resources and requests that the Court encourage the Defendant to consider early ADR. Defendant states that it is willing to discuss settlement with plaintiff. However, Defendant wishes to conduct limited document discovery before engaging in settlement discussions. West Coast has responded to Defendant's initial document request by stating that it will make some of the documents available but objecting to several other requests. Defendant requests that the Court encourage West Coast to respond fully to defendant's document request so that a discovery dispute may be avoided and the parties can engage in settlement discussions.

**(i) Joint Proposed Scheduling Plan**

**1. Joint Proposed Discovery Plan** - The Court's May 10, 2006 Order set the discovery schedule in this case.

**2. Trial** - The earliest date that the parties expect to be ready for trial is May 15, 2007. Based upon trial time from 10:00 a.m. to 4:00 p.m., the parties believe that trial will require 8-10 days. Neither party requests expedited trial scheduling. The parties request that the trial be conducted in Washington, DC.

The parties propose any date of the weeks of March 19, or March 26, 2007 for a post discovery conference.

**(j)** **Electronic Case Management Needs** - There are no special electronic case management needs.

**(k)** **Other Information for the Court** -

**1.** The parties have discussed the issues in Appendix A, paragraph 3, over the course of several telephone conversations between counsel in March 2006. The parties have exchanged RCFC 26 disclosures.

**2.** Defendant believes that the cost of litigating this case through appeal will be less than $10,000, excluding salaries of Government employees and expert witness fees. Defendant cannot estimate expert witness fees at this time. Defendant certifies that this estimate has been provided to agency counsel. Plaintiff's counsel estimates, and has represented to his respective client, that the costs of litigating this case through appeal could be as much as $275,000.

**3.** Defendant's counsel is available for a status conference at any time from June 13-16 and 26-30, 2006. Plaintiff's counsel is available the week of June 19, 2006 and June 26, 2006.

**4.** Attached is an appendix of documents referred to in the Complaint and Answer, including the following:

i. Contract

ii. Specifications

iii. RFP drawings

iv. PCO 00008 and PCO 00013

v. Navy letter dated December 5, 2001

vi. NTP 2, 3 and the NTP referenced in paragraph 30 of the Complaint

vii. Navy letter dated May 23, 2003

viii. Modification P000015 (the Complaint contains a typographical error indicating that this document was a proposed change order, rather than a modification)

ix. Certified Claim to Contracting Officer and responses to Certified Claim letter (indicating that a substantive response to the certified claim letter would not be forthcoming within the statutorily prescribed time period).

Respectfully submitted,

s/William C. Davis, III
William C. Davis, III
11921 Rockville Pike, 3rd Floor
Rockville, MD 20852
Tel. (301) 230-5239
Attorneys for Plaintiff

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Brian M. Simkin
BRIAN M. SIMKIN
Assistant Director

Michael N. O'Connell

s/Michael N. O'Connell
MICHAEL N. O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L. Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7561

May 31, 2006

Attorneys for Defendant