Q. Sole owner?
A. No, my son owns 22%, I own 78% of the stock.
Q. And is West Coast Contractors a business that you founded?
A. Yes, I did.
Q. When did you start West Coast Contractors?
A. March 15th, 1984.
Q. You remember it to the exact date?
A. Yes.
Q. All right.
A. The two dates that I remember, when I got discharged from the Army, and when I started the business. You don't forget either one of those.
Q. What year were you discharged from the Army?
A. June 6th, 1969.
Q. And did you go into the Army after high school?
A. No, I -- no, I was one of those guys who volunteered when I was about 20 some years old.
Q. Were you in construction before you went into the Army?
A. No. I was in and out of school and then, you know, I just decided it was the right thing to do.
Q. Do you have any college education?
A. Not -- not really.
Q. What did you do in the Army?
A. Infantry.
Q. Were you in Vietnam?





A. Yes, I was.
Q. What did you do after you got out of the Army?
A. I went to work for Ryerson Steel as a draftsman and I stayed with them for, I don't know, maybe seven years. I hated to leave the job, you know. It was a good job.
Q. How did you learn to become a draftsman?
A. I took some drafting classes after getting out of high school. I took some -- you know, I dabbled in going in and out of schools and frankly at that point they were drafting people left and right and I just decided to volunteer. And so I went to work for Ryerson as a draftsman. I took -- I had classes in drafting and I just kept getting promoted.
Q. How would you define for a layperson what a draftsman does?
A. Essentially takes a -- a -- a -- a -- you know, a draftsman in my particular case, we would take, um, you know, a part, the concept of a part and draw it in a manner that you could give it to a -- a person and have him process that piece of steel and, you know, round it, square cut it, drill it, whatever is required to -- to -- to produce that component. You know, what I dealt with was components. I didn't do drafting in the sense of a whole building or a whole machine. I dealt with components.
Q. And can you just tell me, you know, briefly, how did your career progress from the point you left Ryerson to the time you started at West Coast?





A. I went to work for W. A. Thomas Company who still is an active company. And I was just one of those individuals that, you know, I picked it up at an incredible speed and I have a logical mind. I don't have an incredible -- I don't have no formal education, but I have an incredible -- I've been told, I've been told enough times that I have a very logical mind. I'm one of those people who sees a problem and comes up with a solution right away when other people are still thinking about the problem. So that's it.
Q. Okay. So did you -- how many jobs did you have, roughly, between the time you left Ryerson and the time you started at West Coast?
A. I didn't have many, but I worked on some huge projects. I mean, again, I -- nobody is from the west coast here so I would throw in some names and you would probably recognize them, but the Pyramid Building in San Francisco I did, you know, hundreds and tons of steel that we provided there and the components, you know. Lee Strauss, the Levi Strauss building in San Francisco, uh, the Prudential. I mean, it goes on and on and on. I just -- I just -- and I just -- I don't know how, I don't know how, all I can tell you is I started at something and within a few years I was, you know, being in charge of these projects that were just monumental. You know, in my mind they were monumental. And I was just given the opportunity and I just took it, period.





Q. So what was your idea when you started West Coast, what kind of projects did you hope to do?
A. I went almost directly to the military. My first job that I bid was Sierra Army, uh, for the Corps of Engineers, the Sierra Army Depot, my very first job. I stopped working on a Friday and I think I turned a bid in on a Monday. It was that quick.
Q. Was there a Veteran's preference on contracts in those days?
A. Yeah, there was a veteran's preference and there was an A-8 preference, which I qualified for both of them. And I was also at that point I was 9% disabled and I could have gone after the one more percent and just qualified for that but, you know, I mean, that's -- I -- I don't know, I did it on drive. I didn't do it on -- I didn't need -- you know, I used the A-8, absolutely, but it was mostly driven.
Q. So, I'm sorry, what kind of a project was that for the military?
A. The very first job we bid was a -- a -- I can't remember the project by now, it's been too long, but it was a project at the Sierra Army Depot for the Corps of Engineers.
Q. So what, a building or what?
A. I'm sure it was a building, but I can't remember.
Q. And what were the sizes of the projects that West Coast was bidding on in those days?
A. I don't think they exceeded a quarter of a million dollars,



f761483e-62cc-4dc4-9c93-294e61cfc12a

you know, I don't think so. They were small, I can tell you that.
Q. And do you recall how it came about that you hired Tracy Hieber?
A. God, it's been so long, I don't know. It's been -- you know, we were talking about it the other day. It's close to 20 years, 18 years, 19 years. We've lost track of it, frankly. How we came about it? I knew he was working for R. Crum and I needed a PM and then we brought him in. And we brought him in, the first job was quality control officer. And I'm doing this out of recollection, it's been too many years, but I think it was quality control officer at the like IMDA or something like that. It stands for intermediate something repairs. That's aircraft repair, not major repair, minor repair to aircraft. And I believe he was the quality control officer on that project.
Q. All right. You would have been responsible for putting together West Coast's team, if you will, choosing the superintendent and the project manager and so forth for the Post Graduate School project?
A. That's correct.
Q. All right. And how would you define the roles or how would you explain the roles of a superintendent and project manager the way West Coast does business?
A. The, um -- and it's changed a little bit because as I, you





know, you asked me earlier do you learn from every project and I said yes, we learn from every project, every project. But I believe at that time Tracy was the PM his basic function as an PM is to handle the paperwork, basically, you know, create the general direction, enforce the -- the subcontractor's obligations of the subcontractors, you know, enforce that, enforce the obligations of the owner, that type of thing.
The superintendent is the guy who makes the decisions in the field. He decides, in other words, I'm going to, you know, put up this wall today and I'm going to put up that wall tomorrow. The PM doesn't get involved to that detail. The PM generally directs we're going to bring in this subcontractor today and we should bring in this one next. He helps with the five week schedule and that type of thing, but the superintendent is the one who gets really involved in the details, the day-to-day functions, you know. You know, am I going to pour this segment today and that segment tomorrow?
Q. So does the project manager tend to only get involved in problems or does he have some, you know, day-to-day, week-to-week managerial responsibility?
A. It changes with each individual, you know. Tracy I would say, knowing by his character, he's probably more involved in the day-to-day. There are some guys who are -- my son is





a little bit more laid back. Tracy -- and we have one guy Dan that you can't even lift a finger without him knowing. But it changes from guy to guy. As long as the progress is being made and all of that, you know, they -- they really direct their own -- their own game plan.
Q. Do the responsibilities vary for a design/build project versus a design/bid/build project?
A. Of course, yes, they do.
Q. And how would you say that the responsibilities of the superintendent say vary on a design/build project?
A. Well, you always have to take into account in a designed building, they give you their criteria. As an example, they may say we want a glass to be of a certain -- what's an -- a certain E-factor, that type of a thing, and the superintendent has to take a little bit more into consideration because he has to make sure that not only is the subcontractor doing his job, but he also has to always go back to the submittal process and even until after the submittal process and make sure that what the owner wants, if he wants a glass with a certain E-factor, that that is being addressed and that is being incorporated into the project. It's a little bit deeper, it's a little bit more.
If it's not a design/build, you know, you basically go through the submittal process, but the reviewer normally assumes a lot of that responsibility. And once the





