APPEARANCES

For the Plaintiff: MR. WILLIAM C. DAVIS, III
Attorney at law
11921 Rockville Pike
Rockville, MD 20852-2743
bdavis@srgpe.com

For the Defendant: MR. MICHAEL N. O'CONNELL
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Michael.o'connell@usdoj.gov

Also Present: Mr. Stephen A. Weathers, P.E.
(Capital Project Management)
Mr. Tracy Hieber, Project Mgr.
(West Coast Contractors)





INDEX


| Examination by | Page Nos |
|---|---|
| MR O'CONNELL | 138-195 |
| MR DAVIS, III | None |


EXHIBITS

| Exhibit No | Page Marked | Description |
|---|---|---|
| Exhibit No 63 | 11 | 1-pg Award of Bid, dated 6-29-01 |
| Exhibit No 64 | 17 | 1-pg Fax Transmittal of 5-11-01 |
| Exhibit No 65 | 18 | 1-pg letter of 5-24-01 |
| Exhibit No 66 | 29 | 1-pg Letter of Transmittal of 4-26-01 |
| Exhibit No 67 | 33 | 1-pg Helix letter of 4-4-02 |
| Exhibit No 68 | 39 | 1-pg Letter of Transmittal of 4-26-01 |
| Exhibit No 69. | 56 | 1-pg Commerce Business Daily ad |
| Exhibit No. 70 | 62 | 1-pg Mt Rose letter of 8-31-01 |
| Exhibit No 71 | 62 | 1-pg Mt Rose letter of 8-7-01 |
| Exhibit No 72 | 68 | 13-pg spreadsheet |
| Exhibit No 73 | 85 | 2-pg Merritt + Pardini memo |
| Exhibit No 74 | 85 | 2-pg Merritt + Pardini memo |
| Exhibit No 75 | 87 | 2-pg Merritt + Pardini letter |
| Exhibit No 76 | 89 | 1-pg West Coast Purchase Order |
| Exhibit No 77 | 90 | 2-pg Merritt + Pardini letter |
| Exhibit No. 78 | 91 | 1-pg West Coast Purchase Order |
| Exhibit No 79 | 94 | 2-pg West Coast letter |
| Exhibit No 80 | 109 | 2-pg Solicitation, Offer & Award, dated 12-11-00 |
| Exhibit No 81 | 110 | 2-pg Solicitation, Offer & Award, dated 12-11-00 |
| Exhibit No 82 | 114 | 2-pg FAR guideline excerpt |
| Exhibit No 83 | 115 | 2-pg Construction Schedule |
| Exhibit No 84 | 120 | 1-pg e-mail West Coast e-mail |
| Exhibit No 85 | 122 | 4-pg Merritt + Pardini fax |
| Exhibit No 86 | 127 | 1-pg notes re Settlement |
| Exhibit No 87 | 129 | 1-pg West Coast letter of 10-14-02 |
| Exhibit No 88 | 130 | 3-pg Merritt + Pardini letter of 11-8-02 |
| Exhibit No 89 | 136 | 1-pg M&P Bullet Points |
| Exhibit No 90 | 145 | 5-pg Settlement Agreement |
| Exhibit No 91 | 148 | 5-pg West Coast letter of 11-22-02 |
| Exhibit No 92 | 156 | 2-pg Memorandum |
| Exhibit No 93 | 159 | 1-pg C-5 Grading Plan |
| Exhibit No 94 | 168 | 1-pg Blue Mountain Fax |
| Exhibit No 95 | 169 | 1-pg Blue Mountain Fax |
| Exhibit No 96 | 170 | 1-pg West Coast letter of 7-17-02 |





BE IT REMEMBERED that on the 24th day of April, 2007, at 700 Wells Fargo Plaza, 1201 Pacific Avenue, Tacoma, Washington, before CATHERINE M. VERNON, CSR# VERNOCM398L4, Notary Public in and for the State of Washington, appeared MARIO RAMIREZ, the witness herein;

WHEREUPON, the following proceedings were had and done, to wit:

* * * * * *

MARIO RAMIREZ, having been first duly sworn by the Notary previously, deposed as follows:

EXAMINATION

BY MR. O'CONNELL:

Q. Mr. Ramirez, you understand you're still under oath, right?
A. Yes.
Q All right. Could you grab Exhibits 86 and 88, please?
A. (Witness complies). Okay, I have 86 and I have 88.
Q. All right. Let's focus on Exhibit 86 for a second. Line two, "split difference," the $27,250, that is what's issue one in Exhibit 88, correct?
A. Yes.
Q. And then on 88, issue two, "Reimbursable Expenses," $17,000. Does that appear anywhere on this spreadsheet?
A. Yes, I believe it's item -- line 13, but the amount is different.





Q. I saw that, that's why I was wondering if it was the same.
A. Yeah, I think it's the same thing, but I think it's a different amount.
Q. Do you have any idea why it would have gone up to $35,000?
A. No.
Q. All right. Issue three in Exhibit 88, I take it that's what is line 11 in Exhibit 86?
A. Correct.
Q. Um --
A. But again, the amount doesn't agree and I can't figure it out.
Q. Well, it does. It apparently agrees with the amount that's in Exhibit 88, because Exhibit 88 says $20,500.
A. Yes, but it --
Q. You're referring to the other REA that says $37,500?
A. That went to Bert. It does not agree with that amount.
Q. All right. What about issues four and five, did -- did some request for additional payment for Construction Administration services from Merritt + Pardini remain pending as an issue?
A. No. What I -- what I remember out of this thing, and what I remember out of this thing is purely memory, is that at one point either Scott or several other people had assumed they had to make a visit every -- biweekly or something like that, and it turns out that, you know, after meeting with

the owner or something to that effect that it turns out they only had like a, you know, monthly visit. There was some difference in the degree -- in the amount of their visits and therefore, they said okay, if you're not going to force us to do this biweekly or whatever then, you know, we'll take that into account. And I think that was just kind of stating that in a different manner. That's what I remember out of this item four.
Q. All right. But I guess what I'm thinking about is if you look at item five, the second sentence: "Further Construction Administration requests will be for an additional cost." Was there ever any kind of request from Merritt + Pardini for additional payment for that Construction Administration?
A. I'm sure there were verbal exchanges, but I don't remember anything in writing.
Q. Now, in 88, number six is the "Maintenance and Operations Manual." And Merritt + Pardini states that they're requesting an estimated cost of $35,000. In Exhibit 86, line 15 is OMSI Manual. It says: "(Effort credited back to Contractor)," and then in parentheses "($8,050)." What happened there; do you recall?
A. No, I do not.
Q. Did the Navy delete the requirement for the OMSI Manual?
A. I don't know that one.





Q. Okay.
A. I don't know. That one is a little bit -- you know, I don't know.
Q. Do you know if Merritt + Pardini ever completed the OMSI Manual?
A. I don't know that either.
Q. On Exhibit 86 down in the bottom left-hand corner there's a handwritten note, "less VS drive." Do you know what that is?
A. I believe we have to go back and adjust a -- one of the components which controlled the heating and/or the cooling, I'm not sure, and it had to be adjusted and it had to be adjusted because there was a, if I'm not mistaken, a design error and we had to expend that money.
Q. A design error by Merritt + Pardini?
A. That is correct. That's my recollection of it.
Q. VS is variable speed?
A. Yes.
Q. All right. Mark this as 90, please.
(Exhibit No. 90 marked for identification)
Were you the one, Mr. Ramirez, who negotiated this document that's Exhibit 90?
A. I did it, but Tracy was also involved on this.
Q. All right. Going back to Exhibit 86, the way I understood Exhibit 86 was that this was some kind of an analysis that





was done by West Coast heading into these settlement negotiations with Merritt + Pardini?
A. That's correct. That's Tracy's analysis of how we should settle this thing.
Q. Right. And you ended up, if I'm reading Exhibit 90 correctly, settling for $36,000; is that correct, if you look on the first page under paragraph one?
A. Yes, correct.
Q. All right. Exhibit 86 seems to indicate that the settlement range is from a minimum of $16,078 to a maximum of $24,432. Do you recall why you agreed to settle it for $36,000?
A. Well, you know, when you sit down and frankly you listen to the other people's arguments, and when I go into these things, I really sincerely make an effort to listen to the other person's argument, not just mine. And it was in my judgment that we should settle for this amount. I can't remember exactly specifically why, but I -- you know, to this day I feel that it was the proper amount.
Q. If you look at the last page of Exhibit 90 --
A. Okay.
Q. -- you can see down on the bottom there's three handwritten lines. The first one says: "Parties agree that Krei is released from providing OMSI Manual."
A. I see that.
Q. Do you recall discussing that issue in connection with this





