A. I have an undergrad -- undergraduate degree from Penn State University, and a Masters in Architecture from the University of Houston in Houston, Texas. And then I've attended several classes put on by the ICBO, which is the International Conference of Building Officials, and the Corps of Engineers on Construction Administration. My formal education is a Bachelors from Penn State University and a Masters Degree from the University of Houston in Houston, Texas.
Q. I'm sorry, what were the Master Degrees in?
A. The Masters Degree is in Architecture, an MA, Master of Arts in Architecture.
Q. And can you give me the years of your degrees?
A. '81 for the Bachelors Degree, '87 for the Masters Degree.
Q. All right. When did you go to work for Merritt + Pardini?
A. 1990.
Q. All right. What did you do for work in the 1980's?
A. Let's see, between graduating from grad -- (cell phone ringing).
Q. Go ahead.
A. Oh -- graduating from graduate school I worked for a while in Houston before I found a job up here in Bellevue, Washington with a small firm. And then from there went on to a larger firm that did federal contracting work that ultimately moved me to San Diego, California for a large job





for the United States Navy, administering the construction contract for a job that was bid. It was a bid job. And the Navy moved me down to California to administer the construction of that project. And then after that tenure finished in San Diego, I moved back, and that's when I started employment with Merritt + Pardini.
Q. Did you remain with Merritt + Pardini from 1990 continuously through 2004?
A. Actually, yes, other than it changing its name to Krei Architecture.
Q. When you first started working at Merritt + Pardini, what was your job title?
A. I was hired as the Project Manager for the Greater Tacoma Convention and Trade Center. Within four months I became Principal-in-Charge of the office, and Partner-in-Charge of the Tacoma Convention and Trade Center because that's when Misters Merritt -- Mr. Merritt, I previously mentioned, left the firm and I took his position as Principal-in-Charge of the Project, which made me the Architect of Record for the Convention Center. So I was the Principal of the Tacoma office, as well as Principal-in-Charge of the Convention Center project.
Q. All right. With respect to your education, do you have any particular training in Design/Build projects?
A. Yes.





Q. What is it? What do you have?
A. I'm a member of the Design/Build Institute of America. I've gone to a plethora of their seminars, a list of which I don't have. My company now does 100% Design/Build jobs. We do not pursue any work that is not Design/Build work. I have probably five or six active contracts with contractors as my clients, and in the other ones my contracts are directly with the owners who have already engaged a contractor. I do nothing but Design/Build work now in my firm and have been and that is all I do.
Q. All right. Going back to the meeting that we talked about a minute ago between you and West Coast, was there any discussion of depositions at that meeting?
A. I don't recall, other than a cursory thing saying I've never been through one and everybody saying, "Don't sweat it."
Q. All right. And for the -- with respect to the notes that you reviewed to prepare for your deposition, can you be any more specific as to what these notes were?
A. I reviewed a letter that I wrote, the dates of which I can't remember, regarding my position. I signed the letter on an issue revolving around the specifications, the way that we were supposed to respond to the Request for Proposal, and the way we interpreted them. So I refreshed my memory on that. That was primarily what, um -- we talked about some other issues pertaining to civil engineering issues. I'm





not really clear on what the exact details were because they didn't pertain to me specifically. We talked about the fact that the number of site visits that I had to make as far as Principal-in-Charge of the Project.
Q. Have you discussed working with West Coast on any future projects?
A. No.
Q. All right. How did you first come into contact with West Coast with respect to the Naval Post Graduate School project?
A. I was already in -- to the best of my recollection, because I was already in Tacoma, Washington, Mario Ramirez called me and said that they were considering pursuing a job at the Post Graduate School in Monterey, California and asked if I would be interested in being his architect. We had a relationship that I had started when I lived in San Diego, as I stated earlier, moving down there for a hard bid project and I had built up a business relationship with Mario and his crew down in San Diego, and let it be known when I left where I was going and how they could get ahold of me. I received a phone call from Mr. Ramirez asking if I would engage -- if I was interested in being his architect for the Monterey project.
Q. I see. And do you recall roughly when he contacted you with respect to that project?



21c432ad-fbc3-49e6-9a6c-bb0da6ca40d8

A. No idea.
Q. When you were down in San Diego did you actually work with West Coast on any projects?
A. Yes.
Q. What were the projects?
A. It was a -- I believe there was a project at Miramar -- Miramar? I might be mispronouncing it, the Base at Marimore (sic) -- no, yeah, Miramar. Um, there was a warehouse conversion project I believe and we pursued some other projects for grate gate replacements, mostly small -- small -- smaller projects; the exact title of them, I can't recall right at this moment.
Q. Okay. The contract was awarded to West Coast, I can show you an exhibit, if you'd like to see it, but the contract was awarded on June 29th, 2001 by the Navy.
A. I'm assuming you're talking about the Monterey project --
Q. The Monterey project.
A. -- and not the project in San Diego? Okay.
Q. The Monterey project, right. Can you tell me roughly how many months before that you were in contact with Mario Ramirez about this project?
A. Off the top of my head, I can't. I can't recall.
Q. Let me -- if you look in that pile of documents in front of you, if you could pull out Exhibit 69.
A. I didn't know these exhibits were marked. Okay.





Q. And you can see Exhibit 69 is a Commerce Business Daily announcement, dated November 13th, 2000. So there's roughly a seven-and-a-half month period between the time of this announcement and the award. Does that help give you a frame of reference as to when you became involved?
A. No, I'm sorry, it doesn't. Nope. I honestly don't remember on or about -- I was pretty buried in the Convention Center project, so I don't remember exactly when he called me, but -- I'm sorry.
Q. As of 2001 how many Design/Build projects had you designed?
A. Am I allowed to guess at this point?
Q. Well, not -- you're not really allowed to -- I don't really want you to guess, but I'd like you to approximate.
A. Okay. And when, 2001?
Q. Yes, as of 2001.
A. I'm going to guess less than ten, probably eight.
Q. Do you know what they were?
A. Let's see, I did a golf course clubhouse, I did a marina building, um, both with Soltec Pacific out of San Diego. I did a golf course clubhouse up here with Bailey Construction. How many is that? That's three or four. Um, I did the one job at Miramar that I talked about earlier. And I did a railroad museum building for the Port of San Diego. After that it starts getting fuzzy.
Q. How do you define a Design/Build project?





A. This is not going to be a brief answer.
Q. Okay.
A. A Design/Build project under the traditional sense is when the design and construction team are one specific entity, typically meaning that my contract as a designer, my contract is held by the general contractor who in turn has a prime contractor -- contract with the end user or owner. That's my strict definition of a Design/Build contract delivery method.
Q. All right. And how would you characterize the Naval Post Graduate School project?
A. In which terms?
Q. Would you say -- would you agree that it was a Design/Build project?
A. Yes, I would, in the definition I just gave you, yes; my contract was held by West Coast Contractors.
Q. All right. Let's mark this as Exhibit No. 97.
(Exhibit No. 97 marked for identification)
Off the record.
(Counsel talked off the record)
Back on the record. Have you seen Exhibit 97 before, Mr. Harm?
A. I don't believe I have. I don't -- I don't believe I've seen it, at least in this form.
Q. I guess one thing you mentioned before was the merger or





whatever, purchase by Parametrix?
A. Acquisition, yeah.
Q. That had already occurred by the time that West Coast was awarded the Naval Post Graduate School project?
A. Yes.
Q. All right.
A. I believe so, not knowing exactly when they were awarded it. Yeah, no, I'm sorry, yes, it would have -- I'm sorry, yes. So repeating what I think I heard, was the acquisition of Merritt + Pardini by Parametrix, did it occur previous to West Coast Contractors being awarded the Monterey project? Yes, it had already occurred.
Q. All right.
A. The name change hadn't occurred yet, though.
Q. One thing I noted when I reviewed this document was that I didn't notice that it said anything about Merritt + Pardini's Design/Build experience?
A. I'll take your word for it. I haven't read it before, so okay.
Q. Okay. But based on what you told me a --
A. I don't know that they had much before I arrived.
Q. Who is they?
A. Merritt + Pardini.
Q. I see.
A. Yeah.



