IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WEST COAST CONTRACTORS OF NEVADA, INC., | ) | |
| Plaintiff, | ) | No. 05-1121C |
| v. | ) | (Chief Judge Damich) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS

Pursuant to Rule 56(h)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant respectfully submits the following proposed findings of uncontroverted fact in support of its motion for partial summary judgment.

The Original Solicitation And Phase One Of The Procurement

1. On November 7, 2000, the Department of the Navy ("Navy"), listed in Commerce Business Daily a procurement announcement for an extension to Building 245 at the Naval Post Graduate School in Monterey, California. Defendant's Appendix ("DA") 1.

2. The announcement stated that the "anticipated" size of the building was two stories of approximately 1,500 square meters [16,146 square feet] floor space. Id.

3. On December 11, 2000, the Navy issued the solicitation using standard form 1442. DA2-40. It stated that offers were due by January 11, 2001.

4. Box 2 of the solicitation identified the type of solicitation as a negotiated request for proposals ("RFP"), rather than a sealed bid procurement. Id.

5. Box 10 of the RFP described the work as "the design and construction of a two-story office/classroom building with connecting bridge to the existing building. . . ." Box 10 further stated that the Navy would use a two-phase design-build procedure outlined in Federal Acquisition Regulation Subpart 36.3. Id.

6. The RFP included "Document 00201 Instructions to Proposers." DA4. In paragraph 1, Description of Work, it described the design work for the project as follows:

> The design phase includes design and engineering to complete the preparation of detailed working drawings and specifications suitable for construction. The Government has developed mandatory design requirements and preliminary design drawings and prescriptive specifications as the basis for the design build requirements.

DA6.

7. Paragraph 2 of the Instructions to Proposers described the nature of the two-phase design-build procedures. It stated that phase one of the technical evaluation would address the following technical factors: (1) past performance; and (2) corporate and key personnel experience. It further stated that after evaluating the phase one proposals, the Navy would select a maximum of five of the most highly qualified offerors to participate in phase two. DA6.

8. Paragraph 23 of the Instructions to Proposers notified offerors that FAR clauses 52.236-2, Differing Site Conditions, and 52.236-3, Site Investigation and Conditions Affecting the Work, would be included in the contract. DA22. It

stated "[a]ccordingly, offerors or quoters are urged and expected to inspect the site where the work will be performed."

9. On December 19, 2000, the Navy issued amendment one to the RFP. DA41. In addition to several minor changes to the solicitation, amendment one stated:

> In clarification of the solicitation requirements, no drawings will be issued during Phase 1 of this two-phase solicitation. It is the Government's intent to issue 35% design drawings to those offerors who are selected to participate in Phase 2. . . .

Id.

10. Amendment two to the solicitation, dated January 10, 2001, extended the deadline for the submission of proposals to January 23, 2001. DA43. Amendment three, dated January 12, 2001, provided detailed criteria with respect to the factors that the Navy would use to evaluate offers and changed the phase two (now referred to as "part two") evaluation so that it included only price and commitment to small business. DA45.

Amendment Four To The RFP

11. Following the receipt of the phase one proposals, on March 19, 2001, the Navy issued amendment four to the RFP. DA41. It described the amendment as "provid[ing] offerors with the SF 1442, SOLICITATION, OFFER, AND AWARD; Sections 00600, 00710, 00711, 00830, Division 01, General Requirements, and 45 Drawings." DA52.

12. With respect to the drawings, amendment four cautioned offerors as follows:

> 5. **NOTE TO OFFERORS**: This is a design build contract. The design shown on the drawings included in this solicitation will require significant development based on requirements in Section 01112 before pricing can take place. The Government's schedule is firm. Offerors' attention to design is considered necessary for adequate pricing.

DA56. (Emphasis in original).

13. Section 01112 of the RFP (and contract) was entitled "General Design and Construction Criteria." At paragraph 1.1.1, "Contractor's Design Responsibility," it stated that the RFP included a "preliminary design package . . . consist[ing] of partial design in architectural and engineering disciplines, and material specifications." It further stated:

> Additional design requirement are contain [sic] in this section of the RFP. The final design developed by the contractor shall combined [sic] the requirements in this section with the preliminary design to produce a complete design package suitable for construction. . . . The Contractor is solely responsible for the final design of the facility.

