No. 05-1121C
(Chief Judge Damich)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WEST COAST CONTRACTORS OF
NEVADA, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S CORRECTED MOTION FOR PARTIAL SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

BRIAN M. SIMKIN
Assistant Director

MICHAEL N. O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
11000 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 353-1618
Fax: (202) 514-8624

Dated: November 9, 2007

Attorneys for Defendant

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.......................................................................................... 1

STATEMENT OF THE ISSUES ........................................................................................ 2

STATEMENT OF THE CASE ........................................................................................... 3

I. Nature Of The Case........................................................................................ 3

II. Statement Of Facts.......................................................................................... 3

ARGUMENT........................................................................................................................ 6

I. Summary Judgment Standards......................................................................... 6

II. The Contract Allocated The Risk Of Defects In The Preliminary Design To West Coast.......................................................................................... 7

A. The HVAC Specifications Are Performance Specifications. ..................... 9

B. The Structural Specification Is A Performance Specification. ................. 12

III. The Contract Was Patently Ambiguous............................................................ 14

IV. West Coast Is Not Entitled To Recover Upon Behalf Of Merritt + Pardini. ........ 17

A. The Severin Doctrine Bars This Claim.................................................... 18

B. West Coast Has Failed To Produce Evidence Of Damages ..................... 19

# TABLE OF AUTHORITIES

## CASES


Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ........ 6, 7

Blake Construction Co., Inc. v. United States, 987 F.2d 743 (Fed. Cir. 1993) ........ 9, 15

Blue Cross & Blue Shield United of Wisconsin & Subsidiaries v. United States, 56 Fed. Cl. 697 (2003) ........ 6

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ........ 7

Dewey Electronics Corp. v. United States, 803 F.2d 650 (Fed. Cir. 1986) ........ 9

Dot Systems, Inc. v. United States, 231 Ct. Cl. 765 (1982) ........ 7

E.L. Hamm & Associates, Inc. v. England, 379 F.3d 1334 (Fed. Cir. 2004) ........ 15, 18

E.R. Mitchell Construction Co., v. Danzig, 175 F.3d 1369 (Fed. Cir. 1999) ........ 18

Franklin Pavkov Construction Co. v. Roche, 279 F.3d 989 (Fed. Cir. 2002) ........ 8

J. L. Simmons Co. v. United States, 412 F.2d 1360 (Ct. Cl. 1969) ........ 8, 9

Lisbon Contractors, Inc. v. United States, 828 F.2d 759 (Fed. Cir. 1987) ........ 20

Metric Constructors v. United States, 314 F.3d 578 (Fed. Cir. 2002) ........ 19

NVT Technologies v. United States, 370 F.3d 1153 (Fed. Cir. 2004) ........ 15

Severin v. United States, 99 Ct. Cl. 435 (1943) ........ 18

United States v. Spearin,
248 U.S. 132 (1918)........................................................................................ 8, 12

W.G. Yates & Sons Constr. Co., Inc. v. Caldera,
192 F.3d 987 (Fed. Cir. 1999)........................................................................ 18, 19

White v. Edsall Constr. Co., Inc.,
296 F.3d 1081 (Fed. Cir. 2002)........................................................................ 8, 9

Willem Industries, Inc. v. United States,
295 F.2d 822 (Ct. Cl. 1961). ........................................................................... 20

**STATUTES**

41 U.S.C. § 601, et se.......................................................................................................... 3

Fed.R.Civ.P. 56(c). .............................................................................................. 6

RCFC 56(c)........................................................................................................... 6

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WEST COAST CONTRACTORS OF NEVADA, INC., | ) | |
| Plaintiff, | ) | No. 05-1121C |
| v. | ) | (Chief Judge Damich) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S CORRECTED MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of the Court of Federal Claims ("RCFC"), defendant respectfully requests that the Court enter summary judgment in the Government's favor upon the following claims set forth in the complaint of plaintiff West Coast Contractors of Nevada, Inc. ("West Coast"): the claim for "Mechanical Equipment" alleged in paragraphs 10 to 13 of the complaint; the claim for "Change in Grade Beam Elevations" alleged in paragraphs 14 to 17 of the complaint; and the "Increased Design Costs" claim alleged in paragraphs 20 to 27 of the complaint. In support of this motion, we rely upon the complaint, defendant's proposed findings of uncontroverted fact, and defendant's appendix, filed concurrently with this brief.

