## INSTRUCTIONS FOR PREPARING PROPOSAL/ESTIMATE FOR CONTRACT MODIFICATION

All Contract Modification Proposals shall be addressed to the Resident Officer in Charge of Construction. Proposals must clearly state the conditions and scope of the modification and shall be accompanied by a breakdown of cost, as indicated. Lump sum costs will not be accepted in either the prime or su-contractor's breakdown of direct cost. The total cost for labor, material, and equipment rental (or ownership) for each item shall be transferred to the corresponding item on the front of this form. At the contractor's option, the overhead rates printed on the front of this form may be used for proposals under $500,000 in lieu of detailed itemized estimates of overhead costs. The proposal should also include a request for an extension of time, in calendar days, only if overall completion of contract is impacted by the proposed modification. The contractor shall not proceed with any of the work included in the modification prior to receipt of an executed modification of contract (SF30).

**BREAKDOWN OF DIRECT COSTS** Contract No.: N62474-00-C-3035 Date: 5/24/2004

| ITEMS OF WORK FOR Prime Contractor | QTY | UNIT | MATERIAL Unit Cost | MATERIAL Total Cost | LABOR Unit Cost | LABOR Total Cost | R/O | EQUIPMENT Days | EQUIPMENT Rate | EQUIPMENT Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Equipment Lost Time 3/14/02-4/09/02 | | | | $ - | | $ - | | | | $ - |
| Loader - John Deere 444 | | | | $ - | | $ - | | 25 | $ 125.00 | $3,125.00 |
| Excavator - John Deere LC200 | | | | $ - | | $ - | | 25 | $ 210.00 | $5,250.00 |
| | | | | $ - | | $ - | | | | $ - |
| Crew Lost Time | | | | $ - | | $ - | | | | $ - |
| Foreman | 40 | hr | | $ - | $ 65.01 | $ 2,600.40 | | | | $ - |
| Operator (2ea) | 80 | hr | | $ - | $ 63.51 | $ 5,080.80 | | | | $ - |
| Laborer (2ea) | 80 | hr | | $ - | $ 41.95 | $ 3,356.00 | | | | $ - |
| Truck Driver | 20 | hr | | $ - | $ 49.68 | $ 993.60 | | | | $ - |
| Subsistence (5men) | 4 | day | $ 600.00 | $2,400.00 | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| Field Overhead/Subsistence | 1 | mo | $ 6,260.00 | $6,260.00 | | $ - | | | | $ - |
| Superintendent | 280 | hr | | $ - | $ 55.00 | $15,400.00 | | | | $ - |
| Quality Control Manager | 280 | hr | | $ - | $ 65.00 | $18,200.00 | | | | $ - |
| Field Secretary | 140 | hr | | $ - | $ 15.00 | $ 2,100.00 | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| DIRECT Prime Contractor's | TOTALS | | | $8,660.00 | | $47,730.80 | R | Total (Rental) | | $8,375.00 |
| | | | | | | | O | Total (Owned) | | |

| ITEMS OF WORK FOR Sub-contractor | QTY | UNIT | MATERIAL Unit Cost | MATERIAL Total Cost | LABOR Unit Cost | LABOR Total Cost | R/O | EQUIPMENT Days | EQUIPMENT Rate | EQUIPMENT Total |
|---|---|---|---|---|---|---|---|---|---|---|
| AHBL | | | | $ - | | $ - | | | | $ - |
| Principle | 12 | hr | | $ - | $ 130.00 | $ 1,560.00 | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| DIRECT Sub-contractor's | TOTALS | | | $ - | | $ 1,560.00 | R | Total (Rental) | | |
| | | | | | | | O | Total (Owned) | | |

NAVFAC 4330/43 (Back)

**Trisha Fitzpatrick**

**From:** Tracy Hieber [tracy@westcoastnv.com]
**Sent:** Friday, September 08, 2006 7:48 AM
**To:** Trisha Fitzpatrick
**Subject:** FW: Primavera Backup files attached (PRX)
**Attachments:** image003.wmz; oledata.mso; P3_PRX_BACKUP_FILES.zip

-----Original Message-----
**From:** Dave Keddie [mailto:dave@ontrackscheduling.com]
**Sent:** Thursday, September 07, 2006 6:22 PM
**To:** trish@westcoastnv.com; tracy@westcoastnv.com
**Cc:** thebert@westcoastnv.com; Kevin Elvrum; Deane Burk; Mike Kust
**Subject:** Primavera Backup files attached (PRX)

ONTRACK
PROJECT PLANNING AND SCHEDULING

Tracy:

Re: Naval Post Grad School Claim

There will be a FedEx as a backup... but here are the P3 files I think you will need. You must restore them (like unzipping) to open & view them. Then you will want to organize the data using layouts etc for viewing/printing. I can help with this if you need it.

Schedules found & converted to P3 for you are.

| SCHEDULE | Data Date | # of Acts | Early Finish | | | |
|---|---|---|---|---|---|---|
| NPS1 | 29-Jun-01 | 313 | 28-Oct-02 | No Status Baseline | | |
| NPS2 | 24-Jan-02 | 477 | 3-Mar-03 | | | |
| NPS3 | 24-Jan-02 | 478 | 3-Mar-03 | | | |
| NPS4 | 24-Jan-02 | 478 | 10-Apr-03 | | | |
| NPS5 | 24-Jan-02 | 479 | 15-Apr-03 | | | |
| NPS6 | 1-Apr-02 | 479 | 9-Jun-03 | | | |
| NPS7 | 8-Jan-03 | 480 | 13-May-03 | | | |
| | | | | | | |
| | | | | | | |

Other Precon/Design Schedules found in MPP format will be on Disk. Most likely not required thus not emailed.

*David P. Keddie Jr.*
*Cell (530) 210-6195*
*Office (530) 885-4425*

# EXHIBIT E

PROPOSAL/ESTIMATE FOR CONTRACT MODIFICATION
Modified form NAVFAC 4330/43 (8/88)

Date: 5/24/2004

CONTRACT TITLE:
Design/Build Naval Postgraduate School Bldg 245 Extension

CONTRACT NO: N62474 -C- 3035
PCO NO:

ROICC OFFICE
NAVAL POSTGRADUATE SCHOOL, MONTEREY

Work Site:

DESCRIPTION:
Fire Alarm Subcontractor Changes

| PRIME CONTRACTOR'S WORK | | | | | Revisions/Comments |
|---|---|---|---|---|---|
| 1. Direct Materials | | | $12,520.00 | | |
| 2. Sales Tax on Materials | % of line 1 | 0.00% | $0.00 | | |
| 3. Direct Labor | | | $40,800.00 | | |
| 4. Insurance, Taxes, and Fringe Benefits | % of line 3 | 0.00% | $0.00 | | included in labor rate |
| 5. Rental Equipment | | | $0.00 | | |
| 6. Sales Tax on Rental Equipment | % of line 5 | 0.00% | $0.00 | | |
| 7. Equipment Ownership and Operating Expenses | | | $0.00 | | |
| 8. SUBTOTAL (add lines 1 - 7) | | | | $53,320.00 | |
| 9. Field Overhead | 10% of line 8 | 0.00% | $0.00 | | included in item 1 |
| 10. SUBTOTAL (Add Lines 8 & 9) | | | | $53,320.00 | |

Prime's Remark

| SUB-CONTRACTOR'S WORK | | | | | |
|---|---|---|---|---|---|
| 11. Direct Materials | | | $0.00 | | |
| 12. Sales Tax on Materials | % of line 11 | 0.00% | $0.00 | | |
| 13. Direct Labor | | | $0.00 | | |
| 14. Insurance, Taxes, and Fringe Benefits | % of line 13 | 0.00% | $0.00 | | |
| 15. Rental Equipment | | | $0.00 | | |
| 16. Sales Tax on Rental Equipment | % of line 15 | 0.00% | $0.00 | | |
| 17. Equipment Ownership and Operating Expenses | | | $0.00 | | |
| 18. SUBTOTAL (add lines 11 -17) | | | | $0.00 | |
| 19. Field Overhead | 10% of line 18 | 0.00% | $0.00 | | |
| 20. SUBTOTAL (Add Lines 18 & 19) | | | | $0.00 | |
| 21. Home Office Overhead | 3% of line 20 | 0.00% | $0.00 | | |
| 22. Profit | % of line 20 | 0.00% | $0.00 | | |
| 23. SUBTOTAL (Add Lines 20 - 22) | | | | $0.00 | |

