said you there, I meant was Mount Rose dealing directly with the mechanical engineer?
A I don't believe we were. Everything came through the channels through the general contractor. I don't believe there was any coordination, direct coordination.
Q Who was the five rounds of golf at Pebble Beach for?
A I don't know.
Q It wasn't for you?
A No, it wasn't for me.
Q Was Craig part owner of the company?
A No, he wasn't.
Q So do you think it was for him maybe?
A That was a joke. That never took place.
Q That never took place, I see. At some point did it come about that there was an issue with respect to the size of the chiller on the project and some of the associated air handling units on the project?
A I'm sorry, what's your question on that?
Q Let me get out an exhibit for you. Actually, it's Exhibit 11. Take a look at Exhibit 11 and you can page through it or read it if you'd like, but you'll see that the last two pages actually are a letter on Mount Rose's letterhead.





What I'm referring to is the November 4th, 2002 letter on the Mount Rose Heating and Air Conditioning letterhead. Have you seen that letter before?
A Yes, I have.
Q Now, do you recall these various items that are set forth in the November 4th, 2002 letter, specifically the revised air handler capacity to 14,000 CFM?
A Yes, I do.
Q All right. And how did it come about that Mount Rose sent this letter to West Coast?
A I think sometime in between, the original RFP had a smaller unit on there and once the final construction set of drawings came out, there was a big increase in the CFM required.
Q What was your role in either drafting or formulating this cost increase request?
A I didn't have much of a role, but it's kind of standard procedure. Once we kind of compare what we estimated compared to construction drawings, the drawings are forthcoming after our price.
Q Was the hierarchy at your company that Craig would report to you as the vice-president?
A Yes.
Q Would he have to get permission or have you review a letter like this before he could send it out?





A Not necessarily, no. It doesn't look like it's put together properly.
Q Why do you say that?
A It's all spelled out with needed breakdowns and the costs shown.
Q I'm sorry, did you say it looks like it was done properly or not?
A It is done properly, yes.
Q And do you recall that the extension that was actually built on the project was a three story building?
A Yes, I do.
Q Do you recall as to whether or not there was ever a possibility that instead of a three story building being constructed, that there would instead be a two story building with a finished basement?
A No, I don't. For one, I can't say if the new building or the old building had a basement, but I don't remember a basement in either project to be honest, but there was -- I believe the original RFP may have showed a two story building.
Q Do you know whether what was built was the two story or the three story building would have affected the air handler capacity and the duct sizes and so forth, the issues that are listed in Mount Rose's





November 4th, 2002 letter?
A For sure, yeah. If you add another floor, if it was two story and went to three story, it's going to add approximately 50 percent more air.
Q Just so I'm clear, though, what about if it's two story with a basement versus a three story?
A That depends what the basement usage would be.
Q If it was a finished basement, would that help you?
A On a finished basement, it would -- you'd still have to supply some air down there, some sort of heating and cooling. Not so much cooling, but you may need some heat. Not much, but you would have to supply some supply air just for fresh air, outside air.
Q So would there be a difference in these items listed in your November 4th letter for a two story with a finished basement versus a three story?
A Oh, definitely. You'd definitely need more air. You have no external gain on a basement. If you've got glass on above ground, you've got external gain, so yeah, it would not be apples to apples.
Q Would you expect that that would also affect the size of the chiller?
A It probably would because there still is some internal loads, lights, depending on what the usage



aab115e1-1298-4145-bfb5-d0fecf933211

would be, lights and computers. There could be an additional load down there.
Q Do you know if Mount Rose was paid the money that is requested in your November -- your meaning Mount Rose's November 4th, 2002 letter?
A We have not been paid for that, no.
Q Why haven't you been paid?
A I believe our contract was paid when paid, and I understand West Coast Contractors hadn't been paid for it, either.
Q Is there any other money outstanding to Mount Rose other than what's requested in this letter?
A I don't believe so, no. I believe we're paid in full other than this.
Q Is there any other correspondence from Mount Rose that you know of to West Coast with respect to this claim that's the subject of the letter?
A I don't believe there's any written correspondence, no.
Q So who initiated this change?
A It must have been the final mechanical design consultant.
Q Did West Coast ever dispute whether or not Mount Rose was entitled to this money?
A I don't believe so.





Q Did you ever do your own review of the drawings that were made available with the RFP with respect to this issue that's the subject of the November 4th, 2002 letter?
A At what point?
Q At any point.
A I have reviewed it lately. I mean, just a comparison.
Q You did lately?
A Yes.
Q What do you mean, you did a comparison of what?
A I just looked over the RFP drawings and the construction set of drawings today as a matter of fact.
Q Did you do anything else to prepare for your deposition?
A No, I didn't.
Q So you looked at the RFP drawings and what drawings?
A The construction drawings.
Q What specifically did you look at on those drawings?
A The size of the air handler comparison from RFP to construction set.
Q And what differences did you see?
A RFP drawings had a 6500 CFM air handler and the





new drawings are 14,000 CFM air handler.
Q Were you aware that the RFP drawings were 35 percent drawings?
A At what point I guess? I didn't review the drawings before the bid, so I guess I'd say no, I was not aware of that.
Q But I mean, are you aware now, or when you did this review earlier today, were you aware that those RFP drawings were 35 percent drawings?
A No, I wasn't. I didn't read that on there and from looking at them, I'd say yeah, they were not complete, but they were farther along than that.
Q Farther along than 35 percent?
A Yeah. They had details, they had duct runs on it, they had equipment selection.
Q When did you become aware that this was a design-build project?
A I wasn't aware of that.
Q Until now?
A Until now. Typical design-build, we would hire the mechanical engineer.
Q Could you look at the top exhibit, Exhibit 1? This is section 01112, general design and construction criteria in the contract between the Government and West Coast. Have you ever -- take a look at it and tell me





if you've ever seen this document before.
A I can't say that I have.
Q Could you turn to Page 21 of the document, under section 1.11, HVAC systems and specifically paragraph 1.11.1. If you look down three paragraphs from the bottom, see there's a paragraph that begins, "Except as noted"?
A I'm sorry?
MR. DAVIS: He's referring to this right here.
THE WITNESS: Okay.
BY MR. O'CONNELL:
Q See there's a sentence that says, "The design-build contractor's team shall perform independent design to meet the requirements of this RFP."
To your knowledge, was Mount Rose supposed to do anything in terms of helping perform the independent design?
A I'm sorry, what was your question?
Q Did Mount Rose have to do anything to help perform the independent design?
A It was not part of our contract, no.
Q Would you say that Mount Rose was part of the design-build contractor's team?
A I would say that, yes, but once again, I'm not sure -- I don't think we had any design

responsibilities. In the contract we may be obligated to be part of the team, but I can't say -- I know we had no design responsibilities.
(Exhibit 62 was marked.)
BY MR. O'CONNELL:
Q Take a look at Exhibit 62, Mr. Bingham. This is a document we found in some records that were provided to us by West Coast and this is a change for an additional $10,945 to Mount Rose.
Are you aware if there was -- besides this, if there were any other changes to Mount Rose's contract for the project?
A I'm not aware of any others.
Q Let's take a five minute break. I'm almost done actually, only a couple more questions.
(A recess was taken.)
BY MR. O'CONNELL:
Q Back on the record. Mr. Bingham, with respect to the money that we were talking about in Mount Rose's November 4th, 2002 letter, is there some kind of an agreement in place between Mount Rose and West Coast with respect to how that's going to be handled or how that's going to be resolved?
A No agreement in place, no.
Q But do you have some expectation that if West





