Q. What does tolerant mean?
A. It means that I had one hell of a hard time, not just Scott but, you know, with keeping some subcontractors and, you know, "Hang on with us, hang with us, hang with us," you know, because, you know, I felt that -- I don't know, I kind of felt like there were some things being demanded, requested, or told by the Navy which was way beyond the contractual things. And I did, I -- I thought Scott was very tolerant considering that, you know, I mean, he was -- in some cases he was very upset because he was being asked to do things that were way beyond what was -- he was obligated to do. And so I had -- you know, I thought he was very patient. Um, I don't know if I gave him -- I'm not sure if I complimented him, but he was very patient.
Q. Okay. In the discussions that you had with Scott Harm prior to bid, how did you relate to Mr. Harm what West Coast's expectations were of Merritt + Pardini as the designer on the project?
A. What did I expect of him? I don't, you know, what was in the specifications, what was required of him by the Navy. I was -- I was relying more upon him as far as the design, the format of the design, because he had done it so many times. And I was more relying upon him than he was relying upon me. In other words, he -- he had done several designs for the Navy, so I kind of like -- you know, whatever you did in the





past, you've got a hell of a good recommendation, please give us the same, that's all I ask. Does that answer your question?
Q. Yes. Let me -- let me ask you a different question. After this issue came up with respect to the, you know, the difference in the bid price of $240,000 --
A. Um hum.
Q. -- and $294,000 --
A. Um hum.
Q. -- how did that affect Merritt + Pardini's performance on the project?
A. None, because from day one I told them that I would not -- a term that we use -- let him hang. In other words, let him hang is when we tell a subcontractor, it's your error, stick it, it's your problem, not mine. And from day one that's not the way West Coast Contractors functions as a company. So basically from day one I told him, "We're not going to let you hang." So I don't think there were any -- any bad feelings, none.
Q. So they were satisfied, in other words, because you gave them half of the underbid?
A. I don't think any -- no, they were not satisfied because I think no subcontractor is going to be satisfied, but were they -- let me put it this way. They were not angry at me anymore or they were not angry or felt that I let them





-- that I left them short of what they -- no, I don't think so. I don't think so. It was never expressed to me. But from day one I told them basically, "We're not going to let you hang on this thing." And I think that established, you know, a fairly good relationship, at least in my eyes it did.
Q. Hum... Well, I guess what I'm thinking about is that if you split the difference between -- with Merritt + Pardini of the difference between $240,000 and $294,000, that would be about $27,000, right?
A. Roughly.
Q. And that is -- is from what you -- from what I understand what you've been telling me is about what you did? Okay.
A. Yes.
Q. So let's just -- $27,000, if you take $27,000 and compare it to the $294,000, it's just a little bit under 10% of their bid price, which would mean to me that a lot of their overhead and profit from the job would be gone. Do you follow me?
A. Yes, I do. Yeah.
Q. And so based upon then on that little mathematical exercise we just did, I'm just curious to know whether or not you found that Merritt + Pardini was cutting corners in their performance or trying to save hours or anything along those lines during the contract?





A. You know, I -- I really can't answer that. I mean, Tracy would have to answer that. But my -- my -- my feeling was that no, they were not at all, you know, cutting corners or trying to save hours, no. I think they -- I mean, I -- my reaction to Merritt + Pardini was they were very tolerant and they were quite the opposite. They went out of their way. I mean, I had a meeting in which they -- you know, I remember Scott saying, "What do you want? I'll do whatever you want, but just give me some direction." And then, you know, that's when I -- what I came and walked away with, Scott is too tolerant, if anything, he's too tolerant. I mean, he was basically saying, "I'll do whatever you want, just give me some direction."
Q. Did -- prior to bid did you and Scott Harm ever discuss the R.F.P. drawings?
A. I'm sure we did, but I don't -- you know, yes, I'm sure we did. I mean, it's just the normal course, yes.
Q. Did you personally make an assessment of the R.F.P. drawings and see how complete they were and so forth?
A. Uh, God. As to the 35%, that's -- considering it's 35%, I thought they were pretty complete.
Q. Okay. Where does it say that the drawings are 35% complete?
A. I don't know if they're stamped or a date that information was passed on the front of the specs, but it does -- somewhere it said that they were 35%. I don't know where.



f761483e-62cc-4dc4-9c93-294e61cfc12a

Q. What did 35% complete mean to you?
A. Well, there's steps in -- in design/build there's a 10%, some owners like to see it 35%, 60%, 95%. I mean, it changes from owner to owner, but it's just the degree of detail that is given to the owner, you know, or to the subcontractor as to the degree of detail that goes into each of the phases. And at 10% you expect less; 35% you expect more; 90% you expect pretty much a complete.
Q. So what -- what can change between the time the drawings go from 35% complete to 65% complete?
A. Well, for instance in the 35%, you point to the door and you say, "I want a door there." You know, between the 35% and the 95% -- 90%, not only do you have to say the door, but you may have to say the type of door, the size of the door, you know, what hinges you're going to use, what locks that you're going to use, and by the way, show the exact location, you know, and how you're going to trim it out. I mean, that's -- you know, that's a basic example, you know. Does that answer it?
Q. So the 35% would just say -- would just say that there's going to be a door there?
A. Yeah.
Q. But the, what did you say, 90% drawings would show the size of the door, exactly where the door is, what kind of hardware, that -- that kind of stuff?





