What percentages, I don't quite frankly remember.
Q. Okay. Did you tend to interact strictly with West Coast or did you deal directly with the Navy?
A. By contract I'm only typically allowed to talk directly to West Coast because they're my client.
Q. And did you ever talk directly to the Navy people?
A. There may have been times that we did. Whether they are in the room with us or not, typically our communication was through the contractor, or at least with their prior approval before contacting the Navy.
Q. All right.
A. So there may be instances where we talked to the Navy or their reviewers.
Q. All right. Why don't we take up a 10-minute break and start up again a little after 3:00. Is that okay with you?
A. Sure.
Q. Okay. Let's go off the record.
(Short break taken)
Back on the record. All right. Let me show you what's previously been marked as Exhibit No. 25, Mr. Harm. My question to you, Mr. Harm, is, first of all, basically do you recall a suspension of work due to the concrete on the project?
A. Yep. I hope you were done, I'm sorry. Yes.
Q. I was. Thank you.





A. Okay.
Q. Did you personally observe the concrete?
A. At some point in my life?
Q. No. No. No. No. This particular concrete. Let me be a little more specific. The second paragraph of Exhibit 25, the second sentence states: "Some areas of the walls and columns have a honeycomb appearance and some columns have exposed rebar." I'm asking you, did you see the concrete that was the subject of the suspension of work?
A. Yes.
Q. And what did you observe with respect to that concrete?
A. Well, this is somewhat accurate, that it was honeycombed, that there were places when they peeled the forms, that it didn't appear that due to the vibration process that the liquid portions of the concrete mixed, adhered to the forms completely, so when they peeled them off, there were pockets where you could see the aggregate. I don't remember specifically being able to see reenforcing, but it -- it was, to say the least, it was concerning.
Q. Why do you say it was concerning?
A. Well, I'm a fan of concrete for its aesthetic form and when you pull it off and it looks like that, it's like whoa, we've got trouble, or do we, so we -- the most senior people for the companies involved, I think myself and Tom Hicks who is now one of the owners of AHBL, flew down to look at it





and figure out what we were going to do and if it was going to be that substantial of an issue.
Q. You mentioned the word aesthetic. Was it strictly an aesthetic issue or was it also a structural issue?
A. I believe in this case it was later determined by Mr. Hicks that it was a non-structural issue. And we as architects couldn't make that determination, but if I recall, Mr. Hicks determined that with adequate patching with epoxy, that if there was indeed a structural issue, that it would have been remedied by his suggested repairs, but it was also pretty aesthetic, a pretty big aesthetic problem too.
Q. You weren't there observing the actual pour, were you?
A. No.
Q. Do you recall also that West Coast later repaired the concrete?
A. Yes.
Q. What was the extent of your involvement with respect to the repair?
A. We, if I remember correctly we engaged, for lack of a better term, an expert in concrete repair. We proposed remedies to fix the problem, both in the aesthetic form and if there were perceived structural implications. We wrote, you know, a procedural document on how we were going to repair it and it was sent to the Navy for review and approval and I think ultimately they concurred with our approach and allowed us





to proceed with a limited area to see how it was going to turn out. And so we proceeded with that, but I think there was some give and take a couple of different times and we determined the approach that we wanted to use.
Q. Who is --
A. I think there was some back and forth.
Q. Who is we?
A. The offices of Merritt + Pardini, the offices of AHBL, the Navy, West Coast, and the Navy's consultant team that wrote the R.F.P., whose names escape me. It was an architectural firm and a corresponding structural firm that got involved with this one.
Q. On sort of the West Coast side of the aisle?
A. (Nodding head up and down).
Q. Or more specifically, with respect to the design consultants Merritt + Pardini was involved?
A. Um hum.
Q. AHBL was involved?
A. Um hum.
Q. You have to say yes or no. It's better.
A. Oh, I'm sorry. Yes.
Q. Any other consultants?
A. For this specific issue?
Q. Yes.
A. I don't believe so.



21c432ad-fbc3-49e6-9a6c-bb0da6ca40d8

Q. All right. And since this was an issue relating to the concrete, was AHBL more in the lead on this particular issue than Merritt + Pardini or what?
A. Contractually speaking we would always be in the lead, but we were deferring to them if it was indeed a structural issue or not. They had to make that call. We certainly couldn't.
Q. Do you recall West Coast entering into a -- some kind of a -- thanks, I'll take that.
A. Yeah, thanks.
Q. Do you recall West Coast entering into some kind of a contract directly with AHBL with respect to that concrete work?
A. (No answer).
Q. Let me show you a document?
A. Yes, okay.
Q. It's marked as an exhibit. Actually, you have it in your pile there somewhere, Exhibit 79.
A. Okay. And I think this is yours again, right?
Q. Yes.
A. You said, I'm looking now for No. 79?
Q. Yes. Have you seen that document before?
A. I don't know for sure that I saw this document before, but I did have knowledge that they were contracting directly with AHBL to get a fix to this pretty quick.





Q. So you think that the reason why West Coast entered into a contract directly with AHBL was just simply for speed?
A. You'd probably have to ask them that. I don't remember.
Q. When you -- going back to Exhibit 25 for a second, the suspension.
A. I don't think I have that one.
Q. Just quickly look.
A. Okay.
Q. Exhibit 25, the suspension of work, is dated May 29th of 2002. Do you recall how quickly it was that you flew to the site to view that concrete?
A. In general terms, real quick, like within the week, I think. I -- you may have records in front of you to tell you when I did it, I don't remember, but I know it was pretty quick.
Q. When you saw the concrete, were you surprised that the Navy had issued a suspension of work?
A. No.
Q. Did you have any disagreement with the Navy suspending the work?
A. I believe at that point I looked at it and I pretty much determined that I didn't believe that it was going to be necessarily endemic of what the rest of the building was going to look like, that it was probably going to be an anomaly for the specific situation, and it was, and that probably an immediate stop of work might have been prudent,





but it shouldn't have been a long-term deal, that we should have been able to -- as a team, we should have been able to get over it pretty quick. I've seen this kind of stuff on other projects and, you know.
Q. Let me show you what's been marked as Exhibit No. 48.
A. I'll return that to you. Yeah, okay. Yep.
Q. The first question with respect to Exhibit 48 is simply why you wrote this letter?
A. I think for documentation to the Navy that we as the designers of record were involved in what was being done and we concurred with the recommendations.
Q. All right.
A. Um --
Q. I have a question with respect to the second-to-the-last paragraph.
A. Um hum.
Q. You state: "As noted by the structural engineer of record, the failure of this repair will, if it occurs, be readily obvious to the most casual of observers and would occur within the first few years of occupancy." What did you mean by that?
A. If it was to, you know, a technical term, fluff back off, what they're doing is essentially putting a gluing patch into the concrete, and if it was going to pop off, it would pop off sooner rather than later, and it would be left with





those pockets again if the repair didn't adhere to the building.
If I remember correctly, the building was left in its natural concrete form, so I don't believe, if I remember correctly, if it was being painted over so the concrete was going to be the concrete. And they talk about blemishes and things like that, that it's hard to match the aesthetic of a concrete by going back and patching it. And if it wasn't going to work, we were going to know pretty quick.
Q. From reading the letter and just listening to your answers, you seem to be indicating that there would be some upside to the fact that the failure would occur within the first few years. Are you meaning to convey that?
A. I don't know that I would say that there was an upside to the fact.
Q. I guess -- I guess the question, maybe let me ask the question this way. Why is it important for you to convey to Mr. Ramirez, and probably ultimately to the Navy that if there's a failure, it would occur within the first few years of occupancy?
A. Because I think they were concerned about ultimately accepting the concrete placement in its entirety, based upon this section of the building not having a perfect form. So do we reject the whole thing in its entirety or do we reject a portion of it and/or are we able to accept the repair.



21c432ad-fbc3-49e6-9a6c-bb0da6ca40d8

And I think what I was stating here is that if it's not going to work, we're all going to know really pretty quick whether it's going to work or not, one way or another. And that there may have been a discussion on warranting the building, that they needed to extend it for some period of time to make sure that the patch was going to work. I'm surmising at this point. I can't specifically remember.
Q. Now, earlier you had mentioned some back-and-forth between the parties concerning the repair procedures. How would you describe this back-and-forth that occurred?
A. As in phone calls, suggested brain-storming sessions, conference calls, phone calls. There might have been e-mail transmissions back and forth, all kinds of different forms on what we were going to do to fix it as a team.
Q. And were these communications simply between you and West Coast or was this an issue where you dealt directly with Navy people?
A. I can't remember specifically if it ever included communication directly back to the Navy or not.
Q. Will you mark this as the next exhibit, please?
(Exhibit No. 98 marked for identification)
Have you seen Exhibit 98 before, Mr. Harm?
A. I don't have specific knowledge, but I would imagine I would have seen it. Is that a fair enough answer?
Q. Yes, it's fair, if it's accurate.





