**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| WEST COAST CONTRACTORS OF NEVADA, INC., | ) | |
| Plaintiff, | ) | No. 05-1121C |
| v. | ) | (Chief Judge Damich) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S CORRECTED MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), Plaintiff West Coast Contractors, Inc. ("West Coast") respectfully submits the following memorandum in opposition to Defendant's Corrected Motion for Partial Summary Judgment (the "Motion").

**BRIEF COUNTER STATEMENT OF THE CASE**

While West Coast largely does not disagree with defendant's brief statement of the case, West Coast does dispute several key points that are highly relevant to the Motion. Defendant relies heavily on Section 01112, the General Design and Construction Criteria, of the Contract Specifications, which was provided with Amendment Four to the Contract. DA267. However, in the Motion Defendant conveniently omits any mention whatsoever of a key sentence contained in Section 01112, Sub-paragraph 1.1.1 Contractor's Design Responsibility. That sentence states:

> The use of the Government's applicable portion of the preliminary design is required, unless it is specifically modified below. Id. (emphasis added).

With Amendment Four to the Contract, Defendant also provided 45 construction drawings. Drawing M-4 (mechanical systems) of the Government's applicable portion of the

preliminary design required the use of an “air cooled chiller (nominal 15-tons)” and a 6,500 cubic feet per minute (CFM) air-handling unit. DA802. This requirement was never specifically modified by the Government.

Likewise, drawings S-5, S-6 and S-7 (structural) of the Government’s applicable portion of the preliminary design required the construction of the grade beams and pile caps one foot below the first-floor top-of-slab. DA793-795. This requirement was never specifically modified by the Government. Moreover, Section 01112, Sub-paragraph 1.3.2 of the Contract Specifications states:

> The Design-Build Team shall be solely responsible for verifying the existing conditions prior to submitting their design. (emphasis added). DA272.

As such, the contract specification only required West Coast to verify existing site conditions prior to submitting its design, not prior to submitting its bid as argued by the Government. Accordingly, any alleged failure by West Coast to verify existing grades prior to bid was not contractually required, and thus irrelevant at this stage.

Finally, the Settlement Agreement entered into between West Coast and Krei Architecture, Inc. (f/k/a Merritt + Pardini, Inc.) clearly included the settlement of the additional design cost claim that was then in dispute between West Coast and Merritt + Pardini. DA 613, 612 & 709. West Coast paid Merritt + Pardini $36,000.00 to resolve all disputes, including the additional design cost claim. DA 613.

## ARGUMENT

### I. Summary Judgment Standards

Pursuant to RCFC 56 an award of summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c). An issue is genuine if it "may be reasonably resolved in favor of either party." Anderson v. Liberty Lobby, Inc. Inc., 477 U.S. 242, 250 (1986). Further, a fact is material if it will "affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating that there is an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The moving party will carry its burden by "showing . . . that there is an absence of evidence to support the nonmoving party's case" through the use of pleadings, depositions, answers to interrogatories and admissions on file. Id.

Consequently, if the moving party demonstrates that there is a lack of a genuine issue of material fact, the burden then shifts to the non-moving party to demonstrate the existence of a genuine factual dispute. Sweats Fashions, Inc. v. Pannill Kniting Co., Inc., 833 F.2d 1560, 1563 (Fed. Cir. 1987). A genuine factual dispute is present when a fact finder is prompted to resolve a factual matter in favor of the non-moving party. Sweats Fashions, Inc., 833 F.2d 1560, 1562-1563.

Summary judgment should not be granted unless it is obvious that a trial is unnecessary. Anderson, 477 U.S. at 255. Further, "if . . . there is any evidence in the record from any source

from which a reasonable inference in the non-moving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." In re Japanese Electronic Products Antitrust Litigation, 723 F.2d 238, 258 (1983).

**II. The Government Is Not Relieved Of Liability For The Government's Portion Of The Defective Design**

As the court stated in White v. Edsall Construction Co., Inc., 296 F.3d 1081 (Fed. Cir. 2002):

