UNITED STATES
COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WEST COAST CONTRACTORS OF NEVADA, | ) | |
| Plaintiff, | ) | |
| v. | ) | Docket No.: 05-1121C |
| UNITED STATES, | ) | |
| Defendant. | ) | |

Pages: 1 through 75

Place: Washington, D.C.

Date: April 3, 2008

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WEST COAST CONTRACTORS OF NEVADA, | ) | |
| Plaintiff, | ) | |
| v. | ) | Docket No.: 05-1121C |
| UNITED STATES, | ) | |
| Defendant. | ) | |

Courtroom 4, Room 501
National Courts Building
717 Madison Place NW
Washington, D.C.

Thursday,
April 3, 2008

The parties met, pursuant to notice of the Court, at 10:05 a.m.

BEFORE: HONORABLE EDWARD J. DAMICH
Chief Judge

APPEARANCES:

For the Plaintiff:

WILLIAM C. DAVIS, III, Esquire
Shulman Rogers Gandal Pordy & Ecker, P.A.
11921 Rockville Pike
Rockville, Maryland 20852-2743
(301) 230-5217

For the Defendant:

MICHAEL N. O'CONNELL, JR., Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W., Room 12062
Washington, D.C. 20530
(202) 307-0282

APPEARANCES: (Cont'd.)

<u>Also for the Defendant</u>:

PAMELA NESTELL, Esquire
Department of the Navy
NAVFAC Litigator
720 Kennon Street, S.E.
Washington Navy Yard, D.C. 22374
(202) 685-2136

P R O C E E D I N G S

(10:05 a.m.)

THE CLERK: All rise. The United States Court of Federal Claims is now in session, the Honorable Edward J. Damich, Chief Judge, presiding. God save the United States and this Honorable Court.

THE COURT: Please be seated.

This is the case of West Coast Contractors of Nevada v. United States. Representing the Plaintiff is Mr. William C. Davis, III. Mr. Davis?

MR. DAVIS: Good morning, Your Honor.

THE COURT: Welcome.

MR. DAVIS: Thank you.

THE COURT: And representing the United States is Mr. Michael N. O'Connell, Jr.

MR. O'CONNELL: Yes. Thank you. Good morning.

THE COURT: Hi, Mr. O'Connell. Welcome. And with you is?

MR. O'CONNELL: Pamela Nestell from the Navy.

THE COURT: What is the name again?

MS. NESTELL: Pamela Nestell.

THE COURT: Nestell. Okay. Great. Welcome, Ms. Nestell.

MS. NESTELL: Thank you. Good morning.

THE COURT: Okay. This is an oral argument on the motion for partial summary judgment. The notice that I sent out, and my apologies that it came out so late.

The way I conduct oral argument is having familiarized myself already with the briefs and discussed it with my law clerk, I like to use oral argument for clarifying the questions that are still in my mind. So rather than come to the podium and make a presentation, what I would like to do is have you remain seated as long as you're within microphone range, because that's important for the reporter, and I will ask various questions.

The questions in the order that went out give you an idea of the basic areas, but my questions will range more than just in the oral argument. I hope that I can create actually a kind of dialogue, or maybe a trialogue, and we can all try to get to the truth of the matter, the heart of the case, and I can have in my mind a more clear view of the arguments of the parties so that I can fulfill my job as best that I can.

At the end of the questions if there is anything that you feel is important and has not been

discussed then I will ask you and you can take the podium and you can make your argument, but I've found that in almost all cases doing that would be duplicative, and it saves time if you don't do that.

I'm not forbidding you, but make sure that you think that there's a fundamental misunderstanding on my part that has come out in the questions, for example, and you haven't corrected in the answers. Come to the podium and say I want to reorient Your Honor because this is the real issue, et cetera, et cetera.

Please feel free to do that because, as I say, what I want to do -- we all want to do here. The whole purpose of any judicial proceeding is to try to find out what the truth is and to clarify the arguments.

Okay. Now, with that perhaps too extensive an introduction what I want to do is I want to focus in on the problems in interpretation of the contract that have been presented I think by the motion for partial summary judgment.

In particular those are the questions with regard to the mechanical equipment and the grade beam elevation, which seems to be two issues that can be grouped, and then the increased design costs having to

do with Plaintiff's relationship with its design firm, Merritt & Pardini.

The way I see it right now is that the parties have posed a question as to a determination regarding whether there is a design specification or a performance specification. The design specification, if it is in fact a design specification, then it seems to me that the government is under an obligation that it be accurate.

And if it's a performance specification then an objective is proposed to the contractor, and the contractor is supposed to meet that objective and is given leeway to meet that objective. Therefore, if it doesn't meet that objective then it seems to me the risk, fault if you will, is on the contractor.

I guess the difficulty here is that with regard to the mechanical equipment and the grade beam elevations in the RFP we have some rather specific descriptions. We're not going to call them requirements. Rather specific descriptions from the government.

And the question of course is are they design specifications that the Plaintiff had to follow and the Plaintiff, in trying to comply with those and fulfill the performance objective of the contract,

discovered that it simply wouldn't work and had to make modifications, and this of course entailed more money. Otherwise you wouldn't be here.

Okay. The first question that I have I guess is I'm not sure what your position is, Mr. Davis, is it?

MR. DAVIS: Yes, Your Honor.

THE COURT: Mr. Davis. Regarding what I should look at to get to the ultimate conclusions here.

The government I think has argued pretty clearly that what I have to do is I have to look at the contract as a whole in interpretation of whether or not what appeared in the RFP and is alluded to in the contract, how to interpret that, which seems to be almost kind of black letter law, boilerplate. We all learned this in law school. You have an objective.

Is that correct? I should look at everything?

MR. DAVIS: Yes. I'm certainly not going to argue that the Court should ignore any part of the contract.

THE COURT: Okay. Great. I just wanted to make sure that was clear.

Your position I presume is as I stated it?

MR. O'CONNELL: Yes.

THE COURT: Okay. Great. That's Mr. O'Connell. I have to make sure I mention the names.

Okay. What I want to focus on then is, as I said in my notice for oral argument, in the contract itself Section 01112. General Design and Construction Criteria is the title for this section, and then we move to Part 1, General, and then under Part 1, General, we have Section 1.1.1. I love these contracts. That is labeled Contractor's Design Responsibility. It's amazing, isn't it, how detailed everything is and we still have lawsuits. Okay.

What I said in my questions here, and I want to parse this because I find this at least to be very important as a starting point for interpretation of the contract. It says: This RFP includes a preliminary design package developed by the government.

Okay. I'm going to go through this and tell you what I think it means, and then I'm going to ask you. Preliminary design package developed by the government, so right away a little lightbulb -- not a 70 watt, but a 25 -- goes up and says this is a design package by the government. Maybe it's a design specification.

Then it says: The preliminary design package consists of partial design in architectural and engineering disciplines -- and I must say that it's somewhat unclear what in architectural and engineering disciplines means; I suppose it means in terms of those arts -- and material specifications.

Okay. So what I see here is a distinction. We have a preliminary design package, and we have a partial design and material specifications. Okay. Now, when I see partial design of course what I think is well, there must be some leeway here because it's only a partial design. On the other hand, though, partial design seems to be contrasted with, separated from, distinguished from material specifications.

I see the word specification, and that makes me think well, this is definite so there's something which is a partial design which by virtue of being partial has some leeway. Then there's material specifications, which seems to me well, this is not really subject to negotiation. These are perhaps design specifications, although it doesn't say that.

The partial designs, which again is contrasted with material specifications, are in various stages of development. It even underscores the fact that partial design is not set. The use of

the government's applicable portion of the preliminary design is required -- and I'm completely lost at what the government's applicable portion of the preliminary design is required -- unless it is specifically modified below, and that's important, so what it says really is it is required, but then it really isn't because it cannot be melded with, blended with I guess what is below.

