# In the United States Court of Federal Claims

No. 05-1121 C

Filed: September 15, 2008

| | |
|---|---|
| **WEST COAST CONTRACTORS OF NEVADA, INC.**, Plaintiff, | * |
| v. | * |
| **THE UNITED STATES,** Defendant. | * |

## OPINION AND ORDER

This dispute concerns a design-build construction contract between Plaintiff, West Coast Contractors of Nevada, Inc. ("West Coast"), and the United States Department of the Navy for a building extension at the Naval Postgraduate School in Monterey, California. The case is now before the Court on Defendant's Corrected Motion for Partial Summary Judgment ("Defendant's Motion").

The Government seeks summary judgment on three of West Coast's claims. Two of those claims--for heating, ventilation, and air conditioning ("HVAC") equipment and for grade beam elevation changes--are based on allegedly defective specifications provided by the Navy in solicitation drawings. The Government argues that West Coast cannot recover on these claims under the *Spearin* doctrine, and the Court agrees. The third claim challenged in Defendant's Motion concerns increased design costs incurred by West Coast's architect. The Government argues that a settlement between West Coast and its architect bars recovery under the *Severin* doctrine. On this claim, a genuine issue of material fact remains. Accordingly, the Court GRANTS Defendant's Motion with respect to the HVAC equipment and grade beam elevation claims, and DENIES Defendant's Motion on the increased design costs claim.

## I. BACKGROUND

On November 7, 2000, the Navy announced plans to solicit design and construction of an extension to Building 245 of the Naval Postgraduate School in Monterey, California. Pl.'s Resp. to Def.'s Proposed Findings of Uncontroverted Facts ("PRDPFUF") ¶ 1. That announcement described a two story extension enclosing approximately 1,500 square meters of floor space. App. for Def.'s Mot. for Partial Summ. J. ("Def.'s App.") 1. On December 11, 2000, the Navy issued a request for proposals ("RFP"). PRDPFUF ¶¶ 3-4. Like the announcement, the RFP described a two story extension to Building 245. *Id.* ¶ 5.

The solicitation explained that the Navy would use a two-phase design-build award procedure, as outlined in Federal Acquisition Regulation Subpart 36.3. PRDPFUF ¶ 5. In phase one, offerors submitted information regarding past performance and corporate and key personnel experience. *Id.* ¶ 7. From that information, the Navy selected a group of the most highly qualified offerors to participate in phase two. *Id.* In phase two, participants' proposals were evaluated on price and commitment to small business. *Id.* ¶ 10.

For those selected to participate in phase two, including West Coast, the Navy issued Amendment Four to the RFP on March 19, 2001. *Id.* ¶ 11. In specifications included with Amendment Four, the Navy notified offerors that it had determined that the building would need to enclose a minimum of 2,025 square meters, rather than the originally announced figure of 1,500 square meters. *Id.* ¶ 15. Instead of a two story building, the specifications now required either a three story above ground building or a two story above ground building with a full size basement. *Id.* Along with the specifications, Amendment Four also included a "preliminary design package" with "partial design" drawings known as 35% design drawings ("RFP drawings"). *Id.* ¶¶ 9, 13. Those drawings were dated February 15, 2001, and showed plans for only a two story building (without a basement). PRDPFUF ¶¶ 17-18.

On June 21, 2001, West Coast submitted its best and final offer with separate cost breakdowns for both a three story building without a basement and a two story building with a basement. Def.'s App. 512-39. On June 29, 2001, the Navy awarded West Coast the contract for design and construction of a three story building. PRDPFUF ¶ 48.

On October 18, 2005, approximately two years after the project was completed, West Coast filed a complaint against the United States seeking damages totaling $756,654.62. Compl. ¶ 6. West Coast alleged that it (1) was entitled to equitable adjustments for additional work required by the Navy, (2) incurred delay damages, and (3) was improperly assessed liquidated damages. *Id.* The parties stipulated to the dismissal of one of the delay damages claims. Stipulation of Partial Dismissal, Nov. 7, 2007.