submittal is approved, you go a little bit quicker. The other one, you have to go back, you have to take that additional step and go back to it and make sure that you satisfy that owner requirement.
Q. So I'm not sure if I understand. The additional step is reviewing the submittal more closely and matching it to what the contract actually says?
A. I would say reviewing the submittal more closely and even after the submittal ensuring that again those, that design, you know, that those design requirements are being met, yes.
Q. And how would you explain what a design/build project is?
A. Um, a design/build -- well, I have seen two different types and I've seen the type where -- where it's a little bit different where they give you the Statement of Work where they give you a, you know, a three-page thing, a Statement of Work, which essentially says I want a, you know, one-story building, I want a warehouse, I want a row of doors to accommodate a, you know, truck, I want a row of doors to accommodate a forklift, you know, that type of thing. But other than the basic outline, this is where I want it and this is my plot of land, you -- you get nothing else. Okay? You have to develop it completely from everything. You have to make the decisions on everything.
And then there's the other ones such as, you know, this is where the owner gives you not just a Statement of

Work, and I believe this one had a Statement of Work, but they also give you the criteria. We want it on this plot of land versus the other one, but we want it in this specific location, you know, specifically facing south/north and we specifically want the door to this size, we specifically want this, we specifically want that; it's more specific. Um, those are the two types. We have not -- I don't think we have done a Statement of Work. I don't remember one.
Q. You lost me with that last part where you say we haven't done a Statement of Work.
A. I don't think we have done a Statement of Work and I would have to, you know, go back a little bit, but I don't think we have done where there's clearly a Statement of Work. You get a two-page description of the project versus a thick document with a lot of drawings attached to it.
Q. So you're saying that all of the design/build projects that West Coast has done have been more similar to the --
A. Than in the --
Q. -- Naval Post Graduate School project?
A. You're correct.
Q. Okay. What was it about Jim Miller that led you to choose him to be the superintendent on the project?
A. He's good.
Q. What was good about him?
A. He's just good. He's just -- he's -- he's -- he's good.





You know, there are superintendents that you wouldn't hire them and there are people that you would hire them over and over and over. Jim falls in the category that he's a good superintendent.
Q. Okay. But is there anything specific about him that you would say makes him good at a design/build project?
A. No. I just think he's a good superintendent, you know. Um, you know, is he good -- I think if you're asking me is he -- is he good with a design/build and not with a design/build? I'm not sure what you're asking me.
Q. What would make you think that he would be good at a design/build project?
A. He's a good superintendent. He's a good superintendent. He's a very good superintendent, you know.
Q. On design/bid/build projects?
A. On the design/build as well as a fully designed, I think he's good. Yes, he is, he's good.
Q. What other design/build projects did he work on that he did well on?
A. I don't know. I can't answer that question, but I -- you've got to remember that you are asking a question that I can't really answer without the -- on the design/build and in this particular case, although it was a design/build as far as Jim Miller was concerned, you've got to remember that we hired an architect and the architect was supposed to take





those plans and develop fully working plans, which at that point the project becomes more like a fully developed, you know, go hard bid, if you want to call it, you know. It -- it changes a little different. But as I said, the superintendent still has that additional step of making sure that it complies with that. But once you hire the architect and he develops the plans, it's not much different. Once he develops the plans, you've got to remember that, once he develops the plans, then it's not much different than it is when we get a set of plans and it's 100% designed, right down to the color of the paint.
Q. Okay. Let's talk about the designers then for a second. What -- let me back up a second. I don't know if you use this term, but would you call Merritt + Pardini the lead designer on this project or what was the term you used to refer to them?
A. You know, I'm not sure what you mean by lead designer.
Q. What was -- what would you call the nature of Merritt + Pardini's role on this project?
A. Merritt + Pardini was the architect who was responsible for giving us a complete set of working plans and he was also responsible for his team of, you know, mechanical, electrical, civil, etcetera, etcetera.
Q. Had West Coast used Merritt + Pardini before?
A. No, I don't think so, no.





Q. So how did West Coast, you know, in Reno, you know, somehow come upon Merritt + Pardini, which is up here in Tacoma?
A. You know, I can't remember, but they had a reputation of doing a lot of work for the Navy. And they had done, Scott specifically had done an incredible amount of work with the Navy. I believe, and again, it goes back to what I was saying earlier, the Navy that I had with the Navy, but I believe, and I'm saying that I believe, that when we -- when the job came out to bid, a lot of the architectural firms will contact the general contractors and a lot of the general contractors will contact the designing teams based on the -- on the plan holder's list. And I'm assuming that's how the conversation started.

I think in this particular case Scott had quite a reputation of doing work with the Navy, a lot, in this area specifically. And if I -- and, you know, and I won't swear to this on a stack of Bibles, but I think I did ask the Navy about them and they gave them real good references and that's how we choose Merritt + Pardini and then I met Scott.
Q. When you said this area, were you referring to Tacoma?
A. Yes.
Q. And who did you ask at the Navy about either Merritt + Pardini or Scott Harm?
A. I believe that there was a -- and I don't know if I can ask Tracy at this point, but there was a guy that, um, he

retired, I believe his name was Ed. I can't remember because I barely had dealings with him because he retired when I started getting heavily involved. And we did run, you know, have-you-heard-of-this-guy type of conversations, and yes, they're very good, they-designed-this-and-this-and-this type of a conversation. I, you know, I can't remember the specifics, you know, who did I ask or what projects or when I asked them; all I can tell you is that I -- I -- I did do it and asked questions around, checked him up, ran a check-up on him, you know. It's -- it's just a prudent thing to do. I do remember doing it, but I can't remember when, how or who.
Q. How do you choose an architect for a project such as the Naval Post Graduate School, you meaning West Coast?
A. How do we choose them?
Q. Yes.
A. Based on its reputation.
Q. Is it reputation? How does, you know, their bid price come into it? What are the factors that West Coast would consider?
A. I don't think we took any other prices on this case except Merritt + Pardini's price. That I'm almost positive of. I think we did it purely on the basis of its reputation, that he had a lot of -- a lot of Navy background work and he -- and he was -- when I ran checks on him, you know, he





-- everybody gave us an A+ type of a reference, you know.
Q. And you would have been the person dealing with Merritt + Pardini pre-bid, right?
A. Yes.
Q. Did you deal with anybody at Merritt + Pardini besides Scott Harm?
A. I don't remember, but I -- you know, all I remember, all that comes to my mind is Scott Harm.
Q. Did you -- did you talk to Scott Harm about how much experience he had with design/build projects?
A. I'm sure I did.
Q. Do you remember what he said?
A. Well, I know -- I remember him at one point saying that he had a lot of work in, you know, Seattle and, you know, we -- we exchanged things, like I did the work at the, you know, where the submarine base is, you know, that type of thing. And we exchanged ideas, exchanged things, but I can't remember specifics now.
Q. Did West Coast approve the subconsultants that Merritt + Pardini hired, such as AHBL?
A. No, I don't think so.
Q. Did you talk with them prior to bid?
A. No, I don't think so, hum um.
Q. Let's go off the record for a second.
(Counsel talked off the record)





(Lunch break taken)
All right. Back on the record, please. Let's mark this as the next exhibit, please.
(Exhibit No. 69 marked for identification)
Mr. Ramirez, could you look at Exhibit No. 69, please, and tell me if you've seen Exhibit No. 69 before?
A. Uh, no.
Q. No?
A. I've seen similar things, yes. You mean this specific one right here?
Q. Well, I guess maybe not specifically this -- this format, the way it's printed out on this page, but did you see an announcement for this contract in the Commerce Business Daily for this project?
A. Something, probably something similar, yeah.
Q. And I'll just represent to you that we got this from your files.
A. Okay.
Q. So do you -- does that change your testimony?
A. I don't remember, but if you said you got it from my files, yes, I obviously have seen it.
Q. And do you recall, was it around approximately this time, November of 2000, that West Coast received the R.F.P. drawings?
A. I would probably say yes.