Settlement Agreement?
A. I'm sure I did, because it states it here, but I don't remember specifically, no.
Q. Going back to Exhibit 88 for a second, you see on page two of Exhibit 88 at the bottom: "My firm shows an outstanding balance of $87,571," and then above that they have breakout costs for the various issues. Did -- was this settlement for $36,000, was it a lump sum of $36,000 or was there some allocation of the $36,000 to the various issues that were open between West Coast and Merritt + Pardini?
A. No, it was a lump sum. It was not pro-rated to any one item. It was just a number that we came up with.
Q. Let me -- let's switch over and talk about the grade beam elevation claim, Mr. Ramirez.
A. Okay.
Q. Let me show you what's been previously marked -- oh, yes, let me show you what's been previously marked as Exhibit No. 15. Mr. Ramirez, can you explain to me what you found different doing the work as compared to what you believed when you calculated West Coast's bid for the project?
A. Well, without those sketches, it is not in here, but I made some sketches and I thought they were provided to you, but I made some hand sketches which were -- we held a meeting with the Navy which they were passed out as well as we drew it up on the board, just some hand sketches. And I think that's

the one that -- I thought it was part of this exhibit at one point.
Q. Let's go off the record for a second.
(Counsel talked off the record)
Let's go back on the record. Let's mark this as Exhibit No. 91.
(Exhibit No. 91 marked for identification)
A. Okay. What I did in a very simple way, I met with them and I met with several people.
Q. Who is them? Sorry.
A. Navy staff, and there was -- oh, there must have been five, six, seven, eight, nine, there was a bunch of people that I met with and essentially took these sketches and not only did I go through these sketches, but also drew them on a white board. And essentially they explained that sheet number one is -- is intended, what is shown and indicated on the drawings, without putting any dimensions, just a very rough draft, and it indicated if we went with that, what would have occurred. In other words, this is too indicated on the drawings typically as a condition.
Q. What page? I'm sorry, what page are you on now?
A. I'm on page one.
Q. Page one?
A. Okay, flip back.
MR. DAVIS: No, sheet one.





THE WITNESS: Sheet one.
MR. DAVIS: Down on the bottom.
THE WITNESS: I think you've got them out of order.
MR. O'CONNELL: No, it says page two at the top.
MR. DAVIS: No, that's what he's talking about.
THE WITNESS: Down here at the bottom.
MR. O'CONNELL: Yes, right here, sheet it. Sheet one, it says sheet one on mine.
MR. DAVIS: You're right.
THE WITNESS: Okay. This is as it was intended or indicated on the drawings and the typical details. Um, I think this is what I explained would have occurred if we followed the same -- the same elevation, elevations.
BY MR. O'CONNELL:
Q. So what's the difference between as intended and what would have occurred?
A. Well, I'm going to have to look at the drawings. I can't -- can I borrow your structural again?
MR. WEATHERS: Sure.
BY MR. O'CONNELL:
Q. Here you go; I'm handing you the structural drawings.
A. You know, to really answer this in a really -- in a pretty -- a way that's going to make sense, because these sketches made an incredible amount of sense at one point, and I would have to spend quite a few minutes or a few minutes, I'm not





sure how long.
When I did this in front of them, not only did it make a lot of sense to me, but it made a lot of sense to them, not everybody in the group but I'll say, you know, to four, five, or half of the people in the group, it made a lot of sense. Um, but I made a mistake that I didn't tie them into these. At one point I had, and it made a lot of sense, but I can't -- I can't -- I can't honestly look at them myself right now and make absolute 100% sense.
Q. If you look at Exhibit 91 -- let me -- let me just tell you one thing that I thought maybe, you know, you can at least tell me if you agree or disagree. If you compare sheet one and sheet three, you can see on sheet three there's a much longer wall there. Do you see that?
A. Correct.
Q. Is that sort of the heart of this claim, that that foundation wall had to be constructed by West Coast?
A. That is part of the claim.
Q. And can you recall any other parts of it?
A. Well, it -- not only does it relate to the stem wall being larger, but the excavation and all of that, you know. There's a lot of other components. If they're reenforcing everything, just in proportion it grows. I just cannot walk you through this problem right now --
Q. Sure.





A. -- and feel real confident about it where I could when I drew these sketches.
Q. Did you visit the site before bid?
A. Yes, I did.
Q. Did you take anyone from Merritt + Pardini with you?
A. I don't think so.
Q. Do you know if they visited the site independently of you?
A. I can't answer that, no.
Q. And how about AHBL; do you know?
A. I don't know.
Q. When you did the structural bid for West Coast, what drawings were you using; do you recall?
A. The structural drawings.
Q. And did you cross-check the structural drawings with any of the other drawings?
A. Well, on a general basis, but not a specific basis. In other words, we make sure that -- on a general basis, yeah, there's some things we checked, but I -- I know on a general basis, yeah, but I'm not sure. Why don't you ask the next question.
Q. Were you the one who determined how deep the excavation would be?
A. On the actual versus the --
Q. No. No. When you were doing your bid.
A. I went per the -- per the structural drawings, yes.



0d463623-640c-4e88-ba10-19365542315c

Q. So you were the one that did it?
A. Yes, I did, yeah.
Q. When you went on your site visit -- or let's -- let's back up for a second. So when you did the bid, did you assume that the site was level, the existing site?
A. Um, was it level? There was some slope to it, but not significant, no. I need to back up a little bit. Don Tranberg did the estimate on the civil side, so he determined the -- anything related to any earth work or any grading, he did that because this was self-performed, so Don Tranberg would have done that.
Q. He would have done the bid?
A. He would have done the bid on the earth work. In other words, he would -- he was -- he's the one who would have determined how deep to excavate the footing; I would have determined how deep to make, you know, the size of the footing.
Q. You would have determined how deep to make the size of the footing?
A. No, I would have determined the dimensions of the footing, width, length, thickness. He would have determined the depth of the trench to place that footing.
Q. And can you spell Don's last name?
A. Tranberg is T-R-A-N-B-E-R-G.
Q. Is he still with West Coast?





A. No. He is at Sierra Nevada Constructors.
Q. Oh, okay. So he was -- was he with Sierra Nevada at that time as well?
A. No, he was -- this was self-performed, so he was working for us at that time.
Q. Well, do you know if Mr. Tranberg looked at any of the other drawings to see the -- what the existing elevations on the site were?
A. I assume that he would have, yes.
Q. Going back to Exhibit 91 for a second -- well, first let me ask you a question. Did you understand that the new building was to be constructed at the same elevation as the existing building?
A. Yes.
Q. All right. If you go to sheet one of Exhibit 91, which is -- yes, you have it right there. On sheet one of 91, how much of a change in elevation could there be at the project site in order to be able to construct the foundation the way it's shown on sheet one?
A. I can't answer that question. I can't.
Q. What would you need to be able to answer that question?
A. I would have to go to Don Tranberg.
Q. Would you agree with me that you need to review both the civil and the structural drawings to assess the work for a foundation?





A. No, I would disagree with you. Normally what is shown, if -- if this is going to vary, okay, if this foundation is going to vary, what you normally see in the drawings, you will see a notation there that that depth is going to vary. You'll actually see the two arrows pointing from the top to the bottom with the little notation saying will vary or varies; there's several wordings that are used.
Q. On the structural drawings?
A. Yes. In other words, you'll see the -- sometimes you'll see the elevation, you'll actually see it, and instead of giving you a fixed dimension, say it's 4-foot, five-foot, three-foot, whatever it may be, you'll see no -- no elevation and what you -- instead you will see the notation will vary or varies or something to that effect.
Q. If the civil drawings showed a difference in elevation of three to 3-1/2 feet from the existing site to the finished elevation of the building, would that -- wouldn't that indicate that you would have to construct the foundation wall that you actually did construct?
A. Not necessarily. Again, if -- if that is the case, then you would see that notation on the drawings, you know. Again, you would see -- instead of seeing a -- a fixed, and I'm just picking this detail because I have nothing. Instead of seeing a fixed dimension, you will see some note there indicating that it's going to vary. And then you have to go





back and then I would go back to Don Tranberg and ask him, "How much is it going to vary?"
Q. Well, at least for the work that you did on this aspect of West Coast's bid, could you explain to me any differences in your method of bidding the work for this project as compared to a standard Design/Bid/Build project?
A. We generally rely upon the same notes unless the notes differ. I don't know if I would -- I don't know if I would do it that different, unless the notes indicated something that is -- that is going to be different. I'm not sure if I'm answering the question.
Q. Did you -- when you were building -- when you were bidding the project and you were calculating the bid for this aspect of the work, were you discussing that bid with either Merritt + Pardini or AHBL?
A. No.
Q. Mr. Ramirez, take a look at Exhibit 15 for a second.
A. (Witness complies).
Q. On the third page -- let's see, one, two, three, the fourth page, down on the bottom, there's $7,140 listed for AHBL there. Did West Coast pay that?
A. Give me that one more time, where it is.
MR. DAVIS: All of the way on the bottom.
BY MR. O'CONNELL:
Q. Right there.