21c432ad-fbc3-49e6-9a6c-bb0da6ca40d8

Q. But you arrived in 1990, correct?
A. I believe that's what I said, and I believe I'd have to -- yeah, I think that's about when it was.
Q. Okay. But I guess I just have a little disconnect with your answer.
A. Wait, wait, wait, I may -- hold on. No, I am way off on when I arrived. Can I correct what I said?
Q. Sure.
A. Yeah, I'm sorry. I go by kids' birthdays. I've got the wrong kid. Yeah, I believe I arrived in '99. Let's see, seven years ago Clifton was born. He was born -- actually, I arrived up here in about the year 2000, sorry.
Q. That's okay.
A. I was remembering the wrong kid's birthday.
Q. That's fine. So what did you do -- where did you work in the 1990s?
A. So prior to arriving at Merritt + Pardini, which is right after my seven-year-old was born, which is where I got it wrong, I was working, employed by Anderson, Koch and Smith, working down in San Diego, California for the three-and-a-half years previous to that. So that takes me from roughly '97 to -- I mean, 2000 to '97, '96. Previous to that I was working in Pioneer Square in Seattle, Washington, for the same Anderson, Koch & Smith. Anderson, Koch & Smith, with a contract through the Navy, moved me





from downtown Seattle to San Diego where I stayed there for three years, starting a field office for them. At the conclusion of that, when my now-seven-year-old was born, we moved back up here.
Q. All right. So --
A. Sorry for all of the timelines.
Q. That's okay. So if I understood what you just said, it was in the late 1990s that you were working down in San Diego?
A. Correct.
Q. And would this also have been when you were previously working with West Coast on projects?
A. Correct. I very much apologize for getting the time --
Q. That's okay.
A. -- schedule wrong.
Q. What was the -- who were the people from Merritt + Pardini that worked on the Naval Post Graduate School project?
A. Uh, myself, a gentleman by the name of Jim Cockerill. There was a specification writer. His name will come to me sometime while we're sitting here, but it's just not coming to me. And then some -- another architect in town whose name is Jim Walsh, I think is -- he's still working in town. And then maybe one or two interns and a young lady named Christy Pope who was our Office Project Administrator.
Q. Okay. Just with respect to the people that are actually doing design or I guess Construction Administration as well,





who were those people?
A. It was primarily myself and Jim Cockerill, as well as the specification writer whose name still hasn't popped into my head.
Q. And what is Mr. Cockerill's specialty?
A. I don't know.
Q. Is he an architect?
A. Yes, he is. He's a licensed architect, moderately older than myself, more senior than me. When I arrived, he'd been at the firm long -- much longer than I had been.
Q. Was he Merritt + Pardini's Project Manager?
A. He was a Project Manager for Merritt + Pardini. And then when I was hired on, I was again hired on specifically for the Convention Center, and then had a client who I guess liked working with me, came in and I became the Principal-in-Charge of the Monterey Post Graduate School and Jim would have been acting as my Project Manager for that job.
Q. All right. So how does it -- how were the duties divided up day-to-day between you as the Principal and Mr. Cockerill as the Project Manager?
A. Specific to this job or typically?
Q. Well, why don't you give me -- start with typically and then tell me how it works out.
A. Typically the Principal-in-Charge will have two or three





Project Managers, each of whom are responsible for an individual project, doing the coordination with our internal team as well as the external team of consultants. And then with them I would meet at least once a week to get a project update, and then ultimately I would do the quality control reviews of their project drawings before they were issued from our office.
Q. So for Mr. Cockerill, for the Project Manager, would he typically be spending all of his time on one project?
A. Correct.
Q. And then you as the Principal might have three or four projects?
A. Correct.
Q. All right. And then so if that's the general rule, how did the general rule apply to the Monterey project?
A. Initially it was pretty much the same and then it became evident, for reasons that I wasn't yet aware of, that it was becoming more and more of my specific time and that I had to be involved on it almost as a daily basis, supplanting a lot of what Mr. Cockerill was doing. Remember, my definition of a Project Manager is coordinating with our internal team as well as coordinating with an external team of consultants and sometimes the client. And then in the Monterey Post Graduate School a lot of the activities of coordinating with the other consultants fell to me as well as talking to Mario



21c432ad-fbc3-49e6-9a6c-bb0da6ca40d8

and his team as things got more and more complicated, our risk and liability started to be elevated, and so as a response to that, the Principals get more and more involved with the project.
Q. Do you know how long Mr. Cockerill had worked for Merritt + Pardini?
A. No.
Q. What -- do you know what his prior Design/Build experience was?
A. No, I don't.
Q. Do you know if he had any?
A. I -- I don't know.
Q. Do you know why you picked him to be the Project Manager?
A. He was assigned to me by my then boss.
Q. All right. So when Mr. Ramirez first contacted you about the Naval project, the Post Graduate School project, can you tell me sort of the substance of the conversation?
A. I can't remember the details of it. I could -- I don't know if I'm allowed to do my best remembrance. I don't remember the exact.
Q. Just tell me to the extent you can.
A. You know, the cordial initial, you know, the nice-to-talk-to-you-again. I can't remember, honestly, if it was we are considering going after this or we have already started the process of submitting, but would you be





interested in working with us again. And I found the experience of working with them down in San Diego as being pretty pleasurable and I said, "Let me check." I wasn't yet the boss of the firm, so let me check with my superiors, did a quick go-around, asked people, and they said they would be interested in Design/Build jobs. So I believe at that point I might have called them back and said, "Yeah, we're good to go, I can go ahead and get signed up with you." And that started a, you know, what-do-you-need-from-us kind of a thing and then go off from there.
Q. And at that point in time what did you understand the nature of the project to be? In other words, what was going to be built?
A. An extension to an existing building, an educational facility. Again, having not re -- I haven't reviewed those kind of materials pursuant to this interview, so I can't remember specifically what it was. I think we were forwarded -- back then I don't think e-mail was as effective as it is now, so I think we were receiving Federal Express packages back and forth as far as what the Request for Proposal documents were and what we would need to be providing and I just remember there were a lot of phone calls going back and forth and facsimile transmissions and things like that, but specifics I'm not real clear on right now.