DA267.

14. Nothing in amendment four to the RFP described the drawings as being at any particular stage of completion in terms of a numerical percentage. Rather, section 01112, paragraph 1.1.1 described the "partial designs" provided by the Navy as being in "various stages of development." Id.

15. Section 01112, paragraph 1.1.2, of the RFP (and contract) was entitled "Modifications to the Government's Design Package." Id. It stated that the Navy

had determined to acquire a building with a minimum square footage of 2,025 square meters [21,797 square feet]. Instead of the two-story building referenced in the original RFP, this paragraph stated that the required structure must either be a two story above ground structure with a full size basement or a three story above ground structure, plus a connecting link to the existing building. Either structure must be on an 81 by 91 foot "nominal building footprint."

16. An 81 by 91 foot building footprint would provide the Navy with 7,371 square feet (684.78 square meters) per floor.

17. The drawings provided with amendment four were dated February 15, 2002. E.g., DA767.

18. None of the drawings provided by the Navy in amendment four showed a two story building with a full size basement or a three story building. Rather, the drawings showed a two story slab on grade building as identified in the Commerce Business Daily announcement and the original solicitation. See e.g., structural drawing 1 (S1), DA789 (referring to slab on grade construction in detail nine); drawing S5, DA793 (showing two story building with piers extending from beneath first floor).

19. West Coast's architect, Scott Harm, testified at his deposition with respect to the design work required to transform a design for a two story building into a three story building:

> Q. All right. So how do you turn 35% drawings for a two-story building into 100% drawings for a three-story building?

> A. Lots of pain and agony.
>
> Q. Lots of pain and agony?
>
> A. I mean, that's, yeah, essentially starting from the ground up again because foundations are formed by gravity loads and when you're adding one extra floor of a building to foundations, those things start changing, they have to get bigger, deeper, wider, more reinforcing, so you're actually redesigning the building from the ground up.

DA733 (deposition (depo.) page (p.) 37, lines (ll.) 3-12).

20. The reference in section 01112, paragraph 1.1.1 to the "partial designs" as being in "various stages of development" was demonstrated, in part, by the differing sizes of the building footprint shown on the drawings. While all drawings showed a two story slab on grade design, the structural, mechanical, electrical, and fire protection drawings showed a building with 81 by 91 foot dimensions, while the architectural drawings showed dimensions of 91 by 61 feet. Compare, e.g., A2 (DA780) with S2 (DA790).

Provisions Of The RFP Pertaining To The HVAC Design

21. Section 01112, paragraph 1.11, of the RFP and design-build contract provided the requirements for the heating, ventilation, and air conditioning system ("HVAC") for the building. DA287.

22. Section 01112, subparagraph 1.11.1, is entitled "SYSTEM DESCRIPTION AND REQUIREMENTS." Id. Its first sentence informed offerors "This is a Design Build project. Provide a complete, functional, operational and maintainable HVAC system." Id.

23. With respect to the mechanical drawings (M drawings) provided with amendment four to the RFP, subparagraph 1.11.1 informed offerors:

> Except as noted in Paragraph 1.1.2 above, Preliminary Design Drawings Sheets M-1 through M-5 issued with this RFP are intended to show design intent only. The Design Build Contractor's Team shall perform independent design to meet the requirements of this RFP. The Contractor's design shall fully demonstrate and meet the functional, operational, and maintenance adequacy of this RFP. The Contractor shall be fully responsible for the design.

Id.

24. Section 01112, subparagraph 1.11.3, is entitled "DESIGN CRITERIA." DA289. Its subparagraphs provided the external and internal load criteria that the design-build contractor had to consider and accommodate in its design of the HVAC system.

25. With respect to external loads, among other things, this subparagraph required the design-build contractor to accommodate 37 degree winter days and 78 degree summer days, with a daily range of 20 degrees. Id.

26. With respect to internal loads, this subparagraph provided the number of persons for which various areas of the building must be designed, and the number of watts per square foot generated by lights and equipment. Id.

27. Section 01112, subparagraph 1.11.4, is entitled "Indoor Temperature Requirements." Id. It provided that the "system shall be capable of maintaining indoor design temperatures at outdoor design conditions." It further provided that

the temperature in all occupied spaces must not vary by more than two degrees, plus or minus, from the inside winter design temperature of 72 degrees Fahrenheit, and the inside summer design temperature of 74 degrees. DA290.