PRELIMINARY STATEMENT

The first two issues upon which the Government seeks summary judgment are well suited for resolution by motion because the key facts are not in dispute and the Court must only decide which party bore the risk with respect to that issue. Thus, with respect to the mechanical equipment issue, the Government does not dispute, for purposes of this motion, that drawing M-4 showed a 15-ton chiller, that such a chiller would not have been sufficient to cool the building, and that West Coast ultimately installed a 40-ton chiller. The issue for the Court is strictly a

legal question: which party bore the risk if the 15-ton chiller shown on drawing M-4 was not sufficient.

Similarly, with respect to West Coast's foundation elevation change claim the Government does not dispute, for purposes of this motion, that details on the structural drawings showed the grade beams immediately below the foundation. The issue for the Court is which party bore the risk if the foundation could not be constructed as shown on the structural drawing details.

If the Court does not rule for the Government on these issues, a related second question for the Court is whether the design-build contract was patently ambiguous because of conflicting information provided in other parts of the specifications and preliminary design.

Finally, the claim for additional design expenses of West Coast's designer is appropriate for summary resolution because Merritt + Pardini has released West Coast for all damages associated with this claim. In addition, West Coast has produced no evidence that supports its damages.

## STATEMENT OF THE ISSUES

1. Whether the contract allocated the risk of inaccuracies in the mechanical and structural drawings to West Coast.

2. Whether the contract is patently ambiguous.

3. Whether the Severin doctrine bars West Coast's claim for additional design costs.

4. Whether West Coast's failure to produce evidence of its additional design costs bars the claim.

# STATEMENT OF THE CASE

## I. Nature Of The Case

West Coast brings this action pursuant to the Contract Disputes Act, 41 U.S.C. § 601, et seq., for additional time and costs allegedly incurred in the performance of a design-build contract with the Department of the Navy ("Navy").

## II. Statement Of Facts

For our statement of facts, we respectfully refer the Court to defendant's proposed findings of uncontroverted facts ("DPFUF") filed concurrently with this brief. We summarize those facts here.

In December 2001, the Navy issued a solicitation providing for a negotiated request for proposals ("RFP") for a two-story extension to an existing building, building 245. The extension was to provide additional office and classroom space. The RFP described the work as "the design and construction of a two-story office/classroom building with connecting bridge to the existing building. . . ." It further stated that the Government had "developed mandatory design requirements and preliminary design drawings. . . ." DPFUF ¶¶3-6.

After the completion of phase I of the procurement in which the Navy assessed past performance and the experience of key personnel, the Navy issued amendment four to the RFP, which, among other things, provided offerors section 01112, the general design and construction criteria, and 45 drawings. Amendment four added an additional floor to the building and warned offerors that the "design shown on the drawings included in this solicitation will require significant development based on requirements in Section 01112 before pricing can take place." Section 01112 informed offerors that they would be required to combine the design requirements in this section with the preliminary drawings to produce a final design "suitable for

construction." Finally, it also informed offerors that they were "solely responsible for the final design of the facility." DPFUF ¶¶11-13.

Section 01112 provided design criteria for the mechanical system of the building. It noted that five mechanical drawings had been issued with the RFP but they were "intended to show design intent only." It required the design-build contractor to "perform independent design to meet the requirements of this RFP" and informed offerors that they would be "fully responsible for the design." It further provided the indoor and outdoor temperatures that the design, and the number of people per room, among other things, that the design must accommodate, DPFUF ¶¶21-31.

Drawing M-4 showed a 15-ton chiller in a two story building. After West Coast began performance of the contract, it discovered that this chiller was not sufficient to cool the three story building it would construct. West Coast submitted a request for equitable adjustment ("REA") in the amount of $114,489, which the Navy denied. DPFUF ¶¶67-69.