Subcontractor's Remark

| SUMMARY | | | | | |
|---|---|---|---|---|---|
| 24. Prime Contractor's Work (from line 10) | | | $53,320.00 | | |
| 25. Sub-contractor's work (from line 23) | | | $0.00 | | |
| 26. SUBTOTAL (Add Lines 24 & 25) | | | | $53,320.00 | |
| 27. Prime Overhead on Sub-contractor | 5% of line 25 | 0.00% | $0.00 | | |
| 28. Prime's Home Office Overhead | 3% of line 24 | 3.00% | $1,599.60 | | |
| 29. Prime's Profit | % of line 26 | 7.00% | $3,732.40 | | |
| 30. SUBTOTAL (Add Lines 26 - 29) | | | | $58,652.00 | |
| 31. Prime Contractor's Bond Premium | % of line 30 | 0.65% | $381.24 | | |
| 32 TOTAL COST (Add Lines 30 & 31) | | | | $59,033.24 | |

Estimated Time Extension and Justification

Prime Contractor Name: West Coast Contractors of Nevada, Inc.
Sub-Contractor Name:

Signature & Title of Preparer:

Date: ____________

S/N 0105-LF-005-6900

## INSTRUCTIONS FOR PREPARING PROPOSAL/ESTIMATE FOR CONTRACT MODIFICATION

All Contract Modification Proposals shall be addressed to the Resident Officer in Charge of Construction. Proposals must clearly state the conditions and scope of the modification and shall be accompanied by a breakdown of cost, as indicated. Lump sum costs will not be accepted in either the prime or su-contractor's breakdown of direct cost. The total cost for labor, material, and equipment rental (or ownership) for each item shall be transferred to the corresponding item on the front of this form. At the contractor's option, the overhead rates printed on the front of this form may be used for proposals under $500,000 in lieu of detailed itemized estimates of overhead costs. The proposal should also include a request for an extension of time, in calendar days, only if overall completion of contract is impacted by the proposed modification. The contractor shall not proceed with any of the work included in the modification prior to receipt of an executed modification of contract (SF30).

**BREAKDOWN OF DIRECT COSTS** **Contract No.:** N62474-00-C-3035 **Date:** 5/24/2004

| ITEMS OF WORK FOR Prime Contractor | QTY | UNIT | MATERIAL Unit Cost | MATERIAL Total Cost | LABOR Unit Cost | LABOR Total Cost | R O | EQUIPMENT Days | EQUIPMENT Rate | EQUIPMENT Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Construction Delay 29OCT02-06JAN03 | 2 | mo | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| Superintendent | 320 | hr | | $ - | $ 55.00 | $ 17,600.00 | | | | $ - |
| Quality Control Manager | 320 | hr | | $ - | $ 65.00 | $ 20,800.00 | | | | $ - |
| Field Secretary | 160 | hr | | $ - | $ 15.00 | $ 2,400.00 | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| Field Overhead/Subsistence | 2 | mo | $ 6,260.00 | $ 12,520.00 | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| DIRECT Prime Contractor's | TOTALS | | | $ 12,520.00 | | $ 40,800.00 | R | Total (Rental) | | |
| | | | | | | | O | Total (Owned) | | |

| ITEMS OF WORK FOR Sub-contractor | QTY | UNIT | MATERIAL Unit Cost | MATERIAL Total Cost | LABOR Unit Cost | LABOR Total Cost | R O | EQUIPMENT Days | EQUIPMENT Rate | EQUIPMENT Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| DIRECT Sub-contractor's | TOTALS | | | $ - | | $ - | R | Total (Rental) | | |
| | | | | | | | O | Total (Owned) | | |

NAVFAC 4330/43 (Back)

**Trisha Fitzpatrick**

**From:** Tracy Hieber [tracy@westcoastnv.com]
**Sent:** Friday, September 08, 2006 7:48 AM
**To:** Trisha Fitzpatrick
**Subject:** FW: Primavera Backup files attached (PRX)
**Attachments:** image003.wmz; oledata.mso; P3_PRX_BACKUP_FILES.zip

-----Original Message-----
**From:** Dave Keddie [mailto:dave@ontrackscheduling.com]
**Sent:** Thursday, September 07, 2006 6:22 PM
**To:** trish@westcoastnv.com; tracy@westcoastnv.com
**Cc:** thebert@westcoastnv.com; Kevin Elvrum; Deane Burk; Mike Kust
**Subject:** Primavera Backup files attached (PRX)

ONTRACK
PROJECT PLANNING AND SCHEDULING

Tracy:

Re: Naval Post Grad School Claim

There will be a FedEx as a backup... but here are the P3 files I think you will need. You must restore them (like unzipping) to open & view them. Then you will want to organize the data using layouts etc for viewing/printing. I can help with this if you need it.

Schedules found & converted to P3 for you are.

| SCHEDULE | Data Date | # of Acts | Early Finish | | | |
|---|---|---|---|---|---|---|
| NPS1 | 29-Jun-01 | 313 | 28-Oct-02 | No Status Baseline | | |
| NPS2 | 24-Jan-02 | 477 | 3-Mar-03 | | | |
| NPS3 | 24-Jan-02 | 478 | 3-Mar-03 | | | |
| NPS4 | 24-Jan-02 | 478 | 10-Apr-03 | | | |
| NPS5 | 24-Jan-02 | 479 | 15-Apr-03 | | | |
| NPS6 | 1-Apr-02 | 479 | 9-Jun-03 | | | |
| NPS7 | 8-Jan-03 | 480 | 13-May-03 | | | |
| | | | | | | |
| | | | | | | |

Other Precon/Design Schedules found in MPP format will be on Disk. Most likely not required thus not emailed.

*David P. Keddie Jr.*
*Cell (530) 210-6195*
*Office (530) 885-4425*

9/8/2006

# EXHIBIT F

PROPOSAL/ESTIMATE FOR CONTRACT MODIFICATION — Date: 5/27/2004
Modified form NAVFAC 4330/43 (8/88)

CONTRACT TITLE: Design/Build Naval Postgraduate School Bldg 245 Extension
CONTRACT NO: N62474 -C- 3035
PCO NO:

ROICC OFFICE: NAVAL POSTGRADUATE SCHOOL, MONTEREY
Work Site:

DESCRIPTION:
Concrete Suspension of Work

| PRIME CONTRACTOR'S WORK | | | | | Revisions/Comments |
|---|---|---|---|---|---|
| 1. Direct Materials | | | $0.00 | | |
| 2. Sales Tax on Materials | % of line 1 | 0.00% | $0.00 | | |
| 3. Direct Labor | | | $65,416.40 | | |
| 4. Insurance, Taxes, and Fringe Benefits | % of line 3 | 0.00% | $0.00 | | Included in labor rate |
| 5. Rental Equipment | | | $10,982.80 | | |
| 6. Sales Tax on Rental Equipment | % of line 5 | 0.00% | $0.00 | | |
| 7. Equipment Ownership and Operating Expenses | | | $0.00 | | |
| 8. SUBTOTAL (add lines 1 - 7) | | | | $76,399.20 | |
| 9. Field Overhead | 10% of line 8 | 0.00% | $0.00 | | |
| 10. SUBTOTAL (Add Lines 8 & 9) | | | | $76,399.20 | |

Prime's Remark

| SUB-CONTRACTOR'S WORK | | | | | |
|---|---|---|---|---|---|
| 11. Direct Materials | | | $5,683.00 | | |
| 12. Sales Tax on Materials | % of line 11 | 0.00% | $0.00 | | |
| 13. Direct Labor | | | $0.00 | | |
| 14. Insurance, Taxes, and Fringe Benefits | % of line 13 | 0.00% | $0.00 | | |
| 15. Rental Equipment | | | $0.00 | | |
| 16. Sales Tax on Rental Equipment | % of line 15 | 0.00% | $0.00 | | |
| 17. Equipment Ownership and Operating Expenses | | | $0.00 | | |
| 18. SUBTOTAL (add lines 11 -17) | | | | $5,683.00 | |
| 19. Field Overhead | 10% of line 18 | 0.00% | $0.00 | | |
| 20. SUBTOTAL (Add Lines 18 & 19) | | | | $5,683.00 | |
| 21. Home Office Overhead | 3% of line 20 | 0.00% | $0.00 | | |
| 22. Profit | % of line 20 | 0.00% | $0.00 | | |
| 23. SUBTOTAL (Add Lines 20 - 22) | | | | $5,683.00 | |

Subcontractor's Remark

| SUMMARY | | | | | |
|---|---|---|---|---|---|
| 24. Prime Contractor's Work (from line 10) | | | $76,399.20 | | |
| 25. Sub-contractor's work (from line 23) | | | $5,683.00 | | |
| 26. SUBTOTAL (Add Lines 24 & 25) | | | | $82,082.20 | |
| 27. Prime Overhead on Sub-contractor | 5% of line 25 | 5.00% | $284.15 | | |
| 28. Prime's Home Office Overhead | 3% of line 24 | 3.00% | $2,291.98 | | |
| 29. Prime's Profit | % of line 26 | 7.00% | $5,745.75 | | |
| 30. SUBTOTAL (Add Lines 26 - 29) | | | | $90,404.08 | |
| 31. Prime Contractor's Bond Premium | % of line 30 | 0.65% | $587.63 | | |
| 32 TOTAL COST (Add Lines 30 & 31) | | | | $90,991.71 | |

Estimated Time Extension and Justification
Project Construction Delayed 40 Days

Prime Contractor Name: West Coast Contractors of Nevada, Inc.
Sub-Contractor Name:

Signature & Title of Preparer:

Date:

S/N 0105-LF-005-6900

## INSTRUCTIONS FOR PREPARING PROPOSAL/ESTIMATE FOR CONTRACT MODIFICATION

All Contract Modification Proposals shall be addressed to the Resident Officer in Charge of Construction. Proposals must clearly state the conditions and scope of the modification and shall be accompanied by a breakdown of cost, as indicated. Lump sum costs will not be accepted in either the prime or su-contractor's breakdown of direct cost. The total cost for labor, material, and equipment rental (or ownership) for each item shall be transferred to the corresponding item on the front of this form. At the contractor's option, the overhead rates printed on the front of this form may be used for proposals under $500,000 in lieu of detailed itemized estimates of overhead costs. The proposal should also include a request for an extension of time, in calendar days, only if overall completion of contract is impacted by the proposed modification. The contractor shall not proceed with any of the work included in the modification prior to receipt of an executed modification of contract (SF30).