Coast prevails in this lawsuit, that some money will come Mount Rose's way?
A Oh, definitely. We're just caught in the middle between possibly two engineers and we're just a small subcontractor, so we're just trying to get what we should have coming.
Q When you say caught in the middle between two engineers, what do you mean?
A Maybe the RFP engineer and the design engineer.
Q And what is your expectation that Mount Rose will be paid something if some money is paid to West Coast, what's it based upon, just good faith or what?
A At this point, good faith.
Q And if West Coast doesn't prevail in this case or something to that effect happens, what, if anything, is Mount Rose going to do?
A I guess we'll take it from there. I haven't thought that through yet.
Q Did Mount Rose make a bond claim or anything like that here?
A No, we didn't.
Q I don't have any further questions.
MR. DAVIS: We're done. (3:20 p.m.)

______________________________
Joe Bingham





STATE OF NEVADA )
) ss.
COUNTY OF WASHOE )

I, , a notary public in and for the County of , State of , do hereby certify:
That on the day of , 2007, before me personally appeared the witness whose deposition appears herein;
That the deposition was read to or by the witness;
That any changes in form or substance desired by the witness were entered upon the deposition by the witness;
That the witness thereupon signed the deposition under penalty of perjury.
DATED: At this day of , 2007.





STATE OF NEVADA )
COUNTY OF WASHOE ) ss.

I, DIANNE M. BRUMLEY, a Certified Court Reporter and Notary Public for the County of Washoe, State of Nevada, do hereby certify that on ______________, the _______ day of ________________, 2007, I reported the deposition of __________________ in the matter entitled herein; that said witness was duly sworn by me; that before the proceedings' completion, the reading and signing of the deposition (has/has not) been requested by the deponent or party;
That the foregoing transcript is a true and correct transcript of the stenographic notes of testimony taken by me in the above-captioned matter to the best of my knowledge, skill and ability.
I further certify that I am not an attorney or counsel for any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

______________________________
DIANNE M. BRUMLEY, NV CCR #205
CALIFORNIA CSR #6796
BONANZA REPORTING - RENO



aab115e1-1298-4145-bfb5-d0fecf933211

February 28, 2007

Joe Bingham
310 Sunshine Lane
Reno, Nevada 89502

Dear Mr. Bingham:

This is to inform you that the deposition given by you on the 14th day of February, 2007 in the matter of West Coast Contractors vs United States of America is ready for reading and signing at the offices of Bonanza Reporting, 1111 Forest Street, Reno, Nevada, 89509, (Tel: 775-786-7655). Our office hours are 8:00 a.m. to 5.00 p.m. Monday through Friday.

You may change any answer either by appearing in person or by a signed letter to me at the address listed above and may approve the transcript by signing it, or choose not to read and sign the transcript, in which event after 30 days from today's date the deposition may be used by the parties for any lawful purpose.

Sincerely,

Dianne M Brumley, NV CCR #205
1111 Forest Street
Reno, Nevada 89509





OFFICER'S ACTIONS RE SIGNING OF DEPOSITION

DATE

2-28-07 LETTER SENT TO WITNESS FOR READING AND SIGNING

OTHER ACTIONS





February 28, 2007

Joe Bingham
310 Sunshine Lane
Reno, Nevada 89502

Dear Mr. Bingham:

This is to inform you that the deposition given by you on the 14th day of February, 2007 in the matter of West Coast Contractors vs. United States of America is ready for reading and signing at the offices of Bonanza Reporting, 1111 Forest Street, Reno, Nevada, 89509, (Tel: 775-786-7655). Our office hours are 8:00 a.m. to 5:00 p.m. Monday through Friday.

You may change any answer either by appearing in person or by a signed letter to me at the address listed above and may approve the transcript by signing it, or choose not to read and sign the transcript, in which event after 30 days from today's date the deposition may be used by the parties for any lawful purpose.

Sincerely,

Dianne M. Brumley, NV CCR #205
1111 Forest Street
Reno, Nevada 89509



aab115e1-1298-4145-bfb5-d0fecf933211

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WEST COAST CONTRACTORS OF ) NO. 05-1121C
NEVADA, INC. )
7785 White Fir Street )
Reno, NV 89523 )
)
Plaintiff, )
)
vs. )
)
UNITED STATES OF AMERICA )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF:
MARIO RAMIREZ, VOL. 1

April 23, 2007
Tacoma, Washington

* * * * * * *

REPORTED BY:

CATHERINE M. VERNON, CSR, RPR

#408 Albers Mill Building

1821 Dock Street

Tacoma, WA 98402

(253) 627-2062



f761483e-62cc-4dc4-9c93-294e61cfc12a

# APPEARANCES

For the Plaintiff: MR. WILLIAM C. DAVIS, III
Attorney at law
11921 Rockville Pike
Rockville, MD 20852-2743
bdavis@srgpe.com

For the Defendant: MR. MICHAEL N. O'CONNELL
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Michael.o'connell@usdoj.gov

Also Present: Mr. Stephen A. Weathers, P.E.
(Capital Project Management)
Mr. Tracy Hieber, Project Mgr.
(West Coast Contractors)





INDEX

| Examination by | Page Nos |
|---|---|
| MR O'CONNELL | 3-137 |
| MR. DAVIS, III· | None |