A. Yes. And I'm using that as an example. Now, I'm not sure if that, you know, that detail is provided at the 60% or at the 90%, that I'm not sure, but I can tell you the difference between one and the other one. It's basically -- that's the basic thing.
Q. Okay. So for this project, say for the mechanical system --
A. Um hum.
Q. -- what kind of expectations did you have with respect to how the design, and by virtue of the design changing, how the work would change as the design went from 35% to 100%?
A. I really can't answer that one because I'm not a mechanical estimator, but I expect that the 35% would provide the basic information. I mean, this is one of our arguments, that the 35% provided the basic information such as the, you know, size of the chiller, the size of this, the size of that, and -- and the 100%, with the 90% or the 100%, it's going to refine that.
Q. Okay. For the plumbing work, none of that was self-performed West Coast work, correct?
A. Correct.
Q. So since West Coast wasn't self-performing it, how closely were you personally looking at that when you put together West Coast's bid?
A. I relied upon the subcontractor.
Q. Okay. And what, for example, with respect to Johnson





Plumbing, what did you expect Johnson Plumbing to do with respect to its design/build work?
A. To provide all of the information necessary to complete the job. I mean, not just I want hot water over here, but I want the size of the pipe and how you're going to anchor the pipe, and how you're going to insulate it, not insulate it, what's the size of the pipe, that is -- that is going to be provided. At the 35% you may see, you know, more on a general basis how you get to the specific basis.
Q. Okay. Would you have expected Johnson Plumbing to have looked at the chiller size?
A. As to the size? I mean, the fact that it's a chiller?
Q. Yes.
A. There's one or there's two or there's three, but as far as -- as far as the size, is that what you're asking me?
Q. Yes.
A. I would expect them to rely on the drawings at 35%.
Q. Okay. But if you recall the drawings, as we discussed this morning, the drawings simply show a two-story building, yet what you built and bid on was a three-story building. Would you expect him to rely on the 15-ton Chiller where there's an extra floor for the building?
A. There were never -- there was never an extra floor. The basic R.F.P. was for three levels at so many square feet. That has not changed. The square footage never changed.





The number of offices has never changed.
Q. So you're saying that the two-story -- the two-story building that's on the drawings, that has the same number of total square feet as the three-story building that West Coast eventually built?
A. No. What I'm saying is that the three-story building that was a requirement on the R.F.P. gave it, that square footage has never changed. The Navy did not -- I think what you're -- what you're asking me, did the Navy go from a two-story, you know, so many 'X' amount of square feet, to a three-story 'X' amount of square feet? No. What I'm telling you is that the 'X' amount of -- 'X' amount of square feet, that has never changed. The three levels has never changed. The only thing that it changes, you may have this ground floor in the ground or you may have it on the first floor, ground level. That -- that is the only thing. The fact that it's three stories, that has never changed.
Q. I'm not sure if I followed that, I'm sorry, but take a look at Exhibit 69. That appears just to discuss a two-story building. That's --
A. Which exhibit?
Q. Exhibit 69.
A. Okay. Do you -- do you have the spec book?
Q. Um --
A. The original-original spec book?



f761483e-62cc-4dc4-9c93-294e61cfc12a

Q. The original-original spec book? I do not.
MR. DAVIS: You don't get to look at what I'm looking at. I'll have a chance to cross-examine you, but I'd rather not put it in front of you. That's his deal.
THE WITNESS: Okay.
BY MR. O'CONNELL:
Q. I don't know if I'm going to mark this, but let me show you this document and tell me if that's what you're talking about.
A. (Witness perusing document). If you take construction of a basement, a two-story aboveground office/classroom building, or a three-story aboveground office/classroom building, that square footage has never changed. It's the same square footage.
Q. So how much square footage was the three-story building?
A. I can't remember, but I can -- if you give me the plans, I can figure it out, but the square footage has never changed.
See, the way I read this thing, and correct me if I'm reading it incorrectly, but and I don't know if I'm conveying myself to you, but it says: "... a basement with two-story aboveground office/classroom building, or" -- "or a three-story aboveground office/classroom building..." But if you take the basement and two aboveground or you take the three-story aboveground, the square footage is the same. That has never changed.





Q. Okay. So the two-story with the basement -- I'll take that back.
A. Okay.
Q. That's -- I think what you were reading from was the final R.F.P., because it actually has the Amendments listed, yes.
So the two -- but what about the original building shown on the plans, which from what we were saying -- you were saying earlier this morning included only two stories? And let me show you, we have -- we marked -- I finally found it. We marked the M drawings before. You can take a look at it.
A. (Witness looking).
Q. And just for the record, I gave you Exhibit 57, I believe.
A. What are you asking me?
Q. Take a look at the M drawings and tell me if that's what you had when West Coast was preparing its bid.
A. I'm assuming it is. Without looking at my original plans, I think it is.
Q. All right. And you would agree with me that like the architectural drawings and the structural drawings that you were looking at this morning, the mechanical drawings show a two-story building?
A. Correct, but the general description of that gives you the -- gives you, tells you that it's -- the end result is going to be a three-story. It's -- the square footage is never