A. Yes.
Q. Now, do you remember an issue on the project concerning approval of the 100% design submittal?
A. At this point in time my remembrance is foggy, at best. I just know it became extremely painful and I remember there was dialogue going between, for example, my structural engineer and the structural engineer who originally wrote the R.F.P. on things that they quite frankly did not agree on.
Q. I'm sorry, who is they?
A. The -- our structural engineer, AHBL, and the structural engineer whose name I don't remember that wrote the original Request for Proposal, that did the R.F.P. drawings.
Q. Is that D-A-S-S-E or Dasse?
A. Yeah. Yeah, that would be it, or that could have been the architect that did it, but yeah, that's part of the name, yeah. And I remember our structural engineer getting quite heated about the liabilities inherent because they even state, you know, calculations and our engineers ultimately had the liability for the building, let the engineers who created the R.F.P., and yet we were being inundated with requirements to provide additional calculations. And if our engineers are willing to stand behind their work, then that's the way it should have been.
Q. All right. Let me just ask you with respect to some of the





--
A. Um hum.
Q. -- specific issues on the letter. First under drawings it states that fire protection system design drawings were not submitted. Do you recall anything about that issue?
A. Not specifically. It's often a problem with Design/Build projects, and I could elaborate specific to this one. At this point I don't remember specifically to this project.
Q. What do you mean it's often a problem?
A. This is a long story, but most true fire protection drawings are ultimately done by the people that are going to install them, so there's sprinklers running through this room, and typically the people that want to install them will be doing their drawings so they can do it most efficiently and they're doing the pricing at the same time. Often a design team will have a fire protection engineer on staff who is doing the criteria by which those drawings will be produced. And ultimately you cannot get -- usually you cannot get the drawings for actually where the pipes are going to go until you've awarded the contract for installation for someone to actually install them. And it's quite common, even today, it's an issue on when fire protection drawings are submitted because they're usually submitted as what are called shop drawings. You're reviewing the actual drawings of the way it's going to be installed, not someone's concept of a





design on how they're going to be installed.
Q. Have you ever seen a contract before where the fire protection system design drawings had to be submitted with the 100% design submittal?
A. At this point?
Q. Yes. Yes.
A. I -- Design/Build was so new, I don't know that I'd ever seen it where it was required.
Q. How about since then have you seen it?
A. Since, at 100% design? No, usually they're typically one of the -- we do the -- like I stated just a minute ago, the fire protection engineer working for the design team does a set of performance specs to which ultimately the shop drawings provided by the installer would have to adhere to and then be reviewed by our own fire protection engineer. It's a real tricky thing that everybody is still struggling with.
Q. Okay. Do you know how ultimately the issue of the fire protection system design drawings was resolved here?
A. No, I can't recall.
Q. Okay. What about the next issue down, HVAC control design is missing from the drawings?
A. That's exactly, almost exactly the same kind of issue. It's like if you want to get Siemens to do it or -- oh, who is the real big guys?

MR. WEATHERS: Johnson.
THE WITNESS: Yeah, Johnson Controls, thanks. Johnson Controls is another company that do the DGC, the Directed General Control systems, and often you're just reviewing shop drawings. And then, again, like the fire protection, it's still something today people are struggling with on when to do them. Almost all of our Design/Build contracts to date only permit us to submit shop drawings after the 100% design submittal has been approved. It's a pretty common practice today. Back then people were just trying to figure out how to do it.
BY MR. O'CONNELL:
Q. All right. From the owner's perspective, do you understand why the owner would want to see either fire protection system design drawings or DGC control design at the 100% design submittal?
A. You've asked a rather tricky question. I can understand why they would want to but they're, in my opinion, not fully informed in wanting to -- wanting to get them at that point. Certainly they should ultimately be able to see them and if they have somebody that knows what they're doing to review and approve them, it does them value, but if they don't have any, they're so technically in detail, that a layperson looking at them, their eyes would cross and they wouldn't know what they were looking at. So if they had their own





fire protection engineer that could look at a very technical set of drawings, it does them value. If not, then they need to wait until they have that person to review them.
Q. Do you know if the Navy had anybody like that on this project?
A. I would have to assume they did. I don't recall.
Q. All right. What about the third issue, telecommunication distribution system design?
A. It's like the Trifecta of issues. It's -- it's -- it's exactly the same thing.
Q. All right.
A. Yeah, it really -- at this point it literally is we are submitting shop drawings after 100% design is approved.
Q. All right. Factually, you don't have any dispute with this letter in that to the extent that this letter says that, you know, for example, the fire protection system design drawings were not submitted with the 100% design submittal, correct?
A. It would probably be an accurate statement that they were not submitted.
Q. All right. Do you know if --
A. I believe our position was, though, that we wanted to defer and do them as shop drawing submittals, which is what we are allowed to do today.
Q. All right. Do you know if anybody from either Merritt +





Pardini or West Coast contacted the Navy ahead of time and said these things aren't going to be coming, and here's why we think it makes sense?
A. It was my understanding that that contact was being done by West Coast, who was our con -- who was our client.
Q. All right. Under number two, specifications, and that talks about prescriptive specifications. You were talking about prescriptive specifications in connection with Merritt + Pardini's REA earlier this afternoon. Do these two issues have any relation?
A. It's exactly I believe the same thing, and I still agree even this statement is wrong.
Q. What statement is wrong? I'm sorry.
A. The first word or first two words are prescriptive specifications, and then it talks about required catalog cuts and manufacturer's statements. Prospective -- prescriptive specifications are different than proprietary specifications. A prescriptive specification says your toilet is going to be made of virtuous china and white in color and flush, not wall-mounted. Prescriptive -- I mean proprietary, which is the second sentence, which is catalog cuts and manufacturers, says you are going to get a Kohler Model 1730 floor-mounted flush valve toilet. So this paragraph in my opinion is contradictory in itself, and to this day I still have an issue with what it says. And I can





elaborate all day long on this one.
Q. What about the second page, paragraph four, fire protection system?
A. I don't know what difference that would be from -- yeah, I don't know off the top of my head what the difference between that one and 1-A is, to be honest with you. To me it appears to be a redundant statement.
Q. All right. Let me show you what's been marked as Exhibit No. 54. And I'm actually most -- you can take a look at the front page. I'm most interested to start with the last page.
A. (Witness complies).
Q. There's a date at the top March 27th, 2002, and I believe it states Design Review Meeting. Do you recall attending a design review meeting around this time?
A. Not specifically, but it wouldn't surprise me.
Q. Why do you say it wouldn't surprise you?
A. Well, you may have documentation showing I have an airline ticket for down there. I believe I remember attending a meeting where we came to an agreement on what we could do to get this thing off the dime and get moving. Do I have specific recall that it was March 27th or a few days preceding that? Not specifically. I don't see an attendance sheet, but I'm assuming I was there.
Q. I'm not so interested in tying it to, you know, the exact



21c432ad-fbc3-49e6-9ac6-bb0da6ca40d8

date of March 27th or even within a few days of that date.
A. Okay.
Q. I'm just more interested in, you know, whether you attended?
A. I remember seeing this action item list and I believe I was in attendance when it was generated.
Q. Do you recall whether this action items list had any effect on the progress of the project?
A. I believe the project was on hold until we had resolution and had submitted the required information, if I remember correctly.
Q. All right. So did this action items list somehow cause that hold to be released?
A. I think adherence to the action items list permitted the hold to be released.
Q. Turn -- if you could turn to the second page of the document. Do you see the second paragraph there? It states: "The government agrees to relax contractual requirements for 100%" --
A. Right.
Q. -- "design, pre-final and final design submittals, by replacing these submittals with construction drawings and other documentation." Do you recall anything about such an agreement?
A. This does ring a bell.
Q. And what about it rings a bell?





A. It's just that everybody was acknowledging the fact that this project was not moving anywhere very fast and it was done under the guise of partnering and partnering had completely failed and the project was not moving forward and somebody had to do something. So I remember finally that there was an agreement that we would go ahead and come up with a list of things that absolutely needed to be initiated so that we could go ahead and move forward with the project and get it completed.
Q. Do you recall whether this relaxation of contractual requirements for 100% design and so forth actually happened?
A. I -- I don't have any specific recollection. I believe it did.
Q. All right. If it did happen, would that have helped move things forward?
A. No, it would stop the -- it would help them in not being stopped. I don't know that it helped them move forward. It's two different ways of looking at the same thing.
Q. All right.
A. It might have removed an obstacle, but not helped it move forward any better.
Q. Do you recall any discussions between Merritt + Pardini and West Coast about any delay costs or liquidated damages being assessed against Merritt + Pardini on the project?
A. No.