> When the Government provides a contractor with design specifications, such that the contractor is bound by contract to build according to the specifications, the contract carries an implied warranty that the specifications are free from design defects. United States v. Spearin, 248 U.S. 132, 136, 54 Ct. Cl. 187, 39 S.Ct. 59, 63 L.Ed. 166 (1918); [additional citations omitted] . . . This implied warranty attaches only to design specifications detailing the actual method of performance. It does not accompany performance specifications that merely set forth an objective without specifying the method of obtaining the objective. Because the implied warranty protects contractors who fully comply with the design specifications, the contractors are not responsible for the consequences of defects in the specified design. Spearin, 248 U.S. at 136, 39 S.Ct. 59.
>
> Moreover, general disclaimers requiring the contractor to check plans to determine project requirements do not overcome the implied warranty, and thus do not shift the risk of design flaws to contractors who follow the specifications. Id. at 137, 39 S.Ct. 59; see also Al Johnson Constr. Co. v. United States, 854 F.2d 467, 468 (Fed. Cir. 1988) ("The implied warranty is not overcome by the customary self-protective clauses the government inserts in its contracts . . ."). Only express and specific disclaimers suffice to overcome the implied warranty that accompanies design specifications.

Id. at 1084-85.

In White, the court found that the government's design of a canopy door for a helicopter hangar that specified use of a "three-pick-point" system of motors, cables, pulleys and counterweights to open the canopy door was a design specification. Id. at 1085. Moreover, the court in White held that the inclusion in the contract of language that required the contractor to

verify "canopy door details, arrangements, loads, attachments, supports, brackets, hardware etc. . . . prior to bidding" did not shift the risk of design defects to the contractor; but rather was a mere general disclaimer. Id. at 1086.

In the case of Appeal of M.A. Mortenson Co., ASBCA No. 39978, 93-3 BCA ¶ 26,189 (1993), the Government awarded M.A. Mortenson Co. a design-build contract for a medical clinic replacement facility at Kirtland Air Force Base in New Mexico. The contractor relied upon structural framing and footing dimensions contained in the RFP drawings in formulating its bid. Coincidentally, RFP drawings were 35% complete (as in this case), and did not expressly require the contractor to use the information contained therein. The special instructions to bidders stated only that the requirements in the RFP drawings "may be used to form the basis for the pricing proposal." Similarly, the design criteria stated that "[t]he following . . . drawings are provided as guidance. These requirements may be used to prepare the proposals." The contractor did not have structural engineer review the RFP drawings during the bidding phase. During the design phase of the contract, the contractor realized that the RFP drawings contained inaccurate information relative to the structural framing and footing dimensions, and substituted the proper design information at a higher cost in its 100% design submittal.

The Government rejected the contractor's request for equitable adjustment for the increased costs, claiming that the contractor was obligated to have its structural engineer review the RFP drawings at the bidding stage, and thus bore all of the risk of design deficiencies in the RFP drawings. The contractor appealed. The ASBCA disagreed, holding that the contractor's reliance on the specific information contained in the RFP drawings was reasonable and entitled the contractor to a recovery.

Similarly, in the case of Appeal of Donahue Electric, Inc., VABCA No. 6618, 03-1 BCA ¶ 32,129 (2002), the contractor formulated its bid for work on an existing VA medical facility located in Las Vegas, Nevada in reliance upon specifications in the 50% complete RFP drawings that a 196 LB/hr boiler was sufficient to power the facility's sterilizer. The drawings did not mention that the boiler specification was dependant upon the Government's architectural/ engineering firm's "fine-tuning" of the project (which would allow a smaller boiler to work if, for example, it was housed in its own building). Later in the design phase, the contractor realized that absent the "fine tuning" aspects of the project -- which were not within the scope of the final award -- a larger 518 LB/hr boiler was required to power the sterilizer.

The Government argued that the contractor should have known that a 196 LB/he boiler would not run the sterilizer and thus should bear the risk of the changed requirements. From a deemed denial of its request for equitable adjustment, the contractor appealed. The VABCA held that because the specifications never mentioned that the lower boiler requirement was dependant upon the "fine-tuning conditions," nor did the RFP simply request "any" boiler that would power the sterilizer, the specifications were incomplete and defective, the contractor had reasonably relied on the drawings and the contractor was thus entitled to an equitable adjustment for the cost of purchasing a larger boiler. In so holding, the VABCA stated that "[s]pecifications included in a design-build contract, however, to the extent specific requirements, quantities and sizes are set forth in those specifications, place the risk of design deficiencies on the owner. Thus, the VA reassumed the risk and warranted the accuracy of the specification with regard to the 196 LB/hr boiler output." Id. (emphasis added).

The Government argues that the relevant mechanical and structural drawings/ specifications of the contract are design specifications, thus relieving the Government of the warranty liability for its portion of the design under applicable caselaw. In support of its position, the Government cites to many other specifications and/or drawings for the purpose of demonstrating that the contract contains performance specifications relative to the mechanical and structural aspects of the project. The Government's argument is essentially that since the contract contains performance specifications relative to the mechanic and structural aspects of the project the actual specifications at issue must also be performance specifications.