Additional design requirements are contained in this section of the RFP, so we have more, and these are called requirements. The final design developed by the contractor shall combined -- we all know that must be combine -- the requirements in this section, meaning 01111.2 (sic), I presume, with the preliminary design to produce the complete design package suitable for construction, so it does seem as if the government is not insisting on everything. It says you've got to be creative in making this combination.

The material and related specifications define the minimum acceptable quality of the materials and construction. Okay. Now, here when it says the material and related specifications, and I had contrasted that with the partial design because this paragraph does.

Define the minimum acceptable quality of the

materials and construction, which makes me think well gee, despite the fact that the material specifications were somewhat distinguished from this partial design which is in flux, the fact that these are only minima must mean that they're also in flux as well because why would they just be minima. They must mean that you can change them.

Okay. Where am I? Define the minimum acceptable quality of the materials and construction. The contractor is solely responsible for the final design of the facility, so that I think is perhaps the only thing that is completely clear in that particular paragraph.

Okay. Where am I going with this? What I'd like to find out is what is wrong with my interpretation? Let me give you where I guess it kind of leads me, and that is that the partial design seems to be in flux. Material specifications which seem to be contrasted with material design and in flux I think was put in flux again by the statement that they were just minimum, you know.

So then I think well, they may have been specifications to some degree, but the government clearly thought that they might change, and then I'm completely open because I have no real idea what it

means to say the use of the government's applicable portion of the preliminary design is required. The preliminary design means this partial design plus the material specifications.

Now, let me go to the government first instead of the ones that filed the motion. Mr. O'Connell?

MR. O'CONNELL: Well, there's one piece of history that maybe I could fill in here.

THE COURT: After all that I missed it.

MR. O'CONNELL: Which is that Amendment 4, which is what we're looking at, to the RFP --

THE COURT: Yes.

MR. O'CONNELL: -- gave the contractor Division 1 to the specifications. A later amendment provided the contractors with Divisions 2 through 15. Divisions 2 through 15 provide a lot of information which I thought wasn't in dispute.

If the Court would like, I could certainly file it with the Court, but typically in a government contract, just sort of talking about it in the generic sense, you'll look at the drawings and you'll see --

THE COURT: Excuse me. What you're talking about then are things that were later added to the contract?

MR. O'CONNELL: Yes. Right.

THE COURT: And what prompted that?

MR. O'CONNELL: Well, even in Amendment 4 they noted that we're giving you Division 1 now. In a later amendment we'll give you Divisions 2 through 15.

THE COURT: Okay.

MR. O'CONNELL: I'll talk about it sort of on the generic level and then on the specific level if I could.

THE COURT: And what you're saying is that this is the first time the Court has been made aware of Divisions 2 through 15?

MR. O'CONNELL: Well, it's identified in the amendment, but we certainly didn't talk about it in our briefs.

THE COURT: Okay. Is it part of the record, though?

MR. O'CONNELL: It's not in the appendix.

THE COURT: Okay. All right. You're aware of this, Mr. Davis?

MR. DAVIS: Well, I'm aware that it's not in the appendix.

THE COURT: Yes.

MR. DAVIS: I'm not sure that I agree with the government that it has any particular relevance to

the issue presented in the motion.

THE COURT: Okay. All right. It would be nice if you had included this in your brief.

MR. O'CONNELL: I tend to agree with Mr. Davis that I don't think it directly bears on --

THE COURT: All right.

MR. O'CONNELL: I'm just trying to give you a little history that might be helpful.

THE COURT: All right. I'm sorry.

MR. O'CONNELL: So just again going back to what I was going to say, on the generic level in a government contract you'll look at the drawings and you'll see windows, doors, acoustical ceiling tiles, toilet partitions, all kinds of things like that, and then you go to the specifications and the specifications will have material requirements for all of those things.

You'll see if there's a steel door shown on a drawing you'll go to the specification dealing with doors and windows, and it will tell you we want doors of this type of steel and windows. It could say something like an Anderson type window that has a wind rating of whatever X, whatever nomenclature that they use. We want toilet partitions of that type.

So to a certain extent those kinds of things

were added in Divisions 2 through 15 here. You know, for example, there's stuff about toilet partitions and things like that, but those were not fully identified. Those were not fully developed in what the Navy gave to the bidders here.

The contractor had to develop the specifications here as well, and that's actually what the third dispute is getting to, the types of specifications that had to be produced by Merritt & Pardini, West Coast's designer. The legal issues involving that third dispute don't touch upon the substance of the dispute.

I don't know if I'm making myself clear, but --

THE COURT: I think you are, yes. I'm a little unclear. So what you're saying is Divisions 2 through 15 actually contain a lot of material that is relevant to the Merritt & Pardini part of our argument today. Is that correct?

MR. O'CONNELL: Well, I don't know if I would go that far, but maybe if I could just identify two pages of the appendix that might help you, Your Honor?

THE COURT: What would really help me, I guess, is to tell me where you're going with this.

MR. O'CONNELL: Well, I'm just trying to tell you what the material specifications are, and the material specifications part of the contract you don't have, but I tended to agree with Mr. Davis that those Divisions 2 through 15 of the contract really are not in dispute, so just to keep things simple and only give you one phone book of documents I didn't give you Divisions 2 through 15, but I'm certainly willing to file them if the Court would like to see them.

THE COURT: Hold on. The sentence here says: The RFP includes a preliminary design package, which the preliminary design package consists of partial design plus material specifications. So were these Divisions 2 through 15 part of the RFP?

MR. O'CONNELL: Yes.

THE COURT: Okay. So what you're saying is in trying to figure out what the material specification is in contrast to the partial design you're telling me now what material specifications are?

MR. O'CONNELL: Right. I'm just trying to identify to you in a general sense what material specifications are, yes.

THE COURT: Okay. What I'm interested in is of course exactly what the material specifications

were in the preliminary design package. Can you identify those?

MR. O'CONNELL: Well, those would be Divisions 2 through 15 that were added later.

THE COURT: Okay. All right. And nothing else? That's it? Just Divisions 2 through 15?

MR. O'CONNELL: No. I mean, the use of the word material in front of the noun specifications, I would interpret it the way I've told you, but you could probably make an argument that what's in Section 1112 are material specifications, but I would say that the correct interpretation would be that it's what is in Divisions 2 through 15.

THE COURT: You have to take a position. What is the government's position?

MR. O'CONNELL: The government's position is Divisions 2 through 15.

THE COURT: Okay. And so I now know from the government's standpoint what material specifications means in paragraph 1.1.1. Is that right?

MR. O'CONNELL: Yes.

THE COURT: Okay. Good. And that's your point?

MR. O'CONNELL: Yes.

THE COURT: Okay. Does that lead to the conclusion that because they are material specifications and they are separated from the partial design that these are design specifications that the government is responsible for?

In other words, if Mr. Davis can prove that these were erroneous the government would be responsible for that?

MR. O'CONNELL: Divisions 2 through 15?

THE COURT: Yes.

MR. O'CONNELL: Well, I don't think so because they don't have a claim based on anything in Divisions 2 through 15.

THE COURT: That's entirely for the Merritt & Pardini thing?

MR. O'CONNELL: I see. Well, I guess if we got to the substance of the Merritt & Pardini dispute possibly what's in Divisions 2 through 15 could come into play.

THE COURT: Okay. So where should I go with what you told me about material specifications and coming to a conclusion whether it's a design or performance specification?

MR. O'CONNELL: Are you asking me if Divisions 2 through 15 --

THE COURT: Are design specifications.

MR. O'CONNELL: -- as a whole are design or material?

THE COURT: Yes.

MR. O'CONNELL: Design or performance?

THE COURT: Yes.

MR. O'CONNELL: I would say generally they are performance specifications, but I wouldn't rule out the fact that there are mandatory aspects of them.

THE COURT: Okay. But because we know that this is in dispute there's no point in making that separation. Is that correct?

MR. O'CONNELL: I don't think so.

THE COURT: Okay. All right. Let me turn to Mr. Davis and ask you my sort of parsing of that 1.1.1, whether you think that was correct.