Of the remaining claims, three of West Coast's claims for equitable adjustments are now before the Court on Defendant's Motion. Specifically, the Government seeks summary judgment on West Coast's claims relating to (1) HVAC equipment, (2) alleged changes in grade beam

elevations, and (3) increased design costs. In both the HVAC and grade beam elevation claims, West Coast seeks to recover based on defective specifications. In the HVAC claim, West Coast seeks compensation for additional costs incurred in installing larger capacity HVAC equipment than was shown in the 35% RFP drawings. In the grade beam elevation claim, West Coast seeks to recover costs associated with having to construct grade beams and pile caps more than one foot below the first floor slab, in contrast to one of the 35% RFP drawings. On the increased design costs claim, West Coast seeks to recover for additional costs of its design firm, Merritt + Pardini.[1]

The Government argues that it is entitled to summary judgment on all three of these claims. West Coast cannot prevail on either of the defective specifications claims, the Government argues, because the contract allocated the risk of inaccuracies in the 35% RFP drawings to West Coast, and alternatively, the defects were patent ambiguities. On the increased design costs claim, the Government's principal argument is that the *Severin* doctrine bars recovery because of the nature of West Coast's settlement with Merritt + Pardini.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c) of the Rules of the U.S. Court of Federal Claims; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A fact is material if it might affect the outcome; an issue is genuine if a reasonable trier of fact could find for the nonmoving party. *Anderson*, 477 U.S. at 248. All evidence must be viewed in the light most favorable to the nonmovant, with any doubts resolved in its favor. *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307 (Fed. Cir. 1998).

## III. DISCUSSION

### A. The HVAC and Grade Beam Elevation Claims

#### 1. Recovery for Defective Specifications under the *Spearin* Doctrine

As the Federal Circuit has explained, the "*Spearin* doctrine provides that if a government contract contains detailed design specifications, as opposed to performance specifications, the government gives an implied warranty that if the specifications are followed an acceptable result will be produced." *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1344 (Fed. Cir. 2008); *see United States v. Spearin*, 248 U.S. 132 (1918). Design specifications "set forth in precise detail the materials to be employed and the manner in which the work [is] to be performed." *J. L. Simmons Co. v. United States*, 412 F.2d 1360, 1362 (Ct. Cl. 1969). Contractors do not have the option of deviating from design specifications but must follow them

---

[1]At some point, Merritt + Pardini became known as Krei Architecture, Inc. PRDPFUF ¶ 96. The Court refers to the entity as Merritt + Pardini throughout.

like "a road map." *Id.* Performance specifications, on the other hand, prescribe results that must be achieved, but leave the means of achieving those ends to the contractor's discretion. *See id.* The implied warranty does not arise from performance specifications; only defective design specifications can provide a basis for *Spearin* recovery. *See Rick's Mushroom Serv., Inc.*, 521 F.3d at 1344.

However, merely showing a defective design specification is not sufficient for a contractor to recover under *Spearin*. *See Robins Maint., Inc. v. United States*, 265 F.3d 1254, 1257 (Fed. Cir. 2001). "The test for recovery based on inaccurate specifications is whether the contractor was misled by these errors in the specifications." *Id.* "To demonstrate that it was misled, the contractor-claimant must show both that it relied on the defect and that the defect was not an obvious omission, inconsistency or discrepancy of significance--in other words, a patent defect--that would have made such reliance unreasonable." *E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1339 (Fed. Cir. 2004).

Here, West Coast cannot recover for the defects it alleges--regardless of whether they concerned design specifications--because the alleged defects were obvious discrepancies that West Coast could not reasonably have relied on. In preparing its proposal for a three story building, West Coast could not reasonably have been misled by drawings showing HVAC equipment for a much smaller two story building. With regard to the grade beam elevations, West Coast could not reasonably have been misled by structural drawings showing grade beams and pile caps just one foot below the slab because civil drawings showed site elevations three feet below the finished floor level.