Q. All right. And you saw before or we saw before from Exhibit 63 I believe it was that there were several Amendments to the Solicitation. Do you recall seeing that?
A. Yes.
Q. Correct me if I'm wrong, but the drawings never changed, correct?
A. The, um, the drawings?
Q. Yes.
A. The plans?
Q. The plans, the R.F.P. drawings.
A. The R.F.P. plans, I don't think they have changed, no.
Q. Now, let me turn back to the HVAC work for a few minutes. I remember what you said prior to lunch, which was that the person who was working with you may not have printed out a cover letter for when West Coast submitted plans and so forth to all of the subcontractors. However, I will tell you that we haven't seen anything coming to West Coast from either Mt. Rose or Johnson Plumbing prior to the award date of June 29th, 2001. Does that conflict with anything that you know?
A. You're asking me -- just to make sure, you're asking me, you know, do I remember seeing anything in a written format from them? Do I remember anything, is that what you're asking me?
Q. Yes.



f761483e-62cc-4dc4-9c93-294e61cfc12a

A. I -- I can't remember a written format.
Q. Let me show you what's been previously marked as Exhibit No. 61. I'm going to give it to you in a second. I only have one copy of this particular document right now, but let me -- put your finger where I have mine, you can take a look at the document and familiarize yourself with it for a moment, but I believe that is Mt. Rose's subcontract with West Coast.
A. Correct.
Q. And you'll see that three pages from the end there's an Exhibit A, scope of work document. And if you look at the bottom of that page you'll see that there's language to the effect that "as per our proposal, August 31st, 2001"?
A. Correct.
Q. So you were shaking your head a minute ago. Why were you shaking your head?
A. No. I was shaking my head because I -- I was trying to find the exhibit and I couldn't find it in here.
Q. What exhibit are you talking about?
A. Well, if it says "as per our proposal," and normally we make that an attachment normally and I couldn't find that in here.
Q. Hum...
A. I mean, this says -- does say, "per our proposal," and I don't see it in here, so that's what I was shaking my head





at. Where is it?
Q. I don't know. That is I think what we have received from West Coast so far in discovery.
A. Hum...
Q. If I can locate that, I'll show it to you before the end of the deposition. But now that you see that scope of work document attached to the subcontract that references a proposal, dated August 31st of 2001, does that tell you that West Coast did not receive a proposal from Mt. Rose until after award?
A. I can't remember if we received it after award or before award, but prob -- normally -- normally the way Craig, you know, normally does, he would send a proposal. That's why I'm surprised it's not attached.
Q. Let me show you what's previously been marked as Exhibit No. 56 which is the Johnson Plumbing subcontract. You'll see, take a look at Exhibit 56, but you'll see at the back there's a letter from Johnson Plumbing dated August 27th, 2001, apparently providing Johnson Plumbing's quote for the work.
A. Okay, I see it.
Q. Does that help refresh your recollection as to when West Coast was negotiating with and discussing a subcontract with Johnson Plumbing for this project?
A. All right. What is your specific question now, now that





I've looked -- now that I've looked at it --
Q. Sure.
A. -- and I compared this date to this date and all of that.
Q. Sure. The question is now that you see that letter from Johnson Plumbing the last week of August 2001, does that help refresh your recollection as to when West Coast was getting a proposal from Johnson Plumbing for this work?
A. You know, I honestly can't remember. My recollection is that we went to them right from day one, and that's my recollection.
Q. Day one meaning what?
A. Well, day one is from the day we get the proposals and, you know, the invitation from the government, and then we send it out to the subcontractors. As I stated, we send a blanket, invite a lot of people, and then they respond to it, you know. Um --
Q. Well, even if you were talking to them for day one, why wouldn't say Mt. Rose be giving you their proposal until August 31st, 2001?
A. Well, sometimes they don't confirm it until a later date. That does happen.
Q. They don't what?
A. They don't confirm it until a later date. You've got to remember again, these are people we deal with day in and day out.





Q. Um hum.
A. And we have accepted their prices, you know, where we would accept it, just -- just a verbal. We had a verbal written form. Since the fax machines and the e-mails went into effect, that rarely happens now, but in those days did it happen a lot where we would accept a verbal? Yes.
Q. Um hum.
A. So it could have -- I could have accepted a verbal and then confirmed it. I can't remember.
Q. Okay. I can give you one more piece of information and it would take me a minute to dig it out, but Jim Miller testified that he didn't become involved in the project until award, and that he was the one who after award who was responsible for negotiating with Mt. Rose and Johnson Plumbing and getting proposals from them.
A. (Nodding head up and down).
Q. You're nodding your head yes?
A. No, I'm just listening to you. Go ahead.
Q. So, you know, I mean, I can show you Jim Miller's testimony, if you want, but based on my representation that that's how Miller testified, would that lead you to believe any more that they didn't provide proposals to you until after award?
A. No, they could have refined the proposal later on. I do not remember. My -- again, you know, you're asking my recollection. My recollection is that they provided

proposals at the beginning, they provided -- but they could have refined it more. I -- I can't -- I honestly can't remember.
Q. Let me show you a document. We'll enter it as an exhibit in a minute.
A. Um hum.
Q. But I think I found the missing proposal from Mt. Rose, August 31st of 2001.
A. Um hum.
Q. Why don't we just break for a second? Can you copy this for an exhibit?
(Short break taken)
Could we mark this as Exhibit No. 70?
(Exhibit No. 70 marked for identification)
Does that document help refresh your recollection, Mr. Ramirez?
A. Uh, refresh my recollection as to the timing? No, it does not.
Q. All right. Let me show you one more document. We'll mark this as 71.
(Exhibit 71 marked for identification)
Take a look at Exhibit 71 and tell me if you've seen 71 before?
A. No, I do not remember.
Q. Seeing Exhibit 71 and now seeing that as of August 7th, 2001