0d463623-640c-4e88-ba10-19365542315c

A. You know, without asking somebody in accounting, I wouldn't know.
Q. Let me mark this as the next exhibit.
(Exhibit No. 92 marked for identification)
Now, Mr. Ramirez, Exhibit 92 is a Navy memo, but it appears to describe a meeting between West Coast and the Navy on November 13th, 2002, concerning the foundation elevation change issue. Do you recall that meeting?
A. I believe this is the meeting where the sketches, is this the same one? Are we talking about the same meeting?
Q. Well, your -- Exhibit 91, which I believe is what you were just pointing to --
A. Um hum.
Q. -- that's a letter dated November 22nd. And if you look at the second page of Exhibit 92, at the top there it says: "Ms. Norgaard requested Mr. Ramirez provide an addendum to his REA providing a further explanation on how his calculations were derived and to what extent he relied on the 35% drawings provided with the R.F.P."
Is it -- does that tell you anything?
A. You know, do I remember this meeting exactly? I do not. I don't -- don't remember, but I would agree with a lot of what she's stating in this thing, you know. I agree with a lot of points that she's making or that I made up, I do -- I would agree with. The "civil costs and structural ... were





worked up independently." That's pretty much what I said; Tranberg took the civil, I took the concrete.
Uh, "Did not find out there was a problem with the elevation until the bills for the plywood were received." I don't remember that.
Um, "Also became aware of the elevation change when the caissons were drilled." I became aware of that.
Um, "A/E knew of the elevation change in October." I don't remember that.
"Used a -4-foot elevation in back of building and a -1-foot elevation in front of building." As I told you, there was some slope, that makes sense, because there was a slight amount of slope.
Um, I don't know about: "Used 15 foot to 30 foot in each direction." I have no idea what that is.
Uh, "Elevation change affected footings and grade beams," yes, they did.
"Top of footing would have been above the paving." I believe I brought that argument.
"... at a site" -- I did bring up the -- one of the questions that came up, "Why didn't you survey? Would you, you know, survey this building prior?" And I said, "No, that's a competitive bid. It's cost prohibitive to go out there and survey a building prior to a bid. You have to assume that somebody did and that's why the 30% drawings,





35% drawings."
"WCC believes that the 35% drawings contain 80% to 90% of the calculations." Yes, I still believe that.
Um, we relied on owner elevations shown on the drawings, yes, I still believe that.
That I assumed that the "owner developed the grades and information is correct," yes, I did.
The design team did not attend the site walk-through, I think that's what that is supposed to state. Um, as I stated previously, I don't remember if they did it or not. Again, pretty much when we go to a site walk, we check for, you know, overhead access to the job, what's -- you know, any access, how are we going to get in and out and that type of thing. We do not check for grades. We rely upon the civil drawings that are provided to us.
Q. I'm sorry, what did you rely on the civil drawings for?
A. We rely upon the drawings, not civil, on the drawings that are provided to us, not specifically the civil; the drawings, we rely on that information is correct.
We used Drawing S-7. Did I use the drawings on S-7? Yes, I did.
So what I remember, I don't remember this, I would agree with most of the thing, that I would -- I would say yes.
Q. Do you recall if any of the elevations shown on the civil





drawings were incorrect?
A. I don't recall that, no.
Q. Do you know when the caissons were installed on the project?
A. I know it was very early in the stage, you know, but I don't know the exact date, but very early.
Q. My understanding is that the caissons were installed in January of '02 and what I'm curious about is why West Coast waited until October of '02 to submit the claim?
A. I can't answer that.
Q. Mark this as the next exhibit, please.
(Exhibit No. 93 marked for identification)
Mr. Ramirez, we've given you drawing C-5 as Exhibit No. 93. Please take a look at it and tell me if you recall reviewing Drawing C-5 before?
A. No.
Q. You don't recall or you never reviewed it?
A. No, I don't recall reviewing this or even seeing this, for that matter.
Q. Okay. For the statement on Exhibit 92, you see these arrow bulleted points, the fifth one down: "Used a -4-foot elevation in back of building and a -1-foot elevation in front of building"?
A. (Nodding head up and down).
Q. What exactly does that mean: "Used a -4-foot elevation in back of building and a -1-foot elevation in front of



0d463623-640c-4e88-ba10-19365542315c

building"? Does that refer to the height of that foundation wall?
A. I would say so, yes. If I'm not mistaken, this drawing you keep referring to, if I'm not mistaken, is the survey drawings after -- after the bid, you know, prior to construction.
Q. Well, take a look.
A. It's on the drawings? Okay.
Q. Take a look at the date on the right side. It's in the middle. It's turned sideways.
MR. DAVIS: It's right there. That's the date.
BY MR. O'CONNELL:
Q. Yes.
A. (Witness complies). I did look at it.
Q. Okay. So do you agree that these are the R.F.P. drawings or one of the R.F.P. drawings?
A. I'm not sure. I do not recollect this drawing, period.
Q. Would -- going back to Exhibit No. 92 for a second, would the -- would the foundation wall based on the 4-foot elevation in the back of the building and a 1-foot elevation in front of the building work if -- (cell phone ringing) -- would that work if the front and back of the building were at approximately the same elevations?
A. If the front of the building was at the same elevation as the back of the building, would the --





Q. Could you have a 4-foot elevation -- a 4-foot -- a foundation wall in the back of the building using a 4-foot elevation, and a foundation wall in front of the building based on this 1-foot elevation?
A. I'm not following you. I'm not following you at all, period.
Q. Well, let me just ask -- let me see if I can just ask the question this way.
A. Okay.
Q. If the back and the front of the building were at the same elevation, approximately, could you -- would this statement make any sense, that you used a 4-foot elevation in the back of the building and a 1-foot elevation in the front of the building?
A. You know, I can't answer that question without spending some time. I -- I just need -- I need to spend some time. I can't -- I can't answer that question.
Q. Well, what would you need to look at?
A. Well, part of it, I'm not following your question. Uh, in other words, you're saying if the existing grade; is that correct? So let me take one step at a time. The existing grade, if it was the same grade in the front of the building, which is this, as well as the back of the building, so that's what I call the front and this is what I call the back. Okay, if the existing grade, if it was the





same, and then the question is how do I explain that 4-foot in the front -- the 1-foot in the front and the 4-foot in the back?
Q. Yes.
A. Okay. If the grades were exactly the same in the front as well as in the back, okay, would there be a need for a 4-foot in the back difference? No. I think that's what you're asking me, but I'm not sure.
Q. Well, let me see if I can -- let me see if I can ask you the question this way. The existing -- do you see on Drawing C-5 that the existing building, it's FF49.0, plus or minus. Okay. Do you see that?
A. Yes.
Q. That's FF is finished foundation?
A. Finished floor elevation --
Q. Finished floor?
A. -- 49.0.
Q. And then the new building is finished floor 49.0. And if you look at the back of the new building, it appears to be that the elevations are all around 46 feet, plus or minus, correct?
A. If those are existing grades, the smaller ones which you read, if those are the existing grades I am reading, um, 46.93, 46.0, 45.93, they vary a little bit, but the ones right next to the building, I mean, right next to the





building I am reading in the center of the building 46.85? This -- this one right here, I'm reading 46.85, this one right there. Are we reading the same ones?
Q. I see it, yes.
A. Okay.
Q. Why don't you -- why don't we circle that one. Here, I'll give you a pen. Circle it in red.
A. (Witness complies). Okay. So if I read that one, if I read that one at 46.85 --
Q. Um hum.
A. -- okay, and assuming that is the existing grade, okay, so the difference between the building and the existing grade is approximately about two feet, approximately.
Q. Well, if you look in here, though, you'll see that there's a couple that are a little under 46.
A. Yeah, there's a 46.93. It's hard to read these things. It's 46.93.
Q. I read them as 45.93.
A. Forty-five?
Q. Yes. Then if you look --
A. Okay, 46 rounded off.
Q. -- that one is 45.94.
A. I'm sorry.
Q. This one appears --
A. I read it --