Q. Okay. Take a look again at Exhibit 69 which I gave you a minute ago.
A. Yes.
Q. You see where it says in capital letters "DESC:"?
A. Near the top or --
Q. About a third of the page down. (Indicating)
A. Oh, yeah, okay, a description, yeah.
Q. And you can see, one, two, three -- starting five lines down: "The building construction is anticipated to be a two-story concrete, masonry, and steel extension..."
A. Um hum.
Q. Is that consistent with your understanding of what the building would be when you first became involved?
A. Uh, yes. I remember, not -- you know, I don't know if it's mentioned in here; there was some discussion about having the option of doing a basement or two -- two stories above grade, but I understood it was a multi-story addition to an existing educational building.
Q. Okay. And do you recall what the R.F.P. drawings showed?
A. I believe, if I remember correctly, the R.F.P. drawings might have even indicated that there was a basement involved --
Q. Let me -- I'm sorry?
A. -- in it. That's, sorry, I just finished the sentence.
Q. We have some of the drawings. What drawings would you need





to take a look at?
A. I would -- you know, the proposed floor plans and maybe a building section.
Q. Let me hand you the structural drawings to start, then I'll give you the architectural drawings.
A. Okay.
Q. So what do the R.F.P. drawings that we just provided to you show?
A. These drawings, the way you presented it, depict a two-story, what we'd call a two-story solution, with a low slope or flat roof, with a slab on grade condition. So it's a two-story building built above grade.
Q. All right.
A. Seems to be pretty consistent between what you're saying are the structural drawings and the architectural drawings.
Q. And do you recall how it came about that the three-story building was actually constructed?
A. Um, I -- my remembrance is that there was something more detailed in the R.F.P., if I remember, that it would -- that the drawings depicted a two-story solution, and ultimately they may need a three-story solution, and it would be at the contractor's I believe alternative whether to do a basement or a third floor above grade.
Q. Okay. And do you recall when that came about?
A. No, I don't.



21c432ad-fbc3-49e6-9a6c-bb0da6ca40d8

Q. Was that before you became involved or after?
A. Um, I believe it -- I don't know that I understand your question.
Q. Sure.
A. I know about it, so it must have happened after I got involved, that there was an option of doing either the basement or a third floor above.
Q. Okay. Do you recall if there were ever any discussions of just simply doing a two-story building?
A. No, I don't remember.
Q. Okay.
A. Not at this point, at least.
Q. Let me show you a couple more documents.
A. Sure.
Q. If you could look in that pile, if you could grab Exhibit 81?
A. Do you want these back?
Q. Sure.
MR. DAVIS: Yes, they're in reverse order.
THE WITNESS: Okay. And, sorry, which one?
BY MR. O'CONNELL:
Q. Eighty-one.
A. Okay. I have it.
Q. You have 81?
A. Yes, I do.





Q. Okay. Look at the first page, under Solicitation, Section 10.
A. Um hum.
Q. You can see: "Work includes the design and construction of a two-story office/classroom building with connecting bridge to the existing building..."
A. Um hum.
Q. And then you can see below in line 13 it appears to speak of a bid submission date of January 11th, 2001?
A. Okay.
Q. Okay. Does anything that we've just shown you on that document help you recollect?
A. No, sorry.
Q. Take a look at the second page. You can see, this is a -- there's no Amendments to the Solicitation listed there. Okay. Take a look then at Exhibit 80.
A. Okay.
Q. Okay. Look at 80 and look again in Section 10.
A. Yeah, "...or a three-story aboveground office/classroom building with connecting bridge..."
Q. Just why don't you read from the start.
A. You want me to read from the start?
Q. Yes, just read it.
A. Oh. "Work includes the design and construction of a basement with two-story aboveground office/classroom

CATHERINE M. VERNON & ASSOCIATES
1821 Dock Street, #408, Tacoma, WA 627-2062



building, or a three-story aboveground office/classroom building..."
Q. Okay, I think that's enough.
A. Okay.
Q. Is that -- now, seeing this document, do you recall if this was the status of the Solicitation when you became involved?
A. No, I -- my remembrance is I was involved when it was a -- I know that I remember a -- at least a phone call where they were saying they were considering that there was going to have to be a three-story solution to it. I don't remember, quite honestly, if I saw this document or this one. Um, I just remember that we had the option of doing a basement or a three-story above grade solution.
Q. All right. Just to clarify what you just said, so the record will be clear, did you just say that you don't recall if you saw Exhibit 80 or 81?
A. Correct, I don't know for sure that I've seen 80 or 81. I would -- yeah, for sure I can't say that I did see it. I would make the assumption that I did, but --
Q. All right, 80, you can see on the second page, this reflects six different Amendments. Do you see that?
A. Hold on.
Q. (Indicating).
A. Okay. Yeah.
Q. And if you look on the first page in Section 13, this one

CATHERINE M. VERNON & ASSOCIATES
1821 Dock Street, #408, Tacoma, WA 627-2062



talks about bid submissions --
A. Yes.
Q. -- due May 8th?
A. Yep -- yes.
Q. So this one would appear to be --
A. Ultimately the one that we submitted on.
Q. All right. Now, looking at 80 and 81, the drawings that we just showed you, which of these two documents are the drawings more representative of?
A. 80 -- 81, I'm sorry, 81.
Q. And why do you say that?
A. Because it's -- the work includes the design and construction of a two-story office/classroom building with connecting bridge to the existing building, etcetera, etcetera, etcetera. And the drawings that you showed me that weren't marked as an exhibit just indicated a two-story solution, not a three-story. And I didn't see in my cursory review of those drawings any notations that say may include a third-story addition.
Q. All right. Let me show you what's previously been marked as Exhibit No. 1.
A. It's not in here?
Q. No, I'm going to give it to you.
A. Hold on.
Q. And I'm obviously not going to ask you to read the whole

CATHERINE M. VERNON & ASSOCIATES
1821 Dock Street, #408, Tacoma, WA 627-2062

21c432ad-fbc3-49e6-9a6c-bb0da6ca40d8

document right now.
A. Um hum, thank you.
Q. But if you could, just take a moment to look at it and tell me if you've seen this document before?
A. I believe I have seen this document before.
Q. In what context?
A. When we were receiving documents back and forth on what the Solicitation was about.
Q. All right. Let me ask you to turn your attention to page one of Exhibit 1. Under paragraph 1.1.1, Contractor's Design Responsibility?
A. Um hum.
Q. The first sentence: "This R.F.P. includes a preliminary design package." And you can take a look at the whole paragraph if you'd like, but tell me if this in your experience as -- in Design/Build if this is typically the kind of language that you encounter in a Design/Build contract?
A. I hate to do this to you, but could you repeat your question? Because I was reading it.
Q. Sure. Is it -- well, the question is basically -- let me see if I can simplify it. Is this -- is there typically a provision like this in the Design/Build contracts that you've worked on?
A. The short answer to your question is no because there's no





typical way any of them are done. I've seen them done like this in the past and most currently they are not done anything like this anymore. Um, this is -- so I have seen them like this. Would I say it's typical? If I answered that question today, it is completely atypical or non-typical, atypical, but back then it was -- it was more typical than it is today.
Q. All right. The first sentence states: "This R.F.P. includes a preliminary design package" --
A. Um hum.
Q. -- "developed by the government"? What is your understanding of the term preliminary design package?
A. Um, in our world we typically call that as a concept design. The government likes to assign percentages complete, so often 30%, 60%, 90% documents. So a preliminary design is typically 30% completed or less. And in the laymen's term for private sector, design development or concept design is prior to construction documents, so it's a preliminary set of documents that you have to proof out and ferret out the issues and --
Q. Would you say the term preliminary design package is reflective of the R.F.P. drawings --
A. Yes.
Q. And let me just finish -- for this project?
A. So say the whole question again.