28. Section 01112, subparagraph 1.11.5, is entitled "Room Noise Criteria." DA290. It provided that the design-build contractor must design the system to meet NC [noise criterion] 35. NC is a measurement system of background noise by the American National Standards Institute. An NC between 30 and 40 is considered quiet. See http://www.engineeringtoolbox.com/noise-criteria-d_726.html.

29. Section 01112, subparagraph 1.11.6, is entitled "Energy Efficient Design." DA290. It required the design-build contractor to "[m]inimize unit energy consumption through the application of energy-efficient designs, construction, and equipment selections."

30. Drawing M-4, diagram three, showed an air cooled chiller with a nominal size of 15 tons. DA802. A chiller is a piece of equipment that provides chilled water to air handling units in a building and is used to provide air conditioning. Diagram one of this drawing also depicted a 6,500 cubic feet per minute ("CFM") air handling unit.

31. The entire set of preliminary mechanical drawings indicated a two story building. DA799-803.

Provisions Of The RFP Pertaining To The Structural Design

32. Section 01112, paragraph 1.9 was entitled "Structural." DA282. Subparagraph 1.9.1, "Design Basis," provided "[u]se design basis as stated in General Structural

Notes of Structural Sheet S-1." Id. The notes on S-1 provided the building codes applicable to the design and provided the vertical, seismic, and wind loads that the design must accommodate. DA789.

33. Section 01112, subparagraphs 1.9.3 and 1.9.4 identified the non-seismic and seismic design requirements for the building. DA282-83.

34. Section 01112, subparagraph 1.9.5, "Geotechnical Report," required the design-build contractor to incorporate the geotechnical report into the design of the building where it was listed as a requirement. It further stated that unless specifically cited as a design requirement, the geotechnical report was provided for informational purposes only. DA283. This subparagraph concluded by stating "[t]he Contractor is solely responsible for the design and construction of this building extension." Id.

35. Section 01112, subparagraph 1.9.6.1 provided the contractor two options from which to construct the foundation system. DA283. Subparagraph 1.9.6.2 specified the upper bounds of vibration for the roof and floor systems. Id. Subparagraph 1.9.6.3 specified the lateral force resisting requirements. Id.

36. Section 01112, subparagraph 1.9.6.4, "Design-Build Team Requirements," provided that during design "[t]he Design-Build Team shall provide a complete structural design of the building shell and link, including foundation." It stated that a complete structural design included structural drawings, structural calculations, structural specifications, quality assurance plan, statements of responsibility, and test and inspections information sheet. DA284-85.

37. Section 01112, paragraph 1.6, was entitled "Civil System." DA274. Subparagraph 1.6.1, Site Grading, at sub-subparagraph (a) stated that "[t]he site shall encompass an existing graded slope created with the final grading and construction of building 245 in 1992." Sub-subparagraph (b) stated that "[t]he finished floor of the project building shall be the same elevation as that of Building 245 and shall be at least 1 foot above the surrounding finished grades." Id.

38. Civil drawing C-5 identified the finished floor elevation of the existing building to be 49.0 feet, plus or minus. DA813.

39. Drawings S-5 and S-6 showed the grade beams for the building to be immediately below the finished floor/slab on grade elevations. DA793-94. A grade beam is a reinforced concrete beam placed directly on the ground to provide the foundation for the superstructure of a building.

40. Similarly, details 8, 14, and 16 on drawing S-7 showed the slab sitting directly on the grade beams. DA795.

41. By themselves, drawings S-5, S-6, and S-7 would have required the contractor to construct little or no foundation wall to connect the slab to the grade beams.

42. Drawing S-7, at drilled pier note 5, provided "see civil drawings for nominal first floor elevation." DA795.

43. Drawings C-1, Existing Topography, and C-5, Grading Plan, showed the actual elevations of the site. They showed that the elevations in the area of the new

building in most cases were about three feet lower than the finished floor of the existing building. DA812-13.