Section 01112 also provided design criteria for the structure of the building. It stated that "[t]he Design-Build Team shall provide a complete design of the building shell and link." It informed offerors that "[t]he Contractor is solely responsible for the design and construction of this building extension." Section 01112 further identified the building codes applicable to the design and provided the vertical, seismic, and wind loads that the design must accommodate. The structural drawings showed the grade beams for the building to be immediately below the finished floor/slab on grade elevations. DPFUF ¶¶32-36.

Section 01112 required the new building to be at the same elevation as the existing building, which the civil drawings identified as an elevation of 49 feet. The civil drawings identified numerous elevations in the area where the new building would be constructed.

Although these elevations varied, most were at about 46 feet. If the new building were to be constructed at the 49 foot elevation required by section 01112, ¶ 1.6.1(b), it would not have been possible to construct the foundation with the grade beams immediately below the finished floor because the site was too low. Rather, a stem wall or some other device would be needed to connect the grade beams to the slab. DPFUF ¶¶37-44.

West Coast submitted an REA to the Navy seeking an additional $170,767.54 due to a "foundation elevation change." It stated that the "RFP drawings indicated the foundation grade to be 1 foot below first floor top of slab" but "[d]uring the design process and design review these elevations changed to 3 feet below finish floor typically. . . ." The Navy denied the REA. DPFUF ¶¶74-79.

A number of disputes arose between West Coast and its designer, Merritt + Pardini. In September, 2005, more than two years after the project had been completed in May, 2003, a West Coast spreadsheet indicated that West Coast had paid Merritt + Pardini a total of $259,386.54, but Merritt + Pardini was seeking $406,817.44. The spreadsheet listed various issues that the parties disputed, including an REA that Merritt + Pardini had submitted to the Navy. DPFUF ¶¶97.

West Coast and Merritt + Pardini's successor-in-interest settled all of the issues in dispute for $36,000. Merritt + Pardini fully released West Coast for all amounts due for this project. Merritt + Pardini also agreed to dismiss a pending arbitration with prejudice. West Coast and Merritt + Pardini did not allocate the settlement amount among the various issues. The $36,000 settlement amount was strictly a lump sum. DPFUF ¶¶99-101.

## ARGUMENT

I. Summary Judgment Standards

RCFC 56 is patterned upon Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed.R.Civ.P. 56(c). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. Blue Cross & Blue Shield United of Wisconsin & Subsidiaries v. United States, 56 Fed. Cl. 697, 702 (2003)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48(1986)). When reaching a summary judgment determination, the court's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. Id. (citing Anderson v. Liberty Lobby, 477 U.S. at 249). The court must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. Id. (citing Anderson v. Liberty Lobby, 477 U.S. at 250-52). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Id.

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party

can demonstrate that there is an absence of evidence to support the nonmoving party's case. A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. Id.

## II. The Contract Allocated The Risk Of Defects In The Preliminary Design To West Coast

It is well settled that the parties to a Government contract can allocate risks to either party. The party who freely accepted a risk cannot later seek judicial relief from the result of that risk. As the Court of Claims stated, "[t]he general rule is clear: a contractor cannot sign a contract which allocates the risk to it and then 4 years later come to this court, having lost its gamble, and insist that the risk be placed on the Government." Dot Systems, Inc. v. United States, 231 Ct. Cl. 765, 768 (1982). Here, the central question with respect to West Coast's claims for the mechanical equipment and foundation elevation changes is to which party did the contract allocate the risk if the preliminary design was inaccurate. West Coast contends that it "reasonably relied" upon the depiction of a 15-ton chiller on drawing M-4 (Complaint, ¶ 11), and upon details in the RFP structural drawings that showed the "exterior wall grade beam and pile caps to be one foot below the first floor top-of-slab." Complaint, ¶ 15.