**BREAKDOWN OF DIRECT COSTS** Contract No.: N62474-00-C-3035 Date: 5/27/2004

| ITEMS OF WORK FOR Prime Contractor | QTY | UNIT | MATERIAL | | LABOR | | R O | EQUIPMENT | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Unit Cost | Total Cost | Unit Cost | Total Cost | | Month | Rate | Total |
| Construction Lost Time 1/29/02-3/14/02 | | | | $ - | | $ - | | | | $ - |
| Supervision | 40 | day | | $ - | $ 398.70 | $ 15,948.00 | | | | $ - |
| QC Manager | 40 | day | | $ - | $ 325.37 | $ 13,014.80 | | | | $ - |
| Field Secretary | 40 | day | | $ - | $ 33.51 | $ 1,340.40 | | | | $ - |
| Foreman | 40 | day | | $ - | $ 367.45 | $ 14,698.00 | | | | $ - |
| Administration | 40 | day | | $ - | $ 54.60 | $ 2,184.00 | | | | $ - |
| Office Expense | 40 | day | | $ - | $ 18.31 | $ 732.40 | | | | $ - |
| Office Trailer | 40 | day | | $ - | $ 14.26 | $ 570.40 | | | | $ - |
| Toilets | 40 | day | | $ - | $ 13.82 | $ 552.80 | | | | $ - |
| Phone | 40 | day | | $ - | $ 11.79 | $ 471.60 | | | | $ - |
| Temp Fence | 40 | day | | $ - | $ 6.85 | $ 274.00 | | | | $ - |
| Safety | 40 | day | | $ - | $ 7.18 | $ 287.20 | | | | $ - |
| Subsistence | 40 | day | | $ - | $ 113.13 | $ 4,525.20 | | | | $ - |
| Foreman Subsistence | 40 | day | | $ - | $ 125.00 | $ 5,000.00 | | | | $ - |
| Transportation | 40 | day | | $ - | $ 21.88 | $ 875.20 | | | | $ - |
| Project Manager | 40 | day | | $ - | $ 123.56 | $ 4,942.40 | | | | $ - |
| Forklift Rental | 1 | mo | | $ - | | $ - | | 1 | $ 2,600.00 | $ 2,600.00 |
| Form/Scaffolding/Shoring Rental | 40 | day | | $ - | | $ - | | 40 | $ 209.57 | $ 8,382.80 |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| DIRECT Prime Contractor's | TOTALS | | | $ - | | $ 65,416.40 | R | Total (Rental) | | $10,982.80 |
| | | | | | | | O | Total (Owned) | | |

| ITEMS OF WORK FOR Sub-contractor | QTY | UNIT | MATERIAL | | LABOR | | R O | EQUIPMENT | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Unit Cost | Total Cost | Unit Cost | Total Cost | | Days | Rate | Total |
| Subcontractor MOB/REMOB Costs | 1 | LS | | $5,683.00 | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| DIRECT Sub-contractor's | TOTALS | | | $5,683.00 | | $ - | R | Total (Rental) | | |
| | | | | | | | O | Total (Owned) | | |

NAVFAC 4330/43 (Back)

**Trisha Fitzpatrick**

**From:** Tracy Hieber [tracy@westcoastnv.com]
**Sent:** Friday, September 08, 2006 7:48 AM
**To:** Trisha Fitzpatrick
**Subject:** FW: Primavera Backup files attached (PRX)
**Attachments:** image003.wmz; oledata.mso; P3_PRX_BACKUP_FILES.zip

-----Original Message-----
**From:** Dave Keddie [mailto:dave@ontrackscheduling.com]
**Sent:** Thursday, September 07, 2006 6:22 PM
**To:** trish@westcoastnv.com; tracy@westcoastnv.com
**Cc:** thebert@westcoastnv.com; Kevin Elvrum; Deane Burk; Mike Kust
**Subject:** Primavera Backup files attached (PRX)

ONTRACK
PROJECT PLANNING AND SCHEDULING

Tracy:

Re: Naval Post Grad School Claim

There will be a FedEx as a backup... but here are the P3 files I think you will need. You must restore them (like unzipping) to open & view them. Then you will want to organize the data using layouts etc for viewing/printing. I can help with this if you need it.

Schedules found & converted to P3 for you are.

| SCHEDULE | Data Date | # of Acts | Early Finish | | | |
|---|---|---|---|---|---|---|
| NPS1 | 29-Jun-01 | 313 | 28-Oct-02 | No Status Baseline | | |
| NPS2 | 24-Jan-02 | 477 | 3-Mar-03 | | | |
| NPS3 | 24-Jan-02 | 478 | 3-Mar-03 | | | |
| NPS4 | 24-Jan-02 | 478 | 10-Apr-03 | | | |
| NPS5 | 24-Jan-02 | 479 | 15-Apr-03 | | | |
| NPS6 | 1-Apr-02 | 479 | 9-Jun-03 | | | |
| NPS7 | 8-Jan-03 | 480 | 13-May-03 | | | |
| | | | | | | |
| | | | | | | |

Other Precon/Design Schedules found in MPP format will be on Disk. Most likely not required thus not emailed.

*David P. Keddie Jr.*
*Cell (530) 210-6195*
*Office (530) 885-4425*

9/8/2006

# EXHIBIT G

PROPOSAL/ESTIMATE FOR CONTRACT MODIFICATION
Modified form NAVFAC 4330/43 (8/88)

Date: 5/27/2004

CONTRACT TITLE:
Design/Build Naval Postgraduate School Bldg 245 Extension

CONTRACT NO: N62474 -C- 3035
PCO NO:

ROICC OFFICE
NAVAL POSTGRADUATE SCHOOL, MONTEREY

Work Site:

DESCRIPTION:
Construction Delay (Design)

| PRIME CONTRACTOR'S WORK | | | | | Revisions/Comments |
|---|---|---|---|---|---|
| 1. Direct Materials | | | $0.00 | | |
| 2. Sales Tax on Materials | % of line 1 | 0.00% | $0.00 | | |
| 3. Direct Labor | | | $73,593.45 | | |
| 4. Insurance, Taxes, and Fringe Benefits | % of line 3 | 0.00% | $0.00 | | Included in labor rate |
| 5. Rental Equipment | | | $0.00 | | |
| 6. Sales Tax on Rental Equipment | % of line 5 | 0.00% | $0.00 | | |
| 7. Equipment Ownership and Operating Expenses | | | $0.00 | | |
| 8. SUBTOTAL (add lines 1 - 7) | | | | $73,593.45 | |
| 9. Field Overhead | 10% of line 8 | 0.00% | $0.00 | | |
| 10. SUBTOTAL (Add Lines 8 & 9) | | | | $73,593.45 | |

Prime's Remark

| SUB-CONTRACTOR'S WORK | | | | | |
|---|---|---|---|---|---|
| 11. Direct Materials | | | $0.00 | | |
| 12. Sales Tax on Materials | % of line 11 | 0.00% | $0.00 | | |
| 13. Direct Labor | | | $0.00 | | |
| 14. Insurance, Taxes, and Fringe Benefits | % of line 13 | 0.00% | $0.00 | | |
| 15. Rental Equipment | | | $0.00 | | |
| 16. Sales Tax on Rental Equipment | % of line 15 | 0.00% | $0.00 | | |
| 17. Equipment Ownership and Operating Expenses | | | $0.00 | | |
| 18. SUBTOTAL (add lines 11 -17) | | | | $0.00 | |
| 19. Field Overhead | 10% of line 18 | 0.00% | $0.00 | | |
| 20. SUBTOTAL (Add Lines 18 & 19) | | | | $0.00 | |
| 21. Home Office Overhead | 3% of line 20 | 0.00% | $0.00 | | |
| 22. Profit | % of line 20 | 0.00% | $0.00 | | |
| 23. SUBTOTAL (Add Lines 20 - 22) | | | | $0.00 | |