EXHIBITS

| Exhibit No | Page Marked | Description |
|---|---|---|
| Exhibit No 63. | 11 | 1-pg Award of Bid, dated 6-29-01 |
| Exhibit No 64 | 17 | 1-pg Fax Transmittal of 5-11-01 |
| Exhibit No 65 | 18 | 1-pg letter of 5-24-01 |
| Exhibit No 66 | 29 | 1-pg Letter of Transmittal of 4-26-01 |
| Exhibit No 67 | 33 | 1-pg Helix letter of 4-4-02 |
| Exhibit No 68 | 39 | 1-pg Letter of Transmittal of 4-26-01 |
| Exhibit No 69 | 56 | 1-pg Commerce Business Daily ad |
| Exhibit No 70 | 62 | 1-pg Mt Rose letter of 8-31-01 |
| Exhibit No 71 | 62 | 1-pg Mt Rose letter of 8-7-01 |
| Exhibit No 72 | 68 | 13-pg spreadsheet |
| Exhibit No 73 | 85 | 2-pg Merritt + Pardini memo |
| Exhibit No 74 | 85 | 2-pg Merritt + Pardini memo |
| Exhibit No 75 | 87 | 2-pg Merritt + Pardini letter |
| Exhibit No 76 | 89 | 1-pg West Coast Purchase Order |
| Exhibit No 77 | 90 | 2-pg Merritt + Pardini letter |
| Exhibit No 78 | 91 | 1-pg West Coast Purchase Order |
| Exhibit No 79 | 94 | 2-pg West Coast letter |
| Exhibit No 80 | 109 | 2-pg Solicitation, Offer & Award, dated 12-11-00 |
| Exhibit No. 81 | 110 | 2-pg Solicitation, Offer & Award, dated 12-11-00 |
| Exhibit No 82 | 114 | 2-pg FAR guideline excerpt |
| Exhibit No 83 | 115 | 2-pg Construction Schedule |
| Exhibit No 84 | 120 | 1-pg e-mail West Coast e-mail |
| Exhibit No 85 | 122 | 4-pg Merritt + Pardini fax |
| Exhibit No 86 | 127 | 1-pg notes re Settlement |
| Exhibit No 87 | 129 | 1-pg West Coast letter of 10-14-02 |
| Exhibit No 88 | 130 | 3-pg Merritt + Pardini letter of 11-8-02 |
| Exhibit No 89. | 136 | 1-pg M&P Bullet Points |





BE IT REMEMBERED that on the 23rd day of April, 2007, at 700 Wells Fargo Plaza, 1201 Pacific Avenue, Tacoma, Washington, before CATHERINE M. VERNON, CSR# VERNOCM398L4, Notary Public in and for the State of Washington, appeared MARIO RAMIREZ, the witness herein;

WHEREUPON, the following proceedings were had and done, to wit:

* * * * * *

MARIO RAMIREZ, having been first duly sworn by the Notary, deposed as follows:

EXAMINATION

BY MR. O'CONNELL:
Q. Mr. Ramirez, good morning.
A. Good morning.
Q. Have you ever had your deposition taken before?
A. Yes.
Q. How many times?
A Uh, one to five times, four times, I can't --
Q. Okay. For business reasons or personal reasons?
A. Uh, one personal, the rest have been business.
Q. All right. Well, you probably know how it works then. You need to verbalize all of your responses so the Court Reporter can get it down. We can't talk over each other, because otherwise it's difficult for the Court Reporter to





take it down. And as part of not ver -- or verbalizing your responses, no nods of the head, shakes of the head, and then yes or no is better than um hum and hum um. Okay?
A. Okay.
Q. All right. Mr. Ramirez, what did you do to prepare for this deposition?
A. Frankly, nothing really.
Q. Did you read the transcripts of the depositions that we took back in Reno a month or two back?
A. I -- on the plane down I read Tracy's part of it, you know, I scanned over it, you know, on the flight over. That's it.
Q. You didn't review any documents or anything like that?
A. No, I did not.
Q. When was the last time you read the Certified Claim?
A. Uh, the last time I read the Certified Claim I believe is when you came down to -- to Reno. I read it not from, you know, front cover to back cover, but I read a lot of it. Keep in mind, I wasn't feel exactly the -- I was having some health problems so I read it off and on, yes.
Q. Okay. And you were the person who certified the claim for West Coast, correct?
A. Yes.
Q. Okay. Do you understand why the government requires a certification for claims?
A. Yes, to ensure that what I'm -- what I'm declaring or what



f761483e-62cc-4dc4-9c93-294e61cfc12a

I'm asking is, you know, 100% accurate and the truth and, etcetera, etcetera.
Q. Yes. Mr. Ramirez, can you tell me what subcontractors that worked on the Naval Post Graduate School project that West Coast still either owes money to or has claims outstanding with for that project?
A. Um, as far as any, you know, like written agreements, we still have one with Johnson Plumbing. Uh, as far as verbal agreements, we have nothing. As far as kind of like a verbal, moral type of issue, Mt. Rose. And I think that's it.
Q. So with respect to Mt. Rose you're saying that there's no written agreement, but there's a verbal or moral obligation?
A. Yes, there's -- there's a moral. Keep in mind, Reno, it's a small town and, you know, Joe, the owner of Mt. Rose, I know him pretty well. And then Reno is the type of town that, you know, we live by the rules, by the written agreements, but we also live also by the fact that we know each other.
Q. How would you describe the nature of your agreement or obligation with respect to Mt. Rose? When I say -- by the way, when I say you today, I'm going to probably mean that in terms of West Coast, but let me rephrase the question. What is the nature of West Coast's obligation with respect to Mt. Rose?
A. I think what I told Joe is -- is that if we did recover, um,





that, uh, then we would look at the recovery, the amount of the recovery, look at the expenses, and say, you know, whatever 'X' amount was left over, we would see then and appropriate something to them. It is not a fixed amount. It is not, you know, nothing set into any -- any kind of a number, no.
Q. What about Merritt + Pardini or whatever successor entity there is out there to Merritt + Pardini, is there any outstanding obligation or agreement if there's any recovery by West Coast in this lawsuit?
A. No, we settled with them already about a year ago, a year-and-a-half ago. I can't remember. We just decided to settle with them.
Q. And the successor entity to West Coast (sic) was something called Krei, K-R-E-I; is that right?
A. That is correct.
Q. Do you know if they're still in business?
A. Uh, My understanding is that after Merritt + Pardini, it was Krei, and then Scott Harm, you know, the person we dealt with went into other entity, but I can't remember the name of it, you know.
Q. I'm sorry, Scott Harm went to a different entity or the --
A. Scott Harm, which he was one of the principals of Merritt + Pardini, and then he went up to Krei or Krie or whatever they call themselves. And then I ran into Scott at another





job site and at that point he gave me his card and it was a third entity and I don't remember the name of it.
Q. When West Coast negotiated the settlement with Krei --
A. Um hum.
Q. -- who was West Coast dealing with at Krei?
A. Um, the gentleman that I was -- that I was dealing with at that point was one of the principals. Um, I did ask him when I -- when I met with him, you know, "Are you the principal? Do you have full authority to settle this thing?" He did say yes, he had full authority to negotiate, settle, whatever. And I can't remember his name other than he did -- he was one of the principals from this new entity, Krei, whatever the name of it is.
Q. Did you have any dealings with Scott Harm with respect to the settlement?
A. You know, I can't remember, but I don't think so. I don't think so. I can't -- I can't honestly remember. I can't remember.
Q. Okay.
A. But my inclination is to say no, I did not.
Q. What about either employees or former employees of West Coast, um, do you have any agreements with them or promises to them with respect to any payments that might be made if West Coast gets a recovery in this lawsuit?
A. No. The only one that's outside is Jim Miller and is there