going to change. No matter how you went after it, the square footage has never changed.
Q. What I'm getting at here and just -- let me tell you what I'm thinking and you can tell me where I'm going wrong.
A. Okay.
Q. But sometime in the latter part of 2000 and there's Exhibit 60 -- Exhibit 69 comes out referencing a two-story building, and some drawings are issued which show a two-story building. And in connection with that the mechanical drawings show a nominal 15-ton Chiller. Somewhere along the way during the course of these Amendments that two-story building shown on the drawings becomes an option of a two-story with a finished basement or a three-story. Am I wrong?
A. Yes, I think you're wrong, because I don't think that was part of the Amendments. That option -- if you want to, just for the sake of labeling something -- between a basement and two stories or three stories was never part of the Amendments. I believe that is part of the original bid. That has never changed.
Q. But why would the drawings just show two stories then?
A. Well, for the same reason, sometimes they'll show half of the drawing and then say the symmetrical. That's -- it's just something that is used. Or they'll say this is a typical room, and by the way, you have another 500 rooms to





build the same way. That is -- it's a technique that is used. They're too lazy to draw the three or draw the two or two -- give us two separate plans. But the basic requirement of a three-level, whatever you want to put them, above the ground, underground, that has never changed from day one.
Q. So you -- just so I'm perfectly clear, your understanding all of the way along then was that West Coast could build a three-story building?
A. Correct.
Q. Let's take a five-minute bathroom break or whatever break.
MR. DAVIS: Very well.
(Short break taken)
BY MR. O'CONNELL:
Q. Could we mark this as the next exhibit?
(Exhibit No. 80 marked for identification)
A. Can I take this one?
Q. You can take that one, right. All right. Mr. Ramirez, please take a look at Exhibit 80, and you'll see from page two that this is the Solicitation after six Amendments have been issued. Would you agree with me so far?
A. This is -- Form 1442 is what usually is the first page on the -- on the specifications.
Q. Um hum.
A. And what you gave me is page one and page two of 1442 and



f761483e-62cc-4dc4-9c93-294e61cfc12a

this is where you submit the price, and then when you get the contract, they sign the bottom part and I countersign it and that's what this is.
Q. Right. But what I'm just getting at is that this reflects the Solicitation, presumably it's the final one since -- the final version, since it's signed by both you and the contracting officer. Do you see that at the bottom of page two?
A. Diana, correct.
Q. There's six Amendments, right?
A. Correct.
Q. And if you look on the first page under box 10 or in box 10, you can see there in very small print, it says: "Work includes the design and construction of a basement with two-story aboveground office/classroom building, or a three-story aboveground office/classroom building..." Do you see that?
A. Yes, I do.
Q. Okay. And so that's what you've been talking about, right, the two-story with the basement option or the three-story?
A. Correct.
Q. All right. Now, let's mark this as Exhibit 81.
(Exhibit No. 81 marked for identification)
Take a look at page two of Exhibit 81, but I think that you'll see, since there's no Amendments noted, that





this is the original Solicitation.
A. No, I would disagree with you.
Q. Okay.
A. This is the one that I remember. I do not remember this one. In other words, I remember 80, I do not remember 81.
Q. So you never received 81?
A. I don't remember ever receiving 81, nope. Well, I can tell you this, from day one, from day one --
Q. Um hum.
A. -- the day that I picked up the plans, the day that I started working on it, the day that I started contacting subs, the day that we do what I've done probably 6,000 times by now, it was a three-story building. The only option is you put one in the base -- below the ground or one above the ground. The square footage has never changed.
Q. Okay. Well, do you see, though, what it says in 81, though, that the work includes the design and construction of a two-story office/classroom building?
A. I see where it says that.
Q. Okay. So you never looked at the original Solicitation before the Amendments?
A. I looked at this Solicitation, which you marked as No. 80.
Q. Okay.
A. Have I seen 81?
Q. Yes.





A. Which says, you know, the two-story? I don't recollect ever seeing that, ever.
Q. Okay. But, you know, assuming that I'm right, that this is the original Solicitation, you'd have to agree with me that the original Solicitation only asks for a two-story building with no basement, with no three-story option?
A. Well, again, and again, I don't -- you know, I'm going to have to say no, because I don't -- I don't -- I have -- I don't remember ever seeing this document in which you were saying the two-story office and there's no option, I don't remember ever seeing that. And based on the -- on my experience of, you know, I've probably done 10,000 estimates by this point, would I ignore something as vital as this is? No.
Q. Okay. So you're telling me that document is not the original Solicitation or are you just telling me that you've never seen it?
A. I don't -- both, I've never seen it and I don't think it's the original Solicitation. If -- if you look at something, the bid dates are totally different. Look at that.
Q. You're talking about paragraph 13 of page one of Exhibit 81?
A. Um hum, that's correct.
Q. Well, look at the top. This is the same job that's being talked about, right? I mean, it says design --
A. Uh, let's see, well, the first five numbers are the Navy and





that's what they use, 00-R-3035, yeah, it's the same number, it's the same Solicitation number.
Q. Well, of course, the dates for submission of bids are sometimes moved back; wouldn't that be true?
A. They never move it back, they only always go forward.
Q. Well, okay, whether you want to call it back or forward, you know, it's moved, it's moved up in time or whatever, moved forward in time?
A. (Nodding head up and down).
Q. So that's why I'm curious as to why you're attaching significance to the fact that 81 lists a bid submission date of January 11th, 2001?
A. I can't answer that.
Q. Well, no, what I'm asking you is why you brought it up, why you brought up the fact that the bid dates were different?
A. Well, the reason I brought it up is I just -- you know, it's the same job, I mean, it's the same job and yet, you know, the -- 10 is different, and in 13 the due date is different, and it doesn't make any sense. It does not make any sense. See, Mr. O'Connell, even the other thing that is really weird about this thing --
Q. Um hum.
A. -- Linda Nanbu, whatever that is on 81, I don't remember ever dealing with her, but I certainly remember dealing with Bert from pretty much from day one, so that's another thing