MR. O'CONNELL: I don't have any further questions.
MR. DAVIS: All right. I've got a couple to clarify a few things. Mike, do you mind if I just give him my copies of the exhibits, just to make things move faster?
MR. O'CONNELL: No, not at all.
MR. DAVIS: All right. I have no idea where the actual copies are. Actually, no, that one may be yours.
EXAMINATION
BY MR. DAVIS:
Q. Mr. Harm, I'm going to put in front of you Deposition Exhibit 84, which was your e-mail dated February 13th, 2002. In the Re: section, notice it says IDIQ. That was a separate project --
A. Correct.
Q. -- in Monterey, correct?
A. Correct.
Q. And am I correct in clarifying that the first paragraph of your e-mail strictly related to the IDIQ project?
A. Correct, it does.
Q. Okay. All right. And then with regard to Exhibit 88, which is your November 8th, 2002 letter to West Coast, I'd like to direct your attention to the third page. Your testimony, I believe, was that there was some -- some I guess uncertainty, at least in my mind, about what components made up your $37,500 REA. Is that reflected in page three of





your letter?
A. Yeah, I believe when I was being questioned, I stated there was a discrepancy between the $37,500 and a figure of -- what I'm taking here as $20,000 that appeared on another document, and I said the difference would have been such things as profit, overhead, reimbursable expenses, shipping, printing, Federal Express charges, and all of those things. And there was a question of could it actually have been that much money, and it easily could have been that much money.
Q. But that $17,000 component of the $37,500 total is what's listed in item number two --
A. Correct.
Q. -- of this letter, correct?
A. Correct.
Q. All right. Now, you had stated that -- that currently Design/Build projects for the Navy do not -- do not even provide drawings or specifications at the bid stage; is that correct?
A. Correct.
Q. Okay. From your perspective, why is that the case?
A. They are being -- the federal government people who solicit and procure design and construction services, their fundings are continuously being cut, cut, cut, and more money is being allocated, as the Navy says, to boats and guns, and they preferred it to program projects only once, design them



21c432ad-fbc3-49e6-9a6c-bb0da6ca40d8

once, and build them only once, so we are given more or less prescriptive narratives of what they are ultimately looking for, given an established budget, and the Design/Build teams each come up with their own design story board of what they are proposing to give the government and a firm, fixed price that they will not exceed, given the limitations of the contract.
Q. So the way the Navy currently does it, there are absolutely no drawings or no specifications at all at the design phase?
A. Typically speaking.
Q. I'm sorry.
A. Yeah, at the proposals phase.
Q. Excuse me, wait, wait, wait, wait, I used the wrong word. Let me strike that question let me ask the one I meant to ask. So under the current regime, the Navy provides no specifications or no drawings at the bid stage?
A. That's correct.
Q. And would that eliminate the possibility of the Navy providing inaccurate information in specifications and drawings provided at the bid stage?
A. In my opinion it greatly reduces their chance of having those kinds of errors.
Q. And jumping back to the regime that we were under for this project, we have talked generally about the, I guess the percentage completion of the drawings that were used at the





bid stage, and I believe you had testified that in some cases they were to the level of 35%; is that correct?
A. Correct.
Q. Okay. What is the -- when a general contractor is bidding in a Design/Build with 35% drawings at the bid stage, is the general contractor or the design team required to go back to the bid stage and verify that 35% information or do they just go with it?
A. Could you ask the question again?
Q. Okay.
A. I'm sorry.
Q. All right. You said the design team gets 35% drawings. At the bid stage, does the design team, are they responsible for going back and reverifying that 35% information or do they just accept it at the bid stage?
A. I would imagine there's certain professional allowances that you have to do and things that you would have to look at to verify that you're in conformance. It's so hard to say because we didn't -- I mean, Design/Build was very new back when we did this project. I think for the most part you would have to rely on the technical expertise of the people who produced the R.F.P. document to some extent who were professional engineers, as well as being sufficient in detail to base a price off of.
Q. All right. Jumping forward in the process. Subsequent to





the bid stage, say during the design phase after you've gotten the award, does the design team at that point go back and verify the information that was contained in those 35% drawings?
A. I don't know that I would even do verify. We were ultimately for the technical accuracy of the drawings that we ultimately produce and have to affix our professional stamps. Ultimately the drawings that we have to produce have to stand on their own merit. Whether you go back and verify what was originally given, in some instances that might be deemed not a prudent expenditure of your activity. You just have to go ahead and design what is ultimately required.
MR. DAVIS: Okay. That's it.
MR. O'CONNELL: I have no further questions. You can read and sign your deposition transcript, if you'd like, or you can waive that. If you want to read, if you want to read and sign, you know, you have the opportunity to correct errors, but you'd have to do it within a certain period of time. Would you like to read and sign your deposition transcript or would you waive it?
THE WITNESS: I guess I'll read and sign.
MR. O'CONNELL: All right. Can you do it within 30 days --
THE WITNESS: Yes.





MR. O'CONNELL: -- of receiving it?
THE WITNESS: Yes.
MR. O'CONNELL: All right.
(Deposition Concluded)
(Signature Reserved)



21c432ad-fbc3-49e6-9a6c-bb0da6ca40d8

CERTIFICATE

STATE OF WASHINGTON)
) ss.
County of Lewis )

I, the undersigned Notary Public in and for the State of Washington, do hereby certify:

That the foregoing deposition of the witness named herein was taken stenographically before me and transcribed under my direction; that the deposition is a full, true and complete transcript of the testimony of said witness, including all questions, answers, objections, motions and exceptions;

That the witness, before examination, was by me duly sworn, and the deposition was made available to the witness for reading and signing upon completion of transcription, unless indicated herein the waiving of signature;

That I am not a relative, employee, attorney or counsel of any party to this action or relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or the outcome thereof;

That I am herewith securely sealing this deposition and delivering the same to Mr. O'Connell for filing with the Court.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 21st day of May, 2007.

Notary Public in and for the State
of Washington, residing at
Mossyrock.



21c432ad-fbc3-49e6-9a6c-bb0da6ca40d8

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WEST COAST CONTRACTORS OF ) NO. 05-1121C
NEVADA, INC. )
7785 White Fir Street )
Reno, NV 89523 )
)
Plaintiff, )
)
vs. )
)
UNITED STATES OF AMERICA )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF:
THOMAS R. HICKS, P.E., S.E.

April 24, 2007
Tacoma, Washington

* * * * * * *

REPORTED BY:

CATHERINE M. VERNON, CSR, RPR

#408 Albers Mill Building

1821 Dock Street

Tacoma, WA 98402

(253) 627-2062



4fc17aae-39f7-4935-816d-d23a8bb227d3

APPEARANCES

For the Plaintiff: MR. WILLIAM C. DAVIS, III
Attorney at law
11921 Rockville Pike
Rockville, MD 20852-2743
bdavis@srgpe.com

For the Defendant: MR. MICHAEL N. O'CONNELL
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Michael.o'connell@usdoj.gov

Also Present: Mr. Stephen A. Weathers, P.E.
(Capital Project Management)





INDEX

Examination by: Page Nos.:
MR. O'CONNELL: 5-33, 35
MR. DAVIS, III: 34

EXHIBITS

Exhibit No: Page Marked: Description:
Exhibit No. 63: * 1-pg Award of Bid, dated 6-29-01
Exhibit No. 64: * 1-pg Fax Transmittal of 5-11-01
Exhibit No. 65: * 1-pg letter of 5-24-01
Exhibit No. 66: * 1-pg Letter of Transmittal of 4-26-01
Exhibit No. 67: * 1-pg Helix letter of 4-4-02
Exhibit No. 68: * 1-pg Letter of Transmittal of 4-26-01
Exhibit No. 69: * 1-pg Commerce Business Daily ad
Exhibit No. 70: * 1-pg Mt. Rose letter of 8-31-01
Exhibit No. 71: * 1-pg Mt. Rose letter of 8-7-01
Exhibit No. 72: * 13-pg spreadsheet
Exhibit No. 73: * 2-pg Merritt + Pardini memo
Exhibit No. 74: * 2-pg Merritt + Pardini memo
Exhibit No. 75: * 2-pg Merritt + Pardini letter
Exhibit No. 76: * 1-pg West Coast Purchase Order
Exhibit No. 77: * 2-pg Merritt + Pardini letter
Exhibit No. 78: * 1-pg West Coast Purchase Order
Exhibit No. 79: * 2-pg West Coast letter