West Coast does not dispute that the contract contains performance specifications relative to the mechanical and structural aspects of the project. However, there can be no dispute that the actual contract specifications at issue in this case are design specifications, and as such the Government warranted their accuracy and/or correctness against design deficiencies.

### A. <u>The Specific HVAC Specification Is A Design Specification</u>

The HVAC specification at issue is found at Drawing M-4 (mechanical systems) of the Government's applicable portion of the preliminary design. DA802. This specification required the use of an "air cooled chiller (nominal 15-tons)" and a 6,500 cubic feet per minute (CFM) air-handling unit. Section 01112, Sub-paragraph 1.1.1 of the contract specifications "required" West Coast to "use" the "applicable portion of the [Government's] preliminary design." DA267. This requirement was never specifically modified by the Government. When Government "[s]pecifications included in a design-build contract, however, to the extent specific requirements, quantities and sizes are set forth in those specifications, place the risk of design deficiencies on the owner." <u>Appeal of M.A. Mortenson Co.</u>, ASBCA No. 39978, 93-3 BCA ¶

26,189 (1993). In this case, the Government clearly specified the "sizes" of the chiller and air handler. This alone should be sufficient for the court to conclude that the Government warranted accuracy of the subject HVAC specification, and that it is clearly a "design specification."

The Government also required West Coast to use the applicable portion of the Government's preliminary design, which clearly includes the chiller and air handler size specifications. Because the Government specified the "sizes" of the chiller and air handler and required West Coast to use that portion of the Government's preliminary design, this is further evidence that the subject HVAC specification is a "design specification." Here, the Government set "forth in precise detail the materials to be employed," and West Coast was not allowed to deviate from them, but was "required to follow them as one would a road map." J.L. Simmons Co. v. United States, 412 F.2d 1360, 1362 (Ct. Cl. 1969).

Finally, the Government's reliance on "general disclaimers requiring the contractor to check plans to determine project requirements," cited in the Motion, "do not overcome the implied warranty, and thus do not shift the risk of design flaws to contractors who follow the specifications." White v. Edsall Construction Co., Inc., 296 F.3d at 1085. Such is the case here. That these specifications stated that West Coast was ultimately responsible for the design -- in a design-build contract -- adds little, and does not relieve the Government of its liability for providing a design specification that contained specific requirement that later (during the post-bid design phase) were determined to be inaccurate.

**B. The Specific Structural Specification Is A Design Specification**

The structural specifications at issue are found at Drawings S-5, S-6 and S-7 (structural) of the Government's applicable portion of the preliminary design. DA793-795. These

specifications required the construction of the grade beams and pile caps one foot below the first floor top-of-slab. Section 01112, Sub-paragraph 1.1.1 of the contract specifications "required" West Coast to "use" the "applicable portion of the [Government's] preliminary design." DA267. This requirement was never specifically modified by the Government. When Government "[s]pecifications included in a design-build contract, however, to the extent specific requirements, quantities and sizes are set forth in those specifications, place the risk of design deficiencies on the owner." Appeal of M.A. Mortenson Co., ASBCA No. 39978, 93-3 BCA ¶ 26,189 (1993). In this case, the Government clearly specified the construction of the grade beams and pile caps one foot below the first floor top-of-slab. This alone should be sufficient for the court to conclude that the Government warranted accuracy of the subject structural specification, and that it is clearly a "design specification."

The Government also required West Coast to use the applicable portion of the Government's preliminary design, which clearly includes the subject structural specification. Because the Government specified the requirement that the construction of the grade beams and pile caps be one foot below the first floor top-of-slab and required West Coast to use that portion of the Government's preliminary design, this is further evidence that the subject structural specification is a "design specification." Here, the Government set "forth in precise detail the . . . manner in which the work was to be performed," and West Coast was not allowed to deviate from them, but was "required to follow them as one would a road map." J.L. Simmons Co. v. United States, 412 at 1362.

Moreover, Section 01112, Sub-paragraph 1.3.2 of the Contract Specifications did not require West Coast to verify existing site conditions before submitting its bid, but only before

submitting its design at the end of the design phase of the Contract. DA272. This further supports the argument that the subject structural specification was a "design specification," and that the Government warranted its accuracy.