MR. DAVIS: I think you were 100 percent correct, Your Honor.

THE COURT: That's amazing.

MR. DAVIS: Over the course of this case I think Mr. O'Connell and I have read that section a thousand times, and we probably come to a different conclusion eery time, but the conclusion I came to most recently last night was that you really have three things here. You have a preliminary design

package that's in the first line.

THE COURT: Yes.

MR. DAVIS: And then when you go down to the next line you have two parts to that. You have the partial design.

THE COURT: The partial design, yes.

MR. DAVIS: And preliminary and partial are close words, but they are different and they have different meanings.

THE COURT: Yes.

MR. DAVIS: And then you have this material specification, so I think within preliminary design package you have two parts, the partial design and the material specifications.

Then when you go down to the next sentence, if I could hold in abeyance for a minute the words applicable portion --

THE COURT: Sure.

MR. DAVIS: -- what it says is the use of the government's applicable portion. It doesn't say partial design. It says preliminary design, so that tells me that gets both of the things that Your Honor identified, the partial design and the material spec, and that we're required to use them unless, and I'd like to focus the Court's attention on the words

specifically modify.

Specifically is in there. It doesn't mean to our way of thinking generally modified or modified by implication or look at 100 different places and figure out that it's been modified. You know, I think the word specifically is in there for a reason.

THE COURT: And below.

MR. DAVIS: Yes. Exactly. You know, our position would be that if you have a piece of information that is part of the preliminary design package, which clearly these RFP drawings, which these big pieces of paper at counsel table are.

If it says one thing, if it says, for example, 15-ton chiller, unless the government somewhere else below says no, not a 15-ton chiller -- something else specifically modified -- that we were I guess entitled to rely on that information in the preliminary design package. It's got to be specifically modified; not by implication, not by notice.

The other point I would just like to make is that this contract letting didn't happen all at once. It was a process over many months. I would like to make the distinction and hope the Court will keep this in mind that clearly we are responsible for the final

design, but the real inquiry here is not what the cost of it was at the 100 percent design submittal at the end of the design phase after letting the contract.

Really what we're talking about here, because it was a hard bid contract, is what was our obligation or where were we at the bid stage, okay, because we bid. We look at these drawings and specs. We bid. If we get it then we go through a many month design process, which we get paid for, and then the construction process.

I think that one of the things that is getting lumped together here is where was the contractor in a design/build contract supposed to be at bid stage versus at the end of the design phase when the government was considering its 100 percent design submittal.

THE COURT: Okay.

MR. DAVIS: I'm not sure the contractor even in a design/build contract has an obligation to do the entire design to satisfy itself that there are no substantive errors in the RFP drawings at the bid stage. That seems onerous and not to make much sense because then why would you have a design phase after bid? You have the contractor doing the same thing twice.

THE COURT: What you're getting at here actually is a slightly different point, and that is that if it was obvious that there were some design specifications that wouldn't work the question is at what stage would the burden of seeing those and bringing those to the government's attention fall on the Plaintiff? Is that correct?

MR. DAVIS: Yes.

THE COURT: Let me be clear. When do you think that happens if there is a discrepancy? When was it that you say the Plaintiff at this point should have known that there was something wrong?

MR. DAVIS: Well, I don't know that I can answer the Court's question of when they should have known. I can tell the Court when they did know.

THE COURT: Okay. When?

MR. DAVIS: Which was during the design phase after contract award when they had their MEP and their design team from Merritt & Pardini and their subcontractor going through and trying to get to 100 percent design submittal. That's when it was discovered.

THE COURT: Okay. And then what happened at that point? Was it brought to the attention of the government?

MR. DAVIS: Yes. The contractor did submit an REA.

THE COURT: There was a negotiation? This is when you changed the plans. Is that right?

MR. DAVIS: Well, there was some correspondence back and forth with the contracting officer.

THE COURT: Yes.

MR. DAVIS: And the claim was ultimately rejected at that level, so we went ahead and built it and put in the bigger chiller, for example, and then submitted a claim for our increased cost.

THE COURT: Okay. But the government must have taken a position then before it went to the contracting officer I guess on a formal claim.

MR. DAVIS: Yes, they did.

THE COURT: I suppose there might have been an admission that there was a problem, but then the follow-up with the problem was on your dollar.

MR. DAVIS: Well, yes. The government's general response was sorry, guys. It's a design/build contract. You have the design liability.

THE COURT: Okay. And then it went to the contracting officer as a formal claim, and he agreed with the Agency's position on that?

MR. DAVIS: Yes.

THE COURT: Okay. Let me ask.

MR. DAVIS: I'm sorry. That was kind of running down not a dead end, but a side road staying focused on your question about what does this mean.

THE COURT: Actually that was helpful to me to understand. I want you to just keep your thoughts for a moment, but keep them on the same road. Just go off for a break.

Let me ask Mr. O'Connell if what Mr. Davis has said here is generally true about the RFP, the design phase, its discovery, the government's position. Just in general is that correct? Is that accurate from your standpoint?

MR. O'CONNELL: Well, to the extent that he's saying that they didn't discover it until after award, I mean, I don't have any knowledge to say the west coast knew about these things before bid --

THE COURT: Yes.

MR. O'CONNELL: -- and just were sort of gaming the bid and then planning on submitting a claim afterwards.

THE COURT: Yes.

MR. O'CONNELL: But otherwise I completely disagree with everything else he said.

THE COURT: Well, let me ask you about the fact thing then. It's not true that after an RFP in this kind of contract there is a design phase?

MR. O'CONNELL: Oh, sure there is. Sure there is.

THE COURT: Okay. Now, is it true that during the design phase at some point the Plaintiff brought to the attention of the government that there seemed to be a discrepancy?

MR. O'CONNELL: That's true. That's true.

THE COURT: And then the government basically said well, if there is a discrepancy it's in the kind of specification that is your problem, not the government's? That happened too?

MR. O'CONNELL: Oversimplifying, yes.

THE COURT: Yes?

MR. O'CONNELL: The government felt that this contract allocated the risk of these kind of problems to West Coast.

THE COURT: Okay. All right. Good. We're on the same page with regard to that.

Let me go back to you now. You're up to the point where the use of the government's applicable portion of the preliminary design is required, okay, so here we see the word required.

MR. DAVIS: Yes.

THE COURT: And a suggestion that some portion of the preliminary design is required by the government unless it is specifically modified below.

MR. DAVIS: Yes.

THE COURT: Okay. Go on.

MR. DAVIS: Okay. It is our position obviously that the chiller, the 15-ton chiller, that that was part of the partial design. Again, it's kind of interesting. Well, I have to start completing my thoughts before I go on to the next one.

THE COURT: Yes.

MR. DAVIS: I think it's clearly part of the partial design and so therefore it's part of the preliminary design package, and therefore we are required to use it if it's an applicable portion, I guess.

So then that brings us to what do those words applicable portion mean? I know the government in their reply had made the argument that well, since you have a partial design or a preliminary design package or a partial design and specs that I think they used the word clash.

If they clash or are in conflict we have to I guess make a choice and get rid of the one that

doesn't work and homogenize them or harmonize them to come up with a buildable final design.

THE COURT: So what's required is your attempt to harmonize them?

MR. DAVIS: Yes.

THE COURT: Okay.

MR. DAVIS: And the one that doesn't work, the one that clashes to use the word in the reply, that gets thrown out because that can't be applicable because I can't use it and harmonize it and give the government the final design that the government is looking for.

I don't agree with that. I'm struggling really, Your Honor, to figure out what that means, applicable portion. You know, certainly the Court could say that that word is kind of I don't want to say meaningless, but just surplusage and the Court can't figure out what it means.

Certainly there are contracts where we have words that really don't add anything, but I think the better interpretation and our position is this: It's simply to direct us to what it's talking about. Like if we're trying to design the HVAC system, okay, and the partial design says use a 15-ton chiller then that is applicable to the HVAC system and we need to use

it.