**2. The HVAC Claim**

West Coast claims to have incurred an additional $114,989.08 in labor and material costs when it had to install larger capacity HVAC equipment than expected. Compl. ¶¶ 10-13. The Navy's 35% RFP drawings--which were for a two story building--showed a 15-ton chiller and a 6,500 cubic feet per minute ("CFM") air-handling unit. PRDPFUF ¶¶ 30-31. However, the Navy's written specifications required that the building remain at a summer temperature of 74 degrees Fahrenheit, plus or minus two degrees. *Id.* ¶ 27. West Coast eventually discovered that the equipment shown in the Navy's two story drawings would not be sufficient to achieve that temperature specification in the three story building that West Coast had priced and proposed. Compl. ¶ 12. To achieve the temperature specification in the larger three story building, West Coast found it had to install a 40-ton chiller and a 14,000 CFM air-handling unit. *Id.* On November 5, 2002, West Coast submitted a request for equitable adjustment ("REA") relating to the chiller for $114,489. PRDPFUF ¶ 67. On February 4, 2003, the Navy denied the REA. *Id.* ¶ 69.

Moving for summary judgment on this claim, the Government argues that West Coast bore the risk that the HVAC equipment shown in the 35% RFP drawings could not achieve the temperature specification called for in the written specifications. Def.'s Mot. 7. The

Government argues that this was a performance specification for which no warranty arises. *Id.* at 9. West Coast insists that it was a design specification. Pl.'s Mem. in Opp'n to Def.'s Mot. ("Pl.'s Opp'n") 7. Alternatively, the Government argues that the contract was patently ambiguous. Def.'s Mot. 14. West Coast asserts that the contract was not ambiguous but simply wrong. Pl.'s Opp'n 10-11.

Regardless of whether the HVAC equipment shown was a design specification, West Coast cannot recover because to the extent that West Coast interpreted the HVAC equipment shown in drawings for a two story building as controlling in its proposal to build a significantly larger three story building, the defect was a patent one. "The entire set of preliminary mechanical drawings indicated a two story building." PRDPFUF ¶ 31. The Court agrees with the Government that the "degree to which West Coast could rely upon the mechanical drawings was [] limited by the representation on those drawings of a two story, 81 by 91 foot, slab-on-grade building, in contrast to the requirement in section 01112 [of the written specifications] for a three story building with those same dimensions." Def.'s Mot. 10.

In proposing a three story building covering the same footprint, any reasonable construction contractor would recognize that with the square footage increasing, larger capacity HVAC equipment would be needed. Indeed, personnel from West Coast's design firm, Merritt + Pardini, recognize that a larger building would necessarily require larger capacity HVAC equipment. PRDPFUF ¶¶ 70-73. In proposing a larger building than the drawings showed, West Coast could not reasonably have been misled by the HVAC equipment shown in those drawings. The Government is entitled to summary judgment on the HVAC claim.

### 3. The Grade Beam Elevation Claim

West Coast claims that it incurred additional costs of $170,797.54 when it had to change the elevation of grade beams and pile caps to three feet below the slab rather than one foot below. Compl. ¶¶ 16-17. On October 16, 2002, West Coast submitted an REA regarding this claim, which the Navy denied on February 4, 2003. PRDPFUF ¶¶ 74, 79. According to West Coast, the 35% RFP drawings were defective because they showed the exterior wall grade beam and pile caps one foot below the slab. Compl. ¶ 14.

The Government moves for summary judgment on this claim on substantially the same arguments as for the HVAC claim, namely that this was a performance specification not a design specification and that the contract was patently ambiguous. The contract was patently ambiguous, the Government argues, because the structural drawings that West Coast claims to have relied on conflicted with the civil drawings and written specifications. Def.'s Mot. 15. The Government does not dispute that the structural drawings S5 through S7, by themselves, would have required West Coast to construct little or no foundation wall to connect the slab to the grade beams. PRDPFUF ¶ 41. However, the Government points out that note 5 on one of the structural drawings, S7, advises, "see civil drawings for nominal first floor elevation." *Id.* ¶ 42.