Mt. Rose was providing to West Coast what it refers to as a preliminary scope of work, does that do anything to refresh your recollection as to when West Coast was dealing with Mt. Rose with respect to this contract?
A. Frankly, it doesn't. It does not. It does not.
Q. All right. Well, I guess what I'm getting at is I'm trying to figure out how West Coast bid the HVAC scope of work because we haven't gotten any documents from you in discovery that are dated prior to the award date and then we've got these other documents which are dated after the award date. I mean, based on that, what is there out there that would explain to me how you bid the HVAC scope of work for the project?
A. How I bid it? I received something, I received a bid, a proposal, to the best of my recollection, from Mt. Rose as well as Johnson and all of that. Now, from this point I'm speculating that it could have been -- there was some -- all right, we have the clean-up questions, we have to clean-up this and then the proposal was sent over to Jim Miller, but I -- you know, did I -- I don't know if this is what you're asking me and I don't even know if I should even reply to it, but I did not bid this thing blindly, if that's -- which is one of the words we use in the industry where you plug in a number, no, I did not do that.
Q. But would it be West Coast's usual practice that if it





already had a bid from a subcontractor then six weeks after award to then be getting a preliminary scope of work from the subcontractor?
A. I don't know if preliminary would be the right thing, but a re -- certainly revised would be the proper. I don't know if preliminary would be the right wording.
Q. It's this one. Take a look back at Exhibit 68, if you will, Mr. Ramirez.
A. Sixty-eight? Which one is 68?
MR. DAVIS: Here.
THE WITNESS: I don't have 68.
MR. DAVIS: I'll find it. There you go.
THE WITNESS: Was it the last one?
MR. DAVIS: Yes. There you go.
BY MR. O'CONNELL:
Q. Oh, you have it?
A. Um hum.
Q. I'm sorry, I thought you were looking for it.
A. No, no, we have it.
Q. Now, is it possible that you bid the project based upon a bid from JBK Mechanical?
A. Yes, that is possible. What does happen in the industry and we just had a, you know, a perfectly good example just now, we have a project at Hawthorne in which a subcontractor gave us a figure, not with the intent of doing it, but with the





intent of, you know, hey, this is a figure but, you know, this guy is better suited to do it. It does happen in the industry, so it could have been possible.
Q. And taking all of these documents together, does that help you at all with explaining why West Coast did not use -- is it JBK -- JBK Mechanical, but instead went with Mt. Rose and Johnson Plumbing?
A. No, it does not, because again, we -- we -- a lot of times we'll send out an invitation to, you know, five, ten, mechanicals, see which one will respond. And this could have been -- this JBK could -- notice could have been one of those. I don't know. It could also have been a, you know, a real hard -- requesting a hard bid that he could have responded.
Q. Okay. Are you familiar with JBK Mechanical?
A. To the extent we did one project with them, yes.
Q. Okay. Do you know if they could have performed the scope of work that was performed eventually by the combination of Johnson Plumbing and Mt. Rose Heating?
A. Yes, they could have, they're capable.
Q. And you say you've only used -- West Coast has only used JBK one time?
A. I think so. I don't think we used them more than one time, that is correct.
Q. And is there any particular reason why?



f761483e-62cc-4dc4-9c93-294e61cfc12a

A. No. I can't remember.
Q. When was it that West Coast used JBK on a project?
A. I believe we used them on the firehouse at Beale Air Force Base, but I'm not positive. When, I don't know. We've done 302 projects, you know, so if I can't place them in the proper order for you, it's because there's too many of them.
Q. All right. Well, that's -- okay, that's fine. But can you just tell me if that project was before the Naval Post Graduate School or after?
A. I can't. I can't place it. No, there's too many of them.
Q. Was Jim Miller responsible for negotiating particular contract terms with subcontractors?
A. No, I don't think so. No, not -- not particular individual terms, no. Was he -- you know, do those guys help in, you know, going in and filling in holes that, you know, who's going to take care of this device that goes to the door as an example, because he excluded, he excluded, he excluded, he has it included, and is sometimes responsible for then who ends up with it, yes, on a specific basis, but are they responsible for naming the whole project? No.
Q. But I'm talking about the actual terms that are in the subcontract itself. Does West Coast tend to use a form subcontract?
A. Yes, we do.
Q. And how much negotiation is West Coast amenable to with





respect to the terms of the subcontracts?
A. It depends on the subcontractor. Granite, when he returns the contract, he might as well have written on the whole thing.
Q. I'm sorry, could you say that again?
A. I said it depends on the subcontractor. People like Granite, when they return the subcontract, you might as well, you know, start all over because they red-line so much. You go to the other three, Simas who has probably done 100 projects with us, they sign it because they do their job, it's never used against them. So it depends. There's no fixed rule.
Q. So who has to approve the changes to the terms of the subcontract? Would that be Jim Miller who would be the one who could do that, or do those have to be run by you?
A. What we normally do is when there are changes to the subcontract, terms to the project scope, you know, the guys will look at it. Tracy would have looked at it first. Okay. Jim and Tracy would have looked at it. Okay, terms as far as any payment, any legal issues or something like that, they usually flag it. They put a little sticker on it and say, "You need to look at this one," and then I look it over. But terms to -- once again, we go back to did you include the little knob here, the little knob over there, no, they normally would rely on them to do it.





Q. Okay. Let's take a quick break because I need to run a copy.
(Short break taken)
Okay. Mark this, please.
(Exhibit No. 72 marked for identification)
All right. Mr. Ramirez, take a look at Exhibit No. 72, please.
A. (Witness complies).
Q. Tell me if you recognize this document.
A. Oh, this on I do not recollect, sir. Oh, I'm sorry. We changed the form. Hold on. Hold on. Let me -- I don't have -- I recognize part of it, but I don't recognize part of it. I recognize the columns going across, you know, from left to right, I do recognize those, but I don't recognize this where it says items 1 through 25. That's not the format we normally use, so I'm not sure what this -- I recognize the numbers going across the top. That's how we post a job on the wall, that's how we estimate it, that's the system, the computer system, but I don't recognize the up and down thing. I don't know if this is a breakdown that the Navy requested or something. I don't -- I simply don't recognize the vertical 1 through 25, I do not.
Q. So when you say 1 through 25, you're talking about the column all of the way over to the left where it says item?
A. Yes, precisely. I don't recognize that. There seems to be





something missing from this. In other words, to the left, you see the very first page to the left, normally to the left of item one we put a description, normally we do that and then I would recognize it, but without the description to the left of that, I don't know if this is something that I produced or somebody else produced or -- I -- I --
Q. Sure. I'll represent to you that we got it from West Coast's document production.
A. Yeah.
Q. So is this or does West Coast use Excel or is this some other program that West Coast uses for its bids?
A. It's a program that my son developed when he got out of school, but there's something -- there's a column missing here to the left of it. I don't know.
Q. To the left of what?
A. Well, if you take this first page, the -- normally there's a description here to the left of this, normally. And without that description to the left, I have no idea to identify what's all of this stuff that's behind it, to the right of it. But these numbers going across here, across the top --
Q. Yes.
A. -- that I do recognize.
Q. So, for example, quality control, number three, quality control, you recognize that format?
A. I recognize the number. Merritt + Pardini four is just a