0d463623-640c-4e88-ba10-19365542315c

Q. -- to be 45.94?
A. 45.94? I would say yes. I'd say almost 46, which is about a 3-foot difference between the existing grade and the finished floor elevation; am I correct?
Q. Right. So about a 3-foot difference. So in that light, if those are the elevations, that would be, you know, at least pretty close to in line with the statement in Exhibit 92 that used -- which states: "Used a 4-foot elevation in back of the building"?
A. Correct.
Q. Okay. Now, take a look at the front of the building.
A. That is hard to read, but I read that as 46.57. Would you agree or --
Q. Well, let's see.
A. I agree it's 46.
Q. I see the 46.57 in the front. And I'll point you to one that's -- it's near the point of that arrow, this 46.03?
MR. DAVIS: Don't write on it unless he tells you to.
THE WITNESS: 46.03, this one?
BY MR. O'CONNELL:
Q. Yes. And just underneath that is one, it looks like 45.98.
A. Okay. We'll say --
Q. Do you see that?
A. We'll say 46, okay.





Q. Okay. So wouldn't that indicate to you that you'd need a similar foundation wall in the back and the front of the building?
A. Because it's about a 3-foot difference in the front as well as in the back, yes.
Q. All right. I'll take that. All right. Thank you.
A. You know, but if you look at the -- at this point over here, the extreme, this corner of the building, all of a sudden I'm picking up 47, I believe I'm picking up 47.92, which is about 48, so that might have explained why I said one, because if you go to this corner, then it's only about a 1-foot difference at this corner. But I agree, if I go to this corner, the one you pointed out, there is about a 3-foot. I might have based it on this corner instead of this corner, I don't know, but here there's only about a foot difference here.
Q. Well, do you recall if you noticed when you went and did your pre-bid site visit, if you were looking at the front of the existing building and what would become the front of the new building, did you notice the slope of the ground?
A. There was a slope, but I have yet to see anybody, myself included, that can look at the site and tell whether -- you know, you can tell a dramatic difference, a 10-foot difference, you can tell a dramatic 20-foot difference, but can you tell the difference between a one and 2-foot





difference? No, I can't. Maybe somebody else can, but I can't.
Q. Sure. All I'm getting at really is maybe that there was a slope on the property so that the elevation on what would become the right side of the building was slightly higher than the elevation of what would become the left side of the building?
A. Mr. O'Connell, you're asking me to dig my mind into something after probably putting in 2,000 estimates between that one and this one. I can't -- I can't remember that, I honestly can't, but I can explain to you that there is -- in one end there's about a foot difference, so maybe I took that corner. I don't know.
Q. Okay. So you're saying -- are you saying now that maybe you were using this drawing when you were calculating West Coast's bid?
A. All I'm saying is that you asked me to explain something and I explained something that there was about a 4-foot to a 1-foot difference. And you're asking me did I explain that, yes, I explained that, that there was a -- you know, that I might have estimated a 4-foot in the back and a 1-foot in a different -- and that would explain it.
Q. Okay. So, I --
A. Did I use this drawing at the day that I bid this thing, can I remember that far back? No.





Q. Do you recall either way, if you had the drawing?
A. Oh, I had the drawing, you know, we had a full set of plans, but I don't remember sitting down and doing what I just went through with you.
Q. All right. If you look at Exhibit -- do you still have Exhibit 15 there?
A. Yes, I do.
Q. The second page of Exhibit 2, do you see the paragraph, not the indented paragraph at the top, the next paragraph down that begins with the words "the elevation changes"?
A. I read it.
Q. I see. The last sentence there states: "The impact to the construction schedule was a total of 28 days." Now, just a question, in the Certified Claim in the Complaint, this was not categorized as a delay claim and I'm just wondering why; do you know?
A. I can't answer that. You know, when these claims were put together on a general basis, on a general basis Jim and Tracy sat down and went over it with me on a general basis. Did they go on a specific basis and account for every dollar and every penny? No, hum um.
Q. All right. Do you recall -- you can fold, you can put those exhibits aside now, if you'd like. Fold that drawing up.
A. (Witness complies). That's Exhibit 15.
Q. That's mine, okay.



0d463623-640c-4e88-ba10-19365542315c

MR. DAVIS: Yeah.
BY MR. O'CONNELL:
Q. Let's mark this as the next exhibit, please.
(Exhibit No. 94 marked for identification)
Exhibit No. 94, Mr. Ramirez, is a -- appears to be a fax from Blue Mountain Steel to you. It appears that Blue Mountain Steel is upset about something here, but sort of can you explain to me in your words what -- what was going on between Blue Mountain Steel and West Coast on this project?
A. I don't know about this project, but I can tell you the general basis. Blue Mountain is, his name is Jim Blueberg is a -- became a very loyal subcontractor. He also became a personal friend. We've been fishing together. We've done a lot of things together. He's been to my house. I've been to his house. I know his wife Mary and all of that. Unfortunately, when you do business with a close friend, you run into disputes. When you run into disputes, emotions come up. And when emotions come up, that's when you see things that -- phrases like this: "I guess I just can't figure out people." "And you screw me around on my money." It happens. You're going to run into disputes. And unfortunately, when you mix a friendship with a -- with a business, you -- it's worse. You can't see eye-to-eye, you know. I -- again, you asked me, have I learned from things?





Yes. I tend to separate friendship now from business, because it happens.
And in this note, I can't remember the specifics, but I'm sure we ran into a predicament with Blue Mountain and I'm sure he wrote this note directed to me telling me that I'm screwing him around. I can't remember the specifics, Mr. O'Connell.
Q. Okay. Let me just show you a couple more documents and see if it helps you any more. This is the next exhibit.
(Exhibit No. 95 marked for identification)
By the way, going back to 94 for a second, 94, if you turn it upside down, you can see at the bottom, there's a fax date of May 3rd, 2002. Do you see that?
A. Yes, I do.
Q. Exhibit 95 is a little more than a month later. It's dated June 13th of 2002. In this one, Mr. Blueberg states: "I have called many times and have had no response from either of you regarding money, schedule, and change orders." Do you recall what's -- do you recall any better after reading that as to what the issues between Blue Mountain and West Coast might have been?
A. No, I do not. I can tell you this, though, again that these things happen and the main thing is that we resolved them eventually and we have resolved them with Blueberg. He's back as being a good subcontractor, a loyal subcontractor,





however you want to label it, you know, but these things happen all of the time. And in some cases they are right and in some cases they are wrong.
Q. So you said that this was resolved between West Coast and Blue Mountain?
A. Whatever issue was here, I can tell you that our standing with Blue Mountain right now, Jim Blueberg, it's a good one again.
Q. Is Blue Mountain, are they a manufacturer of structural steel?
A. They are a fabricator of structural steel and an erector of structural steel.
Q. Do they have -- do they have an erector working as a sub to them on the Naval Post Graduate School project called MDS?
A. MDS? I'm not familiar with MDS. I can tell you that on this job they -- they had a -- they sublet the erection to a -- they didn't do it themselves, not with their own work forces, they had somebody else, and I'm not sure what the name of that person was.
Q. All right. Let me -- let me see if you know anything about this. Mark this as the next exhibit, please.
(Exhibit No. 96 marked for identification)
Exhibit No. 96 appears to be a letter from Russ Young, West Coast Project Superintendent, to Blue Mountain Steel. You're cc'd on the letter, as is Mr. Blueberg. And





the letter complains in part about MDS erectors not showing up at the project site. Do you see that?
A. Yes, I do.
Q. Do you recall an issue of the steel erectors not showing up at the project site?
A. No, but again, as I explained to you earlier, once the job starts, unless it's a, you know, monumental problem or a problem with, usually with money as far as the payments are due, the payment is delayed, or a payment is not the regular payment, once the project starts, the problems become -- or the situations, whatever you want to label it, become an issue. And as I stated earlier, even when those letters are addressed to me, they bypass me and they go directly to the PM. That's the way we set it up in the company. Right or wrong, that's the way it's set up. So am I familiar with this letter? No.
Q. Let's move on to something else then. Mr. Ramirez, who at West Coast has to make a decision to assess liquidated damages against a subcontractor?
A. It -- it comes mostly from the PM but I think, you know, that in the final-final-final, I -- I'm probably involved.
Q. And you're aware, of course, that the government assessed liquidated damages against West Coast here of $40,600?
A. Yes, I am aware.
Q. And are you aware of any liquidated damages that West Coast