Q. Sure. Is the term preliminary design package representative of what you received for the Naval Post Graduate School project?
A. No, I would say that the package that we received was a little bit farther developed than what I would typically see as preliminary. It looked like it was a much more substantially complete set of drawings than we would typically see a client spend their money on developing because the engineering was done to such an extent.
Q. You just said I believe 30% or less and the percentage that I've heard from some of the West Coast witnesses has been 35%. Is 35%, is that -- does that square with your --
A. Yeah. I mean, it's been awhile. The system is not being used by, to the best of my knowledge, you know, the Navy and its contracting agents, so it could have been. 35%, 65%, 95%, 100% and final are typically the sets of drawings, so 35% could have actually been more accurate than 30%, it's just been awhile since I've used the nomenclature.
Q. All right. And what exactly does the contractor get when it receives 35% drawings and what remains to be done?
A. In what context?
Q. Well, from your perspective as the architect on the project.
A. I'm sorry?
Q. Let me ask you this way. How would you explain to a layperson what 35% drawings mean and, you know, what -- what





you have to do to go from 35% to 100%?
A. Okay. In today's language 35% drawings usually have, for example, if I'm doing a 35% package of this room, I'm showing you the overall dimensions of the room in its general configuration and shape. I'm showing you where windows are going to be. And I would show, if this was a one-story space sitting on a proposed piece of land, I might show the sidewalks coming to it and leaving it. I would -- might show you one or two exterior elevations. There would be absolutely minimum dimensions on it. There may or may not be a finish schedule or there could be notes that say this room gets carpet, this room gets vinyl, tile. There might be a very conceptual building section. I doubt that there would even be a very specific wall section. So it's just a general overview, like the cliff notes of the overall breadth and depth of a project with very minimal details.
Q. All right. And how heavily can a contractor rely on 35% drawings if it's trying to formulate a bid for the project?
A. The 35% set of drawings that were -- that I just described?
Q. Yes.
A. Or that -- okay. Not very much. It would be more communication. We'd typically -- in today's world we'd develop more than 35% drawings to produce product pricing from.
Q. All right. When you first became involved in this project,



21c432ad-fbc3-49e6-9a6c-bb0da6ca40d8

were you asked to do any kind of review of the drawings to sort of independently just determine the level of completeness, the quality, and so forth of the R.F.P. drawings?
A. I don't recall. Sorry.
Q. All right.
A. I'm -- I was given a set, but I don't recall if I was asked to -- to -- to comment on their completeness.
Q. I mean, is that typically something you would do as the designer pre-bid?
A. I'm trying to make sure. In the -- in the -- see, in -- no, it's not something I think I would typically -- I'm trying to struggle with what it is you're -- so you're asking me, we'd get the set of drawings and asked are they -- do they look fairly complete?
Q. Well, let me see if I can just phrase the question more broadly, because I'm just trying to gather information as to what exactly you do as the designer when you're helping a contractor bid a Design/Build project. When you as the designer get the R.F.P. drawings, do you do any kind of review of them to determine completeness, quality, accuracy?
A. Can we go off the record for just -- is it fair for me to go off record? Because where I'm getting -- everybody has to understand where I'm getting confused.
Q. Well, just tell me, tell me on the record first, and then --





A. Okay. What was done --
Q. We're not going to hold this against you.
A. Okay. What was done then, not only for this job, is completely different than the way things are done now, so I'm trying to do the mental gymnastics on what is typ -- when you say typically, I have to keep saying typically then or typically now?
Q. Well, you know, it actually might help us if you compare and contrast the way things were done then versus the way they are now.
A. Yeah. Back then when the Navy, in my opinion, the Navy was basically in its infancy in figuring out how to do Design/Build. Uh, they would spend, I would guess considerable -- well, I've actually written R.F.P.s. They would spent considerable amounts of monies with one team of professionals to do the type of drawings that were produced that you handed me a few moments ago, then send them out to selected or large groups of contractors to finish the design and do the construction. They've realized since then and now that that is actually designing it twice and they're spending money not efficiently.
So today, for example, I was just awarded a very large job and I was given no drawings in advance. I was given a narrative descriptive form of what they were looking for and the only design that they ever saw was the design I





came up with. So now I am not given any drawings to critique. Back then I used to be given a set of drawings to in some way critique, but also say this shows a two-story building, we ultimately have to give a three-story building, these are some of the things that might have to change to make it a three-story building. So they used to do it this way and I -- editorial comment -- they wised up and stopped spending as much money up front. So now they design it -- they program it once, they design it once, they build it once. They used to program it, design it, redesign it, and then build it. So that's why I'm struggling with when you're asking me a typical, it's they used to do it one way, now they do it a different way.
Q. All right. Well, that's helpful.
A. Good.
Q. So back then the word you just used in your answer was critique. Can you apply how a critique would have been done to this particular project?
A. Yeah. This particular project, I would say that these drawings are pretty complete, probably above the 35% number that you had heard previously. Somewhere in the mix we knew that we had to give them a three-story solution, so there was a discussion on what would be the alternatives of whether we did a basement or a true three-story above grade solution, and what things might have to change, and we would





get our engineering, engineering groups involved to help with that solution.
Q. All right. So how do you turn 35% drawings for a two-story building into 100% drawings for a three-story building?
A. Lots of pain and agony.
Q. Lots of pain and agony?
A. I mean, that's, yeah, essentially starting from the ground up again because foundations are formed by gravity loads and when you're adding one extra floor of a building to foundations, those things start changing, they have to get bigger, deeper, wider, more reinforcing, so you're actually redesigning the building from the ground up.
Q. All right. Well, let me ask you one of the questions, one of the issues that came up. And I could show you the mechanical drawings, but one of the claims here is that there's a 15-ton chiller shown with respect to the two-story building and then ultimately a larger chiller was installed and West Coast has submitted a claim for that. Do you recall that issue on the project?
A. Just a cursory review. I don't remember much of the details specific to it.
Q. Okay. Would it surprise you that the chiller for the two-story building wasn't sufficient for a three-story building?
A. Would it surprise me? Would it surprise me? It would



21c432ad-fbc3-49e6-9a6c-bb0da6ca40d8

surprise me that a two -- a chiller size for a two-story would not be large enough for a three-story building, unless you shrunk the size of the floors to make the gross volume exactly the same.
Q. All right. Okay. And did you understand that part of your role as the designer would be to take this 35% design for the two-story building and make it a 100% design for a three-story building?
A. Correct.
Q. All right. Turning your attention back to Exhibit 1 again, again under paragraph 1.1.1, the third line down, over on the right there's a sentence that states: "The partial designs are in various stages of development"?
A. Oh, okay, yes.
Q. Can you recall enough about this particular design, and, again, we can show you the drawings if we want, but do you recall any particular drawings being, you know, in, you know, higher or lower stages of development, if higher or lower can be applied?
A. Off the top of my head, no, I can't remember any set of drawings other than what you just showed me a couple of moments ago. As far as level of detail, I'd have to look at them again.
Q. Okay. Well, I can show them to you, if you want, but I don't know if we have time for you to do a complete review





of the drawings.
A. And I'm not a mechanical or electrical engineer, so my eyes would glaze over just about as much as yours on some of this stuff.
Q. All right. Well, let me ask you this then. What does the sentence mean, the partial designs are in various stages of development, mean to you as an architect?
A. It just means that they would have to -- I mean, having responded to R.F.P.s like this, I just would assume that we would have to take these designs and working from them as sort of a springboard, taking from them and further developing them to suit mostly the requirements of the Navy and to some extent the contractor's requirements.
Q. All right. What about the last sentence under that same paragraph, you see, it states on the second line from the bottom: "The contractor is solely responsible for the final design of the facility." How did you understand that term?
A. I -- the only way I can assume or interpret it is what I said earlier, is my contract as a designer is held by the contractor, which makes them technically my client, which means they're responsible to the government for the complete and final design of the facility.
Q. All right.
A. Yes.
Q. Could you turn to page six of that exhibit, please?