44. Given the actual elevations shown on the civil drawings, it would not have been possible to construct the building without constructing a foundation wall several feet in height, or using a method such as the construction of a retaining wall, to connect the slab at elevation 49 to the grade beams which would be located at elevation 46. DA753 (depo. p. 20, ll. 7-20).

<u>The Navy Awards The Design-Build Contract To West Coast</u>

45. West Coast's president, Mario Ramirez, prepared West Coast's offer for the project. DA678 (depo. p. 23, ll. 1-3).

46. Mr. Ramirez did not recognize that RFP amendment four added an additional floor to the building so that the specifications differed from the two story slab-on-grade building shown on the RFP drawings. He repeatedly testified in his deposition that the square footage of the building never changed. DA698 (depo. p. 104, l. 25; p. 105, l. 8) DA699 (depo. p. 106, ll. 13 & 24; p. 106, l. 20; p. 109, l. 5) DA700 (depo. p. 111, l. 15).

47. On June 21, 2001, the Navy accepted final proposals from offerors. DA513.

48. West Coast and the Navy executed a design-build contract on June 29, 2001 which required the construction of a three story building. DA540-41.

West Coast's Design Team

49. West Coast entered into a contract with Merritt + Pardini to act as the designer for the project. Scott Harm was the principal at Merritt + Pardini responsible for the project.

50. Merritt + Pardini subcontracted with Hulz/BHU for the mechanical design for the project. Ted Veach was the project manager for Hultz/BHU for this project. DA760 (depo. p. 8, l. 22).

51. Merritt + Pardini subcontracted with AHBL for the structural design for the project. DA751 (depo. p. 12, ll. 14-20).

West Coast Retains Mechanical Subcontractors

52. West Coast did not intend to perform the HVAC work itself, but rather intended to use subcontractors to perform this work. For this reason, Mr. Ramirez testified in his deposition that he relied upon subcontractors for the preparation of the HVAC portion of West Coast's offer. DA697 (depo. p. 103, ll. 6-24).

53. West Coast received a proposal from JBK Mechanical, Inc. ("JBK") in the amount of $565,000 for the mechanical work on the project. In its proposal, JBK described this price as "plug only." DA510-11.

54. West Coast carried this amount of $565,000 for the mechanical work into its best and final proposal to the Navy. DA536 (top of column 38).

55. West Coast did not enter into a subcontract with JBK for the mechanical work on the project. Rather, it retained two subcontractors, Mt. Rose Heating & Air Conditioning Inc. ("Mt. Rose") and Johnson Plumbing to perform this work.

56. West Coast's subcontract with Johnson Plumbing was in the amount of $340,000, while the Mt. Rose subcontract was for $142,950. DA544, 560.

57. The total amount of these two subcontracts was $482,950, or $82,050 less than the JBK proposal that West Coast carried in its offer to the Navy.

58. There is no evidence in West Coast's records that West Coast received a proposal from, or had any dealings with, either Johnson Plumbing or Mt. Rose prior to the Navy and West Coast entering into the design-build contract on June 29, 2001.

59. The first communication from Mt. Rose contained in West Coast's documents is an August 7, 2001 letter from Mt. Rose to West Coast in which Mt. Rose proposed a scope of work to West Coast. DA574. Mt. Rose then followed on August 31, 2001 with a letter to West Coast in which it proposed a price of $142,950. DA576.

60. The first communication from Johnson Plumbing contained in West Coast's records is an August 27, 2001 letter from Johnson Plumbing to West Coast in which Johnson Plumbing submitted its proposed price of $340,000. DA575.

61. Johnson Plumbing's subcontract states on the first page that the agreement is "made this 29th day of JUNE 2001" (the date of the Navy - West Coast design-build contract) but Johnson Plumbing did not sign it until October 9, 2001. DA553. West Coast did not sign the subcontract until November 27, 2001. Id.

62. Similarly, West Coast's subcontract with Mt. Rose states that the agreement was made June 29, 2001, but Mt. Rose and West Coast did not sign it until September 4, 2002 and October 21, 2002, respectively. DA569.

63. The Johnson Plumbing subcontract stated that Johnson Plumbing agreed "to furnish all necessary material, labor, tools, equipment and supplies necessary to perform all work set forth in Exhibit "A" entitled Scope of Work. . . ." DA544. The scope of work required Johnson Plumbing to "furnish and install plumbing system." DA554.