Whether West Coast "reasonably relied" upon this information turns upon whether the Government warranted the accuracy of the information in question. Although not specifically stated by West Coast, it appears to be relying upon the Spearin doctrine. "Under the Spearin doctrine, when the government provides a contractor with defective specifications, the

government is deemed to have breached the implied warranty that satisfactory contract performance will result from adherence to the specifications and the contractor is entitled to recover costs proximately flowing from the breach." Franklin Pavkov Construction Co. v. Roche, 279 F.3d 989, 994-95 (Fed. Cir. 2002) (citing United States v. Spearin, 248 U.S. 132 (1918)). Thus, for example, with respect to West Coast's mechanical equipment claim, if the Navy warranted that West Coast could satisfactorily construct the building with a 15-ton chiller, there would be little doubt that the Government is liable to West Coast for its damages.

However, the Spearin doctrine has an important limitation applicable to this case in that it only applies to contracts where the Government issued "design specifications" and not contracts where it issued "performance specifications." White v. Edsall Constr. Co., Inc., 296 F.3d 1081, 1084 (Fed. Cir. 2002). In design specifications, the Government sets "forth in precise detail the materials to be employed and the manner in which the work was to be performed," and the contractor is not allowed to deviate from them, but is "required to follow them as one would a road map." J. L. Simmons Co. v. United States, 412 F.2d 1360, 1362 (Ct. Cl. 1969). Performance specifications "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection." Id. Because performance specifications do not require the contractor to follow them without deviation as if they were a roadmap, alleged defects in those specifications do not rise to the level of breach of warranty. Edsall Constr., 296 F.3d at 1084; Dewey Electronics Corp. v. United States, 803 F.2d 650, 658 (Fed. Cir. 1986).

"[T]he distinction between design and performance specifications is not absolute" and a contract "may have both design and performance characteristics." Blake Construction Co., Inc.

v. United States, 987 F.2d 743, 746 (Fed. Cir. 1993). "It is the obligations imposed by the specification which determine the extent to which it is 'performance' or 'design,' not the other way around." Id. "'Contracts are viewed in their entirety and given the meaning imputed to a 'reasonably intelligent contractor' acquainted with the involved circumstances, regardless of whether labeled 'design,' 'performance,' or both.'" Id. (quoting Zinger Constr. Co. v. United States, 807 F.2d 979, 981 (Fed. Cir. 1986)).

A. The HVAC Specifications Are Performance Specifications

Pursuant to the Federal Circuit's holding in Zinger, the Court must consider this contract as a whole and not focus strictly upon the work depicted upon drawing M-4, as West Coast has. Viewing the contract in its entirety demonstrates that West Coast has been on notice since the Navy issued the RFP that it would be fully responsible for the design of the HVAC system. It further demonstrates that the Navy did not warrant the preliminary design information contained in drawing M-4 because the HVAC specification is a performance specification.

From the initial RFP, West Coast was on notice that it would be responsible for "design and engineering to complete the preparation of detailed working drawings and specifications suitable for construction." DPFUF ¶6. Subsequently, when the Navy issued the RFP drawings with amendment four, it put West Coast on notice that the 45 drawings would "require significant development based on requirements in Section 01112 before pricing can take place." DPFUF ¶12 (emphasis added). The extent to which West Coast could rely upon the mechanical drawings was also limited by section 01112, which provided the HVAC design requirements. Sub-paragraph 1.11.1, System Description and Requirements, informed West Coast that the mechanical drawings "are intended to show design intent only" and that West Coast would have to "perform independent design to meet the requirements of this RFP." Id. It stated that the

contractor must "[p]rovide a complete, functional, operational and maintainable HVAC system." DPFUF ¶22.

The degree to which West Coast could rely upon the mechanical drawings was also limited by the representation on those drawings of a two story, 81 by 91 foot, slab-on-grade building, in contrast to the requirement in section 01112 for a three story building with those same dimensions. DPFUF ¶15, 18, 31. Thus, the building required by the specifications, and actually built by West Coast, was 50 percent larger than that shown on the mechanical drawings. Even assuming that West Coast did not realize that the same mechanical system might not cool a 50 percent larger building, its designer, the designer's subconsultant for mechanical design, and its subcontractor all testified that the chiller size would increase with the addition of a third floor. Unfortunately for West Coast, it did not seem to realize that there was a difference in square footage between the drawings and the specifications, as Mr. Ramirez repeatedly testified that the square footage "never changed." DPFUF ¶46.