Subcontractor's Remark

| SUMMARY | | | | | |
|---|---|---|---|---|---|
| 24. Prime Contractor's Work (from line 10) | | | $73,593.45 | | |
| 25. Sub-contractor's work (from line 23) | | | $0.00 | | |
| 26. SUBTOTAL (Add Lines 24 & 25) | | | | $73,593.45 | |
| 27. Prime Overhead on Sub-contractor | 5% of line 25 | 0.00% | $0.00 | | |
| 28. Prime's Home Office Overhead | 3% of line 24 | 3.00% | $2,207.80 | | |
| 29. Prime's Profit | % of line 26 | 7.00% | $5,151.54 | | |
| 30. SUBTOTAL (Add Lines 26 - 29) | | | | $80,952.80 | |
| 31. Prime Contractor's Bond Premium | % of line 30 | 0.65% | $526.19 | | |
| 32 TOTAL COST (Add Lines 30 & 31) | | | | $81,478.99 | |

Estimated Time Extension and Justification
Project Construction Delayed 45 Days

Prime Contractor Name: West Coast Contractors of Nevada, Inc.
Sub-Contractor Name:

Signature & Title of Preparer:

Date:

S/N 0105-LF-005-6900

## INSTRUCTIONS FOR PREPARING PROPOSAL/ESTIMATE FOR CONTRACT MODIFICATION

All Contract Modification Proposals shall be addressed to the Resident Officer in Charge of Construction. Proposals must clearly state the conditions and scope of the modification and shall be accompanied by a breakdown of cost, as indicated. Lump sum costs will not be accepted in either the prime or sü-contractor's breakdown of direct cost. The total cost for labor, material, and equipment rental (or ownership) for each item shall be transferred to the corresponding item on the front of this form. At the contractor's option, the overhead rates printed on the front of this form may be used for proposals under $500,000 in lieu of detailed itemized estimates of overhead costs. The proposal should also include a request for an extension of time, in calendar days, only if overall completion of contract is impacted by the proposed modification. The contractor shall not proceed with any of the work included in the modification prior to receipt of an executed modification of contract (SF30).

**BREAKDOWN OF DIRECT COSTS** Contract No.: N62474-00-C-3035 Date: 5/27/2004

| ITEMS OF WORK FOR Prime Contractor | QTY | UNIT | MATERIAL Unit Cost | MATERIAL Total Cost | LABOR Unit Cost | LABOR Total Cost | R O | EQUIPMENT Days | EQUIPMENT Rate | EQUIPMENT Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Construction Lost Time 1/29/02-3/14/02 | | | | $ - | | $ - | | | | $ - |
| Supervision | 45 | day | | $ - | $ 398.70 | $ 17,941.50 | | | | $ - |
| QC Manager | 45 | day | | $ - | $ 325.37 | $ 14,641.65 | | | | $ - |
| Field Secretary | 45 | day | | $ - | $ 33.51 | $ 1,507.95 | | | | $ - |
| Foreman | 45 | day | | $ - | $ 367.45 | $ 16,535.25 | | | | $ - |
| Administration | 45 | day | | $ - | $ 54.60 | $ 2,457.00 | | | | $ - |
| Office Expense | 45 | day | | $ - | $ 18.31 | $ 823.95 | | | | $ - |
| Office Trailer | 45 | day | | $ - | $ 14.26 | $ 641.70 | | | | $ - |
| Toilets | 45 | day | | $ - | $ 13.82 | $ 621.90 | | | | $ - |
| Phone | 45 | day | | $ - | $ 11.79 | $ 530.55 | | | | $ - |
| Temp Fence | 45 | day | | $ - | $ 6.85 | $ 308.25 | | | | $ - |
| Safety | 45 | day | | $ - | $ 7.18 | $ 323.10 | | | | $ - |
| Subsistence | 45 | day | | $ - | $ 113.13 | $ 5,090.85 | | | | $ - |
| Foreman Subsistence | 45 | day | | $ - | $ 125.00 | $ 5,625.00 | | | | $ - |
| Transportation | 45 | day | | $ - | $ 21.88 | $ 984.60 | | | | $ - |
| Project Manager | 45 | day | | $ - | $ 123.56 | $ 5,560.20 | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| DIRECT Prime Contractor's | TOTALS | | | $ - | | $ 73,593.45 | R | Total (Rental) | | |
| | | | | | | | O | Total (Owned) | | |

| ITEMS OF WORK FOR Sub-contractor | QTY | UNIT | MATERIAL Unit Cost | MATERIAL Total Cost | LABOR Unit Cost | LABOR Total Cost | R O | EQUIPMENT Days | EQUIPMENT Rate | EQUIPMENT Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| | | | | $ - | | $ - | | | | $ - |
| DIRECT Sub-contractor's | TOTALS | | | $ - | | $ - | R | Total (Rental) | | |
| | | | | | | | O | Total (Owned) | | |

NAVFAC 4330/43 (Back)

**Trisha Fitzpatrick**

**From:** Tracy Hieber [tracy@westcoastnv.com]
**Sent:** Friday, September 08, 2006 7:48 AM
**To:** Trisha Fitzpatrick
**Subject:** FW: Primavera Backup files attached (PRX)
**Attachments:** image003.wmz; oledata.mso; P3_PRX_BACKUP_FILES.zip

-----Original Message-----
**From:** Dave Keddie [mailto:dave@ontrackscheduling.com]
**Sent:** Thursday, September 07, 2006 6:22 PM
**To:** trish@westcoastnv.com; tracy@westcoastnv.com
**Cc:** thebert@westcoastnv.com; Kevin Elvrum; Deane Burk; Mike Kust
**Subject:** Primavera Backup files attached (PRX)

ONTRACK
PROJECT PLANNING AND SCHEDULING

Tracy:

Re: Naval Post Grad School Claim

There will be a FedEx as a backup... but here are the P3 files I think you will need. You must restore them (like unzipping) to open & view them. Then you will want to organize the data using layouts etc for viewing/printing. I can help with this if you need it.

Schedules found & converted to P3 for you are.

| SCHEDULE | Data Date | # of Acts | Early Finish | | | |
|---|---|---|---|---|---|---|
| NPS1 | 29-Jun-01 | 313 | 28-Oct-02 | No Status Baseline | | |
| NPS2 | 24-Jan-02 | 477 | 3-Mar-03 | | | |
| NPS3 | 24-Jan-02 | 478 | 3-Mar-03 | | | |
| NPS4 | 24-Jan-02 | 478 | 10-Apr-03 | | | |
| NPS5 | 24-Jan-02 | 479 | 15-Apr-03 | | | |
| NPS6 | 1-Apr-02 | 479 | 9-Jun-03 | | | |
| NPS7 | 8-Jan-03 | 480 | 13-May-03 | | | |
| | | | | | | |
| | | | | | | |

Other Precon/Design Schedules found in MPP format will be on Disk. Most likely not required thus not emailed.

*David P. Keddie Jr.*
*Cell (530) 210-6195*
*Office (530) 885-4425*

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-o0o-

WEST COAST CONTRACTORS OF NEVADA, INC., 7785 White Fir Street Reno, Nevada 89523

Plaintiffs,

vs. Case No. 05-1121C

UNITED STATES OF AMERICA,

Defendant.

DEPOSITION OF

CARL JOHNSON

February 14, 2007

Reno, Nevada

Reported by: DIANNE M. BRUMLEY, NV CCR #205
California CSR #6796

BONANZA REPORTING: 1111 FOREST, RENO, NEVADA
Telephone: (775) 786-7655

APPEARANCES

FOR THE PLAINTIFF:
Shulman, Rogers, Gandal, Pordy & Ecker
Attorneys at Law
BY: WILLIAM C. DAVIS, III
11921 Rockville Pike
Rockville, Maryland 20852-2743

FOR THE DEFENDANT UNITED STATES OF AMERICA:
MICHAEL N. O'CONNELL
U.S. Department of Justice - Civil Division
1100 L Street, NW
Room 12062
Washington, DC 20005

FOR THE DEPARTMENT OF THE NAVY:
PAMELA J. NESTELL
Trial Attorney, Litigation Office
720 Kennon Street SE, Room 136
Washington Navy Yard, DC 20374-5051

Also Present:
Stephen Weathers, P.E.
Tracy Hieber





INDEX

EXAMINATION BY PAGE
Mr. Connell 5

EXHIBITS
Exhibit 56 6
Exhibit 57 13
Exhibit 58 28
Exhibit 59 32
Exhibit 60 35





ATTORNEY'S NOTES/CORRECTIONS

PAGELINE





***

RENO, NEVADA, WEDNESDAY, FEBRUARY 14, 2007, 1:00 P.M.