a promise been made to him? No. If that's what you're asking me, no.
Q. Okay. Because I was reading Mr. Miller's transcript last night on the plane --
A. Um hum.
Q. -- and I asked him twice if there might be some kind of a bonus if there was -- to him if there was a recovery in this lawsuit and he didn't really answer the question either time, which I found curious.
A. There's -- there's no agreement, but I mean, once again, would I feel compelled if there's a recovery to say Jim, thank you and, you know, you know, here's -- whether it's $1 or $5,000 or take your wife to a trip, would I do something like that? Probably so.
Q. Have you discussed that with Mr. Miller?
A. No, not in specific terms. I think I might have joked a couple of times, you know, but not in specific terms.
Q. What was the nature of the joking?
A. Oh, you know, we'll send -- just like I said, we'll send you and your wife someplace, like that, but I think it was just a -- you know, I've known Jim for quite a long, long time also, a long, long time.
Q. Okay. Any similar kind of arrangement or different kind of arrangement with Mr. Hieber?
A. No.



f761483e-62cc-4dc4-9c93-294e61cfc12a

Q. How about any of the other of West Coast employees who worked on the project?
A. No.
Q. Mr. Ramirez, how did you find out about the Naval Post Graduate School project?
A. Well, we subscribe to several publications, you know, and I'm sure it was in one of those publications. We subscribe to publications such as The Daily Pacific Builder, The Reno Builder, The Sacramento, you know, that type of thing. And that's where they advertise and that's where we found out about them.
Q. And do you remember specifically what the advertisement stated?
A. No, I do not.
Q. Did you realize from the beginning that it was a design/build project?
A. Yes.
Q. All right. And do you remember anything specific what the advertisement said with respect to a design/build project?
A. Not specific but, you know, when you -- when you -- when the government comes out with those things, the first four, five sentences are typical, will you design this, defining that as a design/build structure for, you know, it's pretty typical, pretty standard. So was there any specifics? I can't remember.





Q. All right. All right. I just talked over you, so I'm the first one to violate that rule.
Let's mark this as Exhibit No. 63, please. You'll get your own copy.
(Exhibit No. 63 marked for identification)
Mr. Ramirez, do you recognize Exhibit No. 63?
A. Yes, I do.
Q. And if you look down at the bottom right-hand corner, it states "award date, June 29th, 2001." Does that square with your recollection as to when this contract was awarded?
A. Yes.
Q. All right. Now having that piece of information, can you tell me roughly how long before this West Coast first learned of this project?
A. You mean prior to the date of award?
Q. Yes.
A. When did we know?
Q. Yes.
A. Well, I would say usually, usually it's, you know, it's usually it's a 30-day bid period. And so I would say it takes the government about 30 days to award, so I would say roughly, very roughly, I would say you could probably back that date up about three months.
Q. That's when West Coast first learned of it?
A. Probably learned of it. And, again, I'm going by that it





takes the government about 30 days to award. They had to advertise for 30 days. I notice there's quite a few amendments. They have to allow so many days for amendments so, you know, it could be even longer. Because every amendment they have to allow so many days for it.
Q. Look under line 19, "acknowledgment of amendments."
A. Um hum.
Q. Do you see the date there for Amendment No. 1, it's December 19th of 2000?
A. That's correct.
Q. Does that help you?
A. Yes.
Q. So roughly when with respect to amendment one do you think you, you meaning West Coast, learned of the project?
A. I would say early December. If amendment one came out 12-19, then it's probably I would say early December.
Q. All right. What is the -- can you give me some idea as to the size and complexity of the projects that West Coast typically does?
A. Presently or at that time?
Q. Well, why don't we start with now and then we can work our way back.
A. Well, currently what we have, um, let's see, um, going back is the jail facility. It's a, oh, sixty some thousand square foot, 254-bed, 144 rooms, 12-month duration. And the





value is about $18 point something, close to $19 million dollars.
And then we have, uh, the second project we have active right now it's called RTC. It is a bus -- it's a bus facility, but it's really misleading. It is more like a museum than it is a bus facility. That building is only 9,000 square feet, but it has a lot of bus lanes and a lot of site work. It's also about a 14-month duration. Not also, but it's a 14-month duration. And the value is approximately, I would say it's about $14 million dollars.
And then in Elko, Nevada we have a museum for the ABLM. It's -- it's about -- I think the square footage is about 12,000. It's a museum. It's an interpretive center. And the value of that is just a little bit under $10 million.
And then we have just starting out right now, it's a greenhouse for the UNR, the University of Nevada, Reno. It's, again, like the name implies it's, you know, five greenhouses with a, what they call the head house which is for -- houses all of the controls. It's about 21,000 square feet and the value of that is $6.5 million.
Let's see, did I cover everything? That, that, that, that; that's what we have active right now.
Q. Are any of those design/build projects?
A. Um, in a minute, little phase RTC is. It's -- RTC has one

component which is a design/build within the project, it's a canopy, and the canopy is -- they give you the option, and regardless of which option you took, you had to design the foundation and also the main supporting member but, you know, they basically did the features, but you still had an option as to found -- totally you're responsible for the foundation and you have a little bit of leeway on the -- on the main supporting member.

Q. RTC, is that the project that you said was a $14 million dollar project?

A. That's correct.

Q. What percentage of the $14 million is this design/build component that you're talking about?

A. I would say the total component is probably about three of the four -- $3 million of the $14 million. If you take, you know, from the third, you know, going all of the way up, you know, but keep in mind a lot of it is already -- you don't have that much leeway.

Q. Has West Coast done any other design/build projects since the Naval Post Graduate School?

A. Yes, we have. The only one that comes to my mind, because it was a neat project, it was a C-12 facility. That was about -- it houses the -- the -- the plane that the governor and all of those people use, you know, like the Air Guard; when the general has to fly around, that's what he uses.





It's a -- it's a C-12. I don't know if you're familiar with that type of aircraft. I think it also houses something else. It was about -- I can't remember the square footage, but it's a pretty good size.

We did -- at the Reno airport we did a hangar which houses a C-130. I don't know how big it is, but it houses a C-130. Those are the two ones that are -- you know, really stand out.

Q. With the C-12, that's with the International Guard you said?

A. I believe it's for the International Guard, I believe, but I'm not sure because I know the State of Nevada was involved and I can't remember who -- who the owner was.