f761483e-62cc-4dc4-9c93-294e61cfc12a

that's kind of just peculiar. I'm just -- I'm just pointing out some things that are peculiar to me when I see these, both of these two documents. But I dealt with Bert a lot and I don't remember ever speaking to a Linda, and I don't remember to a Linda Nanbu. I'm just pointing out some things that are kind of odd to me. I don't --
Q. Okay. But wouldn't you agree with me, though, that Exhibit 81 is more consistent with what the R.F.P. drawings show in that the R.F.P. drawings strictly show a two-story building?
A. With their drawings, yes. With the total specifications, no, I disagree with you.
Q. So and what governs your bid, the spec or the drawings?
A. The precedence is the specifications over the drawings, that's the standard. And I believe in the Navy and in all federal things there's a little paragraph that lists what's precedence over what, you know, and if I'm not mistaken, but if I'm not mistaken, the precedence is the specs over the drawings.
Q. Mark this as the next exhibit, please.
(Exhibit No. 82 marked for identification)
Okay. Let me ask you to turn your attention to the bottom of the first page of Exhibit 82, Mr. Ramirez, the FAR 52.236-15, Schedules for Construction Contracts. Is this a provision of the contract that you were personally aware of?





A. Okay. Am I familiar with this --
Q. Yes.
A. -- paragraph 25?
Q. Yes.
A. It's pretty much a standard paragraph. Yes, I am familiar with it, yes.
Q. Okay. Let's mark this as the next exhibit, 83.
(Exhibit No. 83 marked for identification)
A. Okay.
Q. Okay. Um, 83, you'll see -- and I don't know if you can read it, I can barely read it -- the bottom left-hand corner, it says "date, Wednesday, 7-11-01." Do you see that?
A. Yes, I do.
Q. Would this be the schedule that would tie to the FAR clause in Exhibit 82 that we were just looking at?
A. Yes, it would be.
Q. Okay. Would -- would this be West Coast's as planned schedule for construction?
A. I would have to ask Tracy to this point. Again, the way we -- the way we conduct -- you know, the way that the company is organized at this point, I have to ask Tracy. I can't answer that question.
Q. Do you have any role in scheduling the projects, Mr. Ramirez?





A. No, not -- not the actual project, no.
Q. Would you see schedules as they're produced?
A. What happens -- uh, not this schedule. What happens, I -- we have a meeting once a month and I sit down with Tracy and Tracy -- and Tracy is in charge of it, you know, but Tracy gives me the schedule which addresses each job. In other words, instead of seeing all of these lines that you see right here, you'll see job 903, 901, 899, and he gives me the -- a block of when this is going to happen. And that I do prepare, when we're going to need work, who is tied up, who is not tied up. Within each block each PM is responsible for doing this. That's the way we have it set up. So once the project is released, do I see these things? Not really. You know, I may get them out of courtesy, but do I really see them and -- and let me put it this way. Do I sit down and check every little thing and critique it? No.
Q. When you calculate West Coast's bid for a project, how does the -- how does any completion date that's set out in the contract affect your calculation of the bid?
A. I'm not following you.
Q. Well, for example, I can show you the provision in a second, but I believe this contract originally stated that the work was to be completed by March 1st of 2003. So when you're looking at the contract and putting together West Coast's





bid, how does that March 1st of 2003 date affect your bid price?
A. Oh, God, I don't know. Um, I'm not exactly sure what you're asking me, so I don't know. I'm not sure what you're asking me. When -- when -- um, I'm not sure what you're asking me.
Q. Well, is -- is -- well, let's start at the beginning. Is the completion date something that you look into the contract to find out? Do you want to know the contract completion date?
A. Absolutely.
Q. Okay. And so, well, what -- so what does that contract completion date actually tell you?
A. Boy, the way that it affects me on the bid, and I think that's what you're asking me, how does that -- that margin, that mark up overhead and profit, how does that get affected by the completion date; is that what you're asking me?
Q. Yes.
A. Okay. I can answer that. Uh, okay, normally what I do is we have the overhead, office overhead, okay, which for the sake of argument let's just say it's $1 million dollars, just for the sake of argument, okay? For the sake of argument we have six earners and let's say, make it simple, five earners in the company, I mean five projects going on at any one time. So basically what I do is I take that $1 million dollar overhead, divide it by five, because you



f761483e-62cc-4dc4-9c93-294e61cfc12a

have five projects out there which are contributing to the income of the company. Okay? So that would be $1 million dollars, divided by five, $200,000. And then I'd say divide it by 12 months. Okay, so that -- take the $200,000 and divide it by 12 and that gives you roughly whatever, the $90,000 or whatever it is. Okay? That is the number that exists that each job has to contribute for the company to sustain itself. Okay? So then I take the job and it's going to be 12 months. Okay, remember, we said out of this formula, GNA, divided by five earners, divided by 12 months, I come up with a magical number. Then I take that magical number, I look at the job and say, again, let's say the job is for $1 million dollars. Okay? If I put 5% overhead and profit, is that going to generate enough money to even cover the minimum requirement that we need? I do look at that. So if a job takes two years versus a year, does that affect that? Yes, it does, and we take that into account. But at the same time, it's not that simple. We take other jobs into account. Let's say all of the other jobs are producing, you know, that magical number was $10,000, but if all of the other jobs are producing $20,000, we can afford to be lower on this one. Does that answer your question? That's what I look at at bid time, and I do look at each. As a matter of fact, once again, what you learn from every job? You know, that table, that chart that I showed you, we