Exhibit No. 80: * 2-pg Solicitation, Offer & Award, dated 12-11-00
Exhibit No. 81: * 2-pg Solicitation, Offer & Award, dated 12-11-00
Exhibit No. 82: * 2-pg FAR guideline excerpt
Exhibit No. 83: * 2-pg Construction Schedule
Exhibit No. 84: * 1-pg e-mail West Coast e-mail
Exhibit No. 85: * 4-pg Merritt + Pardini fax
Exhibit No. 86: * 1-pg notes re: Settlement
Exhibit No. 87: * 1-pg West Coast letter of 10-14-02
Exhibit No. 88: * 3-pg Merritt + Pardini letter of 11-8-02
Exhibit No. 89: * 1-pg M&P Bullet Points
Exhibit No. 90: * 5-pg Settlement Agreement
Exhibit No. 91: * 5-pg West Coast letter of 11-22-02
Exhibit No. 92: * 2-pg Memorandum
Exhibit No. 93: * 1-pg C-5 Grading Plan
Exhibit No. 94: * 1-pg Blue Mountain Fax
Exhibit No. 95: * 1-pg Blue Mountain Fax
Exhibit No. 96: * 1-pg West Coast letter of 7-17-02
Exhibit No. 97: ** 3-pg Past Performance statement
Exhibit No. 98: ** 2-pg Navy letter of 12-5-01





Exhibit No: Page Marked: Description:
Exhibit No. 99: 24 15-pg Concrete Mix Designs
Exhibit No. 100: 24 14-pg Cast-In-Place Concrete
Exhibit No. 101: 26 58-pg Request for Approval Of Concrete Repairs
Exhibit No. 102: 27 2-pg Letter of 6-7-02
Exhibit No. 103: 28 2-pg Letter of 6-14-02
Exhibit No. 104: 28 6-pg Letter of 6-14-02
Exhibit No. 105: 30 1-pg Letter of 6-19-02

(*denotes marked in Mario Ramirez's deposition)
(** denotes marked in Scott Harm's deposition)

BE IT REMEMBERED that on the 24th day of April, 2007, at 700 Wells Fargo Plaza, 1201 Pacific Avenue, Tacoma, Washington, before CATHERINE M. VERNON, CSR# VERNOCM398L4, Notary Public in and for the State of Washington, appeared THOMAS HICKS, the witness herein;

WHEREUPON, the following proceedings were had and done, to wit:

* * * * * *

THOMAS HICKS, having been first duly sworn by the Notary, deposed as follows:

EXAMINATION

BY MR. O'CONNELL:

Q. Mr. Hicks, thank you for being here. Have you ever had your deposition taken before?
A. I have.
Q. All right. How many times?
A. One time.
Q. Okay. You may remember the sort of basic ground rules, if you will. You need to articulate all of your responses, yes or no, no shakes of the head, nods of the head; yes or no is better than a, you know, um hum or a hum um. And one important thing also is that we can't talk over each other. Just let me finish my questions and I'll let you finish your answers. If I start talking before you've completed an answer, just let me know and I'll let you complete your





answer. I don't think we'll be going too, too long, but if you need to take a break, just let me know, we'll take a break at any time.

Mr. Hicks, could you just briefly tell me your educational background after high school?
A. Um hum, yes. I went to Willamette University in Salem, Oregon where I studied physics for three years. Then I transferred to Columbia University in the City of New York into the engineering program for two years and in 1989 received a B.A. from Willamette in physics and a B.S. from Columbia University in engineering. And then I went to the University of Washington in Seattle for a Masters program in engineering, and in 1991 was -- received my Masters Degree in engineering from the University of Washington.
Q. Any specific type of engineering?
A. Civil engineering with a structural specialty.
Q. Did you do anything to prepare for your deposition today?
A. I asked Scott Harm several -- several weeks ago if he had any information on this and he had -- he had sent me two documents, one was the -- I believe it was the Complaint, and one was I believe an Answer to Interrogatories, both of which I only skimmed briefly, and that was the only preparation I had, other than meeting with my attorney last week.
Q. Do you recall whose Answers to Interrogatories you reviewed?





A. I do not.
Q. And you didn't bring your attorney today, correct?
A. That is correct.
Q. Could you just briefly tell me your work history, you know, start with your professional work history?
A. I began working at AHBL, the company I'm currently at, in 1991 and I have worked at the same place ever since.
Q. All right. And do you recall the Naval Post Graduate School project in Monterey?
A. I do.
Q. What was your position with AHBL at that time?
A. I was a Principal.
Q. How long have you been a Principal at AHBL?
A. Since 1999.
Q. What kinds of projects or what kind of work do you typically do?
A. I generally work on most type of building structures from multi-family residential through mixed use and mid and high-rise buildings, and for projects that are public as well as private, so public being military and governmental projects.
Q. Do you do a lot of design/build?
A. Yes, we do.
Q. And how long have you been doing design/build?
A. AHBL began doing design/build before I started there, so





I've been involved in design/build projects for -- for my career, essentially.
Q. How did you get involved in the Naval Post Graduate School project?
A. We were invited to be on the team by Scott Harm.
Q. And I'll show you some documents. Actually, take a look at what was marked yesterday as Exhibit 63. You'll see that I believe the award date to West Coast Contractors was June 29th of 2001. Does that give you a frame of reference as to when AHBL might have become involved in the project?
A. Not exactly. I believe we were in -- we were contacted to be part of the team prior to this.
Q. Any idea how long?
A. No.
Q. Was AHBL asked to do anything before bid?
A. I do not recall.
Q. What would -- AHBL was a subconsultant, if you will, to Merritt + Pardini on the project; is that correct?
A. That's correct.
Q. On a typical project, a typical design/build project what, if anything, would AHBL be doing before bid?
A. It depends upon what we're requested to do and what the R.F.P. requests us to do. Sometimes it's -- it's merely providing a fee proposal and sometimes, if the R.F.P. requires it, it's preparing drawings for submittal.



4fc17aae-39f7-4935-816d-d23a8bb227d3

Q. And do you know if AHBL prepared any drawings for submittal before bid on the Naval Post Graduate School project?
A. I don't recall.
Q. When AHBL first -- or when you first became aware of the Naval Post Graduate School project, what did you understand with respect to the nature of the project?
A. As I recall, it was a design/build project for the Naval Post Graduate School at Monterey, California.
Q. And could you give me any more specifics as to the size and so forth of the building?
A. My understanding is, you know, from what I recall, was it entailed I believe a three-story building, generally square, with a link structure linking it to the -- one of the original buildings that was on campus there.
Q. Had you worked with Scott Harm and -- and Merritt + Pardini on projects before this?
A. Yes.
Q. And do you recall roughly how many?
A. I do not. I worked with Merritt + Pardini from my beginning of my career at AHBL
Q. How about Scott Harm?
A. Scott Harm was a more recent addition to Merritt + Pardini and so my background with him was shorter. I don't recall when he began at Merritt + Pardini.
Q. All right. Does AHBL have any outstanding claims or payment





issues with respect to the Naval Post Graduate School project?
A. Yes, we do.
Q. What are those?
A. We have an outstanding invoice for that. I don't recall what the -- what the outstanding invoice is.
Q. And who is the invoice with?
A. Merritt + Pardini.
Q. And correct me if I'm wrong, but I thought they were no longer in business?
A. Merritt + Pardini was purchased by Parametrix Engineering who is still in business.
Q. And my understanding is then they at some point became Krei Architecture?
A. That is correct.
Q. And then what happened to Krei Architecture?
A. Krei Architecture was still owned by Parametrix Engineers.
Q. And is Krei Architecture still around?
A. No, they are not.
Q. Okay.
A. To my knowledge.
Q. But what's the status of the invoice? I mean, is something going to have to happen for AHBL to get paid?
A. What -- what I was told is that our invoice is not going to be paid until this -- this issue before us is addressed.