Finally, the Government's reliance on "general disclaimers requiring the contractor to check plans to determine project requirements" cited in the Motion "do not overcome the implied warranty, and thus do not shift the risk of design flaws to contractors who follow the specifications." White v. Edsall Construction Co., Inc., 296 F.3d at 1085. Such is the case here. That these specifications stated that West Coast was ultimately responsible for the design -- in a design-build contract -- adds little, and does not relieve the Government of its liability for providing a design specification that contained specific requirement that later (during the post-bid design phase) were determined to be inaccurate.

## III. Relevant Contract Provisions Were Not Ambiguous

The Government next makes the argument that the relevant mechanical and structural drawings/specifications of the contract are patently ambiguous. With regard to the mechanical issue, the Government argues that because the government changed its design from a two-story building to a two-story with basement or three-story building, but did not change its applicable portion of the preliminary design, that the mechanical portions of the Government's design were thereby rendered patently ambiguous. With regard to the structural issue, the Government argues that because the structural and civil drawings indicated different information relative to existing grades, that the structural portions of the Government's design were thereby rendered patently ambiguous.

In response to these arguments, West Coast contends that there is no "ambiguity"

between the relevant contract specifications; but rather the specifications at issue are simply incorrect and/or wrong. With regard to the Government's mechanical specification requiring the use of a nominal 15-ton chiller and a 6,500 CFM air-handler, there is nothing ambiguous about this specification, especially in light of the contractual requirement that West Coast use the applicable portion of the government's preliminary design. As it turned out, this specification was simply wrong -- and not ambiguous as the Government contents.

With regard to the Government's structural specifications requiring the construction of the grade beam and pile caps one foot below the first floor top-of-slab, there is likewise nothing ambiguous about these specifications, especially in light of the contractual requirement that West Coast use the applicable portion of the government's preliminary design. As it turned out, these specifications were likewise simply wrong -- and not ambiguous as the Government contents.

## IV. West Coast Is Entitled to Recover Amounts Paid In Settlement To Merritt + Pardini For Design Claim

West Coast agrees with the Government that the Severin doctrine bars Merritt + Pardini's pass-through claim for additional design costs only if the Government satisfies its burden of demonstrating that Merritt + Pardini executed an iron-clad release that released West Coast and the Government from any further claims. Metric Constructors v. United States, 314 F.3d 578 (Fed. Cir. 2002). In Metric, however, the court reversed the trial court's grant of summary judgment in favor of the government finding that the government had failed to carry its burden of demonstrating the existence of an iron-clad release releasing the government. Id. at 579-80.

The Settlement Agreement entered into between West Coast and Krei Architecture, Inc. (f/k/a Merritt + Pardini, Inc.) clearly included the settlement of the additional design cost claim

that was then in dispute between West Coast and Merritt + Pardini. DA 613, 612 & 709. West Coast paid Merritt + Pardini $36,000.00 to resolve all disputes, including the additional design cost claim. DA 613. Accordingly, West Coast has shown damages in the amount of $36,000.00 and is entitled to a recovery in that amount.

With regard to the Government's argument that West Coast has produced no evidence of damages, West Coast respectfully disagrees. Merritt + Pardini's letter to the Government, dated April 24, 2002, is clearly admissible evidence of the $37,500.00 in damages claimed. DA582. According to the deposition testimony of Mr. Harm of Merritt + Pardini, although he did not personally calculate the $37,500.00 amount that amount was calculated by administrative personnel at Merritt + Pardini by reviewing the time cards and activities of Merritt + Pardini employees who worked on the project. DA736 (deposition, p. 51, l. 22 to p. 52, l. 1). It was simply not Mr. Harm's job to calculate those amounts. Moreover, the Government could have obtained the time sheets of Merritt + Pardini from Merritt + Pardini and/or taken the deposition of the administrative personnel at Merritt + Pardini who reviewed the time sheets and calculated the $37,500.00 claim amount.

## V. **<u>Conclusion</u>**

For all of the foregoing reasons, West Coast respectfully requests that Defendant's Corrected Motion for Partial Summary Judgment be denied.

Respectfully submitted,

SHULMAN, ROGERS, GANDAL,
PORDY & ECKER, P.A.

By: /s/ William C. Davis, III
William C. Davis, III

11921 Rockville Pike, Suite 300
Rockville, Maryland 20852
(301) 230-5217
(301) 230-2891 (fax)

Attorneys for Plaintiff West Coast
Contractors of Nevada, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of January, 2008 a copy of the foregoing Plaintiff's Memorandum in Opposition to Defendant's Corrected Motion for Partial Summary Judgment was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ William C. Davis, III
William C. Davis, III

G:\39\West Coast\Documents\110786002.OppositionNavyMotionPartialSummaryJudgment.wpd