So I think applicable here really just has a very simple meaning that if you're designing the HVAC system and you've got something on the partial design that's part of the HVAC system like the chiller or the air handler it's applicable and you've got to use it.

I mean, my reading of applicable is very, very simple. I would respectfully suggest the government's reading of that is somewhat strained.

THE COURT: I guess the problem is that your interpretation seems to suggest then -- how would you distinguish -- it's in every specification, even if it's in the partial design in architectural and engineering disciplines, would be the government's applicable portion which was required. Is that correct?

I think what you're saying is the material specifications mean at least the mechanical equipment that you were talking about, the chiller, right?

MR. DAVIS: Actually, no.

THE COURT: Oh.

MR. DAVIS: I think that's part of the partial design part of preliminary design package.

THE COURT: Then what are the material specifications?

MR. DAVIS: With respect to what Mr. O'Connell was talking about, I'm going to use Pella windows. I'm going to use a Kohler toilet. I'm going to use Smith fixtures.

You know, certainly I don't think structural concrete is a material specification. Material specifications typically mean what kind of chair are you going to use in there. You know, it's a specific thing.

Do you know where I find support for that, Your Honor?

THE COURT: Excuse me. So the RFP drawings which depicted a 15-ton chiller and a 6,500 cfm air handling unit, that's not a material specification?

MR. DAVIS: I don't believe it is.

THE COURT: Okay.

MR. DAVIS: I think that's part of the partial design.

Where I find support for that is in that second to last sentence in the section we're looking at because it says: The material and related specifications define the minimum acceptable quality.

THE COURT: Yes.

MR. DAVIS: Not quantity. Again, you're talking about am I going to put in there the expensive

windows, Pella, or am I going to put in the cheap windows off the back of the truck? That's a quantity indicator there, not a quality indicator there.

THE COURT: Okay. And you and Mr. O'Connell agree on that?

Is that correct, Mr. O'Connell? Do you agree on that?

MR. O'CONNELL: Well, I agree with him to the extent that he's saying that the drawings are not material specifications. They're design. Yes.

THE COURT: But the meaning of material specification. Does it mean this sort of almost like brand name quality type stuff as opposed to the 15 tons and the 6,500 cfm?

MR. O'CONNELL: Yes. I mean, I wouldn't really quibble with his definition for purposes of this.

I mean, I think it could be a little less specific than saying a Pella window. It could be a Pella type window that has a wind rating of X --

THE COURT: Yes.

MR. O'CONNELL: -- and glass that has a solar rating of that, but I think we're basically on the same page.

THE COURT: Okay. All right. You may

continue then, Mr. Davis.

MR. DAVIS: I don't think with regard to the structural concrete and the chiller/air handler claim that the material specification part of the section really has any meaning. I think that relates to other things.

I think we're clearly playing on the field, if you will, of the partial design part of the preliminary design package, and I think that Your Honor is absolutely correct that we can't ignore the fact that the word design is used in this section over and over and over again. It doesn't say performance. It says design.

THE COURT: Yes, but on the other hand although it says design, first of all, we have preliminary. We have partial. The final language is the contractor is solely responsible for the final design of the facility, so that gives me pause.

MR. DAVIS: Yes, as it should. Again, the word final. Final design is at the end of the design phase.

What we're talking about here is many months before at contract award, and I think even though we are clearly responsible for the final design, but if at the bid stage we're given these RFP drawings and

they say 15-ton chiller and we're required to use it unless specifically modified below and it's not specifically modified below, I think that we're required to use that in our bid.

We're entitled to use it in our bid, and then during the design phase which comes after contract award if it later turns out to be wrong I think that we're entitled to be paid for any extra cost, if any. I think that's a very self-serving but reasonable interpretation of how that very confusing section should be read.

THE COURT: Okay. Do you want to respond to that, Mr. O'Connell?

MR. O'CONNELL: Well, I'd like to say a couple things, Your Honor. I think this 1.1.1 is densely worded, and this exercise of focusing in on it is helpful to a certain extent, but we also need to read the other parts of the contract too because the other parts of the contract help provide meaning to 1.1.1.

You know, just going back to the fact that this came out in Amendment 4, Amendment 4 in Note 5, and this is page 56 of the specifications, told us that the design shown --

THE COURT: Just a second. Let me see if I

have it. Do I have this?

THE CLERK: Of the appendix?

MR. O'CONNELL: Yes. Page 56.

THE COURT: Where is 56? Oh, I see. This is not the whole thing. Great. Finally I've got it, I think.

MR. O'CONNELL: So this is what comes out with --

THE COURT: Wait. Explain this. What is this now? Tell me.

MR. O'CONNELL: This starts at page --

THE COURT: Amendment 00004.

MR. O'CONNELL: Right.

THE COURT: And when did this come in? Is this an amendment to the RFP?

MR. O'CONNELL: This is Amendment 4 to the RFP, March 19, 2001. This is what issued Division 1 of the RFP that we've been talking about so far today, okay, and it tells us in Note 5 that the design shown on the drawings included in this solicitation will require significant development based on requirements in Section 01112 before pricing can take place.

So that tells you who the contract is allocating risk to and risk of problems in those drawings. Right there we're telling the design

builders right there that they're going to bear the risk of developing that design, and we're warning them you need to develop the drawings before you develop your pricing.

THE COURT: Okay.

MR. O'CONNELL: Now, this is saying in a more direct and succinct manner everything that is said in 1.1.1.

In other words, the Navy is telling people we're giving you these preliminary drawings and we're giving you the specifications, but what's really important to us is what's in those specifications because those specifications are telling you things such as we need a building that in the summertime is going to be 74 degrees Fahrenheit, and the temperature in the building is not going to vary any more than two degrees from that temperature.

THE COURT: I wish the GSA had had those specs when this place was built.

MR. O'CONNELL: I'm not sure the GSA was around when this building was built.

But, Your Honor, that point is reinforced, and I can just give you a page number and you can look at it later if it's not handy, but there is an order of precedence clause which starts at page 197 and goes

on to page 198, and it reinforces that same notion.

It tells the contractors, and again this came out at Amendment 4: In case of differences between drawings and specifications, the specifications shall govern.

THE COURT: All right. I have 197.

MR. O'CONNELL: The bottom of 197. It's FAR clause 52.236-21, and it carries over to the next page. The second line down: In case of differences between the drawings and specifications, the specifications shall govern.

THE COURT: A discrepancy? In case of discrepancy?

MR. O'CONNELL: In case of difference it says.

THE COURT: Mine says discrepancy. Oh, you're in the sentence above. Sorry. Okay. In case of difference. Go ahead.

MR. O'CONNELL: Okay. That again is the same message that the specifications trump the drawings.

Okay. So then we go back to Section 1112, and several other things shed light on the meaning of paragraph 1.1.1. What I'd like to discuss is paragraph 1.1.2 and then some of the later paragraphs

because the one thing that's been missing from the discussion so far this morning is the fact that this is a two-story building.

You know, we do have modifications to the government's design package in 1.1.2, and I'm going to be talking about page 267 through 269, Your Honor, if you have those.

THE COURT: I do. Thank you.

MR. O'CONNELL: But paragraph 1.1.2 is a very important paragraph because this is where the government adds an additional floor to the building. The floor is either going to be a full-size basement with two stories above ground or a three-story above ground building.

It goes on to page 268, and it discusses each of those buildings in turn. In paragraph (b) it tells us some key things about the structural and mechanical systems of the building which we're talking about now. It says in (b): For the basement structure -- I'll wait until you're there, Your Honor.

THE COURT: Okay.

MR. O'CONNELL: It says: For the basement structure -- at paragraph (b) on page 268 -- the government has not done any foundation or other design of the basement structure, and then it goes on 11

lines down starting over on the right. It says: The government has not done any architectural, mechanical, electrical and fire protection safety design for the basement.

It goes to paragraph (c) below that, and there's even less information for the three-story option. It says: At the contractor's option, the contractor may propose an extension with a three-story, above ground structure to meet the minimum 2,025 square meter building footprint requirements. That building that's shown on the drawings is not a 2,025 square meter building.