Civil drawings C1 and C5 showed some elevations three feet lower than the finished floor of the existing building. *Id.* ¶ 43.

The structural drawings and civil drawings were patently inconsistent. Because the specifications required the finished floor of the new building to be at the same elevation of the existing one, both parties agree that "[g]iven the actual elevations shown on the civil drawings, it would not have been possible to construct the building without constructing a foundation wall several feet in height, or using a method such as the construction of a retaining wall, to connect the slab at elevation 49 to the grade beams which would be located at elevation 46." *Id.* ¶ 44. Considering such an obvious discrepancy, West Coast could not reasonably have been misled by some drawings showing grade beams and pile caps one foot below the slab when those very drawings referenced other civil drawings within the same collection that indicated a site elevation three feet below the existing structure. To the extent the structural drawings were defective, they were patently defective. The Government is entitled to summary judgment on the grade beam elevation claim.

**B. The Increased Design Costs Claim**

Finally, the Government seeks summary judgment on West Coast's claim for increased design costs. On this claim, the Court denies Defendant's Motion. Viewing the evidence in the light most favorable to the nonmovant, a genuine issue of material fact remains as to whether any or all of the settlement between West Coast and Merritt + Pardini can be attributed to claims properly asserted against the Navy and for which West Coast was liable to Merritt + Pardini.

In its Complaint, West Coast alleged that it incurred $37,500 in additional design costs as a result of the Navy improperly withholding 100% design approval. Compl. ¶¶ 20-27. According to West Coast, the claim represents "increased design costs as assessed by West Coast's design firm, Merritt + Pardini. . . . Merritt + Pardini charged West Coast an additional $37,500 in fees for its services resulting from the increase in design work necessitated by the government's refusal to give 100% final design approval as required by the contract." PRDPFUF ¶ 103. On April 24, 2002, Merritt + Pardini sent a letter to both West Coast and the Navy requesting an equitable adjustment of $37,500. *Id.* ¶ 89.

By the time the project was completed in 2003, that dispute remained outstanding. *Id.* ¶ 97. However, it was just one of several lingering disputes between West Coast and Merritt + Pardini regarding this project. *Id.* In 2005, Merritt + Pardini was seeking a total of $406,817.44 for its work on the project, of which West Coast had approved $292,711 and paid only $259,386.54. *Id.* On March 31, 2006, the two settled all of their disputes relating to the project for $36,000. *Id.* ¶ 99. In their settlement agreement, Merritt + Pardini agreed to an unconditional release and dismissal of a pending arbitration with prejudice. *Id.* ¶ 100.

The Government makes two arguments in support of summary judgment on this claim. First, the Government argues that the *Severin* doctrine bars this claim because "any liability that

West Coast had to Merritt + Pardini was released in their settlement." Def.'s Mot. 17. Second, even if the claim is not barred by the *Severin* doctrine, the Government argues that West Coast has not produced any evidence that it or Merritt + Pardini actually suffered damages. *Id.*

The Plaintiff counters, and the Court agrees, that the *Severin* doctrine does not necessarily bar this claim simply because it was settled before this litigation. On the present record, a reasonable trier of fact could conclude that at least some portion of the settlement amount was agreed to for the purpose of discharging West Coast's liability to Merritt + Pardini on a claim for which the Navy was liable.

Under the *Severin* doctrine, a contractor cannot pursue a claim against the Government on behalf of a subcontractor if the contractor itself is not liable to the subcontractor. *E.R. Mitchell Constr. Co. v. Danzig*, 175 F.3d 1369, 1370 (Fed. Cir. 1999) (citing *Severin v. United States*, 99 Ct. Cl. 435, 443 (1943)). "[A] prime contractor cannot recover on behalf of a subcontractor unless the prime contractor has reimbursed the subcontractor or is liable to make such reimbursement." *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1552 n.8 (Fed. Cir. 1983). The *Severin* doctrine will not bar a contractor's claim simply because the contractor has already settled the claim with the subcontractor. *See id.* If the contractor would otherwise prevail on the claim, the *Severin* doctrine operates only to cap recovery at the settlement amount, for which the contractor was liable to the subcontractor. West Coast concedes that its potential recovery on this claim cannot exceed the settlement amount of $36,000. Oral Argument Tr. 63:21-22, Apr. 3, 2008.