f761483e-62cc-4dc4-9c93-294e61cfc12a

tab we gave it to keep track of it. Now we use a decimal point system. It's the same thing, but Merritt + Pardini tab number four is what we call it, tab four design. Their number is $240,150. That I do recognize.
Q. So just the record is clear, maybe we already made this clear, but you were holding the document up and pointing it out to me. This missing descriptive information you're talking about, you're talking about descriptive information for 1 through 25 under the word item all of the way over into the left-hand margin?
A. Correct. That's what I do not recognize.
Q. All right. One thing -- you can compare this with Exhibit 63, but this does appear to track, at least with West Coast's final bid of $4,978,384.00. Do you see that?
A. Correct.
Q. Do you know if there are any other bid sheets out there that either summarize your bid or set forth your calculations when you were performing the bid?
A. No, I don't. No.
Q. Well, do you normally do anything other than this spreadsheet?
A. No, this is -- this is what we do. But, again, it does not have 1 through 25. I mean, normally when you see this vertical, you know, the 1 through 25, normally when you see this, it's when an owner requests a breakdown. Um, we just





did a project in which the owner wanted it broken down in about, you know, seven items, only seven for some reason. So we took the same numbers across and I divided it up and down in seven and I allocated it. Normally this represents that somebody requested an allocation and I did an allocation for them or somebody did an allocation, but I simply -- I do not recognize this one, but it is my program, I can tell you that much.
Q. And we were just talking about number three, quality control, and that column appears to be representative of the columns that come after that in that it then has two smaller columns underneath, one labeled plug and one labeled actual?
A. Um hum.
Q. Is that something that West Coast typically has?
A. Yes. What happens is when I set up the format, we set up the format and we'll put in and plug a number, an actual number, and sometimes we just pick a number. As a matter of fact, sometimes I'll just put $10,000, $11,000, $12,000, just pick a number, and when we get the actual sum, we put in a zero where the plug goes in and the system on the wall, it colors it different. It goes from a red to a green or a green to a red, I can't remember. And then we type in, we punch in the actual number and it gives us a color code so we know -- now we know we have the actual number.
Keep in mind, this is being done for speed purposes





because when you're building something right down to the line, you can look at some graphically that you can look up and say, okay, I have their actual number, so not only the plug becomes a zero, but when we type in an actual number, the color changes, so it all of a sudden gives you -- I think it takes out the red and it gives you the green or blue. I can't remember.
Q. Going back to that column three at the top, it says CTE. And CTE, in fact, is the subcontractor that West Coast used for the quality control on the project, correct?
A. I believe so.
Q. And then Merritt + Pardini, we've already talked about them. They were the architect that West Coast used, correct?
A. Correct.
Q. And did -- I'm just going to work my way across. Did West Coast self-perform the earth work?
A. Yes.
Q. How about the utilities work?
A. We self-performed.
Q. Paving work, did you self-perform that?
A. No.
Q. You did not. Who performed the paving work?
A. I can't remember. A mobile subcontractor, but I can't remember.
Q. Was that Sierra Nevada?





A. I think so. I think so. SNC, yes.
Q. Let me see, let me show you quickly Exhibit 8. Does that help you with that?
A. Sierra Nevada Construction. It's a subcontractor, Sierra Nevada Construction for the paving.
Q. Okay. And it's slightly higher, but it roughly tracks the number in the bid, right?
A. Um hum. See, sometimes what we do with the system and, um, and we have changed the system, you see the very top column, that very row?
Q. Yes.
A. We have changed the format now to clarify that. If we just plug in a unit price, you have -- we have clarified that in those. It used to go to WCC, even if the number came from the subcontractor. For instance, I would say there's 30 square feet, three inches over four, or six inches over ten, whatever the case, what kind of a price can I use for that? They'll say $11.20. Now we've changed the format. If we change the format, we use WCC plug and that plug indicates, hey, this number has just come in for me. Okay?
If, for instance, I see Sierra Nevada gave us a plug, we now change the format now to clean it up a little bit. You say do we learn from every job. We learn from everything. We will say SNC plug, which means it is not a hard bid, it is strictly a unit price. So I can't answer



f761483e-62cc-4dc4-9c93-294e61cfc12a

this because, you know, what does each one mean? It's been too many years, but we have changed it to clean-up some of this stuff.
Q. When you say you've changed it, you're talking about changed it since?
A. Changes. Instead of the first column saying WCC, if this is today, if we were bidding this today and if Sierra Nevada gave me a unit price plug, I'd put in SNC plug, which means it's not a hard bid. In other words, they're going to live with the price, no matter what. Okay? And if it came from me based on historically, I simply say, hey, go ahead, use $1.50 a foot, then I would put WCC plug. In those days we did not enter those two titles, so it's kind of hard for me to say.
Q. So do I infer correctly from what you just told me that it's possible that even though this says WCC at the top, that somebody at West Coast went to Sierra Nevada and said, "Tell me approximately how much this work is"?
A. Yes, that is possible.
Q. All right.
A. Under the new system -- you would be asking me that question.
Q. Okay. Then let's just skip a few, a few columns. Twelve is the structural steel. "Blue, $392,817." And Blue is Blue Mountain Steel, I believe?





A. That's correct.
Q. And they are the subcontractor that West Coast used, correct?
A. Correct.
Q. And I can show you another document because I have it here somewhere, but I believe that the $392,000 is, if not to their -- to the exact dollar, but I believe that is their bid price for the three-story building. Does that square with your recollection?
A. Yes.
Q. So just so I'm clear, I think you've partly answered this, but if you go through the columns, you get to the second-to-the-last page, at the top, the last column is 45, "Tel/Comm." Is this the standard format, at least at that time for West Coast's bidding program?
A. Yes, it is.
Q. Going back to the first page, how come there's no columns one and two before quality control? Is there typically a column one and two?
A. No, because one is what we call indirect, which now we put it at the end. See on the second-to-the-last page?
Q. Yes.
A. You see that "Indirect"?
Q. Yes.
A. Okay. That represents what we call column one, division





one, whichever one you label it. So we start -- normally we don't start with one or two because we reserve that, so we normally start at three. And, again, we changed our format now. Now we start at two.
Q. All right. Well, turn to -- from the page at the Indirect, turn back two pages and you see column 38, the Plumbing, you'll see at the top it states JBK and between that column and the fact that this document adds up to the -- it's West Coast's bid price to the actual collar, that's what was leading me to believe that West Coast was carrying JBK's bid number when West Coast submitted its bid to the Navy. Does that make sense?
A. Based on what you're showing me, I would say more than likely you're correct.
Q. All right. And --
A. Based on the way we worded the system at that time, you know, and based -- yeah, I get them -- you know, we change them so constantly, it's hard. But based on the system, I would say either JBK gave us some kind of a number or gave us some kind of a plug to indicate that. Again, we have changed that now a little bit to clarify it a little bit more, but we didn't do it in those days.
Q. And but you can't say based on this whether the $565,000 is a plug number, as you said, or what we might call a hard number?