assessed against subcontractors on the project?
A. On this particular project? You know, Mr. O'Connell, there were some, but I cannot remember the particulars as to the amounts or which subcontracts, if any, but I know or I -- I think there were some, yes.
Q. Okay. Let me just -- let's go off the record for a second. I'm just going to run a copy.
(Short break taken)
Let's go back on the record. Let me show you, Mr. Ramirez, what's previously been marked as Exhibits 37 and 41. The question is: Based on these documents, West Coast appears to have assessed liquidated damages against KNC Drywall in the amount of $30,450, and Johnson Plumbing for $46,400. Do you see that?
A. Yes, I do.
Q. So my question is why would West Coast assess these liquidated damages against the subcontractors in an amount that's nearly double the amount assessed by the Navy?
A. I can answer that on a -- not on a specific basis without getting into a great deal of time, but the cost of running those jobs out there varies. Um, in other words, you asked me earlier what was division one when I was giving you that breakdown. And I said division one or we can call it indirect, the government I believe calls it something else, it is the cost of maintaining the job which is basically the





cost of the superintendent, the cost of the PM; there's a lot of variables that go into that. That number is a number that when we add all of that up and I've seen it range from a low of $300, and I believe we had a job for the Navy, as a matter of fact, in which it ran like $4,700 a day. Every day we -- we were out there, it ran $4,700 a day. I remember that particular one because I made the joke when you go to the bathroom and you sit there, you know, the minute you sit in the bathroom, you're costing us $75 a minute. I actually calculated it down to a minute.
What this may have represented, and I don't know because I would have to ask Tracy and Jim Miller, is that the costs that for every day that they extended this thing for us, this is not an LD in the sense of the government. It is a cost that is a real cost when we were out there every day. Sometimes it matches the LDs that the owner may state, very seldom. Most of the time it does not. Are you -- it is the cost of being out there. It is what we call an indirect cost.
Q. Okay. Well, let me ask you this. Why do you contend that West Coast -- well, let me just back up for a moment. I can show you a document, but I believe that the final contract completion date, taking into account all of the mods, modifications, was May 3rd, 2003. Does that sound right to you?





A. Sounds right, yeah.
Q. And the Navy -- the date that the Navy assessed liquidated damages based upon was May 30th of 2003; is that correct?
A. I think so.
Q. Okay. Now, do you have an explanation as to why West Coast required those extra 27 days to complete the project?
A. No, I do not.
Q. Do you recall if there was some issue with respect to the fire alarm?
A. I -- it was explained to me, Mr. O'Connell, at one point but, you know, can I get into specific details without stumping myself? No. Again, I have to rely on Tracy to explain that in detail.
Q. Let me show you a document that's previously been marked as Exhibit No. 36. Okay. Exhibit 36 appears to recount a meeting between West Coast and the Navy on May 1st, 2003, actually a conference call. And take a minute, if you'd like, to look at the Memo, but my first question is simply if you remember any such conference call?
A. I do remember the conference call.
Q. What was the subject of the conference call?
A. Well, my recollection of it, and without reading this thing, but my recollection is they called us to essentially tell us we're going to assess you LD's, liquidated damages. That was the gist, you know. And my memory of the conversation





is you're assessing it and it doesn't make sense because you can move the furniture in, you can move all of the -- all of the preparation the government has to do, there's a lot of things the government has to do, even from the day we turn it over, they still have to move furniture in, they still have to do this, they still have to post, you know, there's a lot of stuff that they normally do. You can do that. And they kept saying, "Well, there's a life safety issue." And, again, without reading this thing, I kept saying, "Well, you know, this is ridiculous because you can move the furniture in without having the alarm, and if you really insist upon that" -- uh, I believe that I said I would provide a person to stand there like a fire watch so they could still move in and not -- and save that time. That is my recollection of the conversation, you know. I think it ended up basically them saying we're going to assess it, period.
Q. Okay. Well, take a look at the Memo.
A. Okay.
Q. But do you recall an issue with respect to a pressure relief valve?
A. You know, I -- just vaguely, there was an issue with the pressure relief valve, but I was not involved in a minute-to-minute of that one, no.
Q. All right. The second-to-the-last sentence on the first page, the Memo quotes you as stating that West Coast has

taken over two subcontracts since the subcontractors were not cooperating?
A. Which paragraph is that?
Q. First -- first page, the second sentence from the end of the page.
A. Okay. And your question is?
Q. Do you -- well, do you recall making this statement that West Coast has taken over two subcontracts since the subcontractors were not cooperating?
A. Well, I believe, yeah, one was Johnson, because Johnson refused to work any further. Um, I believe, again, if I'm not mistaken, the PRV question was a question that came up that either it was not indicated on the drawings or it was vague on the drawings and Johnson refused to do it and we ended up -- I believe we ended up replacing the valve with our own workforces or hired another subcontract. So I think that's one of those people we are referring to. I'm not sure who the other one is.
Q. Okay. Take a look back at Exhibit 37, if you still have that handy.
A. Yes, I do.
Q. Okay. The back charges against Johnson Plumbing you'll see there do state: "Removed and did not replace existing steam pressure relief valve." Is that what you were just talking about?





A. I believe PRV and pressure relief valve is the same.
Q. Let me just show you what's previously been marked as Exhibit No. 44. Okay. On this copy of the document, there's no header, letterhead on the first page, but it's from somebody called Sheila Diduch?
A. Correct.
Q. Who is she?
A. She was the painting subcontractor.
Q. Okay. And let me -- it's a fairly long letter and you can take as much time as you want to look at it, obviously, but my first question just simply relates to the first page of the document. In paragraph one she states that: "On May 7th, 2001, I submitted my original bid for the building based on two finished floors and an unfinished basement per your correspondence of May 3rd of 2001. My bid was $45,000."
Then in paragraph two she states that: "In late June or early July, you contacted me by phone to advise that instead of a basement, the plan was now for an unfinished third floor. I agreed to complete the job for the same price."
And then on -- in paragraph five she then states: "Around October 15th, 2001 you sent me revised drawings which now showed a completed third floor."
Do you recall these discussions with the -- with





Ms. Diduch?
A. The only thing that I remember is that this was a -- one of those subcontractors that caused problems from day one. I wish I got rid of her from day one. Beyond that point, I -- you know, her -- not just this letter, but other letters and other phone calls, um, I was advised that they were just fabricated with holes, you know, which is -- I use that term when a subcontractor comes along and then starts barraging us with things that make absolutely no sense. And my only -- the only -- again, the only thing we do now when we run into this thing, we get rid of them immediately at any cost, and we found out that it's cheaper in the long run. That's what I wish I would have done with this lady.
Q. So do you recall what the specific problems that she was causing were?
A. Everything, you name it, paperwork, work, everything. I mean, this was one of those people that, like I said, if I now, that we would react to this nowadays, we get rid of immediately, when this first letter comes in, not the second letter, not the third letter.
Q. Did she delay the project?
A. You know, Mr. O'Connell, there were so many problems with her that it was just -- it was just -- you know, all I remember is Sheila or whatever her name is, oh, God, I wish I stayed away from her. We should have gotten rid of her.





My only recollection of that is bad memories, bad subcontractors, bad this, bad everything. It's nothing but a negative thing, everything, I mean, you name it, from -- from -- remember you asked me earlier, subcontractors, some of them send back the subcontract and they just -- it's just one of those things that --
Q. Yes.
A. She's a pain. We should have gotten rid of her.
Q. But just so I'm clear in your response, you can't remember anything specific that she did?
A. No, just everything. I mean, you name it. I don't think that -- let me put it this way. I don't think she did too many things right. She did an awful -- a lot of things wrong, including, you know, conversations and letters like this which were absolutely ridiculous.
Q. So just so I'm clear then --
A. Um hum, exactly.
Q. -- you don't agree with her, with her version of your conversations concerning the nature of the building that she provides on page one of the letter?
A. She was dead-ass wrong, starting from my name. I mean, dead-ass wrong. I mean, I can't -- you know, I mean, I've been in this business long enough.
Q. I didn't notice that.
A. There are people that you just wish you got rid of them the



0d463623-640c-4e88-ba10-19365542315c

first day and this is one of those people that I wish I got rid on the first day. It's just everything. I can't think of anything she did right. I never met the lady, I don't think I did, but I can't think of anything she did right from day one. I wish I got rid of her.