A. Um hum.
Q. Do you see paragraph 1.3.2?
A. Yes.
Q. And that states: "The Design/Build team shall be solely responsible for verifying the existing conditions prior to submitting their design." What does that provision mean to you?
A. That the Design/Build team, which is inclusive of the contractor and its design team, is responsible for verifying the existing conditions of the site prior to their -- their design.
Q. What kind of existing conditions?
A. Almost anything and everything pertaining to the project.
Q. I mean would that include, for example, the location of pipes?
A. If they were permitted access to it, yeah, you know, yeah.
Q. By the way, did you go on any kind of a pre-bid site visit?
A. I'm sorry, I'm just trying to make sure. I don't recall that I did.
Q. All right. Could you turn to page 20, please?
A. Yes, sir.
Q. Do you see paragraph 1.10.1?
A. Yes.
Q. And that states: "This is a Design/Build project. Provide complete functional" --





A. Wait. Ten? I'm sorry, which one?
Q. 1.10.1, page 20.
A. I'm sorry, I was looking at the wrong place. Go ahead.
Q. You can see it states: "This is a Design/Build project. Provide complete functional, operational, and maintainable plumbing systems"?
A. Correct.
Q. What does that mean to you?
A. I'm not a mechanical engineer, so I would assume it would mean that the plumbing portion of the mechanical system has to be complete in its entirety to make this system -- the extension that we're adding operable.
Q. All right.
A. And maintainable.
Q. All right. You may have already answered this, but just to make sure that I've closed the loop on this, when you did your critique of the R.F.P. drawings here, can you tell us anything specific that you told West Coast?
A. At this point, no, I can't tell you anything specific.
Q. All right. Let me ask you to turn your attention to, in that pile, take a look at Exhibits 73 and 74.
A. (Witness complies). Yep.
Q. And I think they're the same versions of a document with different handwritten notes.
A. Oh, 73 and 74, yes. I'm sorry, yes.



21c432ad-fbc3-49e6-9a6c-bb0da6ca40d8

Q. And I believe these documents relate to an issue concerning what Merritt + Pardini's contract price with West Coast was, but if you could take a look at these two documents and tell me if you can remember that issue?
A. Yeah, I do.
Q. What was the issue?
A. There was a tabbing issue in that the numbers circled in 73 weren't shifted over to the column in the right, nor was there a grand total that would have matched up with all of the numbers or that should have been in the right, what I'll call the right-hand margin.
Q. All right. Let me ask you to turn your attention to Exhibit 76.
A. Yes.
Q. And before I do that, on either Exhibits 73 or 74, just so the record is clear, the numbers that didn't get tabbed, that I think you were just referring to, would be the $5,000 under structural engineering, the $28,600 that's under mechanical engineering design on the second page, and the $20,900 --
A. Correct.
Q. -- that's under electrical engineering design?
A. Correct.
Q. So was it your understanding that these numbers then did not get carried into West Coast's bid to the Navy?





A. No. It didn't come to our attention until I think after the project award.
Q. Well, that's all I'm asking you. I mean, at some point did that become clear to you?
A. At some point it became very, very clear to us.
Q. And how did it become clear?
A. I think there was a discussion before between Christy Pope, who I mentioned earlier is our Project Administer -- Administrator and someone at West Coast's office that there was a -- an error, a typing error, a word processing error in our -- in the spreadsheet that we had sent them and not seeing the final number that was submitted to the Navy until we got our work order I believe to sign that we realized that there was a discrepancy in what we believed we had asked for and what was submitted in the bid.
Q. All right. Well, you can take a look at Exhibit 73 or Exhibit 74, but I believe that the amount in question is roughly $54,000?
A. (Nodding head up and down).
Q. How would a reduction in the contract price of $54,000 have affected Merritt + Pardini?
A. It would have been extremely painful to us.
Q. All right.
A. Yeah. It probably would have removed any chance of making any kind of a profit off of the project.





Q. Take a look at Exhibit 76. Do you still have that?
A. Yes.
Q. I believe it's to your right.
A. Oh, thanks.
Q. Now, Exhibit 76 is a document, I believe it's signed on the lower left by Mr. Ramirez, and you can see above that the total amount of this Purchase Order is $240,150. And I believe that is the contract amount, if the numbers from Exhibits 73 and 74 which didn't get tabbed over, the $240,000 would not include those amounts; is that correct?
A. I believe -- I believe so, yeah.
Q. All right.
A. But I don't have a calculator to check the numbers, but my remembrance is that's when we realized there was an issue.
Q. All right. And once you learned that there was an issue, what did you do personally?
A. Talked to Mario on the phone about what we could possibly do. And that, yeah, it was a mistake I don't think I've ever made since or wish I'd never made the first time.
Q. All right. And what -- what was the -- what was the result of your conversation with Mario Ramirez?
A. That in the spirit of cooperation that we would try to work through it on the project wherever we could and that we, Merritt + Pardini, would probably have to share in the cost of having made the technical error on our request.





Q. Could you turn your attention to Exhibit 77, please?
A. Sure.
Q. All right. Exhibit 77, if you look at the first page, the third paragraph down, second line, starting on the second line, you can see that there's some discussion of that issue, but take a moment and look.
A. (Witness complies). Yeah.
Q. All right.
A. This is pretty consistent with what I just said.
Q. I think it is. I think it is too.
A. Yeah.
Q. Take a look at the last paragraph down, though. It states -- or you state: "As with the contractual issues, Merritt + Pardini and our consultant team have continued progress on this project for the benefit of WCC and my personal history with your organization. During final contract negotiation, you noted, in a conversation with me, that the Navy encouraged WCC to add amounts to their submitted price, which were deemed by the Navy to be too low. Having heard this, I would find it difficult to not be awarded the original amount of the fees we submitted to your office." What are you referring to in that paragraph?
A. It seemed to me that in the bidding phase we were going back and forth again. The drawings had indicated a two-story, what we call a solution to the design, and that we had to



21c432ad-fbc3-49e6-9a6c-bb0da6ca40d8

come up with a three-story addition, and that there was a round of bidding and then I believe what we call in our terms a best and final solicitation from the Navy for your best and final price, and that there was some indication from West Coast that their price may have been -- may have indeed been unreasonably low and that they should look at their numbers a little more carefully.
Q. All right. I think I understand you so far.
A. Good.
Q. But as of October 26th, 2001, West Coast's contract price with the Navy is now set --
A. Set.
Q. -- by contract?
A. Correct.
Q. So just because they were allowed to change their bid price before that, why do you think that that would allow or should allow Merritt + Pardini to change their bid price, you know, when you consider that this is now October of 2001 and West Coast's bid price has been finalized?
A. Well, I was out on a limb. I mean, it was always, as the letter indicates, based on my personal relationship with Mario, recognition that I had made a mistake, our office had made a mistake, no, more specifically I obviously had made a mistake, and I asked for some consideration, if there was anything that they would be able to do of assistance in





stating that I think anybody putting together a final pricing sheet, an Administrative Assistant or otherwise, could have or should have noticed that there were numbers that were shifted, that were out of sequence, and at least asked the question of is this number included in your final total or not. So it was essentially me trying to save face and sharing the guilt in that there was a mistake made and nobody caught it and do I have to eat it all myself or not, so --
Q. I mean, did you feel like Merritt + Pardini was solely responsible for the mistake?
A. No, I felt like I was.
Q. All right. So you felt you were personally --
A. Oh, yeah.
Q. -- solely responsible?
A. I should have caught it and I didn't, but acting as a Principal of the company, I guess I get the royal treatment of saying we made the mistake, but owning up to it, I should have been the one who caught it.
Q. Do you recall who the subconsultants that Merritt + Pardini hired on this project were?
A. By company or individual?
Q. Well, whichever way you can better recall it.
A. Sorry. I believe AHBL, which is -- was our structural and civil engineers. And I believe, I think they went by the