64. Johnson Plumbing's scope of work also included "design build coordination." Carl Johnson of Johnson Plumbing testified at his deposition that this meant that Johnson Plumbing had to "pick the plumbing fixtures." DA654 (depo. p. 8, ll. 22-25).

65. The Mt. Rose subcontract also defined Mt. Rose's scope of work in Exhibit A to the subcontract. The scope of work required Mt. Rose to "furnish and install HVAC system" and to perform design-build coordination. DA570. Moreover, the scope of work stated "Price based on preliminary plans & specifications as prepared by the Department of the Navy, dated 02/15/2001. All changes on construction drawing to be addressed in the form of a change order." Id.

66. Joe Bingham, Mt. Rose's co-owner, vice president, and project manager for this project, signed the subcontract on behalf of Mt. Rose. DA569. Mr. Bingham testified at his deposition that he was not aware that this was a design-build project until told so by Government counsel at his deposition. DA668 (depo. p. 16, ll. 18-21).

West Coast Submits A Request For Equitable Adjustment Relating To the Chiller

67. On November 5, 2002, West Coast submitted a request for equitable adjustment ("REA") in the amount of $114,489 to the Navy on behalf of Mt. Rose and Johnson Plumbing. DA593.

68. The REA stated that the RFP drawings "indicated using a 15 ton chiller and 6500 CFM [cubic feet per minute] air-handling unit." West Coast stated that "to meet the design cooling temperature of 74 F, a 40-ton chiller and a 14,000 CFM air-handling unit were required." Id.

69. The Navy denied the REA in a letter to West Coast dated February 4, 2003. DA610.

Testimony On The Effect To The Mechanical Equipment Of Adding A Third Floor

70. Mr. Veach, Merritt + Pardini's subconsultant responsible for the mechanical design, testified that adding a third floor to the building would not affect the chiller size if the square footage of the building remained the same. However, if the square footage of the building increased, the chiller size would increase. DA761 (depo. p. 12, l. 20 to p. 13, l. 6).

71. Similarly, when Mr. Veach was asked if a change in the building size from 1,500 square meters to 2,025 square meters would affect the size of the chiller, he replied "Certainly." DA762 (depo. p. 14, l. 4). When asked if this would also apply to the air handling unit, he replied, "Yes, absolutely." DA762 (depo. p. 14, l. 6).

72. When asked whether the addition of a third story to the building would have affected the air handler capacity and duct sizes, Mr. Bingham of Mt. Rose testified "For sure, yeah. If you add another floor, if it was two story and went to three story, it's going to add approximately 50 percent more air." DA667 (depo. p. 13, ll. 2-4).

73. Mr. Harm of Merritt + Pardini testified at his deposition that "a chiller size [sic] for a two-story would not be large enough for a three-story building, unless you shrunk the size of the floors to make the gross volume exactly the same." DA733 (depo. p. 38, ll. 1-4).

West Coast's REA Related To The Foundation Elevation Change

74. By letter dated October 16, 2002, West Coast requested an additional $170,767.54 due to a "foundation elevation change." DA585. West Coast stated that the "RFP drawings indicated the foundation grade to be 1 foot below first floor top of slab" but "[d]uring the design process and design review these elevations changed to 3 feet below finish floor typically. . . ." Id.

75. West Coast contended that as a result of the change in foundation elevation it had to perform additional excavation and had to construct stem walls to bring the building foundation to the finish floor grade. DA585-86.

76. West Coast also attached a letter from Thomas Hicks, a principal at AHBL, in support of this REA. DA590.

77. By letter dated November 22, 2002, West Coast furnished additional information to the Navy concerning this REA. DA603. West Coast identified the drawings

that it was relying upon as drawings S5, S6, and S7. West Coast stated that drawings S5 and S6 "indicate that the pier cap and grade beams are immediately below S.O.G. [slab on grade]/F.F. [finished floor] elevation." Id. Among other things West Coast also stated that detail 14 of drawing S7 "indicates that the slab sits directly on the G.B. [grade beam] at the links." Id.

78. West Coast attached sketches to this letter that it contended illustrated the difference between its planned method of constructing the foundation and its actual method. DA604-07.