Section 01112, General Design and Construction Criteria, notified West Coast of the incomplete nature of the design and of its responsibility for the design. Thus, it stated "The Contractor is solely responsible for the final design of the facility." Id. At paragraph 1.1.1, "Contractor's Design Responsibility," it stated that the RFP included a "preliminary design package . . . consist[ing] of partial design in architectural and engineering disciplines, and material specifications." DPFUF ¶13-14. This section further instructed West Coast that it must develop a final design that "combined [sic] the requirements in this section with the preliminary design to produce a complete design package suitable for construction." Id.

Applying this requirement to its design, West Coast should not have considered the 15 ton chiller and the 6,500 cubic feet per minute air handling unit shown on M-4 in isolation, but

in conjunction with the performance requirements contained in section 01112. In developing a design "suitable for construction," its primary duty was to achieve the results that the Navy required in the specification. This required West Coast to design and build an HVAC system "capable of maintaining indoor design temperatures at outdoor design conditions" that would "distribute air to all normally occupied spaces, so that the average temperature within any occupied space shall not vary more that [sic] plus or minus 2 degrees Fahrenheit. . . " from the specified winter and summer temperatures. DPFUF ¶27 . In doing so, West Coast had to consider, among other things, specified external temperatures and internal occupancy rates that it must factor into its design calculations.

Thus, the HVAC system was primarily a performance specification. In addition to specifying the indoor temperature requirements that the building must meet, it provided the contractor with the allowable level of room noise, required the contractor to provide an energy efficient design, to meet certain ventilation requirements, and to furnish a design that met certain service accessibility requirements. DPFUF ¶¶27-29. Because as a matter of law the Navy did not warrant the accuracy of information provided with such a specification, West Coast's mechanical equipment claim fails as a matter of law.

Finally, we note that this claim appears to arise as a result of a disconnect between the terms of the prime contract and those of the subcontracts. Although West Coast included a markup for its own overhead and profit in the REA, all of the direct costs (labor, materials and equipment) claimed are for Mt. Rose and Johnson Plumbing. DA594. Unlike the prime contract, the subcontracts allocated little or no design risk to the subcontractors. In fact, Mt. Rose's project manager testified that he was unaware that the project was design-build until told so by Government counsel at his deposition. DPFUF ¶66. The Mt. Rose subcontract

specifically allocated the risk of design changes to West Coast because it provided that changes to the RFP drawings would be "addressed in the form of a change order." DPFUF ¶65. There is no comparable clause in the prime contract. Thus, West Coast may owe money to Mt. Rose for any increased costs related to the mechanical equipment because it, in effect, made a Spearin warranty to Mt. Rose. West Coast should not be allowed to pass those costs on to the Navy because the terms of West Coast's contract with the Navy are different from the terms of the Mt. Rose subcontract.

B. The Structural Specification Is A Performance Specification

The provisions of the original RFP, amendment four to the RFP, and section 01112, paragraph 1.1.1 concerning West Coast's design responsibilities and the limited reliance that it could place upon the RFP drawings, that we discussed in the previous section of this brief, apply with equal force to the structural design. In addition, section 01112, subparagraph 1.9.6.4, "Design-Build Team Requirements," provided that during design "[t]he Design-Build Team shall provide a complete structural design of the building shell and link, including foundation." DPFUF ¶36.

The difference between the two story building shown on the structural drawings and the three story building required by the specifications and actually built by West Coast also played a prominent part in limiting the reliance West Coast could place upon the structural drawings. West Coast's designer testified:

> Q. All right. So how do you turn 35% drawings for a two-story building into 100% drawings for a three-story building?
>
> A. Lots of pain and agony.
>
> Q. Lots of pain and agony?