***

CARL JOHNSON
having been duly sworn,
was examined and testified as follows:

EXAMINATION

BY MR. O'CONNELL:

Q Mr. Johnson, thank you for coming today. Have you ever had your deposition taken before?
A Yes.
Q All right. More than once, or --
A I believe so.
Q Do you know roughly how many --
A Two or three times.
Q Were these things work related, personal or --
A Both.
Q I see. So you probably know the basic rules, that you need to articulate your answers and you can't nod your head, shake your head no.
A I understand.
Q And probably the most important thing is we don't talk over each other so that the court reporter can take it down accurately, and I don't think we'll be going too, too long this afternoon with you, but if you

feel like you need a break or anything like that, please feel free to ask and we can stop and take a break, all right?
A Fine.
Q All right. Are you the Johnson in the Johnson Plumbing?
A Yes.
Q Are you the owner of the business?
A Yes, I am.
Q When did your company first become involved in the Naval Post Graduate School project, building 245 extension?
A Probably a year before we started work, and I'm guessing, I'm sorry.
Q Do you know when you started work?
A No, not off the top of my head.
Q Let me show you a couple documents. Let's go off the record for a second.
(A discussion was held off the record.)
MR. O'CONNELL: Can we mark this as the next exhibit?
(Exhibit 56 was marked.)
BY MR. O'CONNELL:
Q Take a look at Exhibit 56, Mr. Johnson, please. Do you recognize this document?





A Yes.
Q Turn to the very last page of the exhibit if you would. You can see there's a letter August 27th, 2001 from Johnson Plumbing with what appears to be your signature or somebody signing for you?
A Yes.
Q That's August 27th, 2001. If you look at the first page of the subcontract, it says this agreement made this 29th date of June, 2001.
What can you tell us about these two dates and when things were happening with respect to your proposal and when the subcontract was actually signed, and you can also look at Page 10 of the subcontract if you'd like.
A I'm not sure what you want to know. We would have sent this budget estimate before the contract. The contract was signed in October.
Q So the August 27th, 2001 budget as you just referred to it, so does that help you date when Johnson was first contacted about the project?
A Yeah, it would have been maybe six months before that, maybe nine months, something like that, I believe. I don't remember exactly.
Q Were you the one who prepared Johnson Plumbing's budget?





A Yes.
Q Who were you dealing with at West Coast?
A Jim Miller mostly.
Q How long have you been in business as Johnson Plumbing?
A Here in Nevada, about 12 years.
Q And before that, someplace else?
A California, since '87.
Q What would you say the nature of Johnson Plumbing's business is, what kind of work do you do?
A We do mostly new light commercial piping installation.
Q And have you done a lot of design-build projects?
A Yes.
Q If you'd turn to the scope of work page, that's Page 11. You can see under inclusions, the last line there is design-build coordination.
What was your understanding of what Johnson Plumbing had to do with respect to design-build coordination?
A What we did on this project was pick the plumbing fixtures.
Q Pick the plumbing fixtures?
A Right.





Q And what was the nature of the coordination?
A They asked us what we would like to install and we told them toilets, sinks, faucets, things of that nature.
Q When you say "they," who is they?
A It would be West Coast.
Q Were you dealing with --
A West Coast and the engineer, I'm sorry.
Q Who is the engineer you're referring to?
A I don't remember his name.
Q Was it Merritt & Pardini, does that ring a bell?
A That does ring a bell. I could look it up in my files and find out.
Q Is it Holts BHU, does that ring a bell?
A Yes, that sounds more like who I was talking to.
Q When you put together Johnson Plumbing's bid, what materials did you have in your possession? Did you have the plans and specifications for the project?
A We had a rough plan draft.
Q What do you mean by a rough plan draft?
A We didn't have a final set of drawings, we had a preliminary set of drawings.
Q And are you talking about what we refer to as



d7dbbbd1-3474-4cf9-8f98-45dbd0c6bf80

the RFP drawings, the drawings that the Government gave to the bidders?
A No.
Q Did you have additional drawings from Holts BHU?
A I'm not sure who they came from. I got them from West Coast.
Q But are you saying you think it was something beyond the RFP drawings?
A Yeah, they hadn't been finalized. They were very preliminary.
Q Do you know what I mean, by the way, when I say the RFP, request for proposals?
A Yes. You mean bid documents?
Q Yes.
A Yes. It was not the bid documents.
Q When you say they were very preliminary, can you be more specific as to what you mean with respect to the scope of work that Johnson Plumbing was responsible for?
A Exact and final locations of items had not been determined, quantities and general location had been determined.
Q And just to make sure I understand your testimony, do you know who these drawings were prepared





by that you were looking at?
A Not off the top of my head. They may be signed. I still have them.
Q Do you know whether Johnson Plumbing was ever given the RFP drawings by West Coast?
A I would assume so.
Q Did Johnson Plumbing -- let me back up. Do you recall whether this project had an option to build a two story basement with a building, or a three story building, do you recall that?
A No.
Q Do you know if -- do you recall that the building that was actually built was a three story building?
A Yes.
Q And do you recall if Johnson provided a proposal to West Coast on anything other than a three story building?
A I don't believe so.
Q Do you recall an issue coming up on the project with respect to the size of the chiller that would be installed at the project?
A Yes.
Q How did that issue come up on the project?
A We were asked to change the chiller from the, I





think it was a five ton chiller to, I think it was a 30 ton chiller. I'm not -- I don't remember the numbers exactly, but it increased substantially in size.
Q I can show you the mechanical drawings, but I'll represent to you that one of the mechanical drawings says nominal 15 tons. Does that ring a bell?
A Yeah, yeah.
Q So when you say you were asked, who were you dealing with with respect to this request?
A It would be West Coast.
Q But was it explained to you how it was discovered that --
A No.
Q Let me just finish the question so the record is clear. Was it explained to you why this request was being made?
A It was my understanding the initial chiller was not large enough.
Q When you put together your proposal for the project, did you do that with the assumption that the chiller was going to be 15 tons?
A I don't recall. There was on those preliminary drawings a number for a chiller. I don't remember if it was five tons or 15 tons.
Q Let me just show you the document.





(Exhibit 57 was marked.)
BY MR. O'CONNELL:
Q Mr. Johnson, could you take a look at the Exhibit 57 that I just handed to you? These are -- you can take a quick look at the bottom right corner, but these are drawings labeled M-1 through M-5. Have you seen these drawings before?
A I would say yes.
Q Do you know if this is what Johnson Plumbing used when it formulated its bid?
A I don't think these are what I had.
Q They're not. What makes you say that?
A I don't remember them being this detailed.
Q Anything in particular that you could be specific about?
A No. I'd have to check these against my bid set.
Q Do you still have those, your bid set?
A Yes.
Q Take a look at the fourth page, drawing M-4. You can see in the -- if you'd turn the document sideways, on the bottom right corner there's a chilled water system diagram, and then you can barely read it because this is a reduced size drawing, but I believe it says there to the right, nominal 15 tons.

A I can see that.
Q Was this consistent with what you bid on to your recollection?
A I'd have to look -- I don't recall.
Q Do you recall when you received final construction documents on the project?
A No. Date-wise, I wouldn't remember.
Q Do you recall if it was at that time you received the final drawings or sometime before that the 40 ton chiller issue came up?
A I don't. I'd be guessing. It happened during construction.
Q But I'll just -- we'll see some documents in a few minutes I think that will refer to a 40 ton chiller, but I'll represent to you it's my understanding that what was ultimately installed was a 40 ton chiller. Does that square with your recollection?
A Yes.
Q Can you be any more specific as to how you knew to install a 40 ton chiller?
A We had a change order.
Q Who initiated the change order?
A West Coast.
Q Was this a written request for proposal, or was this verbal or what?