Q. What were the approximate dates of that project?

A. I can't remember.

Q. Do you think it was before or after the Naval Post Graduate School?

A. You know, I can't remember. I cannot.

Q. How about the C-130 project?

A. I would think it was afterwards, but I'm not sure. And then we had a couple of other ones with the Marine Corps, but they were small, you know. We had like the watch facility was small. There were some other smaller ones.

Q. Were there any particular lessons that you learned on the Naval Post Graduate School project that you were able to apply to those later design/build projects?





MR. DAVIS: Objection. You can answer.

THE WITNESS: I don't know if they were later or ahead of it, so I can't say but, you know, Mr. O'Connell, we learned a lesson with every job, every job. There isn't a single job -- we'll do one school here and do the same school here and we still learn something from it. Of course I did. Every -- every job we learn a lesson; I think all of us do, yes.

MR. O'CONNELL: Well, can you think of anything specifically with respect to the Naval Post Graduate School project?

MR. DAVIS: Objection. You can answer.

THE WITNESS: Nothing specific.

BY MR. O'CONNELL:

Q. On Exhibit 63 on line 28, Andy Ramirez, Vice President, is that your son?

A. Yes, he -- yes, it is. Yes, he is.

Q. One thing I noticed, if you look -- compare line 17 and line 22 for the amounts. They appear to be different. Do you see what I'm referring to?

A. Um hum.

Q. Do you know why they're different?

A. I believe that after the -- I believe that after we turned our bid in, there was some questions on the electrical proposal and I believe that the electrical proposal was





adjusted.

Q. So the electrical proposal was adjusted when?

A. After the bid. After we turned the bid in, the bid which you see in line 17. And then the bid item amount in item 22 is different and I believe that was due to some electrical adjustment.

Q. Well, the adjustment appears to be not quite half of a million dollars, but almost. Do you agree?

A. Um hum, yes, I do.

Q. Do you think that there was an adjustment that large to the electrical work?

A. I can't remember.

Q. All right. Well, let me give -- I have a few more documents to show you on this. Maybe we can go through them and maybe that will help. Let's mark this as Exhibit No. 64.

(Exhibit No. 64 marked for identification)

Here you go. Now, Mr. Ramirez, you can see Exhibit No. 64 is a -- it appears to be a fax from you to A. T. Lawrence of the Navy. Right?

A. That's correct.

Q. Now, down below there appears to be a breakdown of the total bid price of $4,493,757. Do you see that?

A. Yes, I do.

Q. And that appears to be -- to correspond to the number in line 17 of Exhibit 63. Do you see that?



f761483e-62cc-4dc4-9c93-294e61cfc12a

A. Yes, I do.
Q. All right. What was the purpose of providing this breakdown to Mr. Lawrence of the Navy?
A. I don't know. Bert requested the -- A. T. Lawrence or Bert Lawrence requested the breakdown. I gave him the breakdown. I gave him another subsequent breakdown which -- prior to this and I cannot remember the reason.
Q. All right. Well, division 16, that is the electrical work, correct?
A. Correct.
Q. And that's $496,080, correct?
A. Correct.
Q. All right. Now, let me show you, now that we've sort of -- to sort of move along sequentially here, let's mark this as Exhibit No. 65.
(Exhibit No. 65 marked for identification)
Take a look at Exhibit No. 65 which appears to be a letter from you to Mr. Lawrence, dated May 24th, 2001. Do you recall this letter?
A. Well, as I said earlier, I believed that it was an electrical claim, an electrical question that came up. And, you know, I'm looking at this letter with my signature and apparently it is something, an increase of $218,000, and it is an electrical increase.
Q. So this was what you were referring to in your previous





answer?
A. Yes.
Q. All right. Well, a couple of things about this. In Exhibit 65 it states: "As directed we have verified the electrical number and it was substantially low. This prior number was $450,000." Do you see that?
A. Yes, I do.
Q. Now, if you take that back and compare it to Exhibit 64, though, the division 16 number, as we said, is about $496,000?
A. That is correct.
Q. So do you know what you were referring to when you -- in Exhibit 65 when you said the electrical number was $450,000?
A. Well, what happens is when we punch this thing in -- and I have to go back to the estimating method which we use. When we use estimated, for instance, the electrical, division 16, may have a component such as electrical excavation. It may have a component such as electrical foundation, you know, light pole foundations, which it still goes into part of division 16. It is still charged to that division. However, the electrical portion may have been only for $50,000 and the balance could have been electrical excavation, electrical foundations. And I'm going by the way we normally do things. I'm not going back to the specifics, because I can't remember but that's the way we





normally do it. Do you follow me? In those we -- like division, oh, let's say the division of flooring, which is, you know, part of division component nine. It may have flooring and the flooring bid may be $20,000, but there may be some floor prep or some other component to it. So we carry on with that item, we carry $23,000, $20,000 being the bid from the subcontractor and $3,000 being the preparation, just as an example. I would say that's probably what happened on this thing.
Q. All right. Well, I think I understand what you just said. If you add $218,000, though, to the price that's in Exhibit 64, that still wouldn't bridge the gap, though, between lines 17 and 22 on Exhibit 63, though, would it?
A. No, because the difference is four -- four, nine, three or four, nine, seven, eight, without a calculator, I'll say it's 4.5 and four, nine, seven, eight is $278,000. And the difference in the letter in 65 is $218,000. So I don't know what the difference is.
Q. Okay. I think I -- maybe I wasn't listening closely enough, but I think I'm going to disagree with your math here. I think there's about a half a million dollars in difference between the two numbers on Exhibit 63.
A. 4.5, uh, four, nine, seven, eight, yes, four, seven, eight, then plus -- yes, you're right.
Q. So is there anything you can add to your explanation?





A. No. No.
Q. Is it -- so, no? Just so the record is clear, no?
A. No, I cannot add anything to the explanation.
Q. Is it possible that the $4,493,000 was the number for the two-story with the basement option?
A. I can't remember.
Q. With respect to Exhibits 64 and 65, actually, just Exhibit 65, apparently Mr. Lawrence or somebody from the Navy asked West Coast to verify its bid number, at least with respect to the electrical; is that correct?
A. That's correct.
Q. Do you recall how that request from the Navy was made?
A. No, other than -- you know, I had worked with Bert on several projects. I worked with Diana with several projects, a lot of people I've worked with the Navy. And they normally ask for breakdowns, and although we were not obligated, I would give it to them on several other projects, you know. And I'm assuming that he was curious about the electrical versus his own estimate and I'm sure that's where the -- everything got started, you know, why is my number this and why is your number this, and we started comparing notes. But to be specific, do I remember exactly? No.
Q. Okay. So the Navy asked West Coast to verify the electrical number. What exactly did West Coast do in response to that?



f761483e-62cc-4dc4-9c93-294e61cfc12a

A. Well, we normally, when that happens, we normally ask the owner to -- not just to say I have, you know, $10 in my estimate, you only have $5, why is there a difference? That is given, but in a lot of cases what the government will do or what owners will do is say, you know, did you include the alarm and are you aware, and I'm using this as an example, are you aware in the alarm, I want a specific component, you know. And then we go back to the subcontractor and say, "Are you aware that the owner wants a specific component, a Simplex alarm system?" And then we give them a chance. Normally that's what happens. We sit down and we talk it over as to what specific items they want.
Q. So what did the Navy tell you then?
A. I can't remember, but that is normally what, you know, this is what that's revealing, that the Navy had asked me to go over specific things, and I went over specific things, and I went to the subcontractor and then in return we changed it, you know.
Q. So was it the subcontractor that found an error in its proposal or was it West Coast?
A. Electrical is purely a subcontractor figure. So, again, we may be doing the excavation, we may be doing the light pole bases, which is a typical item they exclude. But other than that, you know, ninety some percent of the electrical is the electrical subcontractor, where the number comes from, yes.