flash that on the wall now. We take a projector, flash it on the wall, and now we put some formulas at the end of the project. Right next to -- you saw that margin right to the right of it now we put divided by so many months and, boop, it shoots the number per month this is going to earn versus the number that we're bidding it. I do take that into account.
Q. So the completion date -- let me see if I can just sort of --
A. Um hum.
Q. -- sum up that. The completion date affects the percentage of overhead that's going to be carried in the bid?
A. Correct.
Q. Okay. Does it affect anything else?
A. Well, it -- it only affects it to the point that, you know, we're not a -- we're not a company that has 100 superintendents, you know, we have five, six superintendents, and we don't want to tie up a superintendent for forever on a project which is going to make very little margin. It does affect it. That's the other thought that comes into play. But there's several ingredients that go to, you know, how much margin or mark up or overhead we put in that thing. That's some of the principle ones.
Q. Let's go off the record for a second.

CATHERINE M. VERNON & ASSOCIATES
1821 Dock Street, #408, Tacoma, WA 627-2062



(Counsel talked off the record)
Let's mark this as Exhibit No. 84.
(Exhibit No. 84 marked for identification)
Mr. Ramirez, Exhibit No. 84 appears to be a series of e-mails between Scott Harm and somebody called Trisha at West Coast. Is that the same person that we identified this morning? Oh, no, it's not. That was Tasha.
A. Um hum.
Q. Who is Trisha?
A. Trisha is one of the secretaries at work.
Q. Is she your secretary or --
A. She is now working for me directly, yes.
Q. What I'm interested in, for starters in this one, is the e-mail from Scott Harm to Trisha at the top of the second paragraph which states: "We are having pretty substantial fee issues on Monterey because we had a VERY quick turnaround on that one as well and QC missed a typo on that proposal. This one is MUCH larger and therefore the margins of error is much more extreme."
Do you have any idea what he's talking about there?
A. I have no idea, none, none whatsoever, just -- not even remotely.
Q. Do you know what IDIQ stands for?
A. Yeah.
Q. Do you see it at the top under the re:?

CATHERINE M. VERNON & ASSOCIATES
1821 Dock Street, #408, Tacoma, WA 627-2062



A. Yes, I do.
Q. What is -- what is its -- what is your understanding?
A. Well, I don't know exactly the words, but it's a term contract, it's what we call a term contract.
Q. So you call it a term contract?
A. That's -- that's what they call it in the industry. That's what we call it. What it is is you get a master contract, you know. They select -- they send out the invitation. They pre-qualify say three general -- generally speaking, we're bidding on a couple of IDIQ's, there were three of us that qualified, and then from that point on, they send the invitation to the three general contractors that are qualified, and those three respond, and they give them a task order to each one. But the master contract, they already have it set under this IDIQ and I don't know what it stands for. We call it a term contract, a task order, there's several terms, but it's -- it's -- it's a format for bidding, you know, that the government has come up with. We had a couple of them.
Q. So in your answer, which just discussed your understanding of this IDIQ term, how does that relate to the contractual relationship between Merritt + Pardini and West Coast on the Navy project?
A. It doesn't, not at all. This -- this has nothing to do with the Navy project. It is again -- remember I told you at the

CATHERINE M. VERNON & ASSOCIATES
1821 Dock Street, #408, Tacoma, WA 627-2062

beginning that we pick up a job, you know, and we'll send out the invitation to a lot of people, we'll send them the plans and say take a look at it. What I'm assuming has happened is that an IDIQ came in and we picked up the Solicitation, we picked up the plans, and we sent it to several people to see what they think about it. We do that quite often. We spend -- we'll spend $500 in sending out plans and the consensus comes back we have no business bidding this thing, so we back out of it. More than likely that is what happened on this one. An IDIQ came in, Trisha sent it out to get the opinion, and the opinion came back we don't have enough time, it's not something adequate, whatever the case, let's not bid it. It had nothing to do with Monterey other than more than likely that's what happened in this thing.
Q. Next one, please.
(Exhibit No. 85 marked for identification)
Okay. Mr. Ramirez, please take a look at Exhibit No. 85. Do you recall seeing Exhibit 85 before?
A. Yes.
Q. And do you recall seeing it sometime back in April of 2002?
A. Uh, yes.
Q. Now, could you tell me how it came about that Merritt + Pardini submitted this document to West Coast and the government?





A. Yes. Essentially, Scott felt that he was being asked, directed, harassed, whichever way you're wanting to label it, to do things way beyond the contractual obligation of what he was obligated to do. And there were several other problems, so Scott I believe said he was going to send this as a request and I forwarded it on. He sent it directly to Bert and sent it on to me. And, you know, it was a request for -- for payment.
Q. Did you ever get any breakdown for this number of $37,500 that appears on page one -- well, on page one of the letter, which is page two of the exhibit?
A. You know, I can't remember, but I -- again, out of the back of my mind, I believe one was sent to Bert, but I don't remember me seeing or getting it. I don't remember. I think Bert did get one.
Q. And correct me if I'm wrong, but this is the document that forms the basis for part of West Coast's Certified Claim, which became West Coast's Complaint in this action, correct?
A. I think it is.
Q. All right. Now, if you look at the letter, first paragraph, third sentence: "In addition, it is our recommendation that West Coast Contractors be compensated for the additional printing and shipping costs they incurred as a result of this discrepancy."
Do you know what discrepancy he's referring to?