Q. Okay. Are you aware of any settlement between Krei Architecture and West Coast on the project?
A. No, I'm not.
Q. Do you recall roughly how much the invoice that's still outstanding is for?
A. I do not recall.
Q. I'm going to show you a few documents relating to some of the claims that are in litigation between the government and West Coast where AHBL's name appears and I'm just going to try to ask you what you know about the issues. But before I do that, could you just tell me, you know, who was on AHBL's team for the Naval Post Graduate School project and what that person's role was?
A. Yes. On the structural design was Ken Leland as the Project Engineer. So he did the -- the design, um, he did the structural engineering design for the building. Um, on the civil engineering side was Jim Carlson who did the design of the site work and connection of drainage utilities. And I believe Dan Wojtala in our office was the Landscape Designer for this project.
Q. I'm sorry, could you spell his last name?
A. I can try. W-O-J-T-A-L-A.
Q. Anyone else?
A. Not that I recall.
Q. And what was your role, if anything?





A. And my role was the Principal-in-Charge.
Q. Okay. And for the three gentlemen that you mentioned, would this -- would the Naval Post Graduate School project be the only project that they would work on or would they have other responsibilities as well?
A. They would have other responsibilities as well.
Q. And how about you?
A. And I would as well.
Q. All right. Now, on average, how much time would you spend on the Naval Post Graduate School per week? And maybe it went up and down, but try to give me a range, if you could.
A. Yeah, I don't recall exactly, but a typical project, it would -- it would be more at the beginning of the project and less towards the end; possibly 16 hours at the beginning per week and, you know, four hours towards the end.
Q. And do you recall what AHBL's budget for the job was?
A. I do not.
Q. All right. I'm going to -- actually, let me see if I can give you a summary of some of the issues in the claim. I'll give you a copy of West Coast's Certified Claim on the project. It's Exhibit 2. And you see on the first page there, under A-1, "Equitable Adjustment - Paving." Take a look at that and then just look up when you finish reading it.
A. (Witness complies). Yes.



4fc17aae-39f7-4935-816d-d23a8bb227d3

Q. I've got some more documents to show you, but just reading that brief description in Exhibit 2, do you recall anything in particular about what we refer to as the paving issue?
A. As mentioned in here, there's the accommodation of an 80-foot setback. My recollection is that the design of this occurred sometime during the terrorist attacks of September 11th and this was the -- this would have been the -- the, um -- the, um, new requirements imposed for anti-terrorism force setback distances.
Q. All right. Let me show you -- I can take that back for now. Let me show you what was previously marked as Exhibit 4, which is a composite exhibit of some correspondence that went back and forth on this issue. Does that help refresh your recollection as to what work was involved with respect to the paving?
A. Some of the -- some of the issues, yes.
Q. All right. Let me show you some more documents so that I can try to give you -- try to let you see what we have in the record so far. Let me show you what's been previously marked as Exhibit No. 5. Exhibit 5 is a proposal from West Coast, dated March 13th, 2002, so it's within the period of the various documents within Exhibit 4 that I just showed you. And you can see on the last page that there doesn't appear to be any work for AHBL with respect to this particular request for equitable adjustment. And you see on





the second page that the amount of the proposal is $47,662.47?
A. Yes.
Q. Do you recall if at any point AHBL, at any time during the project if AHBL was asked to give a pricing proposal with respect to this paving issue?
A. I do not recall.
Q. All right. Let me show you the next document which is Exhibit 6.
A. Um hum.
Q. And take a minute to review Exhibit 6. What I'm interested in with respect to Exhibit 6 is the second paragraph where the contracting officer states: "... the government is not interested in having you provide a new asphalt driveway and parking lot. The existing paving will be reused to satisfy our parking and traffic needs."
And having read that and seen these various letters, I was hoping you could explain to me what actually happened after the June 14th, 2002 letter from the contracting officer.
A. You know, with -- without reviewing our files, I really cannot recall.
Q. All right. One more document to show you on that issue then. This is what was previously marked as Exhibit No. 7. And this is a proposal from West Coast, approximately two





years later, this time listing the cost of the paving work as $73,000 -- I believe -- 486.36, approximately. And if you look at the second page there is roughly $5,000 in work for AHBL?
A. Yes.
Q. Well, first of all, do you recall when the Naval Post Graduate School project was completed?
A. I believe it was sometime in 2002.
Q. All right.
A. But I don't know the exact date.
Q. If I told you it was May of 2003, would that -- would that make sense to you?
A. Possibly, because our scope of services generally ends considerably sooner than the project completion.
Q. Now, for this amount that's requested in Exhibit 7 on behalf of AHBL, is that part of the outstanding invoice that you had mentioned before?
A. I do not believe so, although I cannot say for sure.
Q. Do you know if AHBL asked West Coast or Merritt + Pardini to request this money on behalf of AHBL?
A. I don't recall.
Q. Do you recall if AHBL was issued any contract modifications during the project for this paving work?
A. I don't recall.
Q. Does -- would AHBL have some kind of a contract





reconciliation sheet that would show the amount of the contract and any modifications, that kind of thing, for this project?
A. It would be something that our accounting department could prepare, but as a standard no.
Q. Let me show you what was previously marked as Exhibit No. 15.
A. Yeah, I can't make out the photographs.
Q. The photographs are not very good, you're right. A couple of questions. You can see that there's a fee request on behalf of AHBL of $7,140. Do you happen to recall if AHBL was ever paid that money?
A. I do not recall if we ever billed that money, much less were paid for it.
Q. All right. You can see that within Exhibit 15 is a letter from you to Mr. Miller of West Coast Contractors. Having taken a look at your letter and these other documents here, could you explain sort of in plain English what the basis of this change was from your perspective?
A. Yes. As I recall, the R.F.P. documents didn't clearly represent that the actual conditions would require a significant grade change, you know, a difference in elevation, between the exterior grade and the finished floor within the building along -- along the majority of the sides, I believe three of the sides. So that what that



4fc17aae-39f7-4935-816d-d23a8bb227d3

resulted in was the grade beam had to be lowered along the perimeter and a larger stem wall, a greater height stem wall had to be constructed to get the finished floor -- to get the stem wall back up to finished floor elevation. And the brace beams that connect, that interconnect the piles of the building sloped back up to meet the original grade of the grade beams within the building or the pop caps within the building rather.
Q. And do you know if you were basing that on the structural drawings or what were you basing that on?
A. I recall that all of the drawings indicated the conditions of one foot below.
Q. What drawings would you look at to ascertain the relationship between the foundation and the grade?
A. Are you saying what drawings from the R.F.P.?
Q. Yes.
A. We would look at the architectural and structural, if there was any.
Q. Would you look at the civil?
A. I do not recall. Sometimes yes, sometimes no; it depends upon how conceptual or how complete the designs are.
Q. Okay. Let me show you one of the civil drawings that's been marked and it should be in front of you in Exhibit 65.
(Mr. O'Connell handed the witness Exhibit No. 93 also, the Grading Plan)





Let me just show you also the architectural and the structural drawings so you'll have them. All right. First of all, would you agree with me that the R.F.P. drawings showed a two-story slab on grade building?
A. It is a two-story building where the first floor is slab on grade, correct.
Q. And where the R.F.P. drawings show that two-story building, and ultimately it became a three-story building, would that affect the foundation design?
A. It would affect the load to the foundation certainly.
Q. All right.
A. And the footprint I'm -- I'm assuming is different, I do not recall, which obviously affects the foundation design.
Q. Take a look at C-5, the big drawing that I gave you, please.
A. (Witness complies). Um hum.
Q. Do you see that for both the new building and the existing building it says FF49.0? What does FF mean?
A. Finished floor, 49.0.
Q. All right.
A. Of the first floor.
Q. And take a look at some of the elevations around the perimeter of the new building, if you would.
A. (Witness complies). Yes.
Q. Okay. And can you see, for example, on the front of the building towards the left that some of the elevations are at





about 46 feet, plus or minus a small amount?
A. Are you referring to the spot elevations from the survey that are the small numbers, or the design numbers that are the larger numbers?
Q. Where are the design numbers? Oh, like the spot elevations?
A. Yes, I can make out some of them.
Q. All right. Now, would that suggest to you that some kind of a stem wall might be needed?
A. That would be one solution.
Q. And what's -- a solution to what problem?
A. That would be one solution to match the exterior grades to make them compatible with the architectural and structural R.F.P. drawings.
Q. What would be the other solutions?
A. Retaining walls adjacent to the parking lots, such as -- such as this sidewalk adjacent to the parking lot has -- in the drive lane it's got an elevation of 47 at the curb and then it shows some stairs up, presumably up to finished grade or finished floor elevation, with either -- either a retaining wall or just a sloped grade.
Q. Is there -- can you tell me any reason why West Coast wouldn't have known prior to bid that either the retaining wall or the stem walls that you just talked about would be required?
A. Well, the architectural and structural do not indicate that.