That paragraph concludes on page 269 with the only information that they give for this third floor. They say: Mechanical, electrical, telecommunication data, transmission and fire protection design shall be similar to that of the preliminary design, so it tells you that there's no design for this third floor.

What we're giving you is a design for a two-story building, and this is important on several levels, Your Honor, but one important thing is that maybe West Coast themselves, the people who prepared the bid, did not discover that the chiller and the grade beams were going to be a problem, but the

design/build contractor who we're hiring for expertise in both construction and design can't throw its common sense out the window.

THE COURT: Even if it's a Pella window?

MR. O'CONNELL: Even if it's a Pella window. Exactly.

THE COURT: I'm sorry. I bet your train of thought was ruined.

MR. O'CONNELL: That's okay. We quote at length and we've given you the deposition transcript. West Coast's designers and subcontractors knew that if you add an additional floor to the building the air conditioning system that's going to work for the two-story building isn't going to work for a three-story building unless, as the architect said, you decrease the square footage of the building by a corresponding amount.

You know, I don't expect the Court or an attorney to be an expert in mechanical design systems, but we ourselves can apply our common sense to this, and anybody who has bought an air conditioner, a fan, a roof for a house, carpet, a bag of grass seed, a bag of fertilizer, knows that the more area you've got to cover the more product you've got to buy and the more money it's going to cost you.

It was not something that escaped their designers in any way that adding this third floor to the building was going to increase the requirements of the mechanical system.

THE COURT: Does this kind of boil down to that, going back to 1.1.1, and I accept your point. Our first point that we nailed down was that we should look at the contract as a whole.

MR. O'CONNELL: Yes.

THE COURT: But I just wanted to say that what that tends to prove, I suppose, is that the use of required and requirements, which we see scattered around which to an academic former professor like me actually means what required means, but looking at the contract as a whole it really sort of means required to be considered. Is that fair to say?

MR. O'CONNELL: I would say that's a fair interpretation.

THE COURT: Yes.

MR. O'CONNELL: Let's take the chiller, okay? You can build this building, and the 15-ton chiller works fine to cool the building. Well, then everybody is happy. They put in the 15-ton chiller, and that's the end of the story.

But what happened here is you can either

have the 15-ton chiller or you can have the building that's going to be 74 degrees in the summertime. You can't have both. If you give us the 15-ton chiller, the building is probably going to be -- I don't know -- 85 degrees or something in the summertime, so that's not what the Navy wants.

So the message that's here in going back to Note 5, develop the drawings in light of what's in Section 1112, that's what they have to do, and order of precedence clause as well. The specifications rule over the drawings, so you've got to develop that design in light of what's shown in the specifications and knowing through your common sense as a design/ builder that the air conditioning system for a two-story isn't going to work for the three-story building.

THE COURT: Okay. Sounds good. Now it's your turn, Mr. Davis.

MR. DAVIS: Okay.

MR. O'CONNELL: Thank you, Your Honor.

MR. DAVIS: First off, I would just note -- we've got to start somewhere. Let's go to page 56 of the appendix, which is that Amendment 4, Note 5.

THE COURT: Now, where are we? Page what?

MR. DAVIS: Pardon me, Your Honor?

THE COURT: Page 56?

MR. DAVIS: Yes. It's on page 56 of the appendix.

THE COURT: All right.

MR. DAVIS: I don't believe that that disclaimer is the type of clear alert that the caselaw requires to get the government out from under liability for design errors.

The case that I think we both cited, probably for different propositions, was the Edsel case. You know, the Edsel case does talk about what the government needs to do as far as clearly alerting bid contractors to the possibility of substantive design errors.

What that case says is that the disclaimer, if you will, has to "clearly alert the contractor" that a design may contain substantive flaws.

THE COURT: The government's position might be that it doesn't contain substantive flaws; that it just simply is saying this is what we think it should look like, but we hired you to do the design so implicit is this is a kind of a wish list that you have to put together so that it actually works, and if it doesn't then you have to make modifications.

MR. DAVIS: Okay. Again, at what point do

we do that? When we're out there bidding it, or is that what happens during the design phase?

THE COURT: What about the phrase before pricing that Mr. O'Connell pointed out?

MR. DAVIS: Okay. I don't think that sentence or that note clearly alerts the bidder that there may be substantive design flaws. I think that that is just simply a reiteration of the fact that hey, Mr. Bidder/Contractor this is a design/build contract and you're going to ultimately be responsible for the design.

The design shown in the drawings will require significant development based upon the requirements. It's not in dispute that it wasn't 100 percent designed at RFP stage and that there was going to be a design phase that would require development. I don't see anything in here that says that hey, Mr. Bidder, there may be substantive design flaws here.

What the caselaw says is you have to clearly alert the bidder to that. I don't think that this language clearly alerts the bidder to that; that there may be substantive design flaws.

THE COURT: Yes. When was the contract actually signed? Did you go through this design phase first and then you signed the contract?

MR. DAVIS: I believe that the process was bid, acceptance of the bid, if you will --

THE COURT: Yes.

MR. DAVIS: -- award of contract, then design phase, then construction phase once the government approved the 100 percent design submittal.

THE COURT: At the time you signed the contract then you had to have a good idea, if not a precise idea, of how much this was going to cost you so that you made some money out of it?

MR. DAVIS: Yes. We put the drawings out for bid. I can't say for certain -- I don't want to misrepresent -- whether we put the specs out for bid too, but I know the drawings were out for bid.

So, yes, we did have an idea, but as Mr. O'Connell just said they changed the building, if you will, okay? This is what, a 1,500 square feet two-story building.

THE COURT: The drawing in the RFP?

MR. DAVIS: The drawings in the RFP. Yes, sir. And then in the specs --

THE COURT: And the specs are the --

MR. DAVIS: -- it's a bigger building. I'm sorry. Square meters. It went from 1,500 square meters to 2,025 square meters.

THE COURT: But on page 267 of the contract there are two buildings mentioned, a two-story or a three-story.

MR. DAVIS: Yes. That's right. There are two ways you can get to that 2,025 square meter.

THE COURT: Oh, I see. It's not those two alternatives. It's a totally different one, a bigger building, is what you're talking about that's not reflected in the specifications at all or in the contract?

MR. DAVIS: I think I've lost you.

THE COURT: All right.

MR. DAVIS: I apologize.

THE COURT: No. I apologize.

MR. DAVIS: In these RFP drawings which came out first --

THE COURT: Yes.

MR. DAVIS: -- and the initial notice of solicitation, it was a 1,500 square meter building, two stories, and that's what these drawings show.

THE COURT: Yes.

MR. DAVIS: And then later in this Amendment 4 I guess the government said no, I don't want a 1,500 square meter two-story building. I want a 2,000 square meter three level building. You can put one of

the levels below ground or you can put all three levels above ground.

THE COURT: Where does it say that in the record?

MR. DAVIS: That the building size increased?

THE COURT: Yes.

MR. DAVIS: Okay.

MR. O'CONNELL: Page 267.

MR. DAVIS: Well, 267 is the new dimension.

THE COURT: Page 267, paragraph 1.1.2?

MR. DAVIS: 1.1.2. Yes, sir.

THE COURT: That's what I was saying. That's what I have been saying.

MR. DAVIS: Okay. Well, then maybe I was confused. If you go to page 1 of the appendix --

THE COURT: I have it.

MR. DAVIS: Okay. That is the *Commerce Business Daily* notice of this project, if you will. If you go down to the last big paragraph where it says Description, if you go to the second sentence: The building construction is anticipated to be a two-story concrete building approximately 1,500 square meters.

THE COURT: Okay. I've got it.

MR. DAVIS: So the building described at

page 1 of the appendix is what is depicted in the RFP drawings.

THE COURT: Okay.

MR. DAVIS: A two-story, 1,500 square meter building.

THE COURT: But the government's position I think is, if I can anticipate it, and correct me if I'm wrong. They don't dispute -- how can they dispute because it says that, right?