The parties' view of the law diverges where the Government argues that simply because West Coast did not expressly allocate its settlement with Merritt + Pardini at the time of the settlement, it cannot now unpackage the amount. The Government cites an Armed Services Board of Contract Appeals ("ASBCA") decision in support of the following proposition: "Where a prime contractor has settled disputes with a subcontractor and has made no allocation of amounts attributable to the Government and the prime, there is no basis upon which the Court can make a damages award to the Contractor." Def.'s Reply to Pl.'s Opp'n 11 (citing *Grumman Aerospace Corp.*, ASBCA No. 48006, 06-1 BCA ¶ 33,216, at 164,622, *aff'd*, 497 F.3d 1350 (Fed. Cir. 2007)).

The ASBCA's decision is not binding on this Court, and, insofar as it is cited as persuasive authority, it does not establish the proposition the Government uses it to advance. In *Grumman Aerospace Corporation*, the ASBCA determined that it could not include the costs the contractor incurred to settle claims with subcontractors in the contractor's equitable adjustment because the record did not show that the settlement was reasonable and included amounts solely attributable to the Government. *Grumman Aerospace Corp.*, 06-1 BCA ¶ 33,216, at 164,622. The Board went on to explain:

> The little we know about these settlements is that [Grumman Aerospace Corporation] and [its subcontractor] settled the claims on a bottom line, lump sum basis (finding

> 57). However, we have found that a portion of [the subcontractor's] claimed costs were attributable to appellant, not the [Government] (finding 55). We have no way of knowing on this record how much of the settlement was attributable to the [Government] and how much was attributable to [Grumman Aerospace Corporation].

*Id.* The ASBCA decision the Government points to merely provides an example of a pass-through claim being denied because the contractor failed to unpackage the settlement amounts for the board. The decision does not support the argument that West Coast cannot be afforded an opportunity to unpackage its lump sum settlement now simply because it did not expressly make an allocation at the time of settlement. The Government cites no authority for, or example of, such an extension of the *Severin* doctrine.

Even if the *Severin* doctrine does not bar the claim, the Government argues, West Coast has not produced any evidence that it or Merritt + Pardini has suffered damages. West Coast disagrees, pointing to the letter Merritt + Pardini sent to West Coast and the Navy requesting an equitable adjustment of $37,500 as "clearly admissible evidence" of damages. Pl.'s Opp'n 12. If West Coast can prove that all or part of the settlement amount was made to settle the claim asserted in that letter, the letter contains details that could be sufficient to convince a reasonable trier of fact that Merritt + Pardini suffered damages for which West Coast and the Navy were liable. For example, the letter explains that "[t]he additional amount requested is for several technical staff members reworking specifications based on comments received from the Navy that, in our opinion, were not consistent with the original requirements of the published [RFP]." Def.'s App. 582.

Viewing the evidence most favorably to West Coast, a genuine issue of material fact remains as to whether the settlement amount can be allocated to a recoverable claim. The Government is not entitled to summary judgment on this claim. At oral argument, the Government suggested that it should be permitted additional discovery here. Oral Argument Tr. 68:9-16. If further discovery is necessary, the Court is willing to entertain a plan to complete it.

## IV. CONCLUSION

The parties are ORDERED to file a joint status report on or before October 15, 2008 explaining whether further discovery is necessary, and if so, proposing a plan for its completion.

The Government's motion for summary judgment is GRANTED in regard to the HVAC claim (Compl. ¶¶ 10-13) and the grade beam elevation claim (Compl. ¶¶ 14-17). The Government's motion for summary judgment is DENIED as to the increased design costs claim (Compl. ¶¶ 20-27).

s/ Edward J. Damich
EDWARD J. DAMICH
Chief Judge