A. I can't remember, no.
Q. I know you've already testified that you didn't know what items 1 through 25 mean, but under JBK they have -- what you have listed here is $226,000 across from item 13 and $339,000 across from item 14. And the number -- those two numbers together I believe add up to $565,000, but can you tell me what the $226,000 is for and what the $339,000 is for?
A. I don't know. The only thing I can think of and the only thing is that the Navy requested a breakdown in a certain format and that's what this is, but that's what this normally would indicate is an owner requesting a format, you know, that's how this normally is used, unless they are bid items, which in this case there were no bid items, but quite frequently after we get done with a bid, the owners will request a bid breakdown for financing purposes, for umpteen purposes it could have been. I mean, I can't --
Q. The two columns that follow 38 are 39 Wet HVAC and then 40 HVAC. There's zero listed in both of those columns.
A. (Nodding head up and down).
Q. Can you tell me why zero would be listed in those two columns?
A. Yes. What we did that for is to ensure that the -- the bid is complete. So, for instance, we'll put Wet HVAC as a check mark, make sure that they do include it, and make sure

we put HVAC and a check mark, that they do include it.
Again, if you saw the new format, we have added even more columns from this thing as we learn from our mistakes, you know, what -- what each one is. It's just -- I don't know what you call it. It's Andy's. He's got a wording for it, but it's like a checklist, you know, plumbing, excavation. We had had that about, you know, three years ago. So now we have plumbing excavation. We also changed the system, so it's just these little check points, bullet points to make sure that we have a project, a complete project. That's what it's for.
Q. So would you read this so that any money for the HVAC and the wet HVAC would be under the plumbing column?
A. That's correct.
Q. Now, I know I took back the Mt. Rose and the Johnson Plumbing subcontracts, I can give them back to you if you need to look at them or want to look at them again, but the actual numbers for the subcontracts with Johnson Plumbing and Mt. Rose are $340,000 with respect to Johnson Plumbing and $142,000 approximately for Mt. Rose. So that adds up to about $482,000, more than $80,000 less than the apparent JBK number. Does that suggest that the reason for going from JBK to Johnson Plumbing and Mt. Rose was the price?
A. Yeah, you can -- you can suggest that. I don't know if that's the right reason, but it can definitely be suggested,





yeah.
Q. I mean, all things considered, wouldn't you rather -- I mean, wouldn't West Coast go with, you know, these other two contractors if -- if the price was $80,000 something lower?
A. Absolutely. See, the problem with this system, it doesn't -- again, that's why we have explained the columns, you know, but sometimes the system doesn't reveal a number. Plumbing will say, um -- and, again, using an example, the original price included the excavation, but I want you to do the excavation, so you've got to have equipment out there, so we'll reduce, just for the sake of argument, we'll reduce the $565,000 to $500,000 and pick up the $65,000 under the excavation column. We have expanded this to accommodate, you know, do you want to do the excavation, do you want us to do the excavation. This was probably a little more condensed. It is a lot broader now.
Q. Going to the last page, the column Mark Up, is that profit?
A. That is overhead and profit. We call it a Mark Up.
Q. So there was a combined 8% overhead and profit?
A. That is correct.
Q. What about on the previous page, the Indirect, what does Indirect include?
A. It includes -- it is basically supervision, you know, code one or two, which is the superintendent, it is -- the other big expense is what would be the PM's time, total and 30.





And then it starts picking up things like, you know, the cost of the bond, the cost of insurance, the cost of -- I mean, it's -- it's a two-page checklist that we use and it changes from job to job.
Q. So what's -- what's included in the overhead that's included within the Mark Up?
A. I'm not following you.
Q. You said that the Mark Up of 8% was for overhead and profit?
A. Overhead and profit, that is correct.
Q. So what percentage of that is profit and what percentage is overhead?
A. It is not -- either one is not fixed because the overhead is in relationship to the volume. In other words, the overhead can be 5% one year because you're doing more volume and the next year your GNA expenses remain, yet you're doing, you know, a higher volume, so your overhead is going to go down. It's not a fixed overhead, um, it changes.
Q. So is it -- but what I'm getting at, is this the -- is this the home office overhead here under Mark Up?
A. That is correct.
Q. What is -- on the last page, what is Base?
A. Um, Base is a good example, and let me go back to one and explain it to you rather than -- okay, go to eight. Let me find eight. Eight is not a good one. Let me find something that is -- okay, go to 19, column 19.





Q. All right.
A. Okay. What that says is that we received a bid or a plug or something from Diamond Supplier. You see the word FOB right below that?
Q. Yes.
A. Well, let me start from -- Diamond, who is who we received the bid from, column 19 is the column that controls this one which now we call it tab. Those numbers are a complete description of what he's bidding on. FOB is he's not installing it, so the labor to pick up that installation has to be someplace, and rather than carrying labor in a lot of places, we combine it and that becomes the base. So, in other words, if a subcontractor or a supplier excludes the installation and it only affects the division, if you look at 19 -- let me show you another one. Okay, go to columns 29, 30 and 31. You see how those are labeled FOB?
Q. Yes.
A. That means that, okay, in this particular case it looks like we -- under Marker Board we probably put in a plug. Again, based on today's standards, I would have been a lot more clearer than that thing, but more than likely, it says WCC, I put in a plug for $2,800, for buying the marker boards. Now we have that to install those marker boards and, therefore, the installation of the marker boards is buried in the base rather than carry out the labor and put it in a



f761483e-62cc-4dc4-9c93-294e61cfc12a

bunch of places, we put it all in a central, if you want to call it that, dumping point for labor.
Q. So would that be self-performed West Coast work under that Base column?
A. That is correct.
Q. I think this might be my last question on this document. Could you just turn through the pages and besides JBK, alert me to any subcontractors that West Coast did not use on the project?
A. You want to -- you know, without looking at the subcontract list, my memory is not that great, I can't. I can tell you -- no, I can't. I can tell you some of them we used, but I can't go column-by-column and give you an accurate answer. I can't.
Q. That's fine. That's fine. Who -- well, you said some of them. Is there somebody that's sticking out in your mind?
A. Yeah. For instance, column 15, WSP, they refused to enter into the contract, you know.
Q. All right. Who did West Coast end up using?
A. I can't remember the name of the guy, but it's a local subcontractor, you know.
Q. Anybody else?
A. Um, 21, Dynamic, we did not use Dynamic. They refused to enter into a contract. You know about JBK. Miracle and Newcom, they did not enter into contracts.





Q. Do you know why these companies refused to enter into subcontracts?
A. Um, in the case of roofing, um, by the time we finished the design, um, he felt that there was a tremendous amount of disparity between the design as called out in the specifications and the design we ended up with and he refused to enter into a contract.
Q. At his original price, I take it?
A. Oh, yeah. He would enter into the contract. I think he wanted $70,000.
Q. How much?
A. I think it was $70,000. He would have loved to have entered into the contract.
The drywall, I can't remember, but I know he did not enter into a contract, but I do not remember the reason. I don't remember the reason that JBK, um, Miracle, I can't remember the reason. And Newcom, um, I can't remember the reason, but I know that they didn't end up doing the job.
Q. So the only one you remember the reason was the roofer, which was column 15?
A. Yeah -- yes.
Q. And so their bid price was approximately $21,000 and they wanted approximately $90,000 to do the work?
A. Approximately. No, approximately $50,000 more, so $70,000 total.