And I do not agree with, you know, the first two, three sentences that I've read, the first two, three, paragraphs. Do I agree with that? No.

Q. On the last page in paragraph 24 she's talking about a Change Order for $27,734.97. Do you recall anything about that?
A. No, I do not.
Q. What was the name of this painting company, by the way? Was it GD Painting?
A. GD something. It was initials something. All I remember is Sheila, Sheila, whatever her name is. It's just --
Q. Do you feel the same way about any of the other subcontractors such as KNC Drywall? In retrospect, would you have terminated them at some point during the project?
A. The one that I would terminate immediately if this thing occurred today? Sheila is the only one that I remember. There were other people that we had differences with, but would I terminate them immediately? No, I don't think so. I don't remember. There are people in the industry that cause problems, you know, and you -- and we learn this the





hard way. There are people that cause problems in this industry and the best thing to do and the thing we do nowadays, we get rid of them immediately. I mean, immediately.

We had one on -- on -- to give you an example, at the Reno Community Assistance Center, I brought them in. We interview the people now. We -- I interviewed them and during the interview it was my opinion he was going to cause problems. It was nothing solid. It was the best move. We got rid of them on the first day, we paid the differences, and it was a great project. Would I do the same thing to her? Yes.

Q. Let's switch topics again. You recall that one of the claims in the lawsuit is delays relating to the concrete issue. Do you know what I'm talking about?
A. Yes, I do.
Q. How involved were you in that issue when it was actually happening?
A. I was not, you know, involved in all of the details. The only thing that I made the comment, and I did speak with the Navy and I did -- I remember having a conversation that on the one hand they said you are totally responsible for the project. So I said okay, we've given you the cure for this, you know, defect, you know, and now that the cure has been given to you for this defect, you will not let us proceed.





You keep putting stumbling blocks and another stumbling block, and we submit this, and then another, another stumbling block. You know, I did have a conversation in which I pleaded with them saying, "You keep saying this on the one hand and you keep saying this on the other hand. Which is it?" But the details, I was not -- was I involved in every little cure? No.
Q. Were you involved in any discussions with AHBL concerning, you know, whatever issues that came up during that process?
A. Not -- I don't remember any specifics ones, no.
Q. Did you visit the site to see the actual condition of the concrete?
A. Yes, I did.
Q. What did you -- what did you see with respect to the condition of the concrete?
A. It needed -- it needed to be addressed and, you know, I wasn't knowledgeable enough to -- to be -- to say this is the specific correction method, but it didn't take a rocket scientist to figure out that it needed some corrective work.
Q. Did you ever try to find out what happened that led to the concrete --
A. Yes, I did. Again, just for future knowledge and, you know, try to find out why and, you know, my assessment of it, they should have vibrated it a little bit better. And we tried to change the mix design and they should have stopped it and





changed, we're going to change the mix design, because it's not going to work, and we should have put our foot down. That's the only two things that, you know, my assessment of it.
Q. Let me just show you what's been -- I don't have an extra copy of it, but let me just show you what's previously been marked as Exhibit No. 23. I believe that's West Coast's calculation of its damages for the concrete issue?
A. Yes.
Q. Do you recall whether there's a -- there is a signed version of that document that was submitted to the Navy?
A. I don't remember, I'm sorry.
Q. Okay. I can show you some others, but let me just have that back for a second. I can show you some others as well, but you can see at the top, that document is dated May 27th of 2004, which is about two years after the issue came up and about a year after West Coast completed the project. Why were several of the REAs -- why are several of the REAs not dated until sometime in 2004?
A. Because that is this policy. This -- this is the first lawsuit we've ever filed against an owner. I have done 303 jobs as of today. We're on 903. We started with 600. This is the first lawsuit I have filed because I love to work things out with owners and I try to delay any kind of a claim as much as I can, but this became to the point that

there were so many things happening, that I felt that they were wrong, and it's the first time that I have actually done the steps that I'm taking today.

I never -- I never -- I was never so frustrated in my life. And this is a typical example of what I'm saying, the frustration. I said on the one hand, give us the repairs. Okay. We go through all of this expense, give them the repairs. And my instructions to this point is guys, if you have to fly, if we have to go carry somebody, if we have to carry them on your back, give them the repairs, give it to the Navy, give it to the owners, get on with it. And this, I became so frustrated on this thing because, like I said, it's on the one hand it's give us the repairs, give us the repairs. We hired the best of the people. We -- we did all of the paperwork to my knowledge that, you know, were required to do the repairs, and we couldn't get an answer. It's just like, you know, people, please, you know. And, you know, I just -- I became frustrated. And, yeah, I tried to delay it because normally we try to, you know, we try to -- we don't try to do this. I mean, I've never done it. This is the first time that I've ever done it. And we've been in predicaments, you know, that may have been equal, if not worse, but I have never done it because we always seem to do -- work things out, but this is just one after another one. It just -- it





doesn't -- it never seems to stop.
Q. Why don't we take a break. I'm getting kind of -- I'm getting ready to start winding it down.
MR. DAVIS: Okay.
MR. O'CONNELL: I don't think too much longer.
MR. DAVIS: Five or ten?
MR. O'CONNELL: Yes.
(Short break taken)
BY MR. O'CONNELL:
Q. Back on the record, please. Mr. Ramirez, I've put in front of you what's previously been marked as Exhibit No. 54, the one on -- right, the other one. Take a look at the last page, if you will. On the last page you'll see at the top it states "Final Discussion, March 27th, 2002, design review meeting." Do you recall any design review meetings in that time period?
A. I attended one. I don't know if this is the same one, you know, without, you know, going back through my mind and -- you know, Mr. O'Connell, without seeing this, I did attend one and I'm not sure if this is the one that this is making -- making a reference to.
Q. All right. Well, why don't we --
A. Let me -- I believe this is the one where they paid us some additional funding. Go ahead. What -- what is your question?





Q. So for the design review meeting that you say you did attend, what can you tell me that you recall about that meeting?
A. It got heated, incredibly heated. Uh --
Q. Who were the participants?
A. Oh, going around the table, um, there were obviously Merritt + Pardini, you know, the consultants, you know, the glass people, um, there were some other -- other people there, but the glass people, because that's the one that became very heated over the glass issue. Um, I'm not sure exactly but I -- I -- um, the consultants and the glass -- the glass people are the ones that still come to my mind right away.
Q. The consultants on the glass issue?
A. The consultants and --
Q. Oh.
A. -- the glass people, the glass subcontractors.
Q. So the consultants would be Merritt + Pardini?
A. Correct.
Q. Anybody else?
A. I believe the mechanical consultant was there. I believe the electrical consultant was there.
Q. Who was the electrical consultants?
A. I can't remember.
Q. And did -- do you recall any issues besides the glass that were discussed?





A. You know, the only glass is the one that stands out because that's the one that I had to finally -- prior to the meeting the Commanding Officer and I agreed that if things started getting kind of bad, then one of us would put up our hands or do a signal, I can't remember. And one of us or both of us had the authority to stop the meeting. And the only thing that I remember is the glass issue got pretty heated up and I think I put up my hand and stopped the meeting, went outside with the Commander and, you know, told him we need to set some rules because this thing is getting pretty heated.
Q. Who was the Commander that you're referring to?
A. I can't remember.
Q. Well, just briefly, what was the glass issue?
A. Well, what was the glass issue was, it was so simple that it was ridiculous, but when they were going through the outline of the specs, there was a gentleman there, um, who kept objecting to the way we were labeling the specs, just the label. In other words, you know, label A/B/C or D/E/F or whatever you want to label it, nothing to do with the context of that specification. Keep in mind, we're talking about strictly the label. And he kept objecting to the way they were labeling it. And so that it became overheated because the glass people said, well, we believe this should be labeled this way, and the consultant was saying -- and so