name of Hultz/BHU/Cross, they could have had another name by then, who were our mechanical and electrical subconsultants. And individuals, I could take guesses at names, but --
Q. Well, are you done?
A. Unless you want names, yeah.
Q. At what point during the process does Merritt + Pardini contact AHBL and Hultz/BHU?
A. You mean on this specific project?
Q. On this specific project.
A. Sorry. When I -- probably almost immediately after getting the initial phone call from Mario asking us if we would like to be the architects for his response to their Request for a Proposal, he would ask me for my recommendations for engineering teams and at that point I would place phone calls to those prospective firms and ask in turn would they be interested in submitting on a Design/Build proposal with our company.
Q. Okay. And do they receive their own copy of the R.F.P. drawings and do they do their own critique --
A. Yes, sir.
Q. -- to use your word from earlier?
A. Sorry, yes, sir.
Q. Okay. And do you recall anything about that process with respect to this particular project say for AHBL?
A. Could you ask that again?





Q. Sure. Do you remember anything in particular that came up in AHBL's critique on this project, or even if it actually occurred?
A. I don't recall anything at this point.
Q. All right. How about with respect to Hultz/BHU?
A. Not at this point, I don't recall anything. Typically we open up the lines of communication, then go directly from subconsultants to the client because of the speed in which things might be happening.
Q. Okay. Do they receive a copy of the R.F.P. drawings so that they can provide a price?
A. Yes.
Q. And just moving through some documents here, if you could, turn next to Exhibit 84. That's in that same pile.
A. Eighty-four?
Q. Yes. Take a look at Exhibit 84, but Exhibit 84 apparently is some e-mails back and forth between you and somebody called Trisha at West Coast?
A. Yep.
Q. All right. What I'm interested in is your e-mail to Trisha at the top. In the first paragraph you state: "I have squawked about this in the past but we really NEED more time than we are often given from West Coast. I understand that Mario had this R.F.P. for some time before anyone realized that there was an A/E component to this submittal." Do you

know what that's talking about in that paragraph?
A. Um, in that paragraph, no, but reading what the subject is, it's an IDIQ. It must have been a separate contract.
Q. All right. What about the second paragraph: "We are having pretty substantial fee issues on Monterey because we had a VERY quick turnaround on that one as well and QC missed a typo on that proposal"?
A. Yep.
Q. What did you mean by a very quick turnaround?
A. Uh, Assuming that I was typing accurate statements then, the time in which we got the R.F.P. documents and the time that the original bid was due by the first date prior to its five or six Amendments, it would lend me to believe that we had a very brief period of time by which we were supposed to respond to the R.F.P.
Q. So you're talking -- you think that when you said a very quick turnaround, you were talking about the original turnaround between the time you got the R.F.P. drawings and when the bid was originally due?
A. Can I repeat what I think I heard you just say?
Q. Yes.
A. Yes. Sorry. We got the original set of R.F.P. documents. It would have had a due date. One of your exhibits in there stipulated a date in which it was due, that ultimately through a course of five or six Amendments, through another





exhibit that you showed me, would have postponed the original due date. So somewhere in that period there was a, according to this e-mail, there was a period in which we were given the documents and said we need the new design for a third-story addition and your fee proposal in what I must have thought was a very brief period of time.
Q. Could you turn to Exhibit 85, please?
A. Of course.
Q. And I believe if you turn to the second page of Exhibit 85 there's a letter from you to Bert Lawrence and Mario Ramirez dated April 24th, 2002?
A. Correct.
Q. And take sometime to look at the letter, if you'd like, but my first question is going to be Merritt + Pardini states or you state that on behalf of Merritt + Pardini, in the second line of the letter: "We are requesting payment in the amount of $37,500 for services rendered in January and February 2002." Do you see that?
A. Oh, yeah. I didn't know you had asked a question.
Q. All right.
A. Yes, I do see it.
Q. Can you tell me how you calculated that $37,500?
A. I wouldn't have calculated it. It would have been a number given to me by Administrative Assistants who would have looked at people's time cards and their activities pursuant





to this project.
Q. All right. And in the original version of this letter there wasn't any kind of a breakdown like this attached, was there?
A. I -- um, well, I don't believe so. I couldn't speak to that, to be honest with you.
Q. All right. Could you turn to the second page --
A. Um hum.
Q. -- of the letter?
A. Yep.
Q. And could you just tell me, sort of in plain English, what from your perspective was the basis for the REA?
A. In my own words, not using the words that may be mentioned in this, there was a discrepancy in my opinion on the requirements of the specifications that the R.F.P. were asking for, that in cases when we knew specifically -- I'm going to use for instances, just to illustrate. For example, if we knew we were going to buy Pella windows, we had to tell them we were going to buy Pella windows, they were going to be these models, we had to give them the catalog cuts. Where we didn't have a specific manufacturer, this is the way the R.F.P. was written, we had to write what was generally prescriptive specifications, meaning if we didn't know we were going to buy Pella windows, we were ultimately going to buy Pella -- we were going to ultimately





buy windows that had certain R-values and efficiency ratings, and it could have been constructed out of these three types of materials, similar or equal, being a rather prescriptive approach for specifying material, giving the contractor enough time to select the actual material that they want to go ahead and purchase. The problem was that we ultimately submitted a set of specifications that when they had decided, in my example, that they wanted to use Pella windows, which we didn't use, I'm just using it to illustrate a point, where we did not have materials selected, for example, we didn't know if we were going to use Kohler toilets. We submitted a specification that says we were going to use toilet fixtures of virtuous china, manufactured in the United States, white in color, and those were rejected because it was -- the government wanted to know an exact cut sheet of the toilet we were going to install and they wanted that for every piece of material that was going to go into the building. And my position was and still is that the R.F.P. specifications said that you didn't have to do that for every product, but where you did know the product, you were supposed to set the cut sheet, which is, by the way, the way they do it now. And so my specification writer, whose name still hasn't popped into my head, created a specification book that was probably that thick, partially included we are going to use Pella windows,



21c432ad-fbc3-49e6-9a6c-bb0da6ca40d8

but we don't know what toilet we're going to use, so we're going to, you know, buy these types of toilets. It was rejected, and at that point my staff and Mario's staff had to quickly decide every single product that was going to go into the building and then regive it back to the Navy for their review and approval, and that was a substantial cost.
Q. When you say quickly decide, how much time are you talking about?
A. Well, time was money at that point, I believe, so I'm saying probably in a matter of like a two or three-week period we had to make an awful lot of decisions. That -- that time frame, I'm honestly guessing, but it was very quick because I believe a final approval of a design packet was being held up for the specifications.
Q. Could you take a look at Exhibit 87 in that pile?
A. (Witness complies).
Q. Exhibit 87, Mr. Harm, is a letter to you from West Coast which states in the first sentence: "You are hereby directed to provide the OMSI Manual for Design/Build per the contract requirements..." First of all, do you know what OMSI is?
A. Oh, that's an acronym for operation maintenance -- the O&M manuals. I can't remember what all of the acronyms, letters stand for, but --
Q. Did this OMSI Manual develop into an issue between West





Coast and Merritt + Pardini?
A. Somewhat, yes.
Q. How so?
A. It was pretty labor intensive and considering the fact that we were already somewhat in a painful experience, given the previous error on our design fees, we were trying again to look for some more cooperation from West Coast to help us to assemble that manual.
Q. Did you understand that there was a provision in the contract between West Coast and the Navy that required this OMSI manual?
A. Pursuant to this letter, yeah, I was painfully aware of it.
Q. All right. And what I'm trying to get at is why did this develop into an issue between Merritt + Pardini and West Coast then? Did you have the opinion that somehow that requirement did not get carried forth into the contract between West Coast and Merritt + Pardini?
A. I don't recall. I think it was a question of not clearly understanding who was responsible for producing it, that ultimately the Design/Build team was responsible for producing, but for actually who had to produce it, I think that became a point of contention.
Q. Okay. Well, wouldn't that be the same thing as saying that you didn't think that Merritt + Pardini was required by contract to provide it?