79. By letter dated February 4, 2003, the contracting officer denied the REA. DA608.

80. At his deposition, Mr. Hicks of AHBL testified that the exterior grades shown on the civil drawings were not compatible with the architectural and structural drawings. As a solution to this problem, West Coast would have needed to construct a stem wall, as it did, or would have needed to construct a retaining wall or a sloped grade. DA753 (depo. p. 20, ll. 11-20).

Merritt + Pardini Issues

81. A number of issues arose during the project between West Coast and its designer, Merritt + Pardini. The first issue involved Merritt + Pardini's contract price.

82. Some time prior to the Navy's award of the design-build contract to West Coast, Merritt + Pardini sent to West Coast an undated memorandum containing a proposal for Merritt + Pardini's fees for the project. DA542. The memorandum listed categories of services to be rendered and then contained prices for the various services in the right hand column. Id.

83. The memorandum did not contain a typed total price, but someone wrote "$240,150" by hand at the end of the memorandum. DA543. $240,150 is the correct total of the numbers in the right hand column of the memorandum.

84. Thereafter, Mr. Ramirez of West Coast signed a purchase order dated June 29, 2001 in the amount of $240,150 for Merritt + Pardini's services for the project. DA573.

85. On October 26, 2001, Mr. Harm of Merritt + Pardini sent Mr. Ramirez a letter. DA577. Mr. Harm stated in relevant part that "[i]n one of our recent conversations, you mentioned that you were aware that some fees were mistakenly not included in your proposal to the Navy. I understand that the cause for this confusion is based on the fact that some numbers in our original proposal (attached) 'shifted' out-of-column and were therefore 'missed' in the administrative process of submitting the proposal."

86. Attached to this October 26, 2001 letter, Mr. Harm provided West Coast its earlier undated memorandum containing its prices for the project. DA579. This memorandum now had the date June 6, 2001 hand written in the top right hand corner of the memorandum. The memorandum also now contained hand written circles around prices that were contained in the text of the services to be rendered with arrows pointing to the right hand corner. This memorandum illustrated that the $240,150 price did not include Merritt + Pardini's price of $5,000 for pile foundation design and drafting, its $28,600 price for mechanical engineering design, and its $20,900 price for electrical engineering design. Id. Including these

amounts in the Merritt + Pardini purchase order price would increase the price from $240,150 to $294,650.

87. On November 13, 2001, Merritt + Pardini faxed to West Coast a signed copy of the purchase order signed by Mr. Ramirez with hand written changes to reflect an increase in price to $294,650. DA581.

88. At his deposition, Mr. Ramirez testified that his reaction when he received these documents from Merritt + Pardini was "I'm taking this thing and, you know, throwing it in the garbage can." DA694 (depo. p. 92, ll. 1-2).

89. Another issue arose concerning the prescriptive and proprietary specifications required by the RFP. By letter to the Navy and West Coast dated April 24, 2002, Mr. Harm requested an additional $37,500 "for several technical staff members reworking specifications based on comments received from the Navy that, in our opinion, were not consistent with the original requirements of the published Request for Proposal (RFP)." DA582.

90. Mr. Harm testified at his deposition concerning the amount of this REA as follows:

> Q. Can you tell me how you calculated that $37,500?
>
> A. I wouldn't have calculated it. It would have been a number given to me by Administrative Assistants who would have looked at people's time cards and their activities pursuant to this project.
>
> Q. All right. And in the original version of this letter there wasn't any kind of a breakdown like this attached, was there?

> A. I -- um, well, I don't believe so. I couldn't speak to that, to be honest with you.

DA736 (depo. p. 51, l. 22 to p. 52. l.6).

91. Another issue arose between West Coast and Merritt + Pardini when, by letter dated October 14, 2002, West Coast directed Merritt + Pardini to provide the operation and maintenance support information ("OMSI") manual "per the contract requirements in Section 01782." DA558.

92. On November 8, 2002, Mr. Harm wrote to West Coast concerning several of these disputed issues. DA600. With respect to the dispute concerning the price of the Merritt + Pardini contract, Mr. Harm stated that he had agreed to compromise for half of the amount in dispute, $27,250 but that Merritt + Pardini would attempt to recover the remaining $27,250 "during Construction Administration by billing the full amount while expending minimum hours."