> A. I mean, that's, yeah, essentially starting from the ground up again because foundations are formed by gravity loads and when you're adding one extra floor of a building to foundations, those things start changing, they have to get bigger, deeper, wider, more reinforcing, so you're actually redesigning the building from the ground up.

DPFUF ¶19.

Like the HVAC specification, the structural specification was a performance specification because section 01112, subparagraph 1.1.1 required West Coast to "combined [sic] the requirements in this section with the preliminary design to produce a complete design package suitable for construction." West Coast's primary duty was to build a three story structure that: accommodated the vertical, seismic, and wind loads pursuant to section 01112, subparagraph 1.9.1; met the non-seismic and seismic design requirements in section 01112, subparagraphs 1.9.3 and 1.9.4, respectively; met the upper bounds of vibration for the roof and floor systems specified in subparagraph 1.9.6.2; and met the lateral force resisting requirements provided in subparagraph 1.9.6.3. DPFUF ¶¶32-33.

Subparagraph 1.9.6.1, Gravity Framing, had both design and performance aspects. Section 1.9.6.1(a) (the second paragraph "a") identified the first of two options the contractor could select for the foundation system. DPFUF ¶35. It specified a foundation system consisting of drilled, cast-in-place concrete piers, pier caps, and interconnected grade beams. However, it had a performance specification aspect to it in that it required the drilled piers to be embedded into the bedrock strata "as required to meet the vertical and lateral load requirements." Thus, the contract left the method of doing so to the contractor.

Subsection 1.9.6.1(b) provided the second option. It allowed the contractor to construct a foundation system of spread footings. DA284. It spoke of the contractor designing this

foundation system. It stated that the method would "require the mitigation of the very loose sand." Although it stated that "this could be accomplished by removing approximately the top eight feet of soil throughout the building pads and replacing it with compacted engineered fill," this subparagraph left it to the contractor to determine how to best mitigate the sand. It further required the contractor to obtain a supplementary geotechnical report that included "full recommendations for the alternate foundation system, anticipating settlements, and soil bearing values, as well as recommendations for installation." Id. Because this subparagraph left it up to the contractor how to design and install the spread footings, it is a performance specification.

Thus, performance specification requirements are the predominant feature of the structural specification. Given the fact that it received preliminary drawings for a two story building that required "starting from the ground up again" as West Coast's designer testified, and required meeting all of the performance requirements in subparagraph 1.9 of the design-build contract, a "'reasonably intelligent contractor' acquainted with the involved circumstances" would not have concluded that it had received a design that it must follow like a roadmap. See Blake Constr., 987 F.2d at 746. Rather, it would have concluded that it had to exercise its ingenuity to achieve the standards set forth in the contract. Thus, it could not have entered into this contract expecting the Navy to warrant the structural design. West Coast's claim fails as a matter of law.

III. The Contract Was Patently Ambiguous

Even if the Court concludes that the Navy warranted the mechanical and structural specifications and that they were defective, West Coast is still not entitled to recover because the contract is patently ambiguous. As the Federal Circuit has stated:

> [w]here a contractor-claimant seeks to recover an equitable adjustment for additional work performed on account of a defective specification, the contractor-claimant must show that it was misled by the defect. To demonstrate that it was misled, the contractor-claimant must show both that it relied on the defect and that the defect was not an obvious omission, inconsistency or discrepancy of significance-in other words, a patent defect-that would have made such reliance unreasonable.

E.L. Hamm & Associates, Inc. v. England, 379 F.3d 1334, 1339 (Fed. Cir. 2004). Thus, if the contractor is faced with a patent defect, it must inquire about the discrepancy pre-award, otherwise its claim fails. Id.; NVT Technologies v. United States, 370 F.3d 1153, 1162 (Fed. Cir. 2004).