A I believe it's a written request.
Q If you could, in this pile of documents I'm going to ask you -- you can fold that document up right there. Actually, you can fold both of these up and put them on top. We're trying to make somewhat of an effort to keep them in order.
Take a look at Exhibit 10, Mr. Johnson, and tell me if you've ever seen this document before.
A I believe so.
Q And there's a couple items, "Add for chiller from 15 ton to 40 ton, and additional chiller upgrade from 15 tons to 40 tons." You can see down at the bottom there the total appears to be 37,504 of those two numbers. Do you see that?
A Yes.
Q Do you recall how much money Johnson Plumbing was looking for with respect to this upgrade in the chiller size?
A I would say it's those two numbers, the 30,730 and the 6774 for whatever upgrade that amount was for.
Q Do you know what percentage profit you would have incorporated in those numbers?
A I don't off the top of my head.
Q Would you expect that there's some proposal letter out there from Johnson Plumbing that sets out the





amount of money it's looking for and the reasons it's looking for the money?
A Yes.
Q Do you know if you still have a copy of that?
A I believe so.
Q What was your initial reaction when you were told that the chiller needed to be increased in size from 15 tons to 40 tons?
A It's not uncommon. I wouldn't have been surprised.
Q Is that because it's design-build or for some other reason?
A For some other reason. Changes are common.
Q Is this something that you would have expected to have been discovered before Johnson Plumbing submitted its proposal for the project?
A It wouldn't matter to me exactly when it was discovered and changes and upgrades go on through any project.
Q Do you recall whether there was any disagreement between West Coast and Johnson Plumbing at that time as to whether or not Johnson Plumbing was entitled to more money?
A Not at the time the change order came out.
Q What was the nature of your discussions at that





point?
A It was basically they wanted a bigger chiller, how soon could I get it, how much to change it.
Q You had actually earlier I believe referred to a 30 ton chiller. Were you aware if there was any discussion among the various people on the project as to whether a 30 ton chiller or a 40 ton chiller would actually be necessary?
A I'm not aware of that.
Q Let me ask you to go back to where you were in this pile. You can put Exhibit 10 back in, but take a look at Exhibit 9. Is this a document you've seen before, Exhibit 9?
A I may have. I don't recall it, though.
Q What I'm interested in on this document is if you turn to the very last page and you see the middle section, system summary, and you can see underneath there there's a sentence that says, the building peaked at hour 17 month eight with a capacity of 28.7 tons?
A I do see that.
Q And do you understand that as a reference to a chiller size?
A I do now, yes.
Q By the way, what are the sizes that chillers are available in? Can you get a 30 ton chiller?

A I'm sure you can.
Q And you can put that one back. Do you have any sense as to what the difference in cost between a 30 ton and a 40 ton chiller is?
A Not off the top of my head.
Q Can you give me a rough estimate?
A $10,000.
Q Could you take a look at Exhibit 30? I'm sorry, not Exhibit 30, Exhibit 13. Take a look at Exhibit 13, please, Mr. Johnson, and have you seen this document before?
A I may have.
Q What I'm interested in is if you turn -- it's actually nine pages in, but you'll see on the bottom corner it's Page 3. Do you see the top there, close to the top, B drawings mechanical?
A Yes.
Q And then underneath that, go about halfway down the page, B, pump schedule, and under one, chilled water pump. The second line down there's a reference to a 30 tons chiller. Do you see that?
A Yes.
Q And then if you turn to three pages from the end, again, that middle section, system summary. There's a sentence there that says the building peaked





at hour 17 month eight with a capacity of 30.3 tons.
Do these two documents that we just looked at, Exhibit 9 we looked at a moment ago and this Exhibit 13, does this refresh your recollection at all with respect to a discussion of a 30 ton chiller?
A It does not. I would not have specified the size of chiller or the type.
Q If the drawings hadn't specified a 15 ton chiller, would you have been able to bid the job?
A Yes, but I would have wanted to know what size chiller they wanted to use.
Q And how would you have handled that?
A I would have spoken with the design engineer.
Q Can we go off the record for a second?
(A discussion was held off the record.)
BY MR. O'CONNELL:
Q Could you take a look at Exhibit 12, Mr. Johnson? If you recall a moment ago, we were looking at a document change order log which listed an amount of $37,504 with respect to the chiller.
Exhibit 12 is a document later in time, August 15th, 2003, but it states, "Resent half C.O. amount due to owner rejecting REA. Final amount of change request will be based on claim filed with owner."
Was there some deal between West Coast and





Johnson Plumbing where West Coast advanced half of the money -- half of the $37,504 to Johnson Plumbing?
A I believe we had a signed change order.
Q Do you recall if the money was actually paid?
A I don't think it was, but I don't recall.
Q Does this amount of $18,752, does that to your recollection accurately reflect the deal between West Coast and Johnson Plumbing?
A No.
Q What was the deal?
A Apparently twice this amount.
Q What I'm referring to, though, was the deal for Johnson to be paid half the money now and then some more money later, do you recall a deal of that nature?
A Not until we saw this.
Q I'm going to ask you to take a look at Exhibit 11. Could you turn four pages into Exhibit 11? On Page 4 of Exhibit 11, do you recognize the handwriting on this document?
A Yes.
Q Whose handwriting is it?
A That's Debbie, my secretary and wife.
Q Did you say secretary and wife?
A Uh-huh.
Q Does this document help refresh your





recollection as to how much money that Johnson Plumbing was looking for with respect to the chiller issue?
A I'm sure it would if I could read it.
Q Unfortunately, that's the best copy I have. Anything further to add?
A No.
Q Would there have been some kind of a cover letter or transmittal letter from Johnson Plumbing with respect to that issue?
A Yes, there would.
Q Do you think you still have that?
A Yes, I do think so.
Q Can we take a look at Exhibit 35, please? I'm going to ask you some questions with respect to what happened at the end of the project. You can see here there's a letter from Jim Miller of West Coast to the Government, and see the second paragraph of the letter states, "The critical path items are the steam PRV installation and TAB HVAC."
Was Johnson Plumbing involved with respect to the installation of the steam PRV?
A Yes.
Q What was the nature of Johnson Plumbing's involvement?
A We supplied and installed the PRV.

Q So Johnson Plumbing purchased it from a manufacturer?
A Yes.
Q And was there some delay associated with the purchase of the steam PRV?
A There was no PRV shown on the plans. When one was determined it was necessary, we had to have it specified, ordered, manufactured and shipped.
Q When were you told that a steam PRV would be necessary for the project?
A I don't recall the exact date. We were well into the project.
Q How long does it take to order one and have it manufactured and delivered?
A I think this one was about three weeks. I could verify that if I looked at my records.
Q Let me ask you to take a look at Exhibit 37. Mr. Johnson, Exhibit 37 is an assessment of delay charges from West Coast to Johnson Plumbing and the document states, "Removed and did not replace existing steam pressure relief valve, delayed from 4-15-03 through 5-8-03 equals 24 days. Installed CP-1 and CP-2 backwards. Delayed tab 5-21-03 through 5-28-03."
Focusing on the sentence which starts removed and did not replace existing steam pressure relief





valve, does that refresh your recollection any more as to what was happening with respect to this issue?
A Yes. Apparently there was an existing pressure reducing valve that we were not aware of. We reassembled the system as shown on the drawings, did not show a pressure reducing valve. When the system was reassembled, it didn't function properly due to the higher pressure.
Q So who discovered the issue with respect to the pressure relief valve?
A I believe it was the Navy.
Q Does this -- do the dates in this letter refresh your recollection as to when Johnson Plumbing was told about the issue?
A No, these don't.
Q Seeing this document, Exhibit 37, does that change your testimony at all with respect to whether there was -- whether or not there was a delay with respect to the manufacturer of the pressure release valve?
A No, it doesn't change it. I'd have to verify when we placed the order and when we received the valve.
Q Do you think that Johnson Plumbing still has those records?
A We should have.





Q But if I understood your earlier testimony, are you trying to tell me that as you sit here today, that to the extent that there was any delay, it was caused just simply by the point in time when Johnson Plumbing was advised about this issue?
A I'm not sure I understand your question. We didn't know we needed the pressure relief valve before the Navy told us.
Q Did Johnson Plumbing ask for any additional money with respect to the pressure relief valve?
A I'm sure we did.
Q Exhibit 37, did Johnson Plumbing either actually pay West Coast this $46,400 or have the money withheld from payments by West Coast?
A Yes.
Q So as you sit here today, Johnson Plumbing has never either received this money or --
A This amount here, 46,400 was deducted from our contract amount.
Q And was that ever resolved, or is that still outstanding today?
A It's still pending.
Q Is there any lawsuit or anything between Johnson Plumbing and West Coast with respect to this project?





A No.
Q When you say still pending, what do you mean by that?
A We have an agreement with West Coast that if they recover funds, that we will recover funds.
Q And what specific money that West Coast could recover would be paid to Johnson Plumbing?
A I don't recall the exact amount.
Q Is there a document that sets forth the nature of the agreement between West Coast and Johnson Plumbing?
A Yes, there is.
Q And what kind of document is that? Is it a letter, or is it some kind of memo, or --
A It's a letter, I'm sure.
Q Can you remember any of the specifics at all of that agreement?
A I'd just be guessing without having it in front of me.
Q And do you know what, if anything, you're going to do if West Coast does not prevail in the lawsuit?
A As pending litigation, there won't be any.
Q Johnson Plumbing didn't make a claim against a payment bond or anything like that on the project, did it?