Q. Did -- did you formulate West Coast's bid for the Post Graduate School project?
A. Was I the estimator? Yes.
Q. Was anybody else working with you?
A. I don't think so. I can't remember.
Q. Did you prepare prices for both the two-story -- or let me -- let me back up a second. Were you aware that there was an option that the contractor could do either a two-story with a basement or a three-story building?
A. Yes.
Q. Did you prepare prices for both the two-story with the basement and the three-story?
A. Yes.
Q. How did it come about that West Coast actually did the three-story building?
A. Um, there was a preference to go to the three-story because it matched the -- the existing building. You know, this was an extension to the existing building. It was not connected, but it was connected by a gangway or like a -- like a walk. And it would be -- there was a preference by the owner or pretty much everybody in question that the preference would be the three-story.
Again, you've got to keep remembering, this is not my first dealing with these people. All of these people, Diana I would know on a first name basis. Bert, I knew him





on a first name basis. We did a lot of projects with them prior to this. So it's not -- from day one when we bid this thing and typical of what the relationship was with the Navy at that point was one of working with them and for them, not here's the bid and by the way, this is it. Here's the bid and -- and there were other projects where we gave them incredible ideas, we saved them an incredible amount of money, because that was the relationship we had with them. It was different. It was not -- although it was still a government entity and a contractor entity, I mean, it was -- it was an incredible working relationship. You know, we didn't just sit down and give them a number. We gave them a number, but then there was cooperation that very few people provided to them, very few.
Q. So what I'm getting from what you've just said, that there were some conversations between West Coast and Bert Lawrence and Diana Gustafson of the Navy about the two-story versus three-story options?
A. There were preferences for the three-story expressed by the Navy, absolutely. Now, was it Diana or Bert? I can't remember at this point, but there were preferences. We were dealing with several people, not just Diana. I think Diana was -- I don't think she was that involved at the beginning, you know, but I can't remember, but there was a preference absolutely for the three-story, because it would match





everything, everything. I mean, it was just the same thing.
Q. This is a slightly different question than the previous one concerning who worked on the estimate, but was there anyone else besides you at West Coast who was interacting with the Navy people during the pre-bid time?
A. You know, I can't remember. I don't know if we had any open projects or closed projects or something but, you know, we did 20, 30, I don't know, umpteen projects for the Navy, so that's -- without looking at dates and the list, I can't answer that. We did quite a few, quite a few projects for them.
Q. So how was this preference, as you said, expressed by the Navy to West Coast?
A. Simply we would prefer a three-story building because it's going to match all of the existing facilities.
Q. So somebody at the Navy said to you personally we would prefer a three-story building?
A. I think that was conveyed, yes.
Q. Okay. Conveyed is a little bit different than said. What do you mean by conveyed?
A. Well, somebody said somewhere along that -- somebody said at one point we would prefer a three-story building because it matches the existing, yes.
Q. And did you meet with anybody from the Navy during the pre-bid phase?

A. Prior to us turning a number in, I don't think so. Um, I don't think -- no, I don't think so, not prior to turning a bid in.
Q. So how was it conveyed then, this preference for the three-story?
A. Well, again, right after the bid, you know, we gave them a breakdown and I'm not sure if this is the breakdown, but right after the bid we gave them a breakdown and it was just general discussions you hold with the owners. Again, you've got to keep in mind, the relationship was a little bit different than your normal contractor/owner relationship. We knew those people pretty well. I mean, Nancy, one of the Navy's contracting officers Nancy, I mean, she knew my sister. She got to know my sister because we turn in so many bids to the Navy, she knew Betty by -- on a first name basis. Nancy and Betty knew each other. It's hard to convey it because, you know, we're supposed to have this contractor/owner relationship, but, you know, a distant relationship with the Navy, but Nancy Gomez, I think that's her last name, knew Betty my sister because both lived in San Bruno, both -- and we turn in so many bids, we got to know each other, you know. It wasn't -- I didn't go to Nancy's office and sit down and just talk about business. As we got into the relationship, then we started talking about my niece and, you know, kids and things. It went





beyond. It's -- it just went so far beyond the relationship with the Navy that for them to con -- to say or convey we want a three-story because we prefer that, it would not be very difficult for them to say it, because I knew them. I knew every one of them. I would walk into that office and that, that, that, that.
Q. Well, I understand your point that you had a good relationship with the Navy.
A. Um hum.
Q. But I guess what I still don't understand is if you didn't meet with them prior to the bid, how did -- how was this preference for the three-story building conveyed, to use your word?
A. I didn't meet with them, but there were probably conversations. I don't know if they were prior to the bid, but there were certainly conversations right after the bid was turned in that they would prefer a three-story, yes.
Q. Was there a difference in cost for the two-story with the basement versus the three-story?
A. You know, I -- I think there was. I remember going through the analysis because I remember, you know, basically the biggest change was you eliminated obviously the concrete walls in the basement, you eliminated some excavation, and you went up and increased the glass, you know. I mean, that was the basic component, you know. The ceilings remained





the same. The walls within the basement or what became the first floor were pretty much the same. Nothing really changed. The big basic difference was you, you know, eliminated a lot of the concrete and increased a lot of the glass, basic component. I mean, there were things like obviously the stairs going up three stories, you know, they're different. One is exposed. I can't -- there were some slight changes definitely.
Q. Do you recall if the Request for Proposal drawings showed the two-story or a three-story building?
A. I believe it showed the three-story with an option.
Q. What do you mean showed a three-story with an option?
A. Well, because we looked at it. I believe it was three elevations, but I'm not sure about that. I'm not sure if it showed three stories with the option or if it showed the two stories with -- with the basement in it.
Q. We've got the drawings, so why don't I show you the drawings.
A. Um hum.
Q. And then you can -- handing you -- I'm not going to mark these as an exhibit right now, but let me hand you the structural drawings which are S-1 through S-10, and then the architectural drawings which are A-1 through A-10.
A. That's what I'd like to see. Okay. A-4 is indicating a two-story structure.