A. Remember that piece of -- that one that he marked-up, you know, remember when he wrote out, he scratched out and he put numbers to the right of that? Okay, part of his original proposal he said that he did not include printing or some other cost. After the fact he said, hey, I didn't really include this thing. And I said, once again, you remember my -- when I told him to take this thing and, you know, I'm throwing it away in the garbage can? This is referring to that that he was saying, look, there was some things that we did not include at bid time and, you know, we should really get paid for that. And I had already told him no, period.
Q. So is that amount included in this $37,500?
A. I don't think so.
Q. Okay. Can you explain to me what -- what Merritt + Pardini, and by extension West Coast through the Certified Claim, what they were actually asking for here?
A. I -- I asked Scott to -- I said, "Explain to me in, you know, laymen's terms and not in a real technical way, explain it to me in a very simple manner." And the way he explained it to me the -- the bid documents say they're to format the plans and the specifications in this format. I mean, literally, you know, 8-1/2 x 11, you will subtitle it this way, blah, blah, blah, blah, blah, very specific. Okay? And this was following standard practice, as in





practices that they made, referred to in the bid documents and the bid specifications. And then the Navy turned around and said no, we want it in this format. Okay? And it was different and it created a lot of extra work. That's the way Scott explained it to me.
And when I went to the Navy, I went to a meeting with them to plead with the Navy to please, just let us do our job and, you know, at that time is when -- remember I said Scott was being very tolerant? That's when I said, "Scott, you know, just let's go in there, you know, let's go in there and see if we can get this thing resolved." He said, but they were asking so much, way beyond what is not indicated in the documents. And I said, "Well, if it's going to clarify something." He says, "It doesn't." You know, when I asked him, "Well, give it to me in -- once again, in terms that I can understand." He said -- and -- and he said, "It's like if you wrote to a subcontractor," and he said something to the effect, "I want you to provide the toilet accessories, but by the way, instead of giving you the liberty to provide the toilet accessories to comply with these two or three brands, I want you to supply the toilet accessories, but I want you only to supply this brand. It's way too restrictive and you can't do that. And that's when -- that's when -- when he explained it to me, because we -- you know, he explained it to me somewhere

outside of the building, and that's the way it made sense to me. And in real technical terms, no, I cannot explain it to you. I can only explain it to you the way he explained it to me, in those real basic terms, you know.
Q. So, I'm sorry, can you run by me your -- your sort of analogy --
A. Yeah.
Q. -- whatever you want to say, to a toilet?
A. In other words, we go to a subcontract.
Q. Yes.
A. FYC Company wants you to furnish toilet accessories. Okay? Now, in the specifications it says you can use Bobrick, you can use Brand A, Brand B, Brand C, Brand D, as long as it complies that it's made out of stainless steel, that it's 22 gauge stainless steel, that it's polished stainless steel, you know, along with the basic criteria. So we give the supplier the option, you can do this, as long as you're meeting those -- those standards.
What Scott explained to me is he said not only is the Navy requesting that we say toilet accessories, but they're asking, say we want you to use Bobrick, in that it's way too restrictive, in other words, and you can't do that. Does that make any sense?
Q. I think I understand what you're saying. Okay. Mark this as Exhibit No. 86, please.





(Exhibit No. 86 marked for identification)
Have you seen Exhibit 86 before, Mr. Ramirez?
A. Yes, I have.
Q. I might be taking this document out of the timeline, and now that I look at it more closely, I think I am, but on the bottom right-hand corner it says 9-20-20, and presumably that does not mean September 20th, 1920. But I see on line 18 over to the left it says "revised total: 9-20-05." All right.
A. Can I -- remember when you showed me that -- that, uh, that Purchase Order and it said there's -- there's -- there's -- there's been several changes to that Purchase Order and it said you must have that because it was attached to it? This is what was attached to that. And what this gives you -- remember the split the difference that I said? If you look at the item, line number two, do you see the difference that we paid him?
Q. Yes.
A. Okay. This is what I was saying, it was attached to that. Somehow this got separated. But regardless, that -- what it does is it takes the original $240,150, which is what went in the bid, is what they gave me. Then it splits the difference. Remember those three numbers that they left off? This is what we paid them. Okay? Then it says, okay, here's a revised contract. And then we gave him all of





those Change Orders which are Change Orders, those are per the owner's request, additional work. Okay. And that's what we ended up paying them.
Q. So when we were looking at those Purchase Orders, you're saying that this -- something along the lines of Exhibit 86 would have been page two of the Purchase Orders?
A. No. This took that Purchase Order and -- and modified the Purchase Order, but it should have been attached to -- it should have been right after that Purchase Order. Remember when I said you're missing page two?
Q. Yes.
A. This should have been behind it.
Q. So then that should have been page three?
A. That's correct.
Q. I see. All right.
A. In the way we keep the files, that should have been page three. And this is what I was telling you. Remember this -- I said there's another piece of paper that changes all of these things? This is it.
Q. All right. Let's -- well, let's sort of keep everything in time. This is -- well, tell me if I'm reading it wrong, but this document seems to be speaking as of September 20th of 2005. Is that the way you read the document?
A. Yeah. What this was produced is -- remember, we said we settled with Merritt + Pardini or Krei or whatever you want