It appears that based on the civil drawings that it's -- without seeing any of these sections and if they relate to the building, it appears that the intent is to have the grade adjacent to the exterior at the finished floor elevation, but it appears that there may be a bit of a conflict of how exactly that transitions to this sidewalk crossing here. And certainly this -- this area generally to the south of the building, one would expect that you can slope the grade across there because there's a large landscaped area.
Q. If you're finished you can fold that one up, if you wouldn't mind.
A. (Witness complies).
Q. Do you recall an issue on the Naval Post Graduate School project with respect to some concrete that had been poured and needed to be repaired?
A. Yes, I do.
Q. Okay. I would like to try -- I know that Mr. Leland was involved in that also because I've seen both your name and his name on correspondence. Could you just give me a basic idea, though, with respect to that particular issue, you know, how much you were involved versus how much Mr. Leland was involved?
A. I cannot recall. We were both very much involved at that phase.



4fc17aae-39f7-4935-816d-d23a8bb227d3

Q. All right. Do you recall if -- if AHBL had any responsibilities on the project for determining the concrete mix or the strength of the concrete to be used on the project?
A. We specified the strength of the concrete to be used.
Q. All right. And the strength of concrete is generally measured in pounds per square inch, correct?
A. That is correct.
Q. And after -- what -- well, first of all, what does AHBL do in order to determine what strength of concrete is required in a building?
A. What do we do to determine what strength of concrete is used in the building?
Q. Yes.
A. The strength of concrete to be used in the building depends upon the design that we -- the design assumptions that we make. For example, we could design a column of 3,000 PSI concrete and it would have one reinforcement and size requirement or we could design a column of 5,000 PSI concrete and it would have a different reinforcement and size requirement.
Q. Sure. So say you've determined that 3,000 PSI concrete is required. How is the mix actually specified?
A. It is specified to be in -- to have substantiating test reports in conformance with ACI, and ACI has -- which is the





American Concrete Institute, and ACI has requirements that tell you what the standard deviation for the cylinder breaks have to be and the number of tests that have to be provided to -- to have a substantiation for the mix design.
Q. But in practice, though, isn't one way to do it to contact a concrete supplier and just, you know, and they will tell you what their mix is for 3,000 PSI concrete?
A. The concrete supplier says what their mix is and they provide substantiating tests to back it up.
Q. Okay. And will concrete suppliers typically have more than one mix for say 3,000 PSI concrete?
A. I'm sure they -- they could, they often do, with different add mixtures or different -- different, um, aggregates.
Q. All right. And so if either the contractor or the designer contacts a concrete supplier and they provide you with their mix for 3,000 PSI concrete, then would AHBL then have some role in reviewing that concrete mix?
A. Yeah. As a typical shop drawing, the contractor contacts their concrete supplier and the concrete supplier submits their proposed mix design with substantiating test results.
Q. All right. Let me show you a document here that we'll mark as the next exhibit.
(Exhibit No. 99 marked for identification)
All right. Now, seeing Exhibit 99, do you recall if you had any personal involvement in furnishing these





concrete mix designs or getting them approved?
A. We did not furnish them. We reviewed their submittal.
Q. Whose submittal?
A. The submittal from West Coast to us for the concrete mix -- mixes.
Q. Okay. And who would have been responsible for that, you or Mr. Leland or whom?
A. Generally Ken Leland as the Project Engineer would have reviewed the mixes.
Q. And based on looking at Exhibit 99, is there anything you can see from this exhibit which would indicate that this concrete mix would have some problems on the project?
A. Not that I can see.
Q. Let me -- let's mark this as the next exhibit, please.
(Exhibit No. 100 marked for identification)
Mr. Hicks, the Section 03300, of which I just handed you, Exhibit 100, is from the contract between the Navy and West Coast. Would this section of the concrete have been drafted by AHBL?
A. Probably not.
Q. Really? Who would have drafted this then?
A. I cannot recall. It was either a spec that was provided with the R.F.P. or it could have been provided by the architect or it could have come from a master spec. I cannot recall at this time.





Q. All right. Let me show you what was marked as Exhibit No. 25. Have you seen that document before?
A. I cannot recall, but I recall the Stop Work Order.
Q. Did you -- after becoming aware of this concrete issue did you ever personally visit the site and view the concrete?
A. Yes, I did.
Q. All right. And can you recall the time frame in relationship to this May 29th, 2002 letter?
A. I cannot.
Q. In Exhibit 25, the second paragraph states: "Some areas of the walls and columns have a honeycomb appearance and some columns have exposed rebar." Does that square with your recollection of how the concrete looked?
A. Yes, it does.
Q. All right. Now, when you -- when you see -- see a letter like this or see the concrete, what goes through your head as the structural engineer?
A. That the concrete work was unacceptable.
Q. Did you or did AHBL ever do any investigation as to why it was unacceptable?
A. I'm not sure I would categorize that as an investigation, and it was unacceptable because it had voids and honeycombed areas and it was not structurally sound.
Q. It was not structurally sound?
A. It was not structurally sound with the voids and the

honeycombs.
Q. Well, let me just phrase the question a little better then. Why -- did you ever determine why the concrete had those voids and honeycombs?
A. I do not recall. It is likely a -- I believe it was likely a combination of, you know, poor consolidation during placement, you know, which has to do with the operation of the -- the concrete sub because they use mechanical vibrators to consolidate the concrete.
Q. Do you know anything about using the wrong mix or anything like that?
A. I can't recall that.
Q. Let me mark this as Exhibit 101, I believe.
(Exhibit No. 101 marked for identification)
You can see within Exhibit 101, Mr. Hicks, that there's a, among other things, a letter from AHBL to Jim Miller, dated June 3rd, 2002, providing a suggested repair procedure for the concrete. Providing recommendations for the repair of concrete like this, is this something that AHBL has done before?
A. Yes.
Q. Did -- in formulating this repair procedure, was AHBL working with any other company or group of people?
A. Yes.
Q. Who was that?





A. Those were the representatives of I believe Chemrex, which was the provider of the repair mortars.
Q. All right. And do you recall if the Navy or the Navy's designers reviewed and commented on the AHBL proposed repair procedure?
A. I believe they did, but I can't recall the specifics.
Q. All right. Let me show you a couple more documents. We might refer back to 101, but -- well, first let me show you what's been marked as Exhibit No. 26 previously. And maybe we can mark this as Exhibit No. 102.
(Exhibit No. 102 marked for identification)
Does reviewing Exhibits 26 and 102 refresh your recollection as to whether the Navy or its designer commented on the repair procedures?
A. Yes.
Q. Okay. Now, are you surprised that the Navy and its designer wanted to comment on the repair procedures, given the nature of the problem?
A. I'm not sure how to answer that.
Q. Would you expect them to comment on the repair procedures?
A. Them being the Navy?
Q. Yes.
A. Certainly.
Q. And did you find the amount of time that the Navy took to respond to the repair procedures to be unreasonable?





A. I can't recall the time frames right now, although I do recall that it appeared to take a long time to review that.
Q. Let me -- let me mark these as Exhibit No. 103 and Exhibit No. 104.
(Exhibit Nos. 103 & 104 marked for identification)
All right. Now, having had a chance to look at Exhibits 103 and 104, Mr. Hicks, could you explain to me what the original repair procedures entailed and then how they have been updated, to use the word in Exhibit 103?
A. Well, Exhibit 104 had the addition of a specific area to address per discussions with Dasse at the top of the column at grids one and DD. In essence -- in essence, they're very, very much the same, just slightly different products being selected and slightly different parameters being established as far as parameters for depth of applicability and minimum depth of the surface honeycomb.
Q. One of the words that appears to be different in 104 is that under preparation it says, it starts out: "Chip out all of the concrete for the entire vertical extent of the void...", whereas in Exhibit 101 the procedure was to "saw cut the perimeter of the anticipated excavation..."?
A. Yes. The first item in Exhibit 101, "Repair of large concrete voids (upwards of one inch)," is essentially now on page three of Exhibit 104, which has "Repair of large





concrete voids (greater than 1-1/2 inches deep, but less than six inches)." The first item on page one of Exhibit 104 is the item that was added after discussions of -- with Dasse to --
Q. I see.
A. -- satisfy some of their comments.
Q. Did you find any of the Dasse comments to be unreasonable?
A. I wouldn't characterize them as unreasonable. They're -- in essence it seems to be just a different approach to do the same -- same task.
Q. Okay. Would you consider what's in Exhibits 103 and 104 to be enhancements to the earlier repair procedure?
A. I believe they're -- they're similar enough to be essentially the same.
Q. Exhibit 104 states that in the first paragraph, last sentence: "Additionally, it is important that the in-place concrete be allowed to reach its 28-day design strength prior to implementing the repairs outlined below."
MR. DAVIS: Which exhibit is that you're reading from?
BY MR. O'CONNELL:
Q. 104. I'm in Exhibit 104. Okay?
A. Yes. It also says the same thing in Exhibit 101.
Q. Okay. Why is it important to wait to the concrete reaching the 28-day design strength?