They don't dispute that this is in it. What they say is there is sufficient language in the contract as a whole to put you on notice that that was kind of like a suggestion that you should work with in the design, and if it turned out to be more expensive you were already working so it's on your head.

MR. DAVIS: I think that's a fair characterization of the government's position. Again, at what point do we have to do that?

At the bid stage, okay, we've got these drawings, and then the government hits us with these nice specifications that say oh, no. No. We've got a bigger building by 500 square meters approximately. We've got a different building. It's not two stories. It's three stories or two stories with a basement.

Oh, by the way, going to page 268, the

government has not done any foundation or design for the basement. Not the whole building; just the basement, and then it says that again in (b) somewhere else.

So at the bid stage what is my contractor supposed to do? The government has completely changed the playing field, and I guess what the government will be saying is gee, we put you on notice that the design in the RFP -- not to be overly argumentative -- is so wrong and so different and so bad you can't rely on it anymore at the bid stage, so it's kind of like what's a contractor to do?

It sounds like what they're telling us is you have to now go through, and I can't rely on any of these drawings or any of this stuff because the government has changed it. I've got to go through and do all that design work prebid award at the bid stage and then maybe not get the contract and not get paid for it.

That's a substantial undertaking and really is I think duplicative of what a contractor is supposed to do in a design phase of a design/build contract. So, yes, the building changed, but I don't think that this was enough to put my client on notice that gee, how do I price this thing?

THE COURT: Okay. Let me ask a fundamental question I should have asked earlier. We haven't talked about the grade beam elevation and the pile caps. Does everything that we've talked about so far, does that really apply to those items as well, Mr. Davis?

MR. DAVIS: I think our discussion generally does. I mean, you had the conflict there was not only the drawings and the specs, but the government's position was you had I guess conflicts within the drawings themselves.

You know, when you're looking at structural drawings you look at the S series, and I believe specifically what it was, Your Honor, was S-7 of the RFP drawings shows the grade beam detail.

THE COURT: Okay. Let me stop you there for a moment.

In other words, the government feels that it has a stronger argument here because it's not a matter of you having the contractor having to sort of like recognize the contract as a whole and pick out this thing and interpret it and pick out this thing, but that you had drawings before you that had this problem evident. Is that what you just said?

MR. DAVIS: I will leave it to Mr.

O'Connell. I will leave it to Mr. O'Connell to determine whether his argument is stronger. I would say that all of his arguments are really strong, but --

THE COURT: Because it seems stronger to me, doesn't it, because rather than trying to put a pastiche together to defeat the Plaintiff's position or have your position succeed, to say that all we have to do is look at one document and there's a problem, that seems like a stronger argument to me.

MR. DAVIS: Simply put, without spending an hour talking about it, although we clearly could --

THE COURT: Yes.

MR. DAVIS: Yes. Our client's position is when you're bidding structural elements you look at the S drawings, and if there's a conflict between the S drawings, which is structural, and the C drawings, which are civil, the S drawings control, okay?

THE COURT: Okay.

MR. DAVIS: And that's what they did. The government is saying look, if you had just looked at the C drawings, I guess specifically C-1 and following, you would see that the property slopes downward to where they were going to build the new building.

And that should have put you on notice that you couldn't just do a pier cap slab on grade right below or a grade beam right below the slab on grade. You're going to have to build a deeper foundation because the ground sloped down. Does that do it?

THE COURT: You just said the S drawings would prevail? Is that right?

MR. DAVIS: Yes.

THE COURT: If there's a conflict between the S and C?

MR. DAVIS: Yes, because you're bidding structural elements and the S drawings have the structural detail.

THE COURT: Okay. All right. Let me ask Mr. O'Connell. What is your position? I'm sure you agree that your argument is stronger.

MR. O'CONNELL: Well, I think that West Coast's argument is incorrect in two respects because just as the framework of the law established by the Federal Circuit is you can't just focus in on one thing. You've got to look at the contract as a whole.

But those drawings on S-7 tell them that look at the civil drawings for the elevations. There's a detail on S-7. It's Note 5. See civil drawings for nominal first floor elevation. So it

refers the bidders to those civil drawings for the elevations.

And then again we go back to the specifications, the specifications being very important.

THE COURT: Before you continue, I just want to make sure I have this right. You're referring to is this where it says --

MR. O'CONNELL: The upper right corner.

THE COURT: -- Drilled Per Notes? Is that what it says?

MR. O'CONNELL: Drill Tier Notes.

THE COURT: All right. And then No. 5: See civil drawings for nominal first floor elevation?

MR. O'CONNELL: Yes.

THE COURT: Okay. Great. Thanks.

MR. O'CONNELL: And just to put another definition on the floor, I don't know if you know this but I think everybody would kind of know what the structural drawings are just hearing the name.

The civil drawings, I mean they tell you things like the site topography, demolition, location of existing utilities, those kind of things, the topography being the important element here.

You know, looking at the civil drawings we

see that there is about a three to three and a half foot drop over the length of the building, and that three to three and a half foot drop apparently is the difference of $170,000 to West Coast.

Number one, based on the drawings they shouldn't have assumed that the site was flat and level, but, number two, the Court in its order cited to paragraph 1.6 of Section 1112, and that's got two additional pieces of information, somewhat repetitive, but it says in paragraph (a), and I'll wait until you're there, Your Honor. It's page 274 of the appendix.

THE COURT: Okay. Thanks. Okay.

MR. O'CONNELL: It tells them that the site shall encompass an existing graded slope created with the final grading and construction of Building 245 -- that's the existing building -- in 1992.

It drains nominally northwesterly away from the northwesterly end of Building 245, so it drains away from the existing building, and -- laws of gravity -- drains means it's going downhill.

THE COURT: Even I can get that.

MR. O'CONNELL: And then paragraph (b). The part about paragraph (b) which is significant is it says that the finished floor of the project building

shall be the same elevation as that of Building 245 and shall be at least one foot above the surrounding finish grades.

The words at least have significance there because it means one or more feet, and I think where West Coast made an error here is that it assumed it would be one foot and not at least one foot.

THE COURT: Okay. Is that it, or are you going on?

MR. O'CONNELL: Well, just one other point on that, Your Honor. If you take paragraph (b) where it says at least one foot below the surrounding finish grades and then if you look at the letter that West Coast submitted in support of the foundation elevation change, which is page 585 of the appendix --

THE COURT: I may not have that. I have it over here. I have so much stuff, just like you guys. Page 585?

MR. O'CONNELL: Yes.

THE COURT: Okay.

MR. O'CONNELL: The claim letter says: The RFP drawings indicated the foundation grade to be one foot below the first floor, so they were thinking one foot, and they just did not recognize what paragraph 1.6.1(b) meant.

THE COURT: Okay. Anything to add to that before we move on to the increased design costs, Mr. Davis?

MR. DAVIS: No, Your Honor.

THE COURT: Okay. All right. Yes. On the increased design costs, the question that I posed in the oral argument for discussion at oral argument is really what intrigues me, and that is, I mean, I think if I understand this correctly, Mr. Davis, you had this settlement with the design firm, and the settlement was that they would not ask any more money from you as long as you paid them or they capped -- whatever -- $36,000. Is that correct?

MR. DAVIS: (Nonverbal response.)

THE COURT: Okay. What is the $37,500 that is mentioned in the complaint?

MR. DAVIS: $37,500, Your Honor, was the original REA claim for increased design costs. Clearly in light of the settlement, if West Coast were to recover anything on this claim we would be capped at $36,000.

THE COURT: Okay. I'm glad that's the case because that seemed to be the case because that's what you paid them, I presume, with regard to this contract.

Now, there's no dispute I take it that the $36,000 was paid to the design firm because of work on this project. We'll later on talk about trying to separate those things out, but obviously you would say yes, Mr. O'Connell?

MR. O'CONNELL: I don't have any information otherwise.