Q. So they wanted $70,000?
A. Which would have been $50,000. And the only reason, I kind of pleaded with the guy, "Come on, come on," and he basically -- somebody at work told me no, no, no. And I pleaded with that one.
Q. So, I'm sorry, you pleaded with him, but he still said no; is that what you're telling me?
A. Right.
Q. Okay. Do you recall who West Coast actually used? Did you already say that?
A. No. Other than the only thing I know is it's a more local guy.
Q. Do you recall if you were able to find somebody to do it less than the $70,000?
A. No, we ended up paying the $70,000.
Q. Oh, you did?
A. Yes.
Q. Okay. I think I -- I think I can probably answer this question for myself, but if it costed you the $70,000 anyway, why not just stick with WSP?
A. Because he refused it.
Q. But he refused it at the $21,000, but he didn't refuse it at the $70,000, did he?
A. I can't answer that question. I know there was a reason, but I can't -- you know, there had to be a reason.





Q. We were talking about Merritt + Pardini before lunch. I'd like to talk about them again now. Mark this as Exhibit No. 73, please.
(Exhibit No. 73 marked for identification)
Mark this as Exhibit No. 74, please.
(Exhibit No. 74 marked for identification)
Mr. Ramirez, take a look, but I believe Exhibits 73 and 74 are essentially the same documents, but with different handwriting on them?
A. Correct.
Q. Do you recognize -- take a look at 73 first. Do you recognize the handwriting at the top where it says June 6, 2001?
A. No, I do not, but I can explain these documents to you, if you want.
Q. Sure, explain away.
A. Okay. What happened? Is 74 is the first one? Okay.
Q. Okay.
A. You've got them labeled, but 74 is the first one in the -- I don't know if it's the time chronology, this is the first one, and this is the document that I received, and this is the document that went into the proposal to the Navy.
Q. I see.
A. Number $240,150. We went over this thing. We asked questions about it, you know, put it into the system. This

is the number we went by. I don't know when, but somewhere after that -- and when you see a fax right there, we received this other document when we were informed that they had made a mistake and that $5,000 should have been added to this column, the $28,600 should have been added to this column, and the $20,900.
Q. You're on 73 now?
A. Yeah, I'm on 73 now. And you see the three numbers that are circled?
Q. Yes.
A. Okay. Those numbers should have been added to this, to this column. In other words, the $240,000, if you look at 74, it totals up to $240,150. Okay? If you add up 73, it is short by the $5,000, plus the $28,600, plus the $20,900. The clerk, whoever typed this thing, made a mathematical -- made a typographical mistake and they essentially came to me, Merritt + Pardini, Scott Harm, said we screwed up. Okay. I'm not sure if it was Scott Harm, but somebody from Merritt + Pardini said, "We screwed up; we left those numbers out." And I said, "Well, it's too late. I went to the Navy with this number. That's what's in the system and now you're coming up with this number for the system?"
Q. So what did you tell Scott Harm when he told you that his price was too low?
A. I believe we ended up paying him, and I can't remember, but





I don't know if Tracy can help me with this, but we ended up paying part of the difference, recognizing the fact that they made a mistake, but we maybe should have added the columns. And, again, you asked me what do I learn from these things when we receive these things? What we do now, we have somebody in the office add these up because this has happened a couple of times. But we ended up paying them I believe 50% of the difference, you know.
Q. Well, I'm going to -- I think I may just skip ahead because I have some documents on that and you've kind of anticipated what I was going to ask. Well, let me just -- I'll get back to that in probably about two minutes. Let me just sort of stay in order here. Exhibit 75, please.
(Exhibit No. 75 marked for identification)
Let me just ask you a simple question first. Exhibit 75 is a letter from Merritt + Pardini, but this time it's not from Scott Harm. It's from somebody by the name of Robert S. Berman. Was he somebody that you were dealing with frequently at Merritt + Pardini?
A. No.
Q. Now, this is apparently attempting to negotiate some of the terms of the contract between Merritt + Pardini and West Coast. Do you agree with my reading of the letter?
A. Yes.
Q. And -- and I'm not sure if we ever received a contract with





-- between Merritt + Pardini and West Coast that's actually this detailed, so that it has paragraph -- or Section 7.0 and 8.0 and 9.0. There's actually a pretty simple Purchase Order. Does that -- you're nodding your head. Does that square with your recollection?
A. Yeah. You have that Purchase Order right in front of you.
Q. I do?
A. When you look at 7.0, 8.0, 13.0, if you look at the next page, there should have been a second page to that.
Q. Okay, 76, you're saying there's a reverse side to 76 or there's a second page?
A. Um, oh, God, I can't remember if it's a reverse side or a second page. I can't -- you know, I've signed hundreds of these things and I can't remember. Can I ask Tracy on that one?
Q. Um...
A. Do you mind?
Q. No, I don't mind.
A. Tracy, two pages?
MR. HIEBER: Two pages.
THE WITNESS: I sign them every day.
BY MR. O'CONNELL:
Q. So there's a second page and that's a standard West Coast -- let me just back up for a second, just so I'm completely clear. So there's one further page that sets out the terms





and the conditions of the Purchase Order between West Coast and Merritt + Pardini, correct?
A. You're correct.
Q. And is this Purchase Order a -- well, what is it? Is it a special Purchase Order that West Coast has developed for contracts with architects or designers or what is it?
A. It's a Purchase Order when we're buying materials which are FOB, not installed, and/or we use the Purchase Order for professional services, because professional services are exempt from, you know, the Davis Bacon, a lot -- a lot of things which you do not accept as a subcontractor, so that's why we use this thing.
Q. So, I mean, going back to 72, the spreadsheet of the bid, you're saying that it's the same Purchase Order that you'd use from -- for these subcontractors where there's FOB listed in the column?
A. Correct. In other words, if you were to look up I think -- remember 19, we mentioned 19, Diamond?
Q. Um hum.
A. They would get a -- they would get the same thing.
Q. I see. Is that still West Coast's practice for contracting with architects or designers on a design/build project?
A. That is correct, and it's never -- it hasn't failed, or with suppliers, it's never failed yet.
(Exhibit No. 76 marked for identification)

Q. I don't think we've seen a fully executed copy of Exhibit 76. Do you recall ever seeing one?
A. (No answer).
Q. Seventy-six is the Purchase Order with Merritt + Pardini?
A. You know -- you know, Mr. O'Connell, I think that was one of -- I don't think they ever had one, a fully executed. I think they did -- I think you're bringing that up right now, that one that they marked up all over the place, yeah.
Q. Well, right. Okay, it's -- there is -- there is one. We haven't seen one for the $240,000. I think that's it.
So let me move on and show you, mark the next document, and then we'll get back to what we were talking about a few minutes ago. Exhibit 77, please.
(Exhibit 77 marked for identification)
All right. Now, Exhibit 77 is, I believe is a document that's consistent with what you told me before, a few minutes ago, which is that Merritt + Pardini writes to you on October 26th, 2001. And then in the last full paragraph on the first page of the letter Mr. Harm states that: "In one of our recent conversations, you mentioned that you were aware that some fees were mistakenly not included in your proposal to the Navy. I understand that the cause for this confusion is based on the fact that some numbers in our original proposal (attached) shifted out-of-column and were therefore missed in the