0d463623-640c-4e88-ba10-19365542315c

finally I said, "Whoa, whoa, whoa." I said, "Tell me, how do you label it and we'll direct these people to label it the way which you tell me." And he said, "Well, no, that's your decision." I said, "Okay, then we will decide this." And he said, "Nope, I don't want that." I said, "Okay. Then, once again, tell me how you want this thing labeled and I will direct the people, they work for me, and I will direct them how to label it." And he said, "No." And then it blew up. Somebody started shouting and I believe there was even some name-calling and that's when I put up my hand and I said, "Time to stop the meeting." And the Commander and I went out and that's when I told him, I said, "You know, at this rate, we will never get this building constructed, because no matter what we do, there seems to be an objection to no matter what we do. We do this and they object, and we do that, and they object. And it's very simple, give us the name, how you want this section labeled, and we will label it." And that is exactly what happened. He stepped in and he said, "You will label it X/Y/Z," and that was the end of that argument, but it became pretty heated. There was some name-calling, you know.
Q. Okay. If you could turn to the second page of Exhibit 54, the second paragraph down, the sentence states: "The government agrees to relax contractual requirements for 100% design pre-final and final design submittals by replacing





these submittals with construction drawings." Do you recall any discussion of that issue?
A. Not specific, but in generalities, you know, I think Scott was arguing again but how do we label this how do would he present this thing? And there was a couple of gentlemen representing the government who just kept insisting upon doing it this way and when Scott would say okay we'll do it this way they would object to something it was you know the old Catch 22 no matter what you do you're wrong you're right you're wrong you're right and that's why it became. And so the government at that meeting decided to as they say relax the contractual requirements I think it was more like all right, we're going to back up on the demands to those people they are making you no there was one guy good I can't remember the guy now we were just talking about him who timely was told in so much words you know that he was going to back off and relax the contractual requirements or relax his particular demand because we were getting nowhere. We were getting nowhere. It was going to be an endless thing, I mean --
Q. Okay. Finally I've just got some questions for you. Go back to Exhibit 15 for a minute. If you could turn to page --
A. And by that way at the meeting.
Q. Sure.





A. There was something that was kind of crucial at that meeting, again you know, I told you that we had agreed in the meeting that we would you know things got heated or things but the commander and I and the commanding and officer and I would go in the room and decide thing we would come back in on a mutual basis agreement and kind of inform them this is what we're going to do, and I don't know, I can't remember this guy's name my mind is going blank but there was one person that I said you need to remove him from this steam or we will never billed this thing it's never going to get built I don't care how much time you allocate to this thing because, again, if you take the issue of the glass, it's a perfect example, you know. It's never going to be built. There isn't enough time. There isn't enough money. This thing is going to end up in an ugly thing and he did agree to remove him you will no longer have authority on this project.
Q. Who is that?
A. Ben Wong I believe is his name. He did agree to remove him and he was instructed to remove him and your no longer to have anything to do with this thing did it happen in reality? No, he never signed anymore documents from that date on, but as we found out later, through memos that we got ahold of, you know, by accident. He was still doing everything in the background and he was still coming out to





the job site. And he was definitely a, you know, negative force in trying to get this thing resolved.
Q. What were these memos that you got ahold of by accident?
A. Well, I think what happened in a couple of cases that somebody in the field saying hey, you need to correct this, but rather than transcribing or retyping what Ben Wong had said they had attached it and I believe that happened in a couple of incidents. In other words, Dan Wong was still involved and we did agree in that meeting because and again you know you talk about you know as I said a few minutes ago the frustration level that was happening to this thing, I never had -- this is the first time that I actually have subs who said to me, it would be cheaper for me to walk away from this project than to continue even if you don't pay me. Um, because it was so frustrating the level of frustration on that job is just we he were making no progress no matter what we did in some cases and it was just frustrating I mean, it was just are frustrating and I believe this is the meeting you know where a lot of frustrations surfaced and --
Q. Okay. Turn to Exhibit No. 15, please.
A. (Witness complies).
Q. Third page, where it says prime contractor's work, line nine, field overhead, 10% of line eight. What are the components of the field overhead?



0d463623-640c-4e88-ba10-19365542315c

A. Um, assuming this is our field overhead, I think it is, the components of the field overhead, um, are -- you want me to go through all of them?
Q. Sure.
A. Okay. And I'll try to use the numbering system so we can try to hit all of them. Okay? Uh, one or two is the superintendent. Um, I think the next significant is the assistant superintendent, which I can't remember, I think it's 103 or 104, I'm not sure. There's a -- a clean-up code we use. I could get these for you right away because it's a standard thing. I could provide them for you, we have no -- it's no big deal to provide them. Uh, it goes on to daily clean-up, uh, utility charges, you know, the cost of electricity, if any, the cost of weather protection, if any. The next significant, move in and move out, project signs. Um --
Q. Does it include the field secretary?
A. I think it does include the field secretary. Um, you know, I know these things by memory, yet I don't know them by memory.
Q. How about the QC manager?
A. I don't know. In some cases we created a different, I think in some cases. I can't remember now, Mr. O'Connell, I can't remember how we did it on this one because, again, it's changed so much, that's the problem I'm having. Now QC, we





treat it as a separate thing. Toilets we treat as a separate thing now where in this system toilets were included in here. Daily clean-up was included in here. Drawing reproduction was included in here. The problem is that it's changed so much, you know, we evolved so much that without going through the checklist with that one and comparing it to the present one, I mean, there may be some inaccuracies, but I hit most of the principal ones. Oh, we have a transportation code, which is large, the office, field -- you know, the office, the office we provide in the field, you know, the field office. The actual structure, the building, though, that's another code. Um, give me a minute. Give me a minute. Um, daily clean-up, that final clean-up, code 112; safety, code 114; office, which is code one something, 109, 129. Uh, there may be some more.
Q. Does it include subsistence?
A. I believe in those days we -- we included it in the -- now we separate it also. I know we separate it now.
Q. Small tools and supplies?
A. No, that is an individual code. That's -- that's what we call STNS. That is also -- that is charged to each. In other words, if you're doing carpentry, carpentry carries its own STNS. I believe it does have tool repair in it, but again, now we separate that. Maintenance, I believe we separate that now, but I believe in the old days, in those





days we still carried it.
Q. How about survey crews, do you know if those were costed to job or home office accounts?
A. No, they -- I don't think that's ever been costed to the home office. I think it's been costed to each individual job. I can't think of a single time that we charged it to the job -- to the home office overhead.
Q. So it's always to the job?
A. That's correct, unless these guys changed something on me, you know, I don't recollect a single time.
Q. Oh, right. One more question. Um, on Exhibit 15, line 31, "Prime Contractor's Bond Premium," if there's a recovery here, is that something that West Coast will actually have to pay to the bonding company?
A. Yes. What happens at the end of each project, about a year later they come in and then we provide the list of changes, they look at them. We get audited every year. And then based on that audit they come in and there's an adjustment which we carry the following year. It is not expended the same year, but it's paid the following year. And I believe that's one of the costs. It used to be carried in that and now we changed it, you know.
MR. O'CONNELL: All right. I don't have any further questions.
MR. DAVIS: Let's take a short break. Let's go





outside.
(Short break taken)
MR. DAVIS: Back on the record. I don't have any questions for Mr. Ramirez. I guess we're done. He will read and sign.
MR. O'CONNELL: Thirty days?
MR. DAVIS: Yes.
(Deposition Concluded)
(Signature Reserved)



0d463623-640c-4e88-ba10-19365542315c

CERTIFICATE

STATE OF WASHINGTON)
) ss.
County of Lewis )

I, the undersigned Notary Public in and for the State of Washington, do hereby certify:

That the foregoing deposition of the witness named herein was taken stenographically before me and transcribed under my direction; that the deposition is a full, true and complete transcript of the testimony of said witness, including all questions, answers, objections, motions and exceptions;

That the witness, before examination, was by me duly sworn, and the deposition was made available to the witness for reading and signing upon completion of transcription, unless indicated herein the waiving of signature;

That I am not a relative, employee, attorney or counsel of any party to this action or relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or the outcome thereof;

That I am herewith securely sealing this deposition and delivering the same to Mr. O'Connell for filing with the Court.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 15th day of May, 2007.