A. Uh, yes, I guess so, yeah.
Q. Could you turn to Exhibit 88, please?
A. (Witness complies).
Q. All right. Exhibit 88 is a November 8, 2002 letter from you to Mario Ramirez, correct?
A. Um hum.
Q. And you started the letter by saying: "Dear Mario: It is disheartening that our relationship has come to the point where I need to put in writing items I would normally entrust to verbal agreements"?
A. Correct.
Q. What led you to start out your letter in that manner?
A. Several unreturned phone calls.
Q. Let's talk about the issues in the letter. What you have is as issue one, "Original Proposal," you state: "I agreed to compromise on the differing opinions of the originally proposed design fees due Merritt + Pardini. In return, you agreed to pay us half the difference, which amounted to $27,250." And then you state: "Merritt + Pardini would attempt to recover its $27,250 during Construction Administration by billing the full amount while expending minimum hours"?
A. Um hum.
Q. In that last sentence, what was the nature -- or let me -- let me take that back for a second. Let me rephrase





that. What are you talking about when you say that "Merritt + Pardini would attempt to recover its $27,250 during" --
A. By being more efficient with our time. For example, back then I may have billed out at $180 an hour and if I could get someone to do it as efficiently as I could and they bill it out at $95 an hour, that we might be able to make up some of it, still getting the work done, but just being more efficient.
Q. Well, from what you've just said, that suggests the same number of hours, but just somebody who works for a lower rate, but the language you actually used in that paragraph is "expending minimum hours," which suggests fewer hours.
A. You can't recall argue with what that says, yep.
Q. Thinking about it that way, does that help you with your answer?
A. Well, it would probably be a combination of both of them. I mean, if we didn't need to expend as much time on it, that would help. Another way would just be flat out more efficient with who we were using to do it.
Q. All right.
A. Yeah.
Q. Well, what about -- I'm sorry?
A. No, I'm done.
Q. What about the first half of that paragraph? You bring up this issue with respect to the original design fee.



21c432ad-fbc3-49e6-9a6c-bb0da6ca40d8

A. Um hum.
Q. And you mention an agreement to pay us half of the difference, as you say?
A. Um hum.
Q. What's the purpose of bringing up that issue in the context of this letter? Was that something that was still being finalized at that point?
A. Yeah. I think, if I remember correctly, Mario and I had a verbal agreement over the phone that may or may not have included our Administrative Assistants, Christy Pope on my side and I can't remember the young lady on his side, a verbal agreement amongst friends that we would split the difference, and that I had not yet received anything in writing confirming that agreement.
Q. I see. And what eventually happened with that? Was Merritt + Pardini paid the $27,250; do you know?
A. Actually, I don't know, to tell you the truth, because I think the closure of that happened after the closing of the company.
Q. All right. Take a look at the following issue, number two, "Reimbursable Expenses." That paragraph concludes where you mention a sum of approximately $17,000?
A. (Nodding head up and down).
Q. Just so I'm clear, was that $17,000 that should be paid to Merritt + Pardini or just simply to West Coast?





A. That was a payment that we were looking for for doing the printing of, I mean, large volumes of drawings and shipping them out via Federal Express from our office here in Tacoma, to be distributed to the people in San Bruno, California and things like that.
Q. And you state in the middle of the paragraph: "We informed Jim, at each printing, that these costs were NOT covered in our proposal and that normally the Contractor ships all prints from its office." Just so I'm clear, what was the departure from the norm, exactly?
A. Back then typically what we would do is we would collect all of the subconsultant's drawings, for example AHBL's drawings, we would bundle them in one package, so one set of originals, stick them in the tube for Federal Express, ship them to our contractor-client's office, who would take the originals, stack them up, send them to their locale reprographics house, who would then do all of the prints, charge them directly to the contractor, and the contractor would ship them out.
Q. Would you turn to page two and look at number three, "REA Rejected by Navy"? Do you see that?
A. Yes.
Q. And correct me if I'm wrong, but I believe this relates back to the REA that was in Exhibit 85?
A. Yeah, I would -- yes, it does.





Q. Okay. One of the things I'm interested about here, you can take a look back at Exhibit 85, if you'd like, but Exhibit 85 seeks $37,500?
A. Right.
Q. But this document mentions $20,500?
A. Right.
Q. What's the reason for the difference?
A. Without looking at any back-up, my assumption would have to be this references that it's our unanticipated labor. So the twenty-five -- the $20,500 in private sector work, that's our direct labor cost, it doesn't include mark-up, profit and overhead costs. So it's our directly-incurred expenses to employees for salaries and their benefits. And then the additional stuff would have been our mark-up and overhead, would be my assumption. So one is I think they call it a fully-loaded price and one is the base rate.
Q. Well, that sounds logical to me to a certain extent, but if --
A. And the $37,000 would include shipping and, you know, all of those extra things. That would be a grand total of the labor, profit margin, overhead, shipping and printing, I mean, all of that stuff wrapped up into it.
Q. Okay.
A. Is my assumption.
Q. Okay. Let me just ask you one other thing, that what you





say is logical I think to a certain extent.
A. Okay.
Q. But the difference between $20,500 and $37,500 is about $17,000. Would you expect that the overhead and the profit and the shipping, whatever you just said, would amount to 85% roughly of the labor amount?
A. Without looking up the back-up, I'd have to see what all it would entail because it could have been multiple shippings of documents, multiple efforts. I -- I'd have to look at the backup.
Q. All right.
A. I didn't create the numbers. I'm given the numbers by Administrative Assistants and stick them into a document.
Q. The third line from the bottom in that paragraph three, you state: "When you requested that the REA be dropped, I reluctantly agreed under the condition that you and I would come to resolution..." What are you getting at in that sentence?
A. (No answer).
Q. Let me -- let me try it this way. Let me start from the beginning. Do you recall at this point in time a request from West Coast that Merritt + Pardini drop the REA?
A. I'm sorry, could you say that again?
Q. Sure. This sentence talks about a request, apparently by West Coast, that Merritt + Pardini drop the REA, to use the

word in the letter. You know, as you sit here today, do you recall any such request --
A. Yes.
Q. -- by West Coast? All right, just let me finish, don't forget. You said yes, right?
A. I'm going to let you finish. Yes, I did say yes.
Q. All right.
A. I'm sorry.
Q. And what was the nature of the request?
A. If I remember correctly it was West Coast, first of all, wasn't really happy about us going after the Request for Equitable Adjustment that the Navy thought of as being one of their better clients. We felt we were done a wrong. We weren't going to be paid back by West Coast. They permitted us to do the REA. I went to California, made our case in front of a conference table much the same as this, and I believe secondary indications are wow, Scott has a pretty good point, but we need you to make this go away. Could you please ask him to drop it. And Mario called and asked me as a favor to drop the REA, for the specific reasons, I'm not sure.
Q. But was -- was there some part -- well, let me ask you this. Did you, in fact, agree to drop the REA?
A. Um, I believe so, yes.
Q. And -- (cell phone ringing). Off the record for a second.