93. With respect to the $37,500 REA included in his April 24, 2002 letter, Mr. Harm stated in a spreadsheet included in the letter that this amount consisted of $17,000 for copying fees and $20,500 for labor. DA602. However, earlier in the letter, he identified the REA amount as $20,500 in paragraph three of the letter and listed the $17,000 in copying charges separately in paragraph two entitled "Reimbursable Expenses." DA600-01.

94. With respect to the $17,000 Merritt + Pardini requested for reimbursable expenses, Mr. Ramirez testified at his deposition:

> Q. Okay. What about the second paragraph, "Reimbursable Expenses"?

> A. That I told him from day one that I disagree with him. And even by -- by Tracy's notes on this thing, I told him from day one I disagree with you. And even when he sent that letter to Bert, I told him I disagreed with him, you know. I never agreed with him on that portion of it.
>
> Q. Did you ever get any breakdown from him as to how he calculated the value of that items as $17,000?
>
> A. No, I did not. I don't remember.

DA704 (depo. p. 133, ll. 6-10).

95. Mr. Harm also stated in his November 8, 2002 letter that "[w]e are being required to collect and submit the maintenance operations manual for the project that will once again cause Merritt + Pardini a great financial expense (estimated cost of $35,000). . . ." DA601. Mr. Harm stated that Merritt + Pardini would not submit the OMSI manual until all other items in his letter had been resolved. Id.

96. Merritt + Pardini at some point became known as Krei Architecture, Inc. ("Krei"). DA613.

97. The disputes between Merritt + Pardini/Krei and West Coast lingered after the completion of the project in 2003. Tracy Heiber, West Coast's project manager, created a spreadsheet dated September 20, 2005 (see line 18 of DA612) which outlined the dispute. DA612. The spreadsheet indicated that Krei was seeking a total amount of $406,817.44, of which West Coast had approved $292,711 and had paid $259,386.54.

98. The spreadsheet also identified the areas in dispute. For example, in the "Krei Requested" column it indicated that Krei was still looking for its full contract price of $294,650. Id. This column also listed the $20,500 REA amount, $23,000 for the O&M manual, and $35,000 for "expenses."

99. By settlement agreement dated March 31, 2006, Krei and West Coast agreed to settle all of their disputes relating to this project for a lump sum payment by West Coast to Krei of $36,000. DA613.

100. In this settlement agreement, Krei "irrevocably and unconditionally release[d]" West Coast for all "amounts claimed due by Krei for Professional Architectural and Engineering Services on the Project." Id. Krei further agreed to dismiss with prejudice a pending arbitration with West Coast. DA615

101. When asked at his deposition if the $36,000 was a lump sum or if West Coast and Krei had allocated it among the various issues pending between them, Mr. Ramirez testified "it was a lump sum. It was not pro-rated to any one item. It was just a number that we came up with." DA709 (depo. p. 147, ll. 11-12).

102. On November 14, 2006, the Government served its first set of interrogatories upon West Coast. Interrogatory no. 3 stated:

> For the "Increased Design Costs" claim alleged in paragraphs 20 through 27 of the complaint, identify all cost components of this claim and explain how you calculated the value of this claim at $37,500.

DA620. In a simultaneous document request, the Government requested that West Coast produce all documents used to calculate the claim. DA623.

103. In West Coast's January 10, 2007 response to this interrogatory, it stated:

> The value of this claim was calculated using the increased design costs as assessed by West Coast's design firm, Merritt + Pardini. As evidence attached hereto as Exhibit C, Merritt + Pardini charged West Coast an additional $37,500 in fees for its services resulting from the increase in design work necessitated by the government's refusal to give 100% final design approval as required by the contract.

DA620. Similarly, West Coast's response to the document request simply referred to the document attached as Exhibit C. DA623

104. Exhibit C to West Coast's interrogatory responses was Merritt + Pardini's April 24, 2002 letter to West Coast. DA633.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Brian M. Simkin
BRIAN M. SIMKIN
Assistant Director

s/Michael N. O'Connell
MICHAEL N. O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
12th Floor
Washington, D.C. 20530
Tele: (202) 307-0282
Attorneys for Defendant

Dated: November 9, 2007

CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of November, 2007, a copy of the foregoing proposed findings of uncontroverted facts was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Michael N. O'Connell