With respect to the mechanical requirements of the contract, drawing M-4 showed the 15 ton chiller and the 6,500 cubic feet per minute ("CFM") air handling unit in the context of a two story building. However, the building described in section 01112, subparagraph 1.1.2, and the building that West Coast agreed to construct, was three stories. By itself, this was an obvious inconsistency, and it was obvious to West Coast's designers and subcontractor that it would increase the size of the mechanical equipment. DPFUF ¶¶70-73. West Coast should have inquired about this discrepancy, asking the Navy if it intended to portray the chiller shown in the two story building as sufficient to cool a three story building. Because it failed to do so, its claim fails as a matter of law.

With respect to the structural requirements of the contract, the contract was patently ambiguous because the structural drawings, to the extent that they could be viewed as representing site conditions, conflicted with section 01112 and the civil drawings. In its letter of October 16, 2002, West Coast stated that it had expected the site grade to be one foot lower than the finished floor elevation but instead had found it to be three feet lower. DPFUF ¶74. It also

explained how the lower site elevations affected its work. Id. It stated that its planned method of construction had been to excavate two feet, compact the soil, and then place a finish grade of structural fill compacted in lifts. Its actual method of construction involved excavating four feet and later constructing a concrete stem wall to connect the slab with the grade beams. Id.

West Coast's plan likely would have worked if the site had been flat and only one foot lower than the existing building, which would have allowed it to place the grade beams immediately below the finished floor. However, the structural drawings themselves directed the contractor to look elsewhere for further information because drawing S-7, at drilled pier note 5, provided "see civil drawings for nominal first floor elevation." If West Coast had considered the specifications and civil drawings, it would have realized that its assumptions were not correct. Section 01112 informed the contractor that the site consisted of a "graded slope" created with the existing building in 1992. DPFUF ¶37. It further stated that [i]t drains nominally northwesterly, away from the northwesterly end of building 245." Id. The civil drawings show that "northwesterly" is essentially the left side of the building as it is depicted on those drawings. E.g., DA813. Thus, from reviewing this information, West Coast should have known that the site would not be flat but would slope downhill away from the edge of building 245.

The site elevations shown on drawings C-1 and C-5 confirm this.[1] DA812-13. At the wall line of the existing building where it meets the new walkway, the civil drawings show three elevations ranging from 49.01 feet to 49.07 feet. These correspond to the elevation for the existing building shown in large letters as "FF 49.0±". Moving to the left on the drawing, just

[1] The elevations that we are referring to are also referred to as "spot elevations." They are the elevations shown in a very small font and are easier to read on C-1 (but only C-5 shows the new building). They are not to be confused with the "TC" (top of the curb) elevations shown in a larger font. We are filing full size copies of these drawings for ease of reference.

outside the existing building in the area where West Coast would construct the new walkway, the drawings demonstrate the slope by reflecting five slightly lower elevations ranging from 48.83 to 48.97 feet. Moving further to the left, inside the footprint of the new building, the elevations range from a high of 47.10 in the lower right corner, to several elevations of about 46.0 on the left side of the new building. Continuing to the left, the civil drawings show a number of elevations just outside and to the left of the new building in the range of about 45.5 to 46.0 feet.

Thus, between the specific provisions discussed in this section of our brief, as well as the overarching fact that this was a design-build contract that allocated the risk of completing the design to the contractor, there was ample information available to West Coast in the RFP to put it on notice that the site was sloped and that there was a <u>three</u> foot elevation difference between the finished floor of the existing building and the footprint of the new building. This information conflicted with the information that West Coast gleaned from the structural drawings, which led it to conclude, as stated in the first sentence of its REA, that the RFP drawings showed only a <u>one</u> foot difference in elevation. Because this was an obvious inconsistency or discrepancy, West Coast's claim fails as a matter of law. <u>E.L. Hamm</u>, 379 F.3d at 1339.

## IV. <u>West Coast Is Not Entitled To Recover Upon Behalf Of Merritt + Pardini</u>

West Coast is not entitled to recover the $37,500 it seeks with respect to the Merritt + Pardini $37,500 REA for two reasons. First, any liability that West Coast had to Merritt + Pardini was released in their settlement. Second, if the claim is not barred by this release, West Coast has not produced any evidence that it, or Merritt + Pardini, actually suffered damages. We discuss each of these issues in turn.