d7dbbbd1-3474-4cf9-8f98-45dbd0c6bf80

A I believe we did.
Q And what happened with respect to that?
A The resulting agreement was made regarding if West Coast recovers funds they're seeking, that we would recover the funds that we were seeking.
Q Is that something --
A That's the way I understand it, excuse me. I should have it in front of me before I say anything.
Q Was that something that an attorney did on behalf of Johnson Plumbing's behalf, or was that handled by somebody in-house?
A It was an attorney.
Q What's the name of your attorney?
A Rod Carucci, C-a-r-u-c-c-i.
Q Is he here in Reno?
A Yes.
Q Were there ever any discussions with West Coast as to why they backcharged Johnson Plumbing for 32 days of delay?
A No meaningful discussions, no.
Q Were you aware that the Government had assessed liquidated damages against West Coast on the project?
A No.
Q What would be your reaction if I told you that the Government had assessed four days fewer delay





against West Coast and about $6000 less than West Coast assessed against Johnson Plumbing?
A I'm not surprised.
Q Why aren't you surprised?
A I'm sure they had to get their money from somebody.
Q How often were you out at the project site personally?
A Very often.
Q How often -- withdraw that.
Towards the latter part of the project, do you recall working out on the site with the drywall subcontractor, K&C Drywall?
A I'm sure we were there at the same time.
Q Were you aware that West Coast had also charged K&C Drywall for $30,450 in delay damages to the project?
A I knew other subcontractors had been backcharged. I wasn't familiar with the amounts or the contractors.
Q What was your relationship like with Jim Miller?
A It was good.
Q Were you guys friends?
A Not socially. We got along well.
Q Did you ever try to talk to Jim about these





issues?
A I did.
Q And what would you guys talk about?
A I asked him to explain to me how these things could happen without me knowing about them or him knowing about them, and he didn't have much to say.
Q I'm sorry, how these things could happen without who knowing about them?
A Without Jim notifying me of them.
Q Which things are you talking about?
A These backcharges, the delays.
Q What exactly do you mean, without notifying you in some manner other than the letter that assesses the backcharges?
A Correct.
Q And what kind of notice would you have been expecting?
A Something more formal. A letter like this stating that you're several days, whatever, behind.
Q You mean like a warning letter kind of?
A Sure.
Q Let's mark this as the next exhibit.
(Exhibit 58 was marked.)
BY MR. O'CONNELL:
Q Mr. Johnson, I just handed you Exhibit 58. Is





this a document that you've seen before?
A Yes.
Q What I'm interested in first is point four on the fax which states, "The backcharges for the steam work are ridiculous." What do you mean by the steam work?
A The work in the existing mechanical room.
Q Is this related to the pressure relief valve?
A Yes, and rerouting the piping to accommodate that.
Q Why do you say it's ridiculous?
A The amounts are exorbitant.
Q When you say the amounts, do you mean the amount per day, or do you mean the length of the alleged delay?
A Both, and the fact that this steam work was not shown on the plans.
Q Do you know what the -- you can look back at the exhibit, I believe it was $1450 a day. Do you know what that was based on?
A No.
Q And then paragraph three of Exhibit 58 says, "The chiller upgrade and extra charges have not been paid for."
Just so I'm clear, was any money ever paid by



d7dbbbd1-3474-4cf9-8f98-45dbd0c6bf80

West Coast to Johnson Plumbing for that chiller issue?
A I'd have to check.
Q What is point one, cancellation of the signed change order to reroute the four-inch domestic water line?
A There was a domestic water line that was not shown that had to be rerouted. We sent them a proposal to reroute it with a signed change order and the change order was rescinded.
Q Do you recall how information with respect to project schedule was conveyed by West Coast to Johnson Plumbing?
A It was either faxed to us or delivered to us at the site.
Q And what exactly was faxed to you or delivered at the site?
A It would be a proposed schedule for the week.
Q So weekly schedules?
A I believe so. I could be wrong about that, I'd have to check.
Q Were you aware of the project's completion date?
A I'm sure I was.
Q Does March 1st of 2003 sound right? I can show you a document if you'd like.





A It could have been, sure.
Q Let me just show you the document real quick. I don't know if I'll mark it as an exhibit. Let me just -- I'm going to hand you Page 17 of contract section 710 and see what I've highlighted there. Have you seen that document before?
A I probably have.
Q Did you have a copy of the contract specifications?
A Yes.
Q Did you have those from the beginning?
A Yes, from the beginning when the job started, yes.
Q When you prepared your bid, did you have them?
A The initial bid, no.
Q Do you know why not?
A I don't think they were available at that time.
Q Somebody told you that they weren't available?
A No, nobody told me that, but the document I was given did not have specifications with it. It did not have a project manual like we would see on a project like this at that point in time.
Q Based upon the specs section that I just showed you, was it the expectation of Johnson Plumbing that Johnson Plumbing would be on the site from its





mobilization date until March 1st of 2003?
A I would expect we would be there until the job was done if that's what you want to know. Typically whenever these changes are requested, extra time is added to accommodate for the extra work.
Q Mark this as the next exhibit.
(Exhibit 59 was marked.)
BY MR. O'CONNELL:
Q Could you take a look at what we've marked as Exhibit 59? This appears to be a fax dated October 15th of 2002 from West Coast to Johnson Plumbing, Carl, which presumably would be you.
What I'm interested in with respect to this fax is point number three which states, "Chiller size, question mark, so I can set up and pour pad, want to pour."
Do you recall receiving this fax from West Coast?
A No, not specifically, but I'm sure we did.
Q Do you recall what "chiller size question mark" meant?
A I'm assuming it's the physical size of the chiller so they know what size of pad to put down.
Q What about the last sentence of the fax where it says, "Please man up, we need your help." Do you





know what that refers to?
A Russ wants more people on the job.
Q And was there some issues as we get into the latter part of 2002 and the early part of 2003 with respect to how much manpower Johnson Plumbing was providing to the project?
A I didn't think so.
Q When you say you didn't think so, why didn't you think so?
A Well, these kind of things are typical in any project. They want more people there. I don't recall us ever holding anybody up. I'm sure we didn't.
Q I'm going to ask you to take a look at Exhibit 38. Exhibit 38, Mr. Johnson, appears to be a fax from West Coast to Johnson Plumbing. It states third notice. Do you recall receiving this fax from West Coast?
A No, but I'm sure I did.
Q The comment section of the fax states, "Carl, this is not an option, this must be done before February 24th."
Does this refresh your recollection at all with respect to any manpower issues between West Coast and Johnson Plumbing?
A This is regarding a waste receptacle for the elevator pump which Russ, who was the superintendent,



d7dbbbd1-3474-4cf9-8f98-45dbd0c6bf80

insisted that we do. It's not shown on the plans. I viewed it as a change.
Q So was West Coast taking the position that because this was a design-build project, Johnson Plumbing had to do the things that were necessary to bring the project to completion?
A That's how it ended up. Excuse me, that was West Coast's position, not mine.
Q What exactly did they tell you?
A That I was part of the design team and therefore responsible for deficiencies in the design.
Q Would that include the upgrade of the chiller?
A It must have.
Q If you could turn -- we're going to go two exhibits forward I guess. Mr. Johnson, if you would, take a look at what I've marked as Exhibit 39 and 40.
Exhibit 39 is dated May 14th of '02 and Exhibit 40 is March 3rd of '03. You can see that Exhibit 39 at the bottom states, "Over 115 days past due, and $8542," and Exhibit 40 is $54,570 over 90 days past due.
Was there some problem that Johnson Plumbing was encountering on the project with respect to getting paid?
A The pay was slow.
Q Do you know why it was slow?





A No, I don't.
Q Let's go off the record for a second.
(A discussion was held off the record.)
(Exhibit 60 was marked.)
BY MR. O'CONNELL:
Q Mr. Johnson, please take a look at what I've just handed you as Exhibit 60. This indicates that -- this appears to be an invoice from Johnson Plumbing dated 8-12-2003 in the amount of $92,806.38. First of all, do you recall when the project was complete?
A No, I don't.
Q If I told you that it was complete in May of 2003, would that sound right to you?
A Yes.
Q Why did Johnson Plumbing still have an outstanding balance of $92,806.38 as of August 1st, 2003?
A Why?
Q Yes.
A These invoices weren't paid.
Q But do you know why you weren't getting paid?
A Specifically, no.
Q For this $92,000 approximately, is this all strictly for claimed or disputed items, or is some of it just simply for undisputed work that Johnson Plumbing





had performed on the project?
A It would be both.
Q Can you tell me approximately how much?
A I can't, not without the invoices in front of me.
Q What is the amount that is currently due Johnson Plumbing from West Coast in your opinion?
A I would have to look that up.
Q Do you know if sometime after August 1st, 2003 Johnson Plumbing was paid any of this $92,806.38 by West Coast?
A I believe we were paid some.
Q Can you tell me roughly how much?
A Not without looking at it. Maybe 30 percent of it.
Q Is the amounts that are outstanding now, do they strictly relate to claimed items, or is it for both claimed and undisputed work?
A I'd have to look at the invoices.
Q Can you tell me how much money Johnson Plumbing is hoping to get from West Coast as a result of this lawsuit?
A I believe it's roughly this amount.
Q Roughly $92,000?
A I believe so.





Q Even though 30 percent might have been paid?
A It wouldn't be in addition to that. I'm sorry, I shouldn't say anything without the invoices in front of me.
Q I have no further questions.
MR. DAVIS: I don't have any questions for Mr. Johnson.
(The proceedings concluded at 2:15 p.m.)