Q. Does it show a basement or no?
A. A-4 does not indicate a basement. And S-5, what I believe is S-5, shows a two-story building and it does not indicate a basement.
Q. All right. When you or when West Coast talked to potential subcontractors about bidding on the project, did West Coast asks for bids for both the two-story and the three-story options?
A. We asked for a three-story building with the option that the first floor could go to a basement or could go to an above-the-ground. The requirement of the three-story square footage never changed. It was -- from day one it was three stories, so many square feet. The only option was whether the first floor went in the ground or above the ground. The square footage never changed.
Q. So then would the spec be the driving force rather than the drawings?
A. Correct.
Q. Did you explain to the potential subcontractors that it was a design/build project?
A. Absolutely.
Q. All right. And how did you -- maybe this is -- well, let me withdraw that for the moment. Let's mark this next document as Exhibit No. 66.
(Exhibit No. 66 marked for identification)

All right, Mr. Ramirez, Exhibit 66 is a fax from West Coast to Miracle Electric, dated April 26th, 2001. Down at the bottom it's signed Tasha Ehlers, E-H-L-E-R-S, Estimating Department. Who is she?
A. Um, she was an employee who was with us for about a year. And she's -- I would say she left us within a year. She worked for me.
Q. What did she do for you?
A. She helped me with the plan distribution and calling subcontractors, you know. There's a lot of leg work to a bid, a tremendous amount of leg work, and that's what she -- she did most of the leg work.
Q. So was her help to you more of an administrative nature?
A. Purely clerical.
Q. I see. Now, would -- would -- or did Miracle Electric become the electrical subcontractor for the project?
A. No. Uh, the subcontractor, um, became -- was it Helix? Helix Electric.
Q. All right. Now, would you say that this document, Exhibit 66, is generally representative of what West Coast provided to potential subcontractors in the bidding stage of the project?
A. No, because normally when you -- when you go to the -- there are certain people such as the electrical, mechanical, by that I mean HVAC, plumber, concrete, dirt people, there are





certain people, they're so vital to the process that we give them the full set. I mean, we hand them everything. Everything we receive from the government or we receive from an owner, we hand to them. And there's certain people that we break down. For instance, if a guy is bidding the doors, frames and hardware, no sense in giving him the electrical drawings, unless there are electrical strikes, then we have to, but most of the time we give them the A sets to the -- to the hardware people. The painter, he gets the A sets, you know. Again, the electrician, the plumber, the mechanical, those people we hand them the whole complete set to avoid them later on saying, well, you gave me partial information. It's just a typical subcontractor.
Q. So are you saying that as an electrical subcontractor Miracle Electric got more than some subcontractors because it got a full set of the plans?
A. Miracle Electric got a full set of plans, which is more than a painter would receive, yes.
Q. How would Miracle Electric know from what it received about the two-story versus the three-story options for the building?
A. Well, there's usually a summary. And I'm not sure that, you know, most projects have a summary and usually it's election -- section 1100 in which in the summary they give you a very brief blurb, you know, as to what the project is and they





give you the basic square footage, the basic usage. It's a little, you know, two, three paragraphs. That is always -- if you want to see what the building is about, that's where you go, 1100. And this project is no different than any other project. They give you those -- the basic information is given in that section.
Q. So why would you think Tasha Ehlers provided that based on what's shown on Exhibit 66?
A. Ask me one more time.
Q. Sure. Why would you -- based on what Tasha Ehlers --
A. Um hum.
Q. -- stated in Exhibit 66, why would you think that Miracle Electric actually received what you were just referring to?
A. Well, um, plans: full set, to me that indicates he received a full set. Why she went ahead and listed division 16, design criteria, general notes, I don't know. Usually plans: full set means you get the whole package that we receive from the owner, usually.
Q. A full set of the drawings?
A. No, a full set -- usually when we write down a full set, it means the whole, everything, the design criteria, the specs, the drawings, and any information right down to the invitation, everything.
Q. So plans: full set, doesn't mean just a full set of plans, it means everything received from the owner?





A. Correct. Now, what she did with the set, I -- you know, I can't -- she's gone. I can't speak for her. But plans: full set, when we indicate plans: full set, it means everything.
Q. How did it come about that West Coast ended up subcontracting with Helix?
A. I can't remember. I can't -- usually apparently, you know, on some of these projects we always try to get two electrical, two plumbers. We try to get two for the simple reason that it's a good check and balance and it's just good business. And I'm assuming that Helix was the low bidder versus not Miracle Electric, but I can't -- I don't know.
Q. Okay. Let's mark this as the next exhibit which we're up to 67.

(Exhibit No. 67 marked for identification)

Mr. Ramirez, have you ever seen Exhibit 67 before?
A. I don't remember. I'll have to read it. Give me a minute.
Q. Sure, take your time.
A. You know, I don't know what this is exactly. I'm not even sure if this was done prior to the bid or after the bid. I'm not sure.
Q. Well, look at the date. It's April 4th, 2002. If you need to, you can compare that with Exhibit 63.
A. And 63 is?

MR. DAVIS: Here.

THE WITNESS: I see. Because what doesn't make sense about this thing is that Jim Miller was not involved in the -- I don't remember, if you're asking me if this was done prior to the bid or after the bid. Regardless of what the date says, Jim Miller was not involved in the estimating and I'm not sure what your question is. Maybe you should ask it. What is your question?

BY MR. O'CONNELL:

Q. Sure. My question was --

A. And I'll stop talking.

Q. My question was just simply have you ever seen this document?

A. I don't think so. I can't remember.

Q. All right. Did you have any dealings with, you personally have any dealings with Helix Electric during the course of the Naval Post Graduate School project?

A. Yes, I did. There were some problems that came up. There were some problems that came up and I was involved with them.

Q. What were the problems that came up?

A. I can't remember the specific ones, but my role -- and maybe I should go back a little bit. My role is preparing the bids. I'm very heavily involved in that. You know, I'm 99.99%, whatever you want to call it, responsible. But once we -- the job is awarded, my role changes and my role





becomes one of I get involved when, you know, real problems come up with the subcontractors. I become the mediator, the peacemaker, whatever you want to call it. And that's when I get involved. The day-to-day, did you include this, you do not include this, do I get involved in that? No. Some of the letters are addressed to me, but I turn them over, in this case I would different them over to Tracy. My role changes once we -- once we get the contract awarded. So any particular questions, even if they are addressed to me, in some cases I don't even get the letters; they go directly to the project manager.

This appears to be a letter which is did you include this or exclude this, this type of thing. And that's why I'm probably not familiar with it because a problem like this, even if I did receive it, I would grab it and turn it over to Tracy.