to call it?
Q. Yes.
A. Remember that?
Q. Yes.
A. Okay. Well, Tracy prepared this for me before we went to the meeting to -- to try to settle with them. This is in preparation for that. Okay, this is something that Tracy provided to me and even his opinion here, as you can see at the bottom line, he's saying this is what we ought to settle max, because there's some margins --
Q. Sure.
A. -- we're saying no. Okay? So this is the -- what was prepared to --
Q. All -- the question only was did you agree with me that that's as of September -- what does it say -- 20th of 2005?
A. I -- I can't.
Q. All right. Well, let's get back to it. I'm going to -- I'm going to treat that, at least for now, as the September 20th, 2005 document, or sometime after that. Let me -- mark this as the next one, please.
(Exhibit No. 87 marked for identification)
MR. DAVIS: Can I have a copy?
MR. O'CONNELL: Oh, what did I do with it? Oh, I marked it for you.
MR. DAVIS: All right.



f761483e-62cc-4dc4-9c93-294e61cfc12a

BY MR. O'CONNELL:
Q. The question, Mr. Ramirez, is what are the OMSI -- what is the OMSI Manual for Design/Build?
A. It stands for operating, maintenance -- operating maintenance, I don't know. I don't remember the two last letters, but it's -- it's a manual that, you know, tells them how to -- you know, when to grease the parts, when to clean them, that type of thing.
Q. This will be Exhibit 88.
(Exhibit No. 88 marked for identification)
Mr. Ramirez, have you seen Exhibit 88 before?
A. Yes, I have.
Q. Exhibit 88 starts out by stating: "Dear Mario: It is disheartening that our relationship has come to the point where I need to put in writing items I would normally entrust to verbal agreements."
Did West Coast's relationship with Merritt + Pardini somehow deteriorate over time?
A. You know, I -- I would probably say yes. I would probably say yes.
Q. How so?
A. Well, you know, I -- I thought that when I split the difference, and as you can see by little Tracy's comment on that Exhibit 86, but no more, I thought that when I settled that difference in which to this day I thought it was their





mistake, that I thought that was going to be the end of it, and then he started coming up with a couple more and frankly I just got to the point where I said no more, I mean, no more means no more, and they reacted by saying, well, you know, and they were kind of upset about it. They expected it.
Q. So it was strictly the fact that they didn't get their full price of $294,000 that caused the relationship to deteriorate?
A. I think so. That's my opinion. I think so.
Q. Take a look at the paragraph numbered one, "Original Proposal." Paragraph one of Exhibit 88 states: "I agreed to compromise on the differing opinions of the originally proposed design fees due Merritt + Pardini." And I take it that this again refers to the difference between the $240,000 and the $294,000?
A. Yes, it does.
Q. And then Mr. Harm states in Exhibit 88: "In return, you agreed to pay us half the difference, which amounted to $27,250." And that is basically what you've been telling me much of today, to split the difference?
A. Yes.
Q. But then Mr. Harm states: "Merritt + Pardini would attempt to recover its $27,250 during Construction Administration by billing the full amount while expending minimum hours."





That last sentence, is that -- does that square with your understanding of some kind of an agreement between Merritt + Pardini and West Coast?
A. No. My -- my understanding of the $27,250 was final, and final means final. It doesn't final plus a mile. Final means final, dead gone, gone, nada.
Q. So --
A. And that was my understanding of it, you know.
Q. Was -- I'm sorry. Are you finished?
A. And that was my understanding, so that's where it caused a lot of strain, because I think at that point Scott was getting pushed -- and, again, this is just me -- I think he was getting pushed by some of the partners, go collect the other money, you know, and I told Scott no. And keep in mind again that we went from a very personal, you know, to Scott getting a little bit angry.
Q. Did he ever discuss with you before this letter some kind of arrangement where Merritt + Pardini would bill the full amount of its Construction Administration, but only expend minimum hours?
A. You know, if he did, I -- I can't remember it or it was wishful, you know, hearing, you know. We all do it as human beings. We -- a person says something, you're so focused that you want to settle on this, you know. I wouldn't swear to Scott. Scott is a very honorable man. If he said that





he said that to me, he probably did. Was I listening? Probably not. I don't remember it but, you know, Scott is not the type who lies. He's too honorable.
Q. Okay. What about the second paragraph, "Reimbursable Expenses"?
A. That I told him from day one that I disagree with him. And even by -- by Tracy's notes on this thing, I told him from day one I disagree with you. And even when he sent that letter to Bert, I told him I disagreed with him, you know. I never agreed with him on that portion of it.
Q. Did you ever get any breakdown from him as to how he calculated the value of that items as $17,000?
A. No, I did not. I don't remember.
Q. If you look at the second page, the "REA Rejected by Navy," if you look at that paragraph three, presumably this would track back to the REA that we were looking at in Exhibit 85?
A. Correct.
Q. Okay. What I'm trying to figure out is why the number he has in Exhibit 88 is $20,500, but in Exhibit 85 it's $37,500?
A. I can't figure that one out either.
Q. Moving on to paragraph four, paragraph four comes back to "Construction Administration," which you will recall was mentioned in paragraph one, also of Exhibit 88. And just from a formatting perspective I'm trying -- and I can ask