A. Concrete shrinks as it cures and you get a large percentage of its cure, of its shrinkage, within the first 28 days while it's attaining its design strength.
Q. And you don't happen to recall when this particular concrete reached its 28-day design strength, do you?
A. No, I do not.
Q. Okay. Is the shrinking something separate from reaching -- reaching the -- reaching its design strength when you're -- what you were just referring to in your answer?
A. Yes. Yes. Shrinkage -- shrinkage occurs and concrete shrinks at different rates, somewhat independent of its design strength.
Q. So if the concrete reached its design strength earlier than 28 days, would you still want to wait the 28 days because of the shrinking?
A. Not necessarily.
Q. Let me show you the next exhibit, which is Exhibit 105, I guess.
(Exhibit No. 105 marked for identification)
All right. Exhibit 105 is a letter from you apparently to Mr. Harm of Merritt + Pardini, and you refer back to the contracting officer's letter, dated June 10th, 2002, which I'm assuming to be Exhibit 26. Now, you see in Exhibit 26 the Navy had requested: "... letters of certification that the President of West Coast Contractors





and Designer of Record/Structural Engineer of Record have reviewed the concrete repair submittal and concur with its findings and associated proposed repair methods and warranty that after the completion of concrete repairs the structural integrity and the aesthetic appearance of the entire structure will be restored to satisfy the design requirements of the R.F.P."
Was your June 19th letter meant to respond to that provision in the contracting officer's June 10th, 2002 letter?
A. It was meant to respond to the structural requirements in his letter, yes.
Q. Who is his?
A. The Exhibit 26 contracting officer -- or hers, sorry.
Q. Sure. So what -- show me in Exhibit 26 what parts of the letter you were responding to.
A. Item A, that the "Designer of Record/Structural Engineer of Record have reviewed the concrete repairs submittal and concur with its findings and associated repair methods ..." Yeah, and let's see, "Designer of Record ... provide a statement that identifies possible indicators of signs of failure...," which would be paragraph B, which is identified in the June 19th letter, Exhibit 105, as: "Failure of the repair would be evident in a failure of the repair mortar to bond to the in-place concrete."





Item E of -- of, uh, commenting on the validity of the -- the non-destructive test method. I believe that's what's addressed by this letter.
Q. All right. Let me show you briefly a document that was previously marked as Exhibit No. 79.
A. Yes.
Q. What I'm interested with respect to that exhibit is West Coast appears to be entering into some kind of a contractual arrangement with AHBL directly. Can you just explain to me how that came about?
A. Per the description of -- of services requested, it's structural engineering consulting for the concrete and **bed repairs.
Q. Well, right, but the context of the project is that West Coast had a contract with Merritt + Pardini and then, I believe, correct me if I'm wrong, Merritt + Pardini had a contract with AHBL, but now there's a change in that structure where West Coast appears to be entering into a contract directly with AHBL.
A. Yes.
Q. Why is that?
A. I would have to suppose that it's for expediency.
Q. All right. But expediency of -- I believe that that document is not dated until sometime in August.
A. Correct.





Q. Which I believe is after the repairs were already done.
A. Based on these letters, I would assume so.
Q. Okay. So is it possible that what happened is that AHBL did the work and that there was some kind of a handshake agreement or something, and then that document memorializes such an understanding?
A. That would be likely, because we certainly would -- to keep the project moving forward, we would have been doing the work immediately.
Q. All right. Going back to that June 10th letter that you were looking at a moment ago from the contracting officer, did you find any of the requests by the Navy in the June 10th letter to be unreasonable?
A. Well, it depends what is intended by the comment: "The structural elements of the building will last for the intended life span of the structure of 50 years." Okay. You know, that's a pretty broad brush there and I guess it depends upon what is meant by last, because certainly an earthquake above design levels would -- would have an impact on any of the structural systems. This doesn't necessarily address repaired areas.
Q. Anything else?
A. I can't speak to what other people would be asked to do.
MR. O'CONNELL: Sure. All right. I don't have any further questions.

EXAMINATION

BY MR. DAVIS:

Q. Mr. Hicks, just one or two questions. With regard to the 28-day design strength, is that more descriptive or is that meant to actually determine a duration, it has to be 28 days?
A. That is descriptive of the required strength. Strength is measured based upon a standard test procedure which tests the concrete at 28 days. There are -- so it's an absolute number of strength. It's not a time duration.
Q. And you can -- you can reach 28-day design strength in less than 28 days, can't you?
A. Yes, as is often done in post tension concrete design.
Q. And with regard to Dasse's comments regarding the concrete repair, it was your understanding that notwithstanding their comments, the design team retained ultimate liability for fixing this problem, correct?
A. That is correct. And their letter pointed out that they're not the engineer of record either.
Q. Yes. So if the repair didn't work, nobody was going to sue Dasse; they were going to come after you guys, right?
A. That's correct.
MR. DAVIS: No more questions.
///
///





EXAMINATION

BY MR. O'CONNELL:

Q. I just have one question. Mr. Hicks, when are cylinders typically broken on a construction project?
A. Typically there are a number of cylinders that are taken and one is broken at seven days, one at 14, one at 28, or more, two at 28. Sometimes they retain one for later to, you know, if there is an issue with the concrete that's found out, they retain an additional cylinder.
MR. O'CONNELL: All right. I have nothing else. You can -- you have the option of reading and signing your deposition transcript. You can make corrections, if you need to, or you can waive that if you don't want to take the time to do that.
THE WITNESS: Okay.
MR. O'CONNELL: It's your call. If you do choose to read and sign, we'd just ask that you do it in a reasonable period of time, such as 30 days.
THE WITNESS: I'll waive signature.
MR. O'CONNELL: Very good. Thank you.
(Deposition Concluded)
(Signature Waived)





CERTIFICATE

STATE OF WASHINGTON)
) ss.
County of Lewis )

I, the undersigned Notary Public in and for the State of Washington, do hereby certify:

That the foregoing deposition of the witness named herein was taken stenographically before me and transcribed under my direction; that the deposition is a full, true and complete transcript of the testimony of said witness, including all questions, answers, objections, motions and exceptions;

That the witness, before examination, was by me duly sworn, and the deposition was made available to the witness for reading and signing upon completion of transcription, unless indicated herein the waiving of signature;

That I am not a relative, employee, attorney or counsel of any party to this action or relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or the outcome thereof;

That I am herewith securely sealing this deposition and delivering the same to Mr. O'Connell for filing with the Court.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 15th day of May, 2007.

Notary Public in and for the State
of Washington, residing at
Mossyrock.



4fc17aae-39f7-4935-816d-d23a8bb227d3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WEST COAST CONTRACTORS OF ) NO. 05-1121C
NEVADA, INC. )
7785 White Fir Street )
Reno, NV 89523 )
)
Plaintiff, )
)
vs. )
)
UNITED STATES OF AMERICA )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION
OF:
TED A. VEACH, P.E., LEED

April 25, 2007
Tacoma, Washington

* * * * * * *

REPORTED BY:

CATHERINE M. VERNON, CSR, RPR

#408 Albers Mill Building

1821 Dock Street

Tacoma, WA 98402

(253) 627-2062



f2a61278-09c4-4dbd-b7f9-6c2dcd6b287c

## APPEARANCES

For the Plaintiff: MR. WILLIAM C. DAVIS, III
Attorney at law
11921 Rockville Pike
Rockville, MD 20852-2743
bdavis@srgpe.com

For the Defendant: MR. MICHAEL N. O'CONNELL
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Michael.o'connell@usdoj.gov

Also Present: Mr. Stephen A. Weathers, P.E.
(Capital Project Management)
Mr. Tracy Hieber, Project Mgr.
(West Coast Contractors)





INDEX


| Examination by | Page Nos |
|---|---|
| MR O'CONNELL | 5-27 |
| MR DAVIS, III | 27-29 |