THE COURT: Okay. All right. Now, the question I guess is, and this is my proposal, I can see the government saying why should we pay for something we haven't been found liable for, and so my argument would be the way to approach this is that if the Plaintiff can unpackage what this $36,000 is -- not even that. I'm sorry. Let me take that back.

To say that these are the things we asked the design firm to design and link that to items that the government would be liable for. Then clearly putting aside the settlement agreement I would say the government is liable for X amount of dollars. You know, you have to pay you for the extra design costs.

The government couldn't be held liable, it seems to me, unless I made that finding that it was for this particular design cost that their design firm did and then normally say that I found the government liable for all of these things totaling $37,500.

I would then say even though it's $37,500 they're only out-of-pocket $36,000, so therefore that's the cap, but you guys wouldn't have to pay anything unless I was able to link a design change that the design firm worked on that you would be liable for, which of course hasn't been done yet.

Does that seem acceptable to you, Mr. O'Connell?

MR. O'CONNELL: Well, I would say I would have some concerns with that, Your Honor.

THE COURT: Okay.

MR. O'CONNELL: It's in the record. I could find the page number if you'd like, but it's quoted in our proposed findings of fact, and the deposition testimony is in the record that Mr. Ramirez testified that the $36,000 was just a lump sum global dispute between West Coast and Merritt & Pardini, so a practical problem that would be presented by what you just said was that's the story that we have now.

If you're going to let them wiggle out of that story then the government would be entitled to discovery as to what really happened then despite the testimony under oath previously.

THE COURT: I don't see how they're in conflict because what I'm saying is what we have to

nail down is what did the design firm do that related to the contract that I would say the government is liable for, and then I would obviously eventually assign a certain amount of money for that, and then we total that all up.

In the absence of the settlement agreement, right, the Plaintiff would be entitled to the whole sum. What I would do then is say but wait a minute. The agreement here capped it at $36,000, so the Plaintiff is not going to get any more than that. I don't see how that is in conflict with what Mr. Ramirez said.

MR. O'CONNELL: Well, what you've got here is you've got a bunch of disputes between West Coast and Merritt & Pardini. Some of them are just disputes that are purely between West Coast and Merritt & Pardini, so if there was a settlement theoretically --

THE COURT: I thought you just said that this money relates to the contract though.

MR. O'CONNELL: It relates to the contract, but it relates for these other disputes that there's no claim for.

Can I ask the Court if you'd turn to page 612 of the appendix?

THE COURT: Let me pursue this a little bit.

I'm not going to find you liable for something that the Plaintiff cannot prove was a design that was related to the contract that the government is liable for, so it seems to me as if we would have nailed that down.

I think I agree with you completely. Your implication is the government shouldn't have to pay for something that is not nailed down as a specific item that was paid to the design firm that the government is liable for for other reasons, which we haven't even got to.

MR. O'CONNELL: Right. What I'm saying is okay, let me see if I can follow the analysis. Let's say that they were able to prove that the government caused them to incur $37,000 in excess design costs.

THE COURT: Yes. Exactly.

MR. O'CONNELL: And then the Court capped it at $36,000 in light of the settlement.

THE COURT: Yes.

MR. O'CONNELL: But where we've got this whole pot of stuff, how do we go from the next step, which would be to go from $36,000 down to allocating some portion of that for the things that the government did wrong versus the things that West Coast did wrong in respect to Merritt & Pardini?

The government is entitled to discovery on that. What we heard in depositions was that they can't do that, so I mean that's the problem that we have with the issue, Your Honor, is that the damages have to be proven to a certain degree of certainty.

THE COURT: I don't see how that follows though because the question is in any event aside from the settlement agreement if I were to find in looking at individual items and saying that the government was responsible, not Plaintiff, for this design change, right?

In looking at those things, regardless of what settlement agreement you would owe them that, so what I'm doing is actually in that case reducing the government's liability by saying that it is reasonable to assume that since everything that the design firm did was related to the contract it's reasonable to assume that this settlement agreement covered everything.

MR. O'CONNELL: Right.

THE COURT: So I just don't see the flaw in the logic.

I certainly agree with you that you have to have the information that the design firm actually did design because of a problem with the contract. I

agree with you there.

MR. O'CONNELL: But it seems to me that there would have to be, in fairness to the government, some additional step that the settlement is a lump sum for everything, and if we just said well, the government caused them $37,000 in damages, they settled it for $36,000, the government should pay West Coast $36,000, that would essentially rewrite the settlement agreement between Merritt & Pardini and West Coast because it would let West Coast have for free all the problems that they caused Merritt & Pardini.

Can I just throw one other thing into the mix, Your Honor? You know, if we're going to talk about capping the Merritt & Pardini settlement, and this was in our proposed findings. It's page 612 of the appendix.

This is a spreadsheet that West Coast's project manager put together before they negotiated the resolution with West Coast, and you can see on the left-hand side it sets out all of Merritt & Pardini's, now known as Krei, K-R-E-I, their wish list.

THE COURT: Yes.

MR. O'CONNELL: They're looking for $406,000, and that includes the REA, which is listed

here as $20,500. They're looking for a total of $406,000.

What's significant though as you move to the right, the second column and the fourth column, which is West Coast has already approved to them the amount of $292,711, so that doesn't include any of these areas that are in dispute. If you move two more columns over, they've paid them $259,386.54, so there's a gap between those two numbers already approved, but not paid, of $33,324.

So essentially West Coast negotiated a settlement with Merritt & Pardini whereby they agreed to give Merritt & Pardini this $33,300 plus an additional $2,700, so if the Court were going to cap the number it really should be capped at the difference between $36,000 and $33,324.

THE COURT: Okay. Is that the difference between the $362,000 and the $259,000? Is that what you're saying?

MR. O'CONNELL: No. It's the difference between the Contractor Approved column and the Paid column.

THE COURT: Okay. Mr. Davis, do you want to respond to that?

MR. DAVIS: Yes, Your Honor. One second,

please.

Yes. There's two points on this issue. Number one, the basis for the Navy's motion for summary judgment on this claim was that because there was a release that's an absolute bar. I think the discussion here has shown that I don't think that's the case because it was a release and return for the payment of money so I think the Court shouldn't grant summary judgment on this claim based upon the release argument that the government has made in their motion.

What we've been talking about right now are really issues of proof at trial, and we respectfully suggest that it's probably not appropriate for disposition on summary judgment. I mean, if the claim survives at all on summary judgment either I'm going to prove it at trial or I'm not, and obviously if I don't carry my burden of proof on that the Court is going to award my client zero, so I believe that's where we are.

The short answer is would I be willing to cap this at $33,324? No. I'd be willing to cap it at $36,000, and it depends on what kind of proof I can put on at trial.

THE COURT: Okay. Do you want to respond to that, Mr. O'Connell? Is that a fair characterization

of the dispute at this level?

MR. O'CONNELL: Well, no. No. We agree on the facts, and the documents speak for themselves.

THE COURT: I should have clarified. I should have clarified. I don't mean the amount, which you would dispute. I mean his characterization that ultimately what the government is asking for in its motion depends upon facts that the Court cannot -- therefore, I can't rule at this point.

Isn't that what you were saying, Mr. Davis?

MR. O'CONNELL: No, I don't agree on that, Your Honor. You know, if Severin has any meaning left at all, just the simple fact that West Coast pays money to Merritt & Pardini in exchange for the release, that that somehow preserves the claim, I don't think that there's any case that stretches the exceptions to Severin that far.

What it turns on is the language of the release, and here it's a full release. They have to dismiss their litigation with prejudice, and they fully release West Coast for any claims related to the project. There's no preservation language left for West Coast to present those claims against the Navy, so it's a textbook Severin claim, Your Honor. It's a textbook Severin argument.

THE COURT: So I guess what you're saying is the $36,000 could be allocated to design items for which the government is not liable, and therefore it would be unjust for Plaintiff to recover. Is that your argument?

MR. O'CONNELL: Well, what I'm saying is with respect to the allocation is that West Coast's president has already told me under oath that they couldn't allocate it, so I don't see how we get past that, Your Honor. We already have testimony under oath from him on that subject, so I don't see how we get past that.