administrative process of submitting the proposal."
Is that what you were referring to a few minutes back?
A. Yes. Essentially what I told Scott, you know, whether it was, you know, this letter to this letter to this letter, I said, "It's too late. I mean, our number has been submitted to the Navy. I can't go back to them and change it, you know, just because somebody in your office typed your numbers in the wrong column." But, again, we ended up paying them I think half of it.
Q. All right. Let me -- let me show you -- let's mark this as Exhibit No. 78.
(Exhibit No. 78 marked for identification)
Take a look at Exhibit No. 78. And maybe, in fact, it would be helpful if you went back to 73 and then see if you can explain how the numbers correspond.
A. They don't. This thing never made any sense. When they came in, I told them, I mean, "I'm literally taking this thing and sticking in the garbage can," that's what I literally told them. They do not correspond.
Q. Oh, I see. So you never approved of --
A. No.
Q. -- Exhibit 78?
A. I'm getting ahead of you. No, because when this came in, I don't remember the exact words, but I think essentially it





was, "I'm taking this thing and, you know, throwing it in the garbage can. I'm helping you already on a mistake you made. You know, no, I'm not accepting any more terms, period."
Q. So you think that the final price of the contract between Merritt + Pardini and West Coast was then halfway between approximately $240,000 and approximately $294,000?
A. Yes. And you should have -- behind this thing, when you guys went through discovery, you should have had something that was behind that thing which gave them the Change Order, so you should have had something. And I believe that Change Order No. 1 was -- or 2 or 3, I'm not sure which one it was, it was something addressing that, you know, those numbers that were missed and picking up half of that. You should have had that.
Q. Well, I'll just -- probably the reason why we don't have it is that when we got the documents from West Coast they were on a CD and a lot of the documents, they were -- the first page was separated from the second page, so we may just not -- assuming that it was produced, as you seem to be saying --
A. Okay.
Q. -- we just might not have known to attach it to this. But can you tell me if there's a -- let me back up a second. Remember a couple of minutes ago I asked you if there was a





signed contract between West Coast and Merritt + Pardini, and you saw that I had here what was the document which became Exhibit 78 and you said, "Oh, you have it there." That's why I was confused a minute ago. So, 78 is not the contract between Merritt + Pardini and West Coast. Is there a signed contract out there somewhere that has a price somewhere in-between $240,000 and $294,000?
A. Yes.
Q. Okay. Because I don't think we've seen that.
A. You should have received a Change Order and -- and a -- I know it exists, I don't know where it is, but there should have been a Change Order which took this price, $240,150, which is in your Exhibit 74, and I believe half of the distance on that. And there should be a document saying this is all we're doing and then that's what we base the, you know, the payments on. Now, I'm not a lawyer, but I'm going to play lawyer for a couple of minutes.
Q. Sure.
A. Once we sent them that and we started issuing payments, you know, as far as I was concerned, they accepted those terms once they were issued the payments and they started working based under those terms. When this came in, which you labeled 78, I essentially told them to throw it in the garbage can. I had already modified this thing on an earlier thing and they had already accepted it because they

started to work, one. And, number two, they accepted money on it. Does that make sense?
Q. Yes.
A. Okay.
Q. Make this Exhibit No. 79, please.
(Exhibit No. 79 marked for identification)
Mr. Ramirez, have you seen Exhibit No. 79 before?
A. No, but I know what it is.
Q. What is it?
A. Um, it's a Long Form Purchase Order which this is -- this is what we call the green sheet which we hand write this thing.
Q. This meaning page two?
A. Yeah. This is the green sheet. And then we hand write this thing and then it gets typed out of this. Out of this piece of paper, we type up this piece of paper, you know, the actual Long Form Purchase Order. This is just the rough draft that we use the form. And what this was, this was paying AHBL for the -- their consulting for the concrete problem we had.
Q. I guess what I'm interested in is why -- why enter into a contract directly with AHBL where the relationship was already structured? West Coast had a contract with Merritt + Pardini and Merritt + Pardini in turn had a contract with AHBL.
A. It was done at their request. That's what I recollect.





Q. It was done at whose request?
A. Um, Merritt + Pardini's and HBL -- AHBL, but I can't -- that's all I remember, it was done at their request. You would have to -- I would have to go to Tracy on this one. Again, if you don't mind, if I could ask him?
Q. That's okay.
A. Okay.
Q. Prior to bid, did you actually meet Scott Harm or did you just simply talk to him over the phone?
A. Um, God, I can't remember. I can't remember.
Q. Do you recall approximately how much time you spent talking to him?
A. Oh, I would consider it a lot.
Q. How frequently?
A. I -- I -- you know, oh, Mr. O'Connell, I can't remember exactly, but I can tell you a lot. I can't really remember. I mean, you know, because I -- once again, it's just my nature, you know, you know, it starts out with his mom and his dad and crap like that and I can tell you if I learned something about his mom and his dad, it was more than just a one-minute conversation, you know. And by the time I met him, I knew something about his parents and what he'd done and where he lived and he was married and had two kids and etcetera, etcetera, etcetera.
Q. Let me see if I can -- I can go at it this way. If we saw





that the -- remember at the beginning of the afternoon session we saw the Commerce Business Daily announcement --
A. Um hum.
Q. -- was in --
A. Um hum.
Q. -- November of 2000, and the award was June 29th of '01? Where in the -- when in that time frame would you have first gotten in touch with Merritt + Pardini, or vice versa, they got in touch with you?
A. I would say as soon as the plan holder's list developed in a -- in a, you know, serious format. In other words, if the job comes out, you usually wait about a week to two weeks before a plan holder's list is firmly developed, you know, and then we usually request it and then usually that's when the phone calling starts, you know, the sub-to-sub, general contracting suppliers, etcetera, etcetera.
Q. Okay. Now, when you say -- I mean, I'm just trying to get a rough idea. When you say you talked to him a lot, does that mean like five times a morning or five times a week or what?
A. I'm not trying to evade your question, but I can't -- all I can tell you is that I did talk to him a lot by the fact that, again, you know, I know he's got two kids and I know he, you know, he likes baseball, football, whatever the hell it is, and you don't get to know that type of depth about a person unless you have a lot of conversations. And I, you





know, and I know that I didn't sit around and just B.S. about family; there had to be some business.
Q. Do you know what the name of the company is that Scott Harm is at now?
A. No, I do not, hum um.
Q. Okay. I'm drawing a blank on it as well, we'll find out tomorrow for sure. But would I take it that you haven't done any further projects with Scott Harm?
A. No, we have not.
Q. Any particular reason?
A. No, we just -- we just haven't, you know, we just haven't because we haven't bid -- uh, you know, we have not bid any -- any more design-builds, and so that's -- that was his primary function, to help us with that.
Q. Let's see. Let's go off the record for a second.
(Counsel talked off the record)
Back on the record. I think the name of his firm is Belay or Belay Architecture?
A. Yeah, that sounds familiar.
Q. Okay. Other than this issue with respect to the contract price with Merritt + Pardini, how did you assess Merritt + Pardini's performance on the project?
A. Tolerant.
Q. Tolerant?
A. Yeah.