Notary Public in and for the State
of Washington, residing at
Mossyrock.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WEST COAST CONTRACTORS OF ) NO. 05-1121C
NEVADA, INC. )
7785 White Fir Street )
Reno, NV 89523 )
)
Plaintiff, )
)
vs. )
)
UNITED STATES OF AMERICA )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF:
SCOTT E. HARM

April 24, 2007
Tacoma, Washington

* * * * * * *

REPORTED BY:

CATHERINE M. VERNON, CSR, RPR

#408 Albers Mill Building

1821 Dock Street

Tacoma, WA 98402

(253) 627-2062



21c432ad-fbc3-49e6-9a6c-bb0da6ca40d8

APPEARANCES

For the Plaintiff: MR. WILLIAM C. DAVIS, III
Attorney at law
11921 Rockville Pike
Rockville, MD 20852-2743
bdavis@srgpe.com

For the Defendant: MR. MICHAEL N. O'CONNELL
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Michael.o'connell@usdoj.gov

Also Present: Mr. Stephen A. Weathers, P.E.
(Capital Project Management)
Mr. Tracy Hieber, Project Mgr.
(West Coast Contractors)
Mr. Mario Ramirez, President
(West Coast Contractors)





INDEX

Examination by: Page Nos.:
MR. O'CONNELL: 5-88
MR. DAVIS, III: 88-93





EXHIBITS

| Exhibit No | Page Marked | Description |
|---|---|---|
| Exhibit No 63 | * | 1-pg Award of Bid, dated 6-29-01 |
| Exhibit No 64 | * | 1-pg Fax Transmittal of 5-11-01 |
| Exhibit No 65 | * | 1-pg letter of 5-24-01 |
| Exhibit No 66 | * | 1-pg Letter of Transmittal of 4-26-01 |
| Exhibit No 67 | * | 1-pg Helix letter of 4-4-02 |
| Exhibit No 68 | * | 1-pg Letter of Transmittal of 4-26-01 |
| Exhibit No 69. | * | 1-pg Commerce Business Daily ad |
| Exhibit No 70 | * | 1-pg Mt Rose letter of 8-31-01 |
| Exhibit No 71 | * | 1-pg Mt Rose letter of 8-7-01 |
| Exhibit No 72 | * | 13-pg spreadsheet |
| Exhibit No 73 | * | 2-pg Merritt + Pardini memo |
| Exhibit No 74 | * | 2-pg Merritt + Pardini memo |
| Exhibit No 75 | * | 2-pg Merritt + Pardini letter |
| Exhibit No 76 | * | 1-pg West Coast Purchase Order |
| Exhibit No 77 | * | 2-pg Merritt + Pardini letter |
| Exhibit No 78 | * | 1-pg West Coast Purchase Order |
| Exhibit No 79 | * | 2-pg West Coast letter |
| Exhibit No 80 | * | 2-pg Solicitation, Offer & Award, dated 12-11-00 |
| Exhibit No 81 | * | 2-pg Solicitation, Offer & Award, dated 12-11-00 |
| Exhibit No 82 | * | 2-pg FAR guideline excerpt |
| Exhibit No 83 | * | 2-pg Construction Schedule |
| Exhibit No 84 | * | 1-pg e-mail West Coast e-mail |
| Exhibit No 85 | * | 4-pg Merritt + Pardini fax |
| Exhibit No 86 | * | 1-pg notes re Settlement |
| Exhibit No 87 | * | 1-pg West Coast letter of 10-14-02 |
| Exhibit No 88. | * | 3-pg Merritt + Pardini letter of 11-8-02 |
| Exhibit No 89 | * | 1-pg M&P Bullet Points |
| Exhibit No 90 | * | 5-pg Settlement Agreement |
| Exhibit No. 91 | * | 5-pg West Coast letter of 11-22-02 |
| Exhibit No 92 | * | 2-pg Memorandum |
| Exhibit No 93 | * | 1-pg C-5 Grading Plan |
| Exhibit No 94 | * | 1-pg Blue Mountain Fax |
| Exhibit No 95 | * | 1-pg Blue Mountain Fax |
| Exhibit No 96 | * | 1-pg West Coast letter of 7-17-02 |
| Exhibit No 97 | 16 | 3-pg Past Performance statement |
| Exhibit No 98 | 78 | 2-pg Navy letter of 12-5-01 |

(*denotes marked in Mario Ramirez's deposition)





BE IT REMEMBERED that on the 24th day of April, 2007, at 700 Wells Fargo Plaza, 1201 Pacific Avenue, Tacoma, Washington, before CATHERINE M. VERNON, CSR# VERNOCM398L4, Notary Public in and for the State of Washington, appeared SCOTT E. HARM, the witness herein;

WHEREUPON, the following proceedings were had and done, to wit:

* * * * * *

SCOTT E. HARM, having been first duly sworn by the Notary, deposed as follows:

EXAMINATION

BY MR. O'CONNELL:
Q. Mr. Harm, good afternoon. Thank you for being here.
A. Good afternoon.
Q. Have you ever had your deposition taken before?
A. No.
Q. All right. Let me just give you a few simple ground rules. One thing is you have to articulate all of your responses. You have to -- you know, you can't nod your head, shake your head no. The Court Reporter has to be able to take everything down and yes and no are obviously also better than um hum and hum um.
Probably the other most important thing is that, you know, when I say -- when I phrase a question, let me

finish the question before you answer. It's difficult for the Court Reporter to take things down if we're talking over each other, things like that.

I don't think we'll be going, you know, terribly, terribly long with your deposition, but if you do need to take a break, just tell me at any time, and we can take a break.

A. Okay.

Q. And you're here under Subpoena, I know. You haven't brought counsel with you or anything, have you?

A. No.

Q. All right. Mr. Harm, where are you currently employed?

A. Belay Architecture. Would you like a street address?

Q. Sure.

A. 708 Broadway, Suite 180, Tacoma, Washington 98402.

Q. What is your role with respect to Belay Architecture?

A. I'm the boss/owner.

Q. Okay. How long has Belay Architecture been in business?

A. In September it will be -- September 13th will be our third year.

Q. All right. So that would mean September of 2004?

A. Correct.

Q. And I understand that you were previously a Principal with a firm called Merritt + Pardini?

A. Correct.





Q. When did you leave Merritt + Pardini?

A. One week prior to the date you just said, when our business was sold and they closed shop.

Q. All right. Who was the business sold to?

A. This is not going to be a brief answer. It was a wholly-owned subsidiary of Parametrix, which is an environmental engineering and civil engineering firm that's employee-owned.

I was the architect of our Convention Center, which was a rather large job. And then immediately following that was the architect of Stadium High School, which was an even larger job right up the street. Immediately after that we were looking towards massive lay-offs and the engineering company decided they wanted to get out of the business of architecture rather than stay in it, so they closed the company and I tried to buy it, but ended up opening my own firm.

Q. And when Merritt + Pardini was sold to Parametrix, did it operate under a new name?

A. It ultimately ended up with a renaming, the rebranding to Krei Architecture, K-R-E-I, Architecture, for the reasons that the former owners, Misters Merritt and Pardini, opened up competing businesses in the same town, so it made things rather confusing to have Merritt + Pardini and Pardini Architecture and Merritt Architecture.





Q. Oh.

A. So the specific answer to your question, it was not changed when it was sold. It ultimately changed for other reasons.

Q. All right. Mr. Harm, did you do anything to prepare for your deposition today?

A. Yes.

Q. What did you do?

A. Reviewed notes that I have from the period surrounding the events I think that we're going to talk about. And I had a previous meeting with the West Coast Contracting group down in Reno. And that would be it.

Q. When was that?

A. I don't remember the date.

Q. Was it within the last year or --

A. Yes.

Q. Was it sometime in 2007?

A. Uh, yes. I'm sorry. I -- I don't even have my Palm Pilot to look up when I did the trip.

Q. And who did you meet with, with respect to West Coast?

A. I met with Mr. Ramirez, the gentleman at the table.

Q. Anyone else?

A. Um, Jim Miller, and their Administrative Assistant whose name I can't recall right at the moment. I'm sorry, my memory isn't any better, but I can't remember her name.

Q. Sure. And this meeting was down in Reno or up here?





A. In Reno.

Q. And who paid for you to travel down to Reno?

A. My airplane ticket was reimbursed by Mr. Ramirez and I donated my time other than that.

Q. All right. What were the topics of discussion at the meeting?

A. Just a review of what notes they had and any notes that I may have had. It was rather brief and that was it, just pertaining to the specific items that I might be talking about, questioned about today.

Q. Can you recall if this was before or after I talked to you with respect to scheduling your deposition?

A. I can't recall.

Q. Okay. Can you tell me any specific issues, though, on the project that you talked about at this meeting?

A. It was just the ones I can specifically remember pertaining to the specifications that we responded to in the R.F.P., the Request for Proposal, what ultimately was delivered, and different issues that happened during construction and review of our drawings.

Q. All right. Could you tell me what your educational background is?

A. Sure. I went to -- I'm assuming you don't want to hear about grade school and things like that?

Q. No.