(Counsel talked off the record)
Back on the record, please. So was -- was there part of this discussion that West Coast would somehow make some separate resolution of the issue with Merritt + Pardini?
A. I don't recall that discussion, even though there seems to be an implication of that in the paragraph that I wrote, but I don't recall it.
Q. Take a look at paragraphs four and five of Exhibit 88.
A. (Witness complies).
Q. These again talk about Construction Administration services. Can you tell me if, first of all, if paragraphs one, five and six are all talking about the same thing?
A. One, five and six? I would say they're not talking about exactly the same thing.
Q. You say they're not talking about?
A. No.
Q. What are they -- what are the differences in what they're talking about?
A. Oh, well, one talks about a discrepancy in our original fee proposal where there was that typographic error where numbers weren't shifted.
Q. Sure.
A. Remember, which put us at a substantial loss, potential for loss. And then it was paragraphs five and six, did you say?





Q. Yes, sure. Let me just interrupt you, if I can, because actually, I should have been more specific, but actually what I was talking about was the construction administration that was mentioned in the last sentence of paragraph one. And by the way, I mean one, four and five.
A. Thanks. Generally speaking, you're talking about the same thing, yes.
Q. In paragraph five you state: "As of now, we have exceeded our minimum budget for these services. Further Construction Administration requests will be for an additional cost." How did that issue get resolved?
A. I don't know.
Q. Do you know if Merritt + Pardini stopped providing Construction Administration services?
A. No, we did not stop, I just don't know how it got resolved because it was after the business was closed.
Q. And paragraph six mentions the Maintenance and Operations Manual. And is this the same manual that was discussed in Exhibit 87?
A. Yes. Yeah.
Q. How did you come up with the estimated cost of $35,000?
A. I don't recall.
Q. Now, at some point it's my understanding that Krei Architecture, Krei Architecture submitted some kind of a claim against West Coast?





A. That's my understanding too. I didn't participate in it.
Q. You didn't participate in it?
A. To the best of my remembrance, yeah.
Q. You didn't participate in it at all?
A. I don't have any specific knowledge. I might have. It was when they were shutting down the company. There were a lot of things going on.
Q. Who handled that for Krei?
A. To its final conclusion? Maybe a Rob Berman or a Jim Dugan or a Christy Pope or Diane Linieus.
Q. And did they have any discussions with you, you know, with respect to any of these issues, such as the REA or any of the other issues we've been discussing?
A. I -- the only limited to me, if I would be available to provide any support if they needed it, and I offered to help out wherever I could, but not specifics.
Q. Would it be fair for me to conclude that if you'd spent a substantial amount of time on that, that you would probably recall it?
A. Oh, yeah. I would think so, yeah.
Q. Let me just ask you to quickly take a look at an exhibit that's marked as No. 90. Have you ever seen Exhibit 90 before?
A. I think I may have been shown a copy of this at one point. Yeah, I think I was sent a cursory copy of this at some



21c432ad-fbc3-49e6-9a6c-bb0da6ca40d8

time.
Q. What do you mean a -- did you say cursory or courtesy?
A. I don't know if I -- maybe courtesy is what I meant to state. Yeah, this is clearly after I owned my own company.
Q. All right. All right. You can set those documents aside. Let me show you a document that's previously been marked as Exhibit No. 4.
A. And is it in here?
Q. No, I'm giving it to you. Here you go.
A. (Witness complies).
Q. Let's see, and also just so I can show you what I'm driving at here, let me show you what's previously been marked as Exhibit No. 46. And it might help you if you take a look at that, that meaning Exhibit 46 first.
A. (Witness complies).
Q. All right. You're looking up at me, so I take it that I've given you enough time --
A. Sure.
Q. -- to review composite Exhibit 4. Let me just ask you a preliminary question. Exhibit 46 is a letter from West Coast to Merritt + Pardini, providing or proposing an additional amount of $1,778 for PCO No. 8 design. And the first question is do you recall if that was even paid?
A. No, I don't recall if that's been paid.
Q. What I was hoping you could do is somehow tell me, if you





can, what the relationship between Exhibit 46 and PCO No. 8, that's set out in various of the letters and Exhibit 4.
A. If I remember correctly, there was a restriping request of the parking lot that was identified pursuant to, among other things, site accessibility and enactment of anti-terrorism force protection standoff distances that were affected during the course of the design, and that there was a change that had to occur between us, or more specifically, our civil engineer which was AHBL. I'm going to be sketchy around a lot of the details.
Q. Okay. What I'm interested in knowing is what would Merritt + Pardini be doing for $1,778?
A. Maybe nothing. It could have been a pass-through to our civil engineer. The civil engineer says we need seventeen -- what is it? Seventeen hundred -- one scenario could have been the civil engineer, AHBL wanted $1,778 to revise their drawings for a new striping plan and we passed it on as a cursory charge to our client, which was West Coast Contractors, so that our civil engineer could be remunerated for changing their drawings. That's one scenario. Another one is they needed $1,000 of it and because of administrative functions, we needed $700 to cover our charges. And without looking at back-up, I can't tell you exactly where the $1,778 came from. This is typically something that would have fallen under the jurisdiction of a





Project Manager like Jim Cockerill.
Q. You can give me that document back, if you'd like, or actually both of them. Thank you.
A. Would you like this also?
Q. Okay, I'll take that too. Let me show you what's been previously marked as Exhibit No. 9. Could you tell me what Exhibit 9 is, Mr. Harm?
A. Typically it's a handwritten document that tells you essentially in verbiage as opposed to graphic form on our plans for what we are going to be designing for the ultimate end user or the client of West Coast Contractors, I believe.
Q. The second page has the Merritt + Pardini letterhead. And is this a document that's written strictly by Merritt + Pardini or is it a collaborative document between Merritt + Pardini and the subconsultants?
A. Up to and including -- well, there's no page numbers on this, the statement, it says: "End of architectural basis of design narrative." That would be the portion to which we solely were the authors of, it would appear, and any attachments to that, including mechanical design paragraphs 1.1 through paragraphs 1.10 would have been supplied by our subconsulting engineers. But it appears to me that the first three -- three pages would have been something solely created by Merritt + Pardini.
Q. Let me show you what's been marked as Exhibit No. 13. Take





a look at Exhibit No. 13 and tell me if you recall seeing that document before.
A. (Witness complies). I believe I remember seeing this.
Q. Did you prepare this document?
A. No.
Q. Who prepared the document?
A. The person who signed the cover sheet, which would have been Jim Cockerill, the Project Manager.
Q. What was the purpose of this document, Exhibit 13?
A. In its completeness, it would have been the Navy reviews our set of design drawings and makes comments, and we have to give them written responses to their review comments, as well as making applicable graphic changes to drawings where they're so warranted or where we agree with their comments. We are permitted to take exception to their comments where we don't agree with their critiques.
Q. All right. And, I mean, can you just tell me in general what was the level of agreement or disagreement on the Navy's comments?
A. At this point I'm not -- I don't know that I can answer that accurately. Typically there will be any number of them that we agree with and, therefore comply with, and there will be a certain percentage that we take exception to and argue the case that we don't agree that we need to make the changes. And I know that this job had, you know, percentages of each.



21c432ad-fbc3-49e6-9a6c-bb0da6ca40d8