A. The Severin Doctrine Bars This Claim

The Severin doctrine limits the Government's exposure in pass-through suits to situations in which the prime contractor is liable for the subcontractor's costs. W.G. Yates & Sons Constr. Co., Inc. v. Caldera, 192 F.3d 987, 991 (Fed. Cir. 1999) (citing Severin v. United States, 99 Ct. Cl. 435, 442 (1943)); E.R. Mitchell Construction Co., v. Danzig, 175 F.3d 1369, 1370 (Fed. Cir. 1999). The Government bears the burden of establishing that the prime contractor is not liable for the subcontractor's claim. Id. The Government can meet this burden by identifying a "full release" by the subcontractor for all further obligations pursuant to the subcontract. Metric Constructors v. United States, 314 F.3d 578, 582 (Fed. Cir. 2002). Severin does not bar subcontractor's claims where the subcontractor signed only limited or partial releases of the prime contractor. Id. at 582-83; W.G. Yates, 192 F.3d at 991.

The "Settlement Agreement And Mutual Release" between West Coast and Krei Architecture, Inc. ("Krei"), Merritt + Pardini's successor-in-interest, provides in relevant part that Krei:

> hereby irrevocably and unconditionally releases, discharges, and covenants not to sue the other Party . . . with respect to any and all claims, liens, covenants, grievances, demands, causes of action, obligations, damages and liabilities, known or unknown, anticipated or unanticipated, contingent or non-contingent, arising under federal or state law that each may have against the other relating to: . . . (3) amounts claimed due by Krei for Professional Architectural and Engineering Services on the Project.

DPFUF ¶100; DA615. The settlement agreement further required Krei to dismiss a law suit that it had filed and to dismiss its claim in an arbitration, to which they had stipulated, with prejudice. Id.

Although the release language on its face extinguishes West Coast's liability to Krei in full for this project, the context from which this settlement agreement arose further demonstrates that the parties were interested in a complete resolution of their disputes. As we set out in DPFUF ¶¶81-95, there were a number of pending disputes between Krei and West Coast. The pendency of these disputes into 2006, the pending arbitration, and Mr. Ramirez's testimony that the parties agreed to settle the disputes by a lump sum not allocated to particular issues, demonstrate that West Coast and Krei were interested in and sought a global resolution of their disputes. They drafted a settlement agreement and mutual release that accomplished such a result. Because Krei has released West Coast in full with respect to this project, West Coast's claim fails as a matter of law.

B. West Coast Has Failed To Produce Evidence Of Damages

West Coast must prove its damages "'with sufficient certainty so that the determination of the amount of damages will be more than mere speculation.'" Lisbon Contractors, Inc. v. United States, 828 F.2d 759, 767 (Fed. Cir. 1987) (quoting Willem Industries, Inc. v. United States, 295 F.2d 822, 831 (Ct. Cl. 1961)). As we set forth at length in DPFUF ¶¶81-95, the Government made attempts through document requests, interrogatories, and deposition questions to obtain documentation and explanations of this $37,500 claim. All that we have been able to determine is that the claim consists of $17,000 in copying charges for Merritt + Pardini, of which Mr. Ramirez testified he did not agree (DFFUF ¶94), and $20,500 in additional labor for Merritt + Pardini. Mr. Harm of Merritt + Pardini could provide no explanation for the damage calculations at his deposition. West Coast has provided no time sheets or other documents from which the additional labor can be verified, nor any invoices from copying services or other documents from which the copying can be verified. Thus, because there is no apparent evidence

that supports this claim, the Government requests that the Court enter judgment for the defendant.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Brian M. Simkin
BRIAN M. SIMKIN
Assistant Director

s/Michael N. O'Connell
MICHAEL N. O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
12th Floor
Washington, D.C. 20530
Tele: (202) 353-1618
Attorneys for Defendant

Dated: November 9, 2007

CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of November, 2007, a copy of the foregoing motion for summary judgment was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Michael N. O’Connell