______________________
Carl Johnson



d7dbbbd1-3474-4cf9-8f98-45dbd0c6bf80

STATE OF NEVADA )
) ss.
COUNTY OF WASHOE )

I, , a notary public in and for the County of , State of , do hereby certify:

That on the day of , 2007, before me personally appeared the witness whose deposition appears herein;

That the deposition was read to or by the witness;

That any changes in form or substance desired by the witness were entered upon the deposition by the witness;

That the witness thereupon signed the deposition under penalty of perjury.

DATED: At this day of , 2007.





February 28, 2007

Carl Johnson
1560 Industrial way
Sparks, Nevada 89431

Dear Mr Johnson:

This is to inform you that the deposition given by you on the 14th day of February, 2007 in the matter of West Coast Contractors vs. United States of America is ready for reading and signing at the offices of Bonanza Reporting, 1111 Forest Street, Reno, Nevada, 89509, (Tel· 775-786-7655). Our office hours are 8·00 a.m. to 5.00 p m. Monday through Friday

You may change any answer either by appearing in person or by a signed letter to me at the address listed above and may approve the transcript by signing it, or choose not to read and sign the transcript, in which event after 30 days from today's date the deposition may be used by the parties for any lawful purpose

Sincerely,

Dianne M. Brumley, NV CCR #205
1111 Forest Street
Reno, Nevada 89509





STATE OF NEVADA )
COUNTY OF WASHOE ) ss.

I, DIANNE M. BRUMLEY, a Certified Court Reporter and Notary Public for the County of Washoe, State of Nevada, do hereby certify that on _____________, the _______ day of _________________, 2007, I reported the deposition of _________________ in the matter entitled herein; that said witness was duly sworn by me; that before the proceedings' completion, the reading and signing of the deposition (has/has not) been requested by the deponent or party;

That the foregoing transcript is a true and correct transcript of the stenographic notes of testimony taken by me in the above-captioned matter to the best of my knowledge, skill and ability.

I further certify that I am not an attorney or counsel for any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

___________________________________
DIANNE M. BRUMLEY, NV CCR #205
CALIFORNIA CSR #6796
BONANZA REPORTING - RENO





OFFICER'S ACTIONS RE SIGNING OF DEPOSITION

DATE

2-28-07 LETTER SENT TO WITNESS FOR READING AND SIGNING

OTHER ACTIONS



d7dbbbd1-3474-4cf9-8f98-45dbd0c6bf80

February 28, 2007

Carl Johnson
1560 Industrial Way
Sparks, Nevada 89431

Dear Mr. Johnson:

This is to inform you that the deposition given by you on the 14th day of February, 2007 in the matter of West Coast Contractors vs. United States of America is ready for reading and signing at the offices of Bonanza Reporting, 1111 Forest Street, Reno, Nevada, 89509, (Tel: 775-786-7655). Our office hours are 8:00 a.m. to 5:00 p.m. Monday through Friday.

You may change any answer either by appearing in person or by a signed letter to me at the address listed above and may approve the transcript by signing it, or choose not to read and sign the transcript, in which event after 30 days from today's date the deposition may be used by the parties for any lawful purpose.

Sincerely,

Dianne M. Brumley, NV CCR #205
1111 Forest Street
Reno, Nevada 89509

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-o0o-

WEST COAST CONTRACTORS OF :
NEVADA, INC., :
7785 White Fir Street :
Reno, Nevada 89523 :
:
Plaintiffs, :
:
vs. : Case No.
: 05-1121C
UNITED STATES OF AMERICA, :
:
Defendant. :

DEPOSITION OF

JOE BINGHAM

February 14, 2007

Reno, Nevada

Reported by: DIANNE M. BRUMLEY, NV CCR #205
California CSR #6796

BONANZA REPORTING: 1111 FOREST, RENO, NEVADA
Telephone: (775) 786-7655

APPEARANCES

FOR THE PLAINTIFF:
Shulman, Rogers, Gandal, Pordy & Ecker
Attorneys at Law
BY: WILLIAM C. DAVIS, III
11921 Rockville Pike
Rockville, Maryland 20852-2743

FOR THE DEFENDANT UNITED STATES OF AMERICA:
MICHAEL N. O'CONNELL
U.S. Department of Justice - Civil Division
1100 L Street, NW
Room 12062
Washington, DC 20005

FOR THE DEPARTMENT OF THE NAVY:
PAMELA J. NESTELL
Trial Attorney, Litigation Office
720 Kennon Street SE, Room 136
Washington Navy Yard, DC 20374-5051

Also Present:
Stephen Weathers, P.E.
Tracy Hieber





INDEX


| EXAMINATION BY | | PAGE |
|---|---|---|
| Mr. O'Connell | 5 | |
| EXHIBITS | | |
| Exhibit 61 | 8 | |
| Exhibit 62 | 18 | |






ATTORNEY'S NOTES/CORRECTIONS

PAGELINE





***
RENO, NEVADA, WEDNESDAY, FEBRUARY 14, 2007, 2:50 P.M.
***

JOE BINGHAM
having been duly sworn,
was examined and testified as follows:

EXAMINATION

BY MR. O'CONNELL:
Q Mr. Bingham, thank you for being here today. What is your position at Mount Rose Heating?
A Vice-president.
Q How long have you been with Mount Rose?
A We started in 1990, so 17 years, coming up on 17.
Q Are you one of the owners?
A Yes, I am.
Q One of, or the owner?
A One of. My wife is the other owner.
Q What was your role on the Naval Post Graduate School building 245 extension project?
A On that one, mainly overseeing the crews and making sure that the guys in the field had what they need.
Q When you say overseeing the crews, were you like the project manager?



aab115e1-1298-4145-bfb5-d0fecf933211

A Yeah, both me and Craig Argall kind of played the project manager role on this one, so I guess kind of split duties.
Q And that Craig that you just mentioned, is it A-r-g-a-l-l?
A Yes.
Q I've seen his name on the correspondence and he's usually listed as the estimator. Is that -- was that his title at that time?
A Yes, it was.
Q So just besides estimating, what exactly did he do?
A Estimator, project manager.
Q How often did you personally get out to the project site?
A I believe I was there -- I'm thinking I was there twice.
Q For the whole length of the project?
A Yes. It was kind of a minor -- it was an easy project, or should have been.
Q When you say "or should have been," does that mean that it was not an easy project?
A Like I said, it was still an easy project. It could have been easier. It could have had less headaches.





Q When did Craig Argall leave the project, or I'm sorry, leave your company?
A The end of -- June of 2006.
Q And it didn't have anything to do with this Naval Post Graduate School project, did it?
A No.
Q By the way, have you ever had your deposition taken before?
A No, I haven't.
Q I should have explained this at the very beginning. Just a couple things, one of which you haven't done this yet, but just remember to articulate all your responses. Don't nod your head yes or shake your head no or anything like that, and the other thing because we just did it and it was my fault, too. We can't talk over each other because it's hard for the court reporter to take down, and --
A Okay.
Q And you just did it right there. It's hard for her to take it down accurately, and we're going to be looking at the record of what was said here and we want to make it as accurate as possible for everybody's sake.
We're not going to be going long at all, but if you need to take a break, just tell me, okay?
A Okay.





Q Let me mark this as the next exhibit, the first exhibit for your deposition.
(Exhibit 61 was marked.)
BY MR. O'CONNELL:
Q Do you recognize this document, Mr. Bingham?
A Yes, I do.
Q And is this Mount Rose Heating and Air Conditioning's subcontract for the project?
A Yes, it is.
Q Do you recall how or in what manner Mount Rose was first contacted to become involved in the project?
A No, I don't. To be specific, I think that was through Craig Argall.
Q Were you involved in preparing Mount Rose's bid for this work?
A No.
Q Was that strictly Craig Argall?
A Yes.
Q Do you know where he works now?
A From what I understand, he's not working, unemployed right now. More retired I'd say.
Q Does he still live locally?
A Yes, he does.
Q Could you turn to Page 11 of the subcontract? What was Mount Rose's scope of work under the project as





you understand it?
A HVAC dry side, so the air handler, the duct work. Pretty much that's it in a nutshell.
Q And do you see there it says design-build coordination. What did that require Mount Rose to do?
A That would probably be make a recommendation on manufacturers of different types of equipment or products.
Q Anything else?
A Anything that may come up with the other trades or other consultants.
Q What do you need to do to size duct work?
A First of all, you've got to have the loads ran to come up with the proper CFM, and you also need to know what's going to supply that CFM, how big that unit is going to be.
Q Would that be part of the design-build coordination?
A No. That would be engineering.
Q Engineering performed by whom?
A Mechanical engineer.
Q Were you dealing directly with the mechanical engineer for this project?
A No, I wasn't.
Q And that was a poorly phrased question. When I