Q. So correct me if I'm wrong, but you would have been the one who made the decision to hire Helix Electric as West Coast's electrical subcontractor on the project, correct?

A. Prior to bid or after the bid? I'm not -- I'm not following you there.

Q. Well, I suppose -- who at West Coast would have made the decision to actually enter into a subcontract with Helix Electric for the electrical work on the Naval Post Graduate School project?





A. Oh, I make that ultimate decision normally, if that answers your question.

Q. All right. So it would have been you, in other words?

A. I think so.

Q. What I find curious about this letter, you can see in the first sentence, "Regarding your comment about smoke detectors we have a spec job with West Coast." And the way I'm reading that, Helix Electric is saying that they don't view their arrangement as a design/build arrangement with West Coast, they have a spec job, that they just simply build it to specifications?

A. But the specifications state that it's a design/build. I would agree with you, but the spec job, it also indicates that it's a design/build, so you can take that and turn it around and say but you have a design/build in the spec job, quote, unquote.

Q. Is that a --

A. Can I finish that?

Q. Sure.

A. Helix clearly knew that this was a, from day one, same as Miracle, same as the other people, that it was a design/build. Is there any question that they didn't know it was a design/build? No, there's no question that they knew it was a design/build. I don't know if that answers your question.





Q. There's no question that Helix knew this was a design/build project?

A. Yes.

Q. Why do you say that?

A. Because it does -- you simply have to open the specs to -- to read it and know that it's a -- it's a design/build job. It's clearly stated in the specifications. There's no question that, in fact, it is a design/build job.

Q. Is this an issue that you recall coming up with other subcontractors on the project, namely that they didn't view their role as being a design builder?

A. Was this an excuse or something that came up later on by other subcontractors? I don't think so.

Q. Well, I'm skipping ahead, but I can show you the transcript but, for example, we took the deposition of Joe Bingham of Mt. Rose and he testified at his deposition that he didn't know the project was design/build until I told him that in a question during the deposition. Would that surprise you?

A. No, because he was not the estimator. The estimator was Craig and Craig did 99.9% and did all of the decisions regarding estimating. So would I expect Joe to know that it was a design/build? I find it hard to believe that Craig didn't tell Joe the owner, yes. I would expect somebody within the company to tell me something like that, but Craig who estimated the job, did he know that it was a



f761483e-62cc-4dc4-9c93-294e61cfc12a

design/build? Absolutely.
Q. But you wouldn't expect -- Mr. Bingham testified that he was the project manager for Mt. Rose's project. You wouldn't expect Mt. Rose's project manager to know that it was a design/build project?
MR. DAVIS: Objection. You can answer.
THE WITNESS: Well, if it's -- there's two phases, just like I -- you know, and Joe operates the company the same way that I do, he hires an estimator, which I fulfill this -- that capacity at West Coast Contractors. But in the case of Joe and Mt. Rose, he had Craig and Craig did all of the estimating for Joe, all of it. If I had a question regarding a job, whether to bid it or not to bid it, or to change something, to adjust something, if it was regarding the bid stages, it was Craig, it was never Joe. I always assumed, frankly, that Craig was the owner because he had such a, you know, such a large capacity, such a large discretion in the bidding.
Now, when it came to the owner, you know, once the project is awarded, then Joe became involved, but up until the point -- and, again, keep in mind that I deal with estimating. Once the job is awarded, I don't really deal with it that much, because again I turn it over to people such as Tracy, so they in turn would deal more with Joe because Joe gets involved at that point. But I find it





incredible to believe that Craig did not tell Joe Bingham, the owner, this is a design/build. I can tell you this, that Craig did know that it was a design/build. Did Joe know? I have no idea. I just find it hard to believe that Craig would not tell Joe Bingham this is a design/build.
BY MR. O'CONNELL:
Q. Okay. So you would agree with me -- well, you're saying that you would be surprised that Mt. Rose's project manager didn't know that this project was a design/build project?
A. No, I disagree with the way you're saying it. I would be very surprised that Joe Bingham, the owner, and I -- I don't know what his role is, you know. I know Joe is the owner, and I find it very -- and I find it hard to believe that Craig did not tell Joe that this is a design/build and he found out about it the day you deposed him. That I find it hard to believe, yes. But, again, what you've got to realize, Joe -- Craig, the estimator, knew it was a design/build.
Q. Let's mark this as 68.
(Exhibit No. 68 marked for identification)
Have you seen Exhibit 68 before, Mr. Ramirez?
A. I don't remember.
Q. Do you remember dealing with JBK Mechanical prior to award?
A. JBK Mechanical had done another project for us. Do I remember dealing with them specifically on this project?





No, I cannot.
Q. You would agree with me that they did not become a mechanical or plumbing subcontractor on this project, right?
A. That is correct.
Q. And the two subcontractors that West Coast actually retained were Johnson Plumbing and Mt. Rose, correct?
A. Correct.
Q. I haven't seen in the documents that West Coast produced any document similar to Exhibit 68 going out to Mt. Rose or Johnson Plumbing prior to the award of the contract to West Coast. Do you recall when West Coast first started dealing with Johnson Plumbing, say first with respect to this project?
A. Um, first of all, do I remember when we started dealing with Johnson? No, I do not, but you've got to -- these things, you know, these letters of transmittal, we had changed the format a little bit, but normally what we do is we have a database. In the database it has -- it's broken down by electrical subcontractors, plumbing subcontractors, HVAC subcontractors, etcetera. What we will normally do is -- is -- is say send this invitation, send this thing to this guy, this individual, this individual, see if they want to bid it. I'm assuming that part of what JBK Mechanical, they had done another job with us, we probably sent them this thing and said, "Would you like to bid it?"





Now, to somebody like Mt. Rose who is up the street from us who is very close that Craig, again, comes by on a regular basis, would we make a letter of transmittal? More than likely, no. More than likely we would call Craig and say, "Craig, we've got this job for you to look at, come on by and look at it." Is she supposed to give them a letter of transmittal every time she sends out a document? Yes, but, you know, people get -- it's easier to pick up the phone and say, "Craig, come by and pick up a set of plans," than to type this up and send him a set of plans.
Q. How about Johnson Plumbing, had West Coast used Johnson Plumbing before?
A. Yes, we had, several projects.
Q. Has West Coast used them on any projects since the --
A. No.
Q. Just let me finish -- since the Naval Post Graduate School project?
A. No. And I would -- I don't know if I can ask Tracy, but I don't think so, no.
Q. All right. Any particular reason?
A. They were incredibly angry about the Naval Post Graduate School project. They felt that, you know, they felt that, you know, they got, quote, unquote, screwed.
Q. Are you the owner of West Coast Contractors?
A. Yes, I am.