f761483e-62cc-4dc4-9c93-294e61cfc12a

him, obviously, but I'm just trying to get to the bottom of what this Construction Administration issue is and I'm just trying to figure out why it's also set up separately as a different issue in paragraph four?
A. You know, what I remember out of this thing and, again, it's -- again, Tracy might be able to, you know, but he's -- he's not getting deposed, I am, but what I remember out of this thing is that he thought he was required to attend like every other week and we found out that he was only required to attend once a week. So, therefore, we said well, that's okay, you can leave it per your requirement at once a week or something to that effect. There was something about the site visits that he overestimated and we told him to go back to the original, you know, and we won't force you to do it twice a week or twice a month or whatever they say and so he kind of agreed that, you know, I had agreed to that. That's what I remember out of this thing, but I wouldn't -- I'm not 100% sure, but that's what I -- that's my first thing that rec -- that jumps to my mind.
Q. Okay. Well, how about in paragraph five of Exhibit 88, it states that: "As of now, we have exceeded our minimum budget for these services," apparently in reference to Construction Administrative -- Administration services?
A. Um hum.
Q. And he states: "Further Construction Administration





requests will be for an additional cost." Did West Coast to your knowledge issue any kind of a modification to Merritt + Pardini for additional Construction Administration costs?
A. No.
Q. Did they -- did they stop providing Construction Administration services?
A. No, not to my knowledge.
Q. Okay. Paragraph six of Exhibit 88 comes back to the -- -- well, it references "Maintenance and Operations Manual." Does that -- is that the same thing as the OMSI Manual that we were talking about in relation to Exhibit 87?
A. I think they are, yes.
Q. And do you understand why Merritt + Pardini was claiming an additional $35,000 for the -- these manuals?
A. No. And, again, you're going to have to refer to Tracy on that one because I don't know. I don't even know what the outcome of that was finally, you know.
Q. Let's go back to Exhibit 86.
A. Okay.
Q. Going back to Exhibit 86, I think you might have referenced this before, but this is a document that I think you said Tracy prepared for you to go into negotiations with Merritt + Pardini. Is that a correct understanding?
A. Yes, that's my -- my recollection.
Q. Okay. And do you know, if you look at line 11, it says





"REA, $20,500," do you know why West Coast was using the $20,500 number rather than the $37,500 number that was in the actual REA?
A. No, other than Tracy could have picked up that number off of this letter, you know, this letter over here on 88, because that agrees with that number, but I -- I don't know, you're going to have to ask Tracy that. But that's the only place that it matches. It matches the numbering here. It does not match the number on the other one, though.
Q. Here meaning exhibit what?
A. Well, you see, this Exhibit 88, it matches the number right there.
Q. That -- sure, yes.
A. Um hum.
Q. All right.
A. And that's the only place that I can see Tracy picked it up from there instead of looking at the other piece of paper.
Q. Next exhibit, please.
(Exhibit No. 89 marked for identification)
Have you seen Exhibit 89 before, Mr. Ramirez?
A. You know, I don't recollect this one really good because I had to really focus on this one. I focused on 86, so 89, I don't -- it doesn't -- you know, it doesn't surface right away.
Q. Okay. Third bullet point, it states: "Bar Chart Design





Schedule sent to M&P 07/17/01 could be used as a counterclaim as to Delay caused by Design"?
A. Um hum.
Q. Do you remember any discussions with respect to a West Coast counterclaim against Merritt + Pardini for delay?
A. No, we never had a counterclaim against them. These were just -- see, knowing Tracy and the way Tracy, you know, we worked -- you know, we worked together for almost 18, 20 years, it's just Tracy likes to do these things, you know, we call them bullet points that I use in trying to settle the issues. And I believe what this is is, you know, if they bring this up, you could bring this up type of a situation.
Q. But are you aware of any delay that Merritt + Pardini caused on the project?
A. No, I'm not.
Q. All right. Why don't we stop.
(Deposition Adjourned)
(Signature Reserved)



f761483e-62cc-4dc4-9c93-294e61cfc12a

CERTIFICATE

STATE OF WASHINGTON)
) ss.
County of Lewis )

I, the undersigned Notary Public in and for the State of Washington, do hereby certify:

That the foregoing deposition of the witness named herein was taken stenographically before me and transcribed under my direction; that the deposition is a full, true and complete transcript of the testimony of said witness, including all questions, answers, objections, motions and exceptions;

That the witness, before examination, was by me duly sworn, and the deposition was made available to the witness for reading and signing upon completion of transcription, unless indicated herein the waiving of signature;

That I am not a relative, employee, attorney or counsel of any party to this action or relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or the outcome thereof;

That I am herewith securely sealing this deposition and delivering the same to Mr. O'Connell for filing with the Court.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 15th day of May, 2007.

Notary Public in and for the State
of Washington, residing at
Mossyrock.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WEST COAST CONTRACTORS OF ) NO. 05-1121C
NEVADA, INC. )
7785 White Fir Street )
Reno, NV 89523 )
)
Plaintiff, )
)
vs. )
)
UNITED STATES OF AMERICA )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF:
MARIO RAMIREZ, VOL. 2

April 24, 2007
Tacoma, Washington

* * * * * * *

REPORTED BY:

CATHERINE M. VERNON, CSR, RPR

#408 Albers Mill Building

1821 Dock Street

Tacoma, WA 98402

(253) 627-2062



0d463623-640c-4e88-ba10-19365542315c