EXHIBITS

| Exhibit No | Page Marked | Description |
|---|---|---|
| Exhibit No 63 | * | 1-pg Award of Bid, dated 6-29-01 |
| Exhibit No 64 | * | 1-pg Fax Transmittal of 5-11-01 |
| Exhibit No 65 | * | 1-pg letter of 5-24-01 |
| Exhibit No 66 | * | 1-pg Letter of Transmittal of 4-26-01 |
| Exhibit No 67 | * | 1-pg Helix letter of 4-4-02 |
| Exhibit No 68 | * | 1-pg Letter of Transmittal of 4-26-01 |
| Exhibit No 69 | * | 1-pg Commerce Business Daily ad |
| Exhibit No 70 | * | 1-pg Mt Rose letter of 8-31-01 |
| Exhibit No 71 | * | 1-pg Mt Rose letter of 8-7-01 |
| Exhibit No 72 | * | 13-pg spreadsheet |
| Exhibit No 73 | * | 2-pg Merritt + Pardini memo |
| Exhibit No 74 | * | 2-pg Merritt + Pardini memo |
| Exhibit No 75 | * | 2-pg Merritt + Pardini letter |
| Exhibit No 76 | * | 1-pg West Coast Purchase Order |
| Exhibit No 77 | * | 2-pg Merritt + Pardini letter |
| Exhibit No 78 | * | 1-pg West Coast Purchase Order |
| Exhibit No 79. | * | 2-pg West Coast letter |
| Exhibit No 80 | * | 2-pg Solicitation, Offer & Award, dated 12-11-00 |
| Exhibit No 81. | * | 2-pg Solicitation, Offer & Award, dated 12-11-00 |
| Exhibit No 82 | * | 2-pg FAR guideline excerpt |
| Exhibit No 83 | * | 2-pg Construction Schedule |
| Exhibit No 84 | * | 1-pg e-mail West Coast e-mail |
| Exhibit No 85 | * | 4-pg Merritt + Pardini fax |
| Exhibit No 86 | * | 1-pg notes re Settlement |
| Exhibit No 87. | * | 1-pg West Coast letter of 10-14-02 |
| Exhibit No 88 | * | 3-pg Merritt + Pardini letter of 11-8-02 |
| Exhibit No 89 | * | 1-pg M&P Bullet Points |
| Exhibit No 90 | * | 5-pg Settlement Agreement |
| Exhibit No 91 | * | 5-pg West Coast letter of 11-22-02 |
| Exhibit No 92 | * | 2-pg Memorandum |
| Exhibit No 93 | * | 1-pg C-5 Grading Plan |





| Exhibit No | Page Marked | Description |
|---|---|---|
| Exhibit No. 94. | * | 1-pg Blue Mountain Fax |
| Exhibit No. 95 | * | 1-pg Blue Mountain Fax |
| Exhibit No. 96: | * | 1-pg West Coast letter of 7-17-02 |
| Exhibit No. 97: | ** | 3-pg Past Performance statement |
| Exhibit No 98: | ** | 2-pg Navy letter of 12-5-01 |
| Exhibit No. 99 | *** | 15-pg Concrete Mix Designs |
| Exhibit No. 100. | *** | 14-pg Cast-In-Place Concrete |
| Exhibit No. 101. | *** | 58-pg Request for Approval Of Concrete Repairs |
| Exhibit No. 102: | *** | 2-pg Letter of 6-7-02 |
| Exhibit No. 103: | *** | 2-pg Letter of 6-14-02 |
| Exhibit No. 104: | *** | 6-pg Letter of 6-14-02 |
| Exhibit No. 105: | *** | 1-pg Letter of 6-19-02 |
| Exhibit No. 106: | **** | 1-pg Daily Field Report |
| Exhibit No 107: | 16 | 4-pg Preliminary Design Submittal |

(* denotes marked in Mario Ramirez's deposition)

(** denotes marked in Scott Harm's deposition)

(*** denotes marked in Thomas Hicks' deposition)

(**** denotes marked in Kenneth Leland's deposition)





BE IT REMEMBERED that on the 25th day of April, 2007, at 700 Wells Fargo Plaza, 1201 Pacific Avenue, Tacoma, Washington, before CATHERINE M. VERNON, CSR# VERNOCM398L4, Notary Public in and for the State of Washington, appeared TED A. VEACH, P.E., L.E E.D., the witness herein;

WHEREUPON, the following proceedings were had and done, to wit:

* * * * * *

TED A. VEACH, having been first duly sworn by the Notary, deposed as follows:

EXAMINATION

BY MR. O'CONNELL:

Q. Mr. Veach, good afternoon. Thank you for being here. Have you ever had your deposition taken before?
A. No.
Q. All right.
A. There's always a first, right?
Q. What's that?
A. There's always a first.
Q. Right Just a few simple things. One is that you need to verbalize all of your responses, no, you know, nods of the head, shakes of the head no, you know, yes or no, or whatever.
A. Okay.

Q. The other most important thing is we can't talk over each other. Please let me finish my questions and I'll try to let you finish your answers. If I interrupt your answer, just let me know and I'll let you finish, because if we interrupt each other, it's just very hard to get a correct transcript.
I don't think we'll be going too long today, but if you need to take a break at any time, just please let me know and we'll take a break.
A. Okay.
Q. Mr. Veach, can you tell me if you did anything to prepare for your deposition today?
A. Unfortunately, no. I have no access to any of the paperwork of the job. I only have my memory at this point.
Q. All right. Did you talk to anyone?
A. No, I have not.
Q. And you said you have no access to the paperwork and I think based on a brief previous conversation we had was that you no longer work for the company by the name of Holtz/BHU?
A. That's correct.
Q. Where do you work now?
A. I have my own firm, Veach Consulting Engineers.
Q. And how long have you been at Veach Consulting Engineers?
A. Three years.
Q. And until three years ago were you at Holtz/BHU?





A. Yes.
Q. How long did you work at Holtz/BHU?
A. Approximately four years.
Q. What was your position with Holtz?
A. I was a project engineer, mechanical engineer.
Q. All right. What is your education after high school?
A. I have a Bachelors of Science in Mechanical Engineering.
Q. All right, just where from and what year?
A. From Oregon State University, 1992.
Q. All right. And just briefly, could you give me your job history after you've been out of college?
A. Yes. I worked for I believe 4-1/2 years for the United States Navy as a civil servant. And then I worked for approximately another four or five years with Hargis Engineers in Seattle, also doing the same sort of mechanical engineering consulting that I did when I worked for Holtz.
Q. Could you be a little more specific as to what the -- what you mean by the kind of mechanical engineering consulting you did at Holtz?
A. The entire time I've worked, of course, I worked for facilities, worked at the Naval Air Station, Whidbey, which is where I worked for the Navy. And then I -- then I've spent the remaining time doing design work for primarily HVAC, plumbing systems, mechanical systems for various buildings, primarily commercial buildings -- or for, sorry,





primarily institutional buildings, schools, a lot of schools, as well as a lot of military and other government facilities.
Q. Have you done Design/Build projects before?
A. There have been a couple that I've done. It's less of those certainly than the standard sort of design and bid process.
Q. Okay. The other ones that you've done, how would they relate in time to the Naval Post Graduate School project?
A. I guess typically I've probably done one or two a year. Most of those that I've done were not -- in fact, probably prior to this project I would say that none of those were -- were done for military or public facilities like that.
Q. Are you aware that the Naval Post Graduate School project was a Design/Build project?
A. Absolutely.
Q. Could you give me the names of the Holtz people who were involved in working on the Naval Post Graduate School project? And I just mean professional people.
A. Professionally it would be Rick Holtz and I, the only licensed professionals I think that worked on that.
Q. And were you the Project Manager for Holtz on that project?
A. Yes.
Q. What did your duties as Project Manager entail?
A. Oh, the majority of the design and calculations and overseeing of other designers who were working on that





project.
Q. And when you say other designers, are you talking about other people at Holtz or other design firms?
A. Other -- other non-professionals at Holtz who were assisting with the design.
Q. Do you recall what was Holtz's budget for the Naval Post Graduate School project?
A. I'm sorry, I don't recall that.
Q. Do you recall if Holtz was paid for all of its work on the project?
A. I was never told one way or the other.
Q. When did you personally become involved in the Naval Post Graduate School project?
A. I don't know the time, but certainly as soon as the -- as soon as it was a design project, because I worked mostly on the design. I was not involved in -- in any of the agreements between architect or anything and Holtz. That was entirely Rick's stuff.
Q. Let me fine-tune the question a little bit. The award -- I can show you a document, if you'd like to see it.
A. Um hum.
Q. But the award to West Coast by the Navy was on June 29th, 2001. And when I'm asking when you became involved in the project, I'm right now most interested in in relation to that award date.