If we did somehow get past that on the motion, then I think the Court would have to allow the government to reopen discovery.

THE COURT: In other words, the Plaintiff has already said that it's impossible to unpackage the items encompassed within the $36,000? Is that what you're saying?

MR. O'CONNELL: I asked him. I said can you allocate the $36,000? He said no, we never tried to do that.

THE COURT: Well, of course, you're paraphrasing I'm sure, but to say no, we've never tried to do that doesn't mean that it's an

impossibility.

MR. O'CONNELL: Why don't we look at the testimony then?

THE COURT: Yes. That would be great to see the quotation.

MR. O'CONNELL: This is page 709 of the appendix. It's page 147 of the deposition transcript. His answer is, and it's referring back to this $36,000. Mr. Ramirez testified:

"A It was a lump sum. It was not prorated to any one item. It was just a number that we came up with."

THE COURT: Which line is that?

MR. O'CONNELL: This is 11 and 12 on page 147.

THE COURT: Okay.

"Q All right. Exhibit 86 seems to indicate that the settlement range is for a minimum of $16,078 to a maximum of $24,432. Do you recall why you agreed to settle it for $36,000?"

"A Well, you know, when you sit down and frankly you listen to the other people's arguments and when I go into these things I really sincerely make an effort to listen to the other person's argument, not just mine," which is commendable. That was not in the

quote.

"It was in my judgment that we should settle for this amount. I can't remember exactly specifically why, but I -- you know, to this day I feel that it was the proper amount."

I don't know if I would put the same meaning on that as you do, Mr. O'Connell.

MR. O'CONNELL: But I was referring actually to the next page. You're on 146. I'm on 147.

THE COURT: Okay.

MR. O'CONNELL: It just continues down, and that actually does sort of provide some context to what you're reading.

THE COURT: All right. And what is on 147?

MR. O'CONNELL: Well, on 147 what I'm keying on are lines 11 and 12 where I had asked him, starting on line 7:

"Q Was this settlement for $36,000? Was it a lump sum of $36,000, or was there some allocation of the $36,000 to the various issues that were open between West Coast and Merritt & Pardini?"

He says:

"A No. It was a lump sum. It was not prorated to any one item. It was just a number that we came up with."

THE COURT: But as I say, that's susceptible to the interpretation that he's saying exactly how the settlement went about. Normally settlements are we're not going to say you're right here and you're wrong here. We just simply say let's talk money and then you arrive at some particular sum.

It doesn't mean that someone else with more evidence could try to unpackage that, don't you think?

MR. O'CONNELL: Well, the unpackaging part is what I'm concerned about because I don't want the unpackaging to happen to me while I'm sitting at a trial. I don't think that's fair to the government.

I think I'm entitled to discovery of their case, and I'm entitled to have a deposition of Mr. Ramirez and have him show to me how he unpackaged the $36,000.

THE COURT: I think that's certainly fair. Do you have any comment on that, Mr. Davis?

MR. DAVIS: Not really other than there are other witnesses who can testify about the cost. One of the depositions that the government took was of a fellow named Scott Harm. For lack of a better word, he's the last standing principal of Merritt & Pardini.

We went out and took his deposition. If I could refer the Court to page 736 of the appendix,

that's Mr. Harm's deposition. I'll wait until the Court gets there.

THE COURT: Okay. I'm on 736.

MR. DAVIS: Okay. On page 51.

THE COURT: Page 51. I'm there.

MR. DAVIS: At the very bottom beginning at line 22 Mr. O'Connell asked Mr. Harm:

"Q Can you tell me how you calculated $37,500, which we now know we're going to cap at $36,000?"

Mr. Harm testified -- you can read it, page 23 through page 52.1.

THE COURT: Yes.

MR. DAVIS: He didn't calculate up the hours for the additional design cost, but not surprisingly an administrative assistant did.

THE COURT: Okay.

MR. DAVIS: So I would agree with the Court that I don't think we can read that much into what the government is saying on this point.

THE COURT: I was just throwing that out as a thought. It wasn't a holding. I want to take all of this into consideration and deliberate about it, of course.

I like to just signal to the parties

thoughts that have occurred to me. Nothing really should be read into my questions or my statements as I'm actually making this holding. I throw it out to get a reaction from you because it is something that I've not decided firmly. That's the whole point of this.

Is there anything else that you want to add? Actually I should be asking you first, Mr. O'Connell. Anything you want to add at this point?

MR. O'CONNELL: Well, are we done?

THE COURT: Yes.

MR. O'CONNELL: I did want to add one thing at the end.

THE COURT: Yes. I've kind of lost my interest.

MR. O'CONNELL: Okay. Well, in 30 seconds I just wanted to tell you something about the timing just so that we're all clear on this.

THE COURT: Sure.

MR. O'CONNELL: Amendment 4 that we've been talking about all day, that came out in March of 2001. Before that there was Phase 1, the design/build. The design/build procurement process works in two phases. Phase 1 is the government is just looking at qualifications basically of design/builders, past

performance, key personnel.

So before Amendment 4 came out in March they didn't have any drawings and they didn't have any specifications. All that they knew at that point was what the government had said was we're going to have this two-story -- whatever -- masonry building, but I just want you to be clear that there's no design. There's no specifications before that.

Amendment 4 comes out, and this is the first time that they've got these design requirements in 1112 and this is the first time that they've got the drawings. I didn't want there to be some misunderstanding that West Coast could have been working on some kind of design prior to Amendment 4 coming out because there were no drawings to develop and there were no specifications to develop the drawings based upon.

THE COURT: Okay. What does the contractor have to bid on the contract to begin with?

MR. O'CONNELL: Well, he doesn't have anything to bid on it. What we're telling them is that okay, we're the Navy and we want to build a two-story building. It's going to be a design/build process so that we're going to need you to design and construct it.

Tell us a little bit about yourselves. We're going to start off I think here we ended up with like 10 people. We're going to winnow that down to no more than five. The five or so contractors that survive the vetting process, if you will, looking at their past performance and the key people that are going to work on the project, the project manager, the superintendent. If we think that you're in the top five --

THE COURT: We're going to give you this information.

MR. O'CONNELL: -- then we're going to give you the design information.

THE COURT: And that was Amendment 4?

MR. O'CONNELL: That was Amendment 4, which came out in March.

THE COURT: Okay. That's Phase 2, I suppose?

MR. O'CONNELL: That's Phase 2 of the process that happens. So they've got roughly three months to work with those drawings and specifications between the time they came out and the time that the contract was actually awarded.

The contract was actually signed on it's 540 and 541 of the appendix. It was June 29, 2001, so

they had a little over three months to work with the drawings and specifications.

THE COURT: Okay. Mr. Davis, do you want to say something?

MR. DAVIS: No. I really don't have any response to that one way or another.

THE COURT: Okay. Does that mean you disagree with it?

MR. DAVIS: No, I don't. I don't disagree with the timing of it. I would just note that these RFP drawings, they are dated 2-15-01.

THE COURT: So they could have been created on 2-15?

MR. DAVIS: Yes. Who knows. There's no evidence in the record when they actually came out, so, yes, the timing that Mr. O'Connell mentioned, approximately March of '01 the drawings came out, there was a bid process and the contract was signed 6-29. I agree with his timeline.

THE COURT: Great. Okay. Let me just see if I have any more questions.

(Pause.)

THE COURT: Okay. Great. Thanks very much, gentlemen. An interesting oral argument. We'll see what happens.

MR. DAVIS: Thank you, Your Honor.

MR. O'CONNELL: Thank you.

THE COURT: Court is adjourned.

(Whereupon, at 11:34 a.m., the hearing in the above-entitled matter was concluded.)

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

REPORTER'S CERTIFICATE

DOCKET NO.: 05-1121C

CASE TITLE: West Coast Contractors v. U.S.

HEARING DATE: April 3, 2008

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: April 3, 2008

______________________________